UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

VONAGE HOLDINGS CORPORATION,      :

                                :        04 Civ. No. _____

               Plaintiff,     :

                                :

        -against-         :

                                :

THE NEW YORK STATE PUBLIC SERVICE    :
COMMISSION, and WILLIAM M. FLYNN,    :
LEONARD A. WEISS, THOMAS J. DUNLEAVY, :
and NEAL N. GALVIN in their official capacities  :
as the Commissioners of the New York State    :
Public Service Commission and not as individuals, :

                                :

              Defendants.   :

------------------------------------------------------------X

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF VONAGE HOLDINGS CORPORATION'S MOTION FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

SWIDLER BERLIN SHEREFF FRIEDMAN, LLP
Ky E. Kirby
William B. Wilhelm
Michael C. Sloan
Yun Lee
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 973-0111
Counsel for Vonage Holdings Corporation

Dated: June 7, 2004
      New York, New York

577105v1

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATEMENT OF UNDISPUTED FACTS ........................................................ 3

    Vonage's Service ........................................................................................ 3

PROCEDURAL/LEGAL BACKGROUND ........................................................ 9

    Federal Law ................................................................................................ 9

    The Federal Court Decision in Minnesota ............................................... 12

    The FCC's Pulver.com Decision .............................................................. 13

    The FCC IP Rulemaking Proceeding ....................................................... 14

    The New York PSC Proceeding ............................................................... 15

ARGUMENT ..................................................................................................... 17

I. VONAGE SUCCEEDS ON THE MERITS.................................................... 17

    A.  The Communications Act & FCC Regulations Preempt the PSC Order............................ 18

       1.  The PSC's Order Constitutes Impermissible Regulation of Information Services and the Internet. ................................ 18

          a.  State Regulation of Information Services Conflicts with the Federal Deregulatory Scheme.................................... 19

          b.  Vonage Provides an Information Service. .............................................. 21

             i.   Vonage's Service Provides A Net Protocol Conversion, a Hallmark of an Information Service. ................................. 22

             ii.  Vonage's Service Accesses and Processes Stored Information............................. 27

             iii. Vonage Does Not Provide Telecommunications Service, but Rather *Uses* It to Provide Its Service to Its Customers.................................... 29

             iv.  Vonage's Service Does Not Fulfill the FCC's Four-Part Test for "Telecommunications Service." .................................... 32

       2.  The PSC is Preempted from Regulating Vonage Because Its Service is Jurisdictionally Interstate. .................................... 34

i

      a.  The FCC Has Preempted State Regulation of Services That Are Inseparably Used for Both Interstate and Intrastate Communication. ..................................................... 34

      b.  Vonage Cannot Separate Its Service Into Distinct Intrastate and Interstate Components. ........................................................................................................... 36

  B.  The PSC Order Violates the Commerce Clause. ............................................................ 39

II. VONAGE WILL SUFFER IRREPARABLE HARM IF THE ORDER IS ENFORCED ...... 41

CONCLUSION.......................................................................................................................... 44

577105v1

## TABLE OF AUTHORITIES

### FEDERAL CASES

*AT&T Corp. v. City of Portland*, 216 F.3d 871 (9th Cir. 2000) ................................... 27-28

*AllTel Corp. v. FCC*, 838 F.2d 551 (D.C. Cir. 1988) ........................................................40

*Allen v. Minnesota*, 867 F.Supp. 853 (D. Minn. 1994)......................................................42

*America Online, Inc. v. GreatDeals.Net*, 49 F.Supp.2d 851 (E.D. Va. 1999)...................21

*Association of Oil Pipe Lines v. F.E.R.C.*, 281 F.3d 239 (D.C. Cir. 2002) .......................40

*Brand X Internet v. FCC*, 345 F.3d 1120 (9th Cir. 2003).................................................27

*Brewer v. West Irondequoit Central Sch. District*, 212 F.3d 738 (2d Cir. 2000).............41

*C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994) ..................................39

*C & A Carbone, Inc. v. Town of Clarkstown*, 770 F.Supp. 848 (S.D.N.Y. 1991).............42

*California v. FCC*, 39 F.3d 919 (9th Cir. 1994) ................................................................11

*Citicorp Services, Inc. v. Gillespie*, 712 F.Supp. 749 (N.D. Cal. 1989) ...........................42

*CompuServe, Inc. v. Cyber Promotions, Inc.*, 962 F.Supp. 1015 (S.D. Ohio 1997) .........21

*Computer & Communications Industrial Association v. FCC*, 693 F.2d 198 (D.C.
    Cir. 1982) ....................................................................................................................11

*Elrod v. Burns*, 427 U.S. 347 (1976) .................................................................................41

*Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144 (2d
    Cir. 1999).....................................................................................................................17

*Government Suppliers Consolidating Services, Inc. v. Bayh*, 734 F.Supp. 853
    (S.D. Ind. 1990) ...........................................................................................................42

*Gucci America, Inc. v. Duty Free Apparel, Ltd.*, 286 F.Supp.2d 284 (S.D.N.Y.
    2003)............................................................................................................................17

*Healy v. Beer Institute, Inc.*, 491 U.S. 324 (1989)............................................................39

*Howard v. America Online, Inc.*, 208 F.3d 741 (9th Cir. 2000).......................................21

*Ivy Broadcasting Co. v. America Telegraph & Telegraph Co.*, 391 F.2d 486 (2d
 Cir. 1968) ..................................................................................................34

*JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75 (2d Cir. 1990) ................................43

*Louisiana Public Serv. Commission v. FCC*, 476 U.S. 355 (1986)......................13, 18, 34

*Mony Group, Inc. v. Highfields Capital Management, L.P.*, No. 04-0678, 2004
 U.S.App. LEXIS 9364 (2d Cir. May 19, 2004) ...........................................17

*NARUC v. FCC*, 746 F.2d 1492 (D.C. Cir. 1984) .............................................34

*Oregon Waste System v. Department of Environmental Quality*, 511 U.S. 93
 (1994)..........................................................................................................39

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) ........................................39, 40

*Register.Com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004).........................44

*Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc.,* 907 F. Supp.
 1361 (N.D. Cal. 1995)................................................................................21

*Southwestern Bell Telegraph Co. v. FCC*, 153 F.3d 523 (8th Cir. 1998)...........................21

*Time Warner v. FCC*, 56 F.3d 151 (D.C. Cir. 1995) .........................................40

*Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27 (2d Cir.
 1995) ..........................................................................................................44

*Vonage Holdings Corp. v. The Minnesota Public Utilities Commission*, 290
 F.Supp.2d 993 (D. Minn. 2003)........................................................... passim

## ADMINISTRATIVE CASES

*Amendment of Section 64.702 of the Commission's Rules and Regulations*
 (Second Computer Inquiry), 84 F.C.C.2d 50 (1980) ....................................22

*Communications Protocols under Section 64.702 of the Commission's Rules and
 Regulations*, 95 F.C.C.2d 584 (1983) ........................................................22

*Computer II Further Reconsideration Order*, 88 F.C.C.2d 512 (1981) ...........................11

*Computer III Remand Proceedings Order*, 6 F.C.C.R. 7571 (1991)................................11

*Federal-State Joint Board on Universal Service, Report to Congress*, 13 F.C.C.R.
 11501 (1998)............................................................................................ passim

ii

*GTE Telegraph Operating Cos. GTOC Transmittal No. 1147*, 13 F.C.C.R. 22466 (1998)..................................................................................................................35

*Implementation of the Non-Accounting Safeguards of Section 271 and 272 of the Communications Act*, 11 F.C.C.R. 21905 (1997) .........................................................23

*In the Matter of IP Enabled Services*, WC Docket No. 04-36, 2004 WL 439260 (rel. March 10, 2004) ........................................................................................... passim

*In the Matter of Petition for Declaratory Ruling That Pulver.com's Free World Dialup is Neither Telecommunications Nor a Telecommunications Service*, 19 F.C.C.R. 3307 (rel. Feb. 19, 2004) .................................................................... passim

*Independent Data Communications Manufacturers Association, Inc.*, 10 F.C.C.R. 13717 (1995)..............................................................................................................23, 24

*Inquiry Concerning High-Speed Access to the Internet over Cable and Other Facilities*, 17 F.C.C.R. 4798 (2002).........................................................................27, 28

*Investigation into Voice Over Internet Protocol Services*, Docket No. 03M-220T, 2004 WL 162970 (Co. PUC 1/2/04) ............................................................................15

*MTS and WATS Market Structure*, 4 F.C.C.R. 5660 (1989)...............................................35

*Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services Are Exempt from Access Charges*, WC Docket 02-361, 2004 WL 856557 (rel. April 21, 2004) ...........................................................................10, 24, 26

*Petitions for Waiver of Section 64.702 of the Commission's Rules*, 100 F.C.C.2d 1057 (1985)................................................................................................................22, 24

*Promotion of Competitive Networks in Local Telecommunications Markets*, 15 F.C.C.R. 22983 (2000).....................................................................................................35

*Rules and Policies Regarding Calling Number Identification Service - Caller ID*, 10 F.C.C.R. 11700 (1995).................................................................................................35

*Second Computer Inquiry, Final Decision* ("Computer II"), 77 F.C.C.2d 384 (1980) ........................................................................................................... passim

## FEDERAL STATUTES

47 U.S.C. § 151, *et seq*...........................................................................................................17

47 U.S.C. § 153 ....................................................................................................1, 9, 12, 29, 31

iii

47 U.S.C. §§ 201 *et seq*.............................................................................10

47 U.S.C. § 230............................................................................................15

47 U.S.C. § 230(a) .......................................................................................11

47 U.S.C. § 230(b) ............................................................................2, 11, 20

## FEDERAL REGULATIONS

47 C.F.R. § 64.702(a)......................................................................10, 12, 29

47 C.F.R. § 68.3 .............................................................................................23

47 C.F.R. § 69.2 .............................................................................................23

## STATE STATUTES

New York Public Service Law, §§ 95, 641..........................................................42

## STATE ADMINISTRATIVE MATERIALS

New York PSC Opinion No. 96-13 ..................................................................42

577105v1

Plaintiff Vonage Holdings Corporation ("Vonage") respectfully submits this memorandum of law in support of its motion for preliminary and permanent injunctive relief against enforcement of an order of the New York Public Service Commission ("PSC") that seeks to impose state telephone regulatory requirements on Vonage despite clear federal law that preempts it from doing so.[1] Vonage also seeks injunctive relief on the ground that the PSC Order impermissibly burdens interstate commerce, in violation of the Commerce Clause of the U.S. Constitution.

## INTRODUCTION

Vonage's DigitalVoice™ service is an innovative Internet-based service that permits Vonage customers to communicate orally over the Internet. Vonage's service qualifies as an "information service" under federal law, 47 U.S.C. § 153(20), and is therefore exempt from State telephone regulation. Vonage does not operate telephone facilities or offer telephone service. But, because Vonage's service involves voice communications, the PSC incorrectly characterized Vonage as a local telephone company. As a result, the Order would impose requirements with which Vonage *cannot* comply, even if it were to undertake all available means to stop serving New York customers. As no material facts are in genuine dispute and only legal issues are in debate, Vonage respectfully submits that it is entitled to preliminary and permanent injunctive relief as a matter of law.

---

[1] Order Establishing Balanced Regulatory Framework for Vonage Holdings Corporation, *Complaint of Frontier Telephone of Rochester, Inc. Against Vonage Holdings Corporation Concerning Provision of Local Exchange and InterExchange Telephone Service in New York State in Violation of the Public Service Law*, Case No. 03-C-1285 (N.Y. PSC May 21, 2004) at 2-3 ("PSC Order" or "Order") (attached as Exh. B to Declaration of John Rego in Support of Vonage Holdings Corporation's Motion for Preliminary and Permanent Injunctive Relief (hereafter "Rego Decl.") (attached as Exhibit 1 to Declaration of Yun Lee).

First, Vonage prevails on the merits of its claim. The Telecommunications Act of 1996 ("1996 Act") expresses the policy of the United States that the Internet remain "unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2). In seeking to extend its regulatory turf, the PSC's Order runs contrary to this Congressional directive. Moreover, the Federal Communications Commission ("FCC") has expressly preempted state telephone regulation over information service providers like Vonage and (separately) over all providers whose service, like that of Vonage, is offered in such a manner that intrastate components of the service cannot reasonably be ascertained and segregated. Further, because the PSC Order would not only severely impair Vonage's service to persons in New York, but would have significant adverse effects on Vonage's interstate service as well, the Order impermissibly burdens interstate commerce in violation of the Commerce Clause of the U.S. Constitution.

Second, Vonage will be irreparably harmed by the state's illegal attempt to regulate it in violation of the Supremacy and Commerce Clauses of the Constitution. Vonage will be made subject to conflicting legal obligations with which it will be impossible to comply and which will cause Vonage to unavoidably violate the PSC regulations and expose it to severe penalties. The disruption to Vonage's business, and the harm to its good-will and business advantages that the Order and imposition of PSC regulations will produce, constitute irreparable harm under applicable Second Circuit standards.

Finally, the balance of hardships and the public interest favor the relief that Vonage seeks. Injunctive relief will further the national policy, expressed by Congress and the FCC, that Internet services and information services should be unfettered by state telephone regulation. By contrast, absent injunctive relief, that national policy will be thwarted. Vonage's ability to offer its service over the Internet will be impaired, if not crippled, because it is impossible for Vonage

2

to adhere its provision of Internet services, which have no discernable physical locations or geographic boundaries, to traditional telephone regulation, which is geographically based.

For these and the other reasons discussed below, Vonage requests that the Court consolidate a hearing on the merits with the hearing on Vonage's preliminary injunction motion, and enter a permanent injunction before the PSC Order's deadline of July 6, 2004. Should the Court feel that a final decision on the merits of Vonage's request for a permanent injunction cannot reasonably be made before the PSC's deadline, issuance of a preliminary injunction against enforcement of the Order, and maintenance of the *status quo* pending final resolution, will not harm the PSC or the public. Permitting the PSC's Order to take effect, on the other hand, would strip Vonage of its ability to provide its services without serious risk of incurable regulatory violations and attendant penalties.

**STATEMENT OF UNDISPUTED FACTS**

**Vonage's Service**

Vonage provides a service that enables its customers to use their high-speed Internet connections to conduct oral communications that in some respects resemble ordinary telephone "calls." Although Vonage describes itself as the "Broadband Phone Company" for marketing purposes, it does not actually provide telephone service.[2] Rego Decl. at 2, ¶ 4. Unlike traditional telephone service users, Vonage customers do not use telephones connected to the Public Switched Telephone Network ("PSTN") operated by local telephone companies, such as

---

[2] Vonage's service is sometimes referred to in the industry as Voice over Internet Protocol or "VoIP." VoIP is a generic term that describes the routing of voice "signals" over the Internet. VoIP does not describe any particular kind of service or technology. There are other providers of VoIP communications whose service is configured and provisioned very differently than Vonage's. Rego Decl. at 3, ¶ 5.

577105v1

Verizon, the incumbent local exchange carrier ("LEC") in most of New York. Rather, Vonage

customers access the service via high speed connections to the Internet supplied by third-party

broadband Internet Service Providers ("ISPs"), such as the service provided by cable modem and

DSL providers. Thus, Vonage, itself, does not provide Internet access service, but its customers

rely on the Internet access provided by other companies.

To place and receive communications over their broadband connections, Vonage

customers install special "softphone" software on their home computers, or purchase a small,

stand-alone computer (called an Analog Telephone Adapter ("ATA")), neither of which is made

by or proprietary to Vonage. Customers may obtain the necessary hardware and/or software from

Vonage, or from other vendors. *Id*. at 3, ¶ 6. Vonage does not retain ownership of the

equipment. Rather, the customer takes ownership and assumes responsibility for its proper

maintenance and operation. *Id*.

To access Vonage's service, a customer's computing equipment can be configured in

many different ways; two configurations are illustrated below:

4



Rego Decl. at 5, ¶ 8.

In the first configuration, the customer has purchased and installed a router that is plugged directly into the customer's Internet access modem and the ATA. The ATA converts the customer's outgoing voice signals into IP and converts incoming IP packets into analog voice signals, thus facilitating a two way oral communication using the Internet. Rego Decl. at 5, ¶ 9. The diagram also illustrates the use of a softphone installed on the customer's computer. *Id*. at 5, ¶ 8. The softphone allows any personal computer to access the Vonage service, using standard audio input and output jacks built into most computers. Softphone software can be downloaded to any Windows-compatible computing device, including a Personal Digital Assistant ("PDA") like a Pocket PC. *Id*. at 4, ¶ 7.

5

577105v1

As the diagram shows, all Vonage customer communications leave and enter the customer's premises in IP format and traverse the third-party ISP's broadband Internet connection, and the public Internet, to or from Vonage's Internet servers, where Vonage's protocol conversion service is performed. *Id.* at 6, ¶ 10. The Internet data packets that comprise Vonage customer communications are indistinguishable from other Internet traffic, such as those carrying e-mail, chat, instant messaging, or other communications to and from servers on the World Wide Web. *Id.*

To enhance customer comfort, the equipment is designed to simulate ordinary telephone service. *Id.* at 2, ¶ 4. For instance, the equipment simulates dial tones and dialing sounds familiar to PSTN callers (and essential to PSTN calling), but which are unnecessary to communications conducted over the Internet. *Id.* at 2-3. Vonage customers also are provided what appear to be traditional ten-digit telephone numbers. The use of these numbers gives the illusion to PSTN users that they are "calling" Vonage customers on the Internet in the same fashion that they might call users of the PSTN. *Id.* and at 9-11, ¶¶ 16-21. Vonage obtains these ten-digit telephone numbers from regulated telephone companies in its capacity as a customer of those telephone companies, just like any large corporation or end-user. *Id.* at 8, ¶ 14. The numbers are assigned to Vonage, and Vonage, in turn, associates them in its proprietary database with its customers' computers on the Internet through the use of unique IP address identifiers; they are, thus, "virtual numbers" only. *Id.* at 8, ¶¶ 14-15.

This virtual numbering feature allows Vonage customers to obtain telephone numbers with "area codes" of their choosing. For example, a New York City resident who would ordinarily be assigned a PSTN telephone number beginning with the familiar "212" area code can, with Vonage's service, be assigned a telephone number beginning with the "202" prefix

577105v1

associated with Washington, D.C. or the "213" area code associated with Los Angeles irrespective of the customer's actual physical location.. Likewise, residents of these other communities can request a "212" or "646" number associated with Manhattan. *Id.* at 9, ¶ 17.

Because Vonage customers access the service over the Internet, however, Vonage cannot determine its customers' actual physical locations when they use its service. *Id.* at 8-11, ¶¶ 15-20. Vonage servers "see" only the IP address of the customer's computer which is not related to the computer's physical or geographic location. *Id.* at 8, ¶ 15. The most that Vonage can ascertain is that a customer with a "212" area code is communicating with a PSTN customer with a "212" area code. But because of the portability of Vonage's service (it can be used by the customer anywhere in the world that a broadband connection is available), Vonage cannot tell whether its "212" customer is physically located in New York or Los Angeles or Chicago (or Tel Aviv) at the time of her communication. *Id.* at 9, ¶ 17; *see also* John C. Dvorak, "Free Phone Calls," *PC Magazine*, July 2003 (describing how one Vonage customer used the service with a California telephone number while staying at a hotel in New York City). *Id.* at 11, ¶ 21 and at Exh. A.

Vonage's service allows its customers to conduct oral communications directly with one another entirely over the Internet and without ever using telephone lines. These "computer-to-computer calls" constitute approximately 3 percent of all Vonage customer communications, a figure that is expected to rise as more and more consumers abandon traditional telephone service. *Id.* at 6, ¶ 11.

Vonage also enables its customers to communicate with non-Vonage customers on the PSTN. To facilitate these "computer-to-phone calls," Vonage provides a bridge between the incompatible and otherwise unconnected networks of the Internet and the PSTN. "Computer-to-

7

phone calls" between Vonage customers and PSTN users are serviced by Vonage in one of two ways. For calls initiated by a Vonage customer, the IP data packets associated with the customer's conversation are routed over the Internet to one of Vonage's Internet servers, and then transformed, by another Vonage computer, into the format (also known as "protocol") of the PSTN. *Id.* at 6-7, ¶¶ 12-13.[3] The communication is then handed to a regulated telephone company (usually a long-distance carrier) via dedicated lines provided by the carrier. *Id.* This carrier then "terminates" the call to the PSTN end-user,[4] thus establishing the connection between Vonage's customer on the Internet and the PSTN user's telephone. *Id.*

Calls from end-users on the PSTN to Vonage customers are handled somewhat differently. First, the call is routed to Vonage, just as if Vonage was any other end-user, over the facilities of the PSTN-user's local carrier (and, depending on the number dialed, their long distance carrier) to a Competitive Local Exchange Carrier ("CLEC" – a regulated telephone company) that provides telecommunications services to Vonage. *Id.* at 8, ¶ 14. From the CLEC's perspective, the phone number dialed by the end user is one assigned to Vonage and, as a result, the CLEC transmits the PSTN user's communication to Vonage where it is delivered to a Vonage media gateway server. *Id.* at 9, ¶ 16. Vonage then converts the format of the communication from TDM into IP for transmission on the Internet. Vonage must also identify the IP address associated with the computer of the Vonage customer to whom the communication is directed. To do this, Vonage maintains databases that allow for the

---

[3] PSTN calls are typically routed in "TDM" format. TDM is the acronym for "time division multiplex," which is a technique for transmitting a number of separate signals simultaneously over one, shared communications line. *Id.* at 7, ¶ 13.

[4] As used here, "end-user" refers to the person making or receiving the communication.

instantaneous translation of the 10-digit "telephone number" into the IP address associated with the customer's computer. *Id.* The Internet data stream is then routed over the Internet to the Vonage customer's computer, which converts it from IP format into audible voice signals.

**PROCEDURAL/LEGAL BACKGROUND**

**Federal Law**

While VoIP is relatively new, the legal framework for regulation of such services is not. A key dichotomy at the heart of federal communications law in general, and this case in particular, is the distinction between telecommunications and information services. "Telecommunications services" involve the transmission of information without alteration, while "information services" involve both the manipulation and transmission of information using telecommunications service. For example, the local and long-distance voice telephone services offered by traditional local exchange carriers ("LECs"), such as Verizon, are telecommunications services. But Internet or database services (such as LEXIS and Westlaw) that use telecommunications networks to provide value-added services to customers are information services. As their statutory definitions make clear, "information services" are provided via "telecommunications," and utilize the "telecommunications services" offered by "telecommunications carriers."[5]

---

[5] "The term 'telecommunications' means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(43). A "telecommunications service" is "the offering of telecommunications for a fee directly to the public ...." 47 U.S.C. § 153(46). Likewise, a "'telecommunications carrier' means any provider of telecommunications services ...." 47 U.S.C. § 153(44). "The term 'information service' means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications ...." 47 U.S.C. § 153(20).

9

Telecommunications carriers are subject to common carrier regulation under Title II of

the Communications Act of 1934 (the "Act"), 47 U.S.C. §§ 201 *et seq*. Title II "imposes certain

requirements on common carriers," insofar as they offer interstate or international services.

*Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services Are Exempt*

*from Access Charges*, WC Docket 02-361, 2004 WL 856557, ¶ 4 n.16 (rel. April 21, 2004)

("*AT&T Declaratory Order*"). In addition, common carriers providing intrastate services are

subject to various state laws imposing similar and, in some cases, more extensive regulation.

Information services, on the other hand, are specifically exempt from both federal and

state common carrier regulation. *See, e.g.,* 47 C.F.R. § 64.702(a) (2002) ("Enhanced services are

not regulated under Title II of the Act").[6] Indeed, noting the competitiveness of the information

services industry, and the benefits that accrue to U.S. consumers as a consequence, the FCC

deliberately has chosen to impose as few regulatory obligations on information services as

possible. *See Second Computer Inquiry*, Final Decision ("*Computer II*"), 77 F.C.C.2d 384

(1980), ¶ 123 ("to subject enhanced services to a common carrier scheme of regulation ... would

negate the dynamics of ... this area"). The FCC has classified Internet access and related services

as information services. *Universal Service Report* ¶ 73.

To prevent the states from establishing regulations that would conflict with these federal

deregulatory policies, the FCC has limited the states' authority to regulate information services.

---

[6] Before Congress amended the Communications Act in 1996 (the "1996 Act"),
"telecommunications services" and "information services" were called "basic" and "enhanced" services
respectively. In its *Universal Service Report* to Congress, the FCC stated: "[W]e find that Congress
intended the categories of 'telecommunications service' and 'information service' [in the 1996 Act] to
parallel the definitions of 'basic service' and 'enhanced service.'" *Federal-State Joint Board on Universal
Service,* Report to Congress, 13 F.C.C.R. 11501, ¶ 21 (1998) ("*Universal Service Report*"). The terms
"enhanced services" and "information services" are used interchangeably in this memorandum.

577105v1

In the *Computer II* proceedings, for example, the FCC "f[ou]nd that the enhanced services under

consideration in this proceeding … fall within the subject matter of this Commission," *Computer*

*II*, 77 F.C.C.2d at ¶ 125, and expressly "preempted the states [from] … impos[ing] common

carrier tariff regulation on a carrier's provision of enhanced services," *Computer II Further*

*Reconsideration Order*, 88 F.C.C.2d 512, ¶ 83 n.34 (1981). The U.S. Court of Appeals for the

D.C. Circuit upheld this exercise of preemptive authority, explaining that "[f]or the federal

program of deregulation to work, state regulation of CPE [customer premises equipment] and

enhanced services ha[ve] to be circumscribed." *Computer & Communications Indus. Ass'n v.*

*FCC*, 693 F.2d 198, 206 (D.C. Cir. 1982). Accordingly, the court held that "state regulatory

power must yield to the federal." *Id.* at 216.

Subsequent FCC orders have continued to maintain that state regulation of information

services, if not preempted, would interfere with federal deregulatory policies. *See Computer III*

*Remand Proceedings Order*, 6 F.C.C.R. 7571, ¶ 121 (1991). These rules have likewise been

affirmed by the courts. *California v. FCC*, 39 F.3d 919, 933 (9th Cir. 1994) (finding that in the

FCC's order preempting state regulation of information services, the FCC had met its burden of

showing that its "regulatory goals … would be negated" by conflicting state regulation).

The 1996 Act codified these long-standing FCC policies, and officially endorsed the

FCC's policy of exempting information services and, by extension, the Internet from

unnecessary regulation. Specifically, Congress found that "[t]he Internet and other interactive

computer services have flourished, to the benefit of all Americans, with a minimum of

government regulation." 47 U.S.C. § 230(a)(4). In order "to promote th[is] continued

development," the 1996 Act reaffirmed the "policy of the United States" of maintaining the

Internet "unfettered by Federal or State regulation." 47 U.S.C. § 230(b). Thus, as the FCC noted

11

in a very recent decision, "federal authority has already been recognized as preeminent in the area of information services, and particularly in the areas of Internet and other interactive computer services, which Congress has explicitly stated should remain free of regulation." *In the Matter of Petition for Declaratory Ruling That Pulver.com's Free World Dialup is Neither Telecommunications Nor a Telecommunications Service*, 19 F.C.C.R. 3307, 3317, ¶ 16 (rel. Feb. 19, 2004) ("*Pulver Order*").

**The Federal Court Decision in Minnesota**

In September 2003, the Minnesota Public Utility Commission issued an order that, similar to the Order Vonage is appealing here, sought to subject Vonage to regulation as a "telephone company" under Minnesota law. Vonage sought relief on two fronts. First, it filed a Petition with the FCC seeking a declaratory ruling that Minnesota PUC's Order was preempted under federal law. Second, it sought injunctive relief from the United States District Court for the District of Minnesota. Because, as here, the facts were undisputed and the only issues were questions of law, the Court considered Vonage's motion as one for a permanent injunction.

In a carefully drawn opinion that surveys the applicable law, the Court concluded that Vonage's service is an "information service" as defined by the 1996 Act because it offers the "'capability for generating, retrieving, utilizing, or making available information via telecommunications'" and because Vonage must "'act on' the format and protocol of the information it receives." *Vonage Holdings Corp. v. The Minnesota Public Utilities Commission*, 290 F.Supp.2d 993, 999 (D. Minn. 2003), *appeal pending*, Docket No. 04-1434 (8th Cir.) (quoting 47 U.S.C. § 153(20) and citing 47 C.F.R. § 64.702(a)) (attached to Declaration of Yun Lee as Exhibit 2). The Court then found that "Congress has clearly stated that it does not intend to regulate the Internet and information services." *Id*. at 1003. It therefore concluded that state

12

regulation was preempted because it "would be an obstacle to the 'accomplishment and execution of the full objectives of Congress'" and entered a permanent injunction against enforcement of the MPUC's order. *Id.* (quoting *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368-69, 106 S.Ct. 1890, 1898 (1986).

**The FCC's Pulver.com Decision**

On February 19, 2004, the FCC issued its <u>Memorandum Opinion and Order</u> in the proceeding styled *In the Matter of Petition for Declaratory Ruling That Pulver.com's Free World Dialup is Neither Telecommunications Nor a Telecommunications Service*, 19 F.C.C.R. 3307 (hereafter *"Pulver Order"*). Pulver.com provides a form of computer-to-computer IP-telephony (as does Vonage for communications between its customers) known as Free World Dialup or "FWD." It requested an FCC declaratory ruling that this service was not a telecommunications service. The FCC not only obliged, but went further, holding that FWD was an unregulated information service provider, that any attempt to impose state regulation on FWD service would impair national policy, and that FWD service was jurisdictionally interstate in nature because of the ubiquitous nature of Internet service and the impossibility for Pulver to identify its customer's physical locations when they were communicating using its service. *Pulver Order* at 3321-22, ¶ 22.

There are marked similarities between Vonage's and Pulver.com's services. Like Vonage customers, Pulver.com's customers are identified by their computer's IP address, which provides no information about physical location. Like Vonage's service, FWD service can only be accessed over the high speed Internet connections supplied by others. Like Vonage customers, Pulver.com customers must acquire and appropriately configure certain equipment or softphones to use its service. Like the numbers associated with Vonage's customer computers, the numbers

13

assigned to Pulver.com's customers are completely portable, which allows its customers to use

its service anywhere in the world that they can obtain a broadband connection. Like Vonage,

Pulver.com does not know where its customers are physically located when they use its FWD

service. *Id.* at ¶ 5.

In finding Pulver.com's service to be an unregulated information service, the FCC

pointed out:

> In section 230 of the 1996 Act, Congress expressed its clear
> preference for a national policy "to preserve the vibrant and
> competitive free market that presently exists for the Internet and
> other interactive computer services" unfettered by Federal or State
> regulations. Courts have repeatedly recognized this congressional
> intent and, as a result, have rejected state attempts to regulate such
> services.

*Id.* at ¶ 19. For this latter proposition, the FCC cited to the Minnesota's federal court decision

that Vonage's service is an information service over which federal law preempts state regulation.

*Id.* and n. 66.

**The FCC IP Rulemaking Proceeding**

On March 10, 2004, the FCC issued a Notice of Proposed Rulemaking entitled *In the*

*Matter of IP Enabled Services*, WC Docket No. 04-36, 2004 WL 439260 (hereafter "*IP*

*Rulemaking Notice*"). The Notice examined and sought comment on "issues relating to services

and applications making use of Internet Protocol (IP), including but not limited to voice over IP

(VoIP) services." *Id.* at ¶ 1. The FCC acknowledged that the Internet had become "one of the

greatest drivers of consumer choice and benefit, technical innovation and economic development

in the United States in the last ten years" and that it had done so "in an environment that is free

of many of the regulatory obligations applied to traditional telecommunications services and

networks." *Id.* The Commission asked whether it could "best meet its role of safeguarding the

public interest by continuing its established policy of minimal regulation of the Internet and the

services provided over it," described the different kinds of IP enabled services being offered and

those anticipated in the future, and requested comments on whether any regulatory treatment

would be appropriate for any class of IP enabled service. *Id.* at ¶ 2. In sum, in the *IP Rulemaking*

*Notice*, the FCC recognized that there are many different types of IP enabled services, including

many different types of VoIP, and sought comment on whether its historic policy of non-

regulation should be adjusted in the future.

The FCC's assertion of jurisdiction over the Internet and related services led the

Colorado Public Utilities Commission to refrain from taking action with respect to any VoIP

type of service. The Colorado Commission noted the United States' policy set forth in 47 U.S.C.

§ 230 to preserve the Internet and other interactive services free from Federal and State

regulation. It further pointed out that existing state regulations were promulgated to police the

behavior of monopoly telephone providers and that it made little sense to impose such regulation

on a nascent competitive industry and thereby doom it via regulatory overkill. *Investigation into*

*Voice Over Internet Protocol Services*, Docket No. 03M-220T, 2004 WL 162970, ¶ 3, 6-8 (Co.

PUC 1/2/04).

**The New York PSC Proceeding**

The PSC proceeding that led to the Order arose from a Complaint that Frontier Telephone

of Rochester, Inc. ("Frontier") filed against Vonage on September 10, 2003. The complaint

alleged that Vonage was providing intrastate "telephone" services in New York without the

PSC's authorization, *i.e.*, in violation of the Public Service Law ("PSL") (Rego Decl. Exh. C).

On October 9, 2003 the PSC issued a *Notice Requesting Comments* (the "Notice"). *Id.*,

Exh. D. Pursuant to the Notice, Vonage filed a Response and Motion to Dismiss the Frontier

577105v1

complaint on the basis that, *inter alia*, Vonage provides interstate information service over the
Internet with respect to which state regulation is preempted and over which state regulation, if
imposed, would impermissibly burden interstate commerce. Rego Decl. at 18, ¶ 39.

On October 15, 2003, the PSC published a notice of proposed rulemaking in the NYS
Register in which it described Frontier's complaint proceeding as "Definition of Telephone
Service by Frontier Telephone of Rochester, Inc." *Id.,* Exh. E. The notice stated: "Because this
complaint raises generic concerns that could affect a number of entities, a notice requesting
comments on the complaint has been issued. The commission will evaluate the comments
received and may make determinations concerning the applicability of the Public Service Law to
various forms of service, including voice over internet protocol (VOIP)." Thereafter, commission
staff invited Vonage to meet with them and advised Vonage and counsel that there need be no
concerns about *ex parte* contacts because the complaint proceeding had been converted to a
rulemaking proceeding. As a consequence, executives from Vonage accompanied by counsel
met with staff at the PSC's New York City offices. *Id.* at 18-19, ¶ 40. No hearing on the Frontier
complaint was ever scheduled. *Id.*

The PSC received comments and reply comments from a variety of third parties. On May
21, 2004, despite the Minnesota federal court's ruling that Vonage's status as an information
service provider preempted that state's PUC from imposing telephone regulation on Vonage, the
FCC's decision in *Pulver.com*, and the pendency of the FCC *IP Rulemaking* proceeding, the PSC
issued its Order. In the Order, the PSC did not adopt any generic rules or make generic
determinations regarding various forms of service, but rather made Vonage the sole focus of its
Order. Despite the facts that no hearing had been held and no evidence taken (as was also the
case with the Minnesota PUC), the PSC concluded that by offering and providing its

DigitalVoice™ service in New York, Vonage was a "telephone corporation" as defined in the

PSL and therefore subject to state regulation. The PSC ordered Vonage to (a) obtain a Certificate

of Public Convenience and Necessity ("CPCN"); and (b) file a tariff, both within 45 days of the

Order (*i.e.*, by July 6, 2004). Within the Order, the PSC also permitted Vonage to seek waiver of

specific rules and regulations.

## ARGUMENT

To secure a preliminary injunction, the moving party must demonstrate: "(1) that it will

be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success

on the merits or (b) sufficiently serious questions going to the merits of the case to make it a fair

ground for litigation, and a balance of hardships tipping decidedly in its favor." *Mony Group,*

*Inc. v. Highfields Capital Mgmt, L.P.,* No. 04-0678, 2004 U.S. App. LEXIS 9364, at *14 (2d Cir.

May 13, 2004) (quoting *Forest City Daly Hous., Inc. v. Town of North Hempstead*, 175 F.3d 144,

149 (2d Cir. 1999)). For a permanent injunction, the applicant must demonstrate (1) actual

success on the merits and (2) irreparable harm. *Gucci America, Inc. v. Duty Free Apparel, Ltd.*,

286 F. Supp.2d 284, 290 (S.D.N.Y. 2003).

## I.
## VONAGE SUCCEEDS ON THE MERITS

The PSC's Order is constitutionally deficient for two reasons: First, the Communications

Act of 1934, as amended, 47 U.S.C. § 151, *et seq.* (the "Act"), and the FCC's various orders

implementing the Act's requirements, preempt the PSC's Order. Second, the PSC's Order

imposes an unconstitutional burden on interstate commerce.

17

A.    **The Communications Act & FCC Regulations Preempt the PSC Order.**

The Supremacy Clause of Article VI of the Constitution empowers Congress to preempt

state law through either express, field, or conflict preemption. *See Louisiana Pub. Serv. Comm'n*

*v. FCC*, 476 U.S. 355, 368-69 (1986). Further, "a federal agency acting within the scope of its

congressionally delegated authority may pre-empt state regulation." *Id.* at 369.

The PSC's Order directly conflicts with the Act, as interpreted and implemented by the

FCC, and is therefore preempted. First, the PSC's Order imposes telephone common carrier

regulation on Vonage's information service/Internet application. The FCC, in its implementation

of both the Act and the 1996 Act, has determined that information services should be exempt

from such regulation. Second, even if Vonage's service could be characterized as a

telecommunications service, the PSC Order would still be preempted because Vonage's services

are jurisdictionally interstate in nature. Congress has expressly preempted the field of interstate

telecommunications, leaving no room for conflicting state regulation in this area. Although states

may continue to regulate purely intrastate telecommunications services, Vonage's service by its

very nature has no separately identifiable intrastate component.

1.    **The PSC's Order Constitutes Impermissible Regulation of Information**
      **Services and the Internet.**

The PSC committed a fundamental error when it treated Vonage's service as a

telecommunications service subject to telephone regulation under New York State law. In the

Order, the PSC stated that Vonage "is a 'telephone corporation' under our jurisdiction," partially

because "Vonage's service allows subscribers to make and receive voice communications with

any other telephone subscriber in the world, and its service is marketed as a substitute for 'home

phone service.'" PSC Order at 10. While this "quacks-like-a-duck" mode of reasoning may have

some superficial appeal, the FCC already has rejected it. It recognized 20 years ago that basic

18

and enhanced services could be similar: "[S]ome enhanced services may *do some of the same things* that regulated communications services did in the past. On the other side, however, is the substantial data processing component in all these services." *Computer II* ¶ 132 (emphasis added).

The FCC specifically has confirmed that "there may be telecommunications services that can be provisioned through the Internet," but nonetheless exempted Internet service and application providers from common carrier regulation like that imposed by the PSC. *Universal Service Report* ¶ 101. The FCC found that the 1996 Act mandated that it continue "[l]imiting carrier regulation to those companies that provide the underlying transport," in order to "ensure[] that regulation is minimized and is targeted to markets where full competition has not emerged." *Id.* at ¶ 95. "We believe that Congress, by distinguishing 'telecommunications service' from 'information service,' and by stating a policy goal of preventing the Internet from being fettered by state or federal regulation, endorsed this general approach." *Id.*

### a.    State Regulation of Information Services Conflicts with the Federal Deregulatory Scheme.

The PSC Order undermines the statutory and regulatory pronouncements that Federal policy requires deregulation of information and Internet services. When the FCC in *Computer II* concluded that the enhanced services market should be exempt from common carrier regulation to stimulate competition and innovation, it determined that it was necessary to preempt the states from undermining that policy by imposing their own forms of common carrier regulation. As described at pages 12-15, *supra*, the FCC's preemption policy has been upheld repeatedly by the Courts of Appeals and has been reaffirmed by the agency as applying specifically to the Internet.

19

That the national hands-off policy regarding information providers is alive and well is demonstrated by the FCC's decision in the *Pulver.com* case. There, the FCC noted that "federal authority has already been recognized as preeminent in the area of information services, and particularly in the areas of Internet and other interactive computer services, which Congress has explicitly stated should remain free of regulation." *Pulver Order* at 3317, ¶ 16. Thus, as the Minnesota federal court found, "Congress has spoken with unmistakable clarity on the issue of regulating the Internet." *Vonage Holdings*, 290 F. Supp.2d at 997 (quoting 47 U.S.C. § 230(b)). Despite the unequivocal congressional pronouncement in § 230(b) of the 1996 Act, the PSC ruled that § 230 was not intended to address traditional common carrier regulation, but rather to address the content of speech transmitted over the Internet. PSC Order at 13. However, the FCC, who is charged with protecting this national policy, is clearly on record as agreeing with the Minnesota federal court that Congress's statement means exactly what it says. *See, e.g.*, *IP Rulemaking Notice* ¶ 39. And the FCC's views on the meaning of § 230 are, of course, subject to *Chevron* deference, a fact that the PSC Order completely ignores. Finally, even if § 230 did not exist, the PSC's Order would still be preempted by the *Computer II* policies adopted long before the 1996 Act.

The principles applied by the FCC in the *Pulver.com* case apply equally here. It cannot be disputed that State common carrier regulation of services offered over the Internet has the potential to prevent "efficient utilization and full exploitation of the interstate telecommunications network," *Computer II* ¶ 7, over which Internet traffic passes. If Vonage's service offerings are impaired by New York state telephony regulation, Internet access customers in New York will not have available to them the same wide range of Internet applications as their counterparts in other states. This will affect their usage of, and subscription to, the Internet itself.

If one State decides to impose common carrier regulation on instant messaging, and another

imposes state telephony regulation on e-mail, the Internet as a whole will become less valuable

to customers in other States (and countries) because they will no longer be able to exchange data

in any format with any other user. Therefore, the imposition of State telecommunications

regulation on services offered over the Internet *necessarily* interferes with interstate use of the

Internet and with the Federal policy promoting its use. Accordingly, the PSC's attempt to impose

telephone common carrier regulation upon Vonage conflicts with the well established federal

policy exempting such services from common carrier regulation. As one federal district court has

observed, no "federal or state court has applied common carrier regulation ... to an information

service provider." *America Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851, 856-57 (E.D. Va.

1999). The *GreatDeals* court refused to "be the first to do so, especially in the face of contrary

direction by Congress and the FCC," *id.* at 857, and other courts, including the federal district

court in Minnesota, have similarly refused to do so.[7]

### b.    Vonage Provides an Information Service.

The PSC Order does not dispute the legal principle that state regulation of information

services is preempted. Instead, it concludes that Vonage does not actually offer an information

service. The PSC is clearly wrong. Vonage qualifies as an information service provider for two

distinct reasons: first, it provides a protocol conversion service by facilitating communications

---

[7] *See, e.g., Howard v. America Online, Inc.*, 208 F.3d 741, 753 (9th Cir. 2000) (refusing to impose common carrier obligations on ISP); *Southwestern Bell Tel. Co. v. FCC*, 153 F.3d 523, 544 (8th Cir. 1998) (determining that ISPs should be exempt from the imposition of interstate access charges based on Congress's intent to leave the Internet unregulated); *CompuServe, Inc. v. Cyber Promotions, Inc.,* 962 F. Supp. 1015, 1025 (S.D. Ohio 1997) ("[ISPs] have been held not to be common carriers") (citing *Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc.,* 907 F. Supp. 1361, 1369 n.12 (N.D. Cal. 1995)).

21

between the IP format of the Internet and the TDM format of the PSTN. Indeed, distilled to its

essence, Vonage's business *is* protocol conversion. Second, Vonage provides access to stored

information in the same manner as other Internet-based services.

### i.    Vonage's Service Provides A Net Protocol Conversion, a Hallmark of an Information Service.

In distinguishing between "basic" and "enhanced" services (codified as

telecommunications and information services by the 1996 Act), the FCC has focused on

"protocol conversion" — the manipulation and transformation of information — as a

distinguishing characteristic of enhanced services.[8] *See Amendment of Section 64.702 of the*

*Commission's Rules and Regulations* (*Second Computer Inquiry*), 84 F.C.C.2d 50, ¶ 26 (1980)

("*Computer II Reconsideration Order*") ("protocol conversion capabilities are now being offered

completely external to the basic transmission network of underlying carriers"); *Communications*

*Protocols under Section 64.702 of the Commission's Rules and Regulations*, 95 F.C.C.2d 584, ¶

16 (1983) (clarifying that only "net" protocol conversions, in which information is terminated in

a protocol different from the one in which it entered the network, qualify as enhanced services).

Thus, in 1985, the FCC classified as "enhanced" an AT&T offering that converted

customers' data received in the protocols of the PSTN into the X.25 protocol used by packet-

switched networks. *Petitions for Waiver of Section 64.702 of the Commission's Rules,* 100

F.C.C.2d 1057, 1066-1067 (1985) ("*X.25 Conversion Order*") ("when a signal enters the packet

network in asynchronous format and exits the network in X.25 format, a net protocol conversion

occurs"). Similarly, 10 years later, the FCC recognized that AT&T's Interspan frame relay

---

[8] Protocols are "the methods used for packaging the transmitted data in quanta, the rules for controlling the flow of information, and the format of headers and trailers surrounding the transmitted information and of separate control messages." *Computer II*, ¶ 97 n.33.

product, which converts data from asynchronous protocols to the X.25 protocol, qualified as an

enhanced service. *Independent Data Communications Manufacturers Association, Inc.*, 10

F.C.C.R. 13717, ¶¶ 36, 40 (1995) ("*Frame Relay Order*").[9]

The FCC has found that Congress intended to include protocol conversions within the

definition of information services established by the 1996 Act. *Implementation of the Non-*

*Accounting Safeguards of Section 271 and 272 of the Communications Act*, 11 F.C.C.R. 21905, ¶

104 (1997) ("protocol processing services constitute information services under the 1996 Act").

As the FCC explained,

> an end-to-end protocol conversion service that enables an end-user
> to send information into a network in one protocol and have it exit
> the network in a different protocol clearly "transforms" user
> information...[and is therefore] information services under the
> 1996 Act.

*Id.* This conclusion conformed to the FCC's pre-1996 Act determination that the net protocol test

measured a net change "between the point where a customer's data enters the public switched

network and the point where it leaves the network." *Frame Relay Order* ¶ 10.[10] The FCC

reasoned that this interpretation was not only "consistent with the Commission's existing

practice of treating end-to-end protocol processing services as enhanced services," but also was

warranted "in light of Congress's deregulatory intent in enacting the 1996 Act." *Id.; see also*

*Universal Service Report*, 13 F.C.C.R. at ¶ 51 ("services offering net protocol conversion appear

---

[9] But in keeping with the *Computer II* framework, the FCC required AT&T to "unbundle" the underlying "basic" transmission component of the service and offer it on a stand-alone, common carrier basis. *Id.* at ¶¶ 40-46.

[10] The entry and exit point of wireline communications networks are defined as the demarcation point at a subscriber's premises; that is, the point of connection between the facilities of the service provider and the terminal equipment used by the customer. *See, e.g.*, 47 C.F.R. § 69.2(cc) (a call "terminates" at the demarcation point); 47 C.F.R. § 68.3 (demarcation point is where the network terminates at a subscriber's premises).

to fall within the statutory language, because they offer a capability for 'transforming [and] processing' information."); *AT&T Declaratory Order* (clarifying that services that offer net protocol conversion are information services, ¶¶ 6-7, but service that does *not* perform a net protocol conversion is a telecommunications service, ¶ 12).

This interpretation of the Act, which is entitled to *Chevron* deference, is dispositive of this case. Vonage's service transforms the format of information between the point at which it is sent "into a network" and the point where it "exit[s] the network," thus qualifying as a *net* protocol conversion characteristic of an information service. In a telecommunications network scenario, on the other hand, calls would both originate and terminate on the PSTN in the same format.[11] For calls originated by Vonage customers, Vonage receives data in IP format,[12] converts the transmission to TDM, and facilitates the call's delivery on the PSTN. Likewise, calls to Vonage customers "enter" the PSTN in TDM, are converted by Vonage to IP, and then delivered to Vonage's customer in that format – a net protocol conversion that is, inescapably, an information service. Thus, for the same reason that the protocol conversions performed by the services at issue in the 1985 *X.25 Conversion Order* and the 1995 *Frame Relay Order* were considered enhanced services, Vonage's protocol conversion qualifies as an information service.

---

[11] As discussed below, the FCC has held that when a customer transmits data to an information provider over the facilities of the customer's ISP, the "end point" where the ISP's service begins or ends is not "imputed" to the information service provider. For the same reasons, the end point where a LEC's provision of service occurs would not be imputed to Vonage. Thus, the true end points for purposes of analyzing Vonage's service are where the data is delivered to Vonage *after* transmission over the Internet or the PSTN, depending on who initiated the communication for which Vonage's conversion service is necessary, and where the converted data exits Vonage's server.

[12] The initial conversion of the customer's voice to IP is performed by the customer's computer, on the customer's side of the demarcation point, not by Vonage.

24

The PSC, however, found that that Vonage's service provides no net protocol conversion.

It explained its reasoning as follows:

> [T]he FCC has ruled that when there are protocol conversions at
> both ends of the call ("no net" protocol conversion), the service is
> a telecommunications service. Vonage's service involves this type
> of "no net" protocol conversion. Its adapter and/or software
> convert [*sic*] its customers' speech into the Internet protocol (IP)
> data format. Vonage's network subsequently converts IP packets
> back to TDM in order to facilitate calls between its customers and
> other carriers' telephone subscribers.

PSC Order at 12-13. This analysis is permeated by errors. First, it is not *Vonage*'s adapter that

converts its customer's speech into IP. This equipment belongs exclusively to the customer and it

is the customer who operates the equipment in order to convert her speech into data packets and

send them to Vonage over her ISP service. Rego Decl. at 3, ¶ 6. Second, there is no "Vonage

network." Rather, Vonage customers use the high-speed Internet connections provided by third-

party, broadband ISPs who own and operate the network Vonage customers use to access

Vonage's service. In some instances (Vonage customer to PSTN customer communications),

communications are terminated on the PSTN, an altogether separate network owned and

operated by regulated telephone companies; in other instances (Vonage customer to Vonage

customer communications), just like the services offered in *Pulver.com*, the communication

remains entirely on the public Internet. Rego Decl. at 2, ¶ 3.

Finally, however unwittingly, the PSC has accurately described a *net* protocol conversion

process in its effort to deny that Vonage performs one. Communications "leave" the Vonage

customer's premises in IP format and terminate on the PSTN in TDM. Vonage provides the

conversion in the "middle" of this transmission. To the extent that the PSC ruled there is no "net

protocol conversion" because the overall transmission is analog at both "ends" – *e.g.,* where the

577105v1

Vonage customer and the PSTN user place the handset to their mouths and ears – it clearly misstates the test. The FCC's net conversion test examines the format of *an electronic transmission* on an end-to-end basis from the demarcation point at the premises of the originating caller to the demarcation point where the call will be terminated – not from one person's mouth to another one's ears.[13] Obviously, human beings do not communicate using electronic signals, either analog or digital. For humans to use any means of electronic communication, they must have some equipment to convert speech (sound waves) or text (symbols on a video screen or piece of paper) into electronic form, and to convert electronic impulses back into a form that can be perceived by the senses. In the extreme sense suggested by the PSC, communications would *never* include a net protocol conversion, or else humans could not understand what was being communicated. Rego Decl. at 14-15, ¶ 28-29.

---

[13] The PSC's apparent conclusion that Vonage provides "phone to phone" IP telephony is likewise wrong. As the has FCC explained, phone-to-phone IP telephony involves calls that are both originated over a "*handset connected to the public switched network*" and that are likewise terminated "to … [an] ordinary telephone at the receiving end." *Universal Service Report* ¶ 84 (emphasis supplied). In this service arrangement, while the communicating parties are both attached to the PSTN, the telecommunications carrier who handles the call retrieves it from the PSTN, converts it to IP format on receipt so that it can take advantage of Internet facilities for transit, but then converts back to TDM format for termination on the PSTN. In other words, the telecommunications carrier is performing protocol conversions at each end of the call for its own convenience, not because the customer chose to do so.

An example of phone-to-phone IP telephony can be found in the FCC's recent decision in *Petition for Declaratory Ruling that AT&T's Phone-To-Phone IP Telephone Services are Exempt from Access Charges,* 2004 WL 856557 (FCC April 21, 2004). There, the FCC clarified that an AT&T service, in which AT&T took a call from the PSTN, converted it to IP format, transmitted it over the Internet, converted it back to TDM, and handed the call to a LEC for termination on the PSTN, was a telecommunications service, not an information service. *Id.* at ¶ 11. The FCC explained that AT&T's decision to handle calls in this manner did not constitute the offering of a unique service to its customers, and that the "internetworking conversion" performed by AT&T was not a *net* protocol conversion characteristic of information services. *Id.* at ¶ 12. Vonage's service is, obviously, very different.

ii.    **Vonage's Service Accesses and Processes Stored Information.**

In addition to "transforming" and "processing" information, Vonage's service includes a

capability for "acquiring, storing, ... retrieving [and] utilizing ... information via

telecommunications," in a manner that the FCC has deemed characteristic of information

services. For example, when an end-user on the PSTN places a call to a phone number assigned

to a Vonage customer, Vonage not only converts the call content into the IP format for

transmission on the Internet, but must also identify the IP address associated with the Vonage

customer being called, and encode that information onto the Internet data stream. This address

identification requires Vonage to access and process stored information.

The FCC has recognized that such computer processing functionality is characteristic of a

statutory information service. For example, the FCC has explained that the Internet's reliance on

Domain Name Systems ("DNS") is one of the "information service" characteristics of the

Internet. As the FCC has explained:

> A DNS is an Internet service that enables the translation of domain
> names into IP addresses. When queried about a domain name, a
> DNS server provides the querier with the IP address of the domain
> name or the IP address of another DNS server.... This translation
> process is necessary because routing of traffic over the Internet is
> based on IP addresses, not domain names. As a result, before a
> browser can send a packet to a website, it must obtain the address
> for the site.

*Inquiry Concerning High-Speed Access to the Internet over Cable and Other Facilities,* 17

F.C.C.R. 4798, ¶ 17 n.74 (2002) ("*Cable Modem Order*"), *vacated on other grounds, Brand X*

*Internet v. FCC,* 345 F.3d 1120 (9th Cir. 2003).[14]

---

[14] Although the Ninth Circuit vacated the FCC's ruling, it did not undermine the FCC's rationale
for classifying Internet access as an information service. Rather, it relied on its earlier decision in *AT&T
Corp. v. City of Portland,* 216 F.3d 871 (9th Cir. 2000), which held that the information *transmission*
provided by the cable company is distinct from the information *processing* performed by the Internet
(continued)

27

The use of DNS, the FCC explained, "constitutes a general purpose information processing and retrieval capability," *id.* at ¶ 37, that "encompasses the capability for 'generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications,'" and thus constitute[s] an information service, as defined in the Act," *id.* at ¶ 38 (quoting 47 U.S.C. § 153(20) (statutory definition of information service).

Similarly, in the recent *Pulver Order*, the FCC explained that various database management and information processing functions necessary to and associated with the provision of Pulver's Free World Dial-up service warranted the classification of the service as a statutory information service. *See Pulver Order* ¶ 11. Pulver offers a service that, like Vonage's, facilitates voice communications between users on the Internet, and in finding Pulver's service to be an information service, the FCC focused on the use of "stored member information (*e.g.*, assigned numbers)," and the "process[ing]" of that information necessary to facilitate communications between users. *Id.*[15] Similar functions are intrinsic to Vonage's service.

Thus, both the *Cable Modem Order* and the *Pulver Order* hold that the routing of information on the Internet necessarily involves an information processing function that renders the overall service an information service. Similar data processing and routing functions are an intrinsic part of Vonage's service. For the same reasons, Vonage's service must similarly be classified as an information service.

---

service provider. That holding has no bearing on the present case, because Vonage itself does not provide any transmission services.

[15] The FCC also cited the availability of voice-mail to Pulver users, which the FCC has long classified as an information service, and which Vonage also provides to its customers. *Id.*

### iii.    Vonage Does Not Provide Telecommunications Service, but Rather *Uses* It to Provide Its Service to Its Customers.

Because Vonage uses telecommunication service in connection with its provision of its information service, the PSC concluded in its Order that Vonage was actually providing telecommunications service as a "reseller." This conclusory leap runs contrary to all federal precedent on the issue. As a threshold matter, the *use* of telecommunications is an integral part of the 1996 Act's definition of an information service: namely, "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information *via telecommunications*…" 47 U.S.C. § 153(20) (emphasis supplied).[16] As the FCC has explained: "[W]hen an entity offers transmission incorporating the 'capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information,' it does not offer telecommunications. Rather it offers an 'information service' even though it uses telecommunications to do so." *Universal Service Report* at 11520, ¶ 39.

In reaching its decision that Vonage is an information service provider, the Minnesota federal court pointed out the FCC's repeated recognitions that the "architecture of information services would be built on top of existing telecommunications service infrastructure, but, in terms of regulation, would still remain separate for strong policy purposes." *Vonage Holdings*, 290 F. Supp.2d at 1001. The Court quoted the FCC:

> "Communications networks function as overlapping layers, with multiple providers often leveraging a common infrastructure. As long as the underlying market for provision of transmission facilities is competitive or is subject to sufficient procompetitive safeguards, *we see no need to regulate the enhanced functionalities*

---

[16] Similarly, FCC regulations define the parallel "enhanced services" as "services, *offered over common carrier transmission facilities used in interstate communications*, which employ computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information." 47 C.F.R. § 64.702(a) (emphasis supplied).

29

> *that can be built on top of those facilities.* We believe that
> Congress, by distinguishing 'telecommunications service' from
> 'information service,' and by stating a policy goal of preventing
> the Internet from being fettered by state or federal regulation,
> endorsed this general approach. *Limiting carrier regulation to*
> *those companies that provide the underlying transport ensures that*
> *regulation is minimized and is targeted to markets where full*
> *competition has not emerged.*"

*Id.* (emphasis in original) (quoting *Universal Service Report* at 11546, ¶ 95).

The Minnesota federal court recognized what the FCC has long said: "some enhanced

services may *do some of the same things* that regulated communications services did in the past.

On the other side, however, is the substantial data processing component in all these services."

*Computer II* ¶ 132 (emphasis added). Even though the FCC recognized that "there may be

telecommunications services that can be provisioned through the Internet," it exempted Internet

service and application providers from common carrier regulation like that imposed by the PSC.

*Universal Service Report* ¶ 101. Information service by its very nature uses telecommunications

as a component. But Vonage no more "resells" telecommunications than does AOL or Westlaw.

While Vonage, like AOL and Westlaw seeks to sell *its* own service to make a profit, Vonage

does not – just as AOL and Westlaw do not – resell the telecommunications that it uses for a

profit.[17]

In claiming that Vonage's service satisfies the definition of a telecommunications service

under federal law, the PSC Order states that: "A Vonage customer's voice is transmitted between

or among points specified by the customer, without any change in the form or content of the

conversation." PSC Order at 12. The PSC is wrong on two counts: First, Vonage's service *does*

---

[17] The PSC's pronouncement that Vonage is a "reseller" of telephone services is in conflict with
NYCRR § 647.1. That statute provides that a reseller is one who subscribes to communications services
and facilities from a telephone corporation and "re-offers the communications services to the public for
profit." This Vonage does not do.

make a "change in the form or content of the information as sent and received" by, among other things, converting the IP packets sent by its customers over the Internet into the TDM format used on the PSTN (and vice versa). Second, Vonage's service does *not* transmit information "between or among *points* specified by the user." *See* 47 U.S.C. § 153(43) (emphasis added).

The *customer's ISP*, not Vonage, transmits the customer's IP packets over the Internet to and from Vonage's servers. Vonage does not provide any aspect of that "transmission" to or from its servers. As the FCC noted in *Pulver.com*, when a communication is transmitted by a customer's ISP over the Internet to or from a VoIP server, the "end point" serviced by the ISP is not "imputed" to a VoIP provider's server. *Pulver Order* at 3321, ¶ 21. Further, to the extent that communications of Vonage customers go to the PSTN, they are carried by regulated telephone companies who service Vonage as a customer.

Additionally, when Vonage routes communications, it does so to IP addresses on the Internet, not to specific "points." *See* The American Heritage College Dictionary (3rd Ed. 1997) at 1055 (defining "point" as "[a] place or locality considered with regard to its position ... a narrowly particularized and localized position or place; a spot"). Vonage cannot determine whether its customers are located in Timbuktu or Tennessee, much less transmit information to "a narrowly particularized and localized position."

Although made in the context of purely computer-to-computer IP telephony service, the FCC's observation in *Pulver.com* is equally applicable here where Vonage provides computer to computer and computer to phone communications service:

> [E]ven if the [Pulver.com customers'] locations were somehow relevant to their use of FWD [Pulver's service], FWD's portable nature without fixed geographic origination or termination points means that no one but the [customers] themselves know where the end points are.

31

*Pulver Order* at 3321, ¶ 21.

Accordingly, the PSC's rationale for finding Vonage a "telecommunications carrier" fails under FCC precedent.

### iv.    Vonage's Service Does Not Fulfill the FCC's Four-Part Test for "Telecommunications Service."

Finally, the FCC already has found that Internet based IP telephony providers, such as Vonage, "do[] not appear to be providing telecommunications services to [their] subscribers." *Universal Service Report* ¶ 87. The Commission crafted a four-part test for determining when IP telephony services may be classified as telecommunications services, rather than information services. Telecommunications services, it found, are characterized by the following: (1) the provider holds itself out as providing voice telephony or facsimile transmission service; (2) the provider does not require the customer to use CPE different from the CPE necessary to place an ordinary touch-tone call (or facsimile transmission) over the public switched telephone network; (3) the provider allows the customer to call telephone numbers assigned in accordance with the North American Numbering Plan, and associated international agreements; and (4) the provider transmits customer information without net change in form or content. *Id.* at ¶ 88.

As the Minnesota federal court found, although Vonage's service satisfies the first and third of these criteria (Vonage customers can use the service as an alternative to placing conventional telephone calls, and can place calls to ordinary telephone numbers), it unequivocally does *not* satisfy the other two elements. Consumers must install special CPE (*i.e.,* a computer equipped with suitable hardware or software) that is different from the CPE necessary to place an ordinary touch-tone call over the public switched network. Moreover,

32

Vonage's service *does* involve a net protocol conversion – from the IP format sent by its customers over the Internet to the TDM format of the PSTN and vice versa.

The PSC simply overlooked, or misunderstood, these aspects of Vonage's service. Indeed, the PSC's Order suggests that *Vonage* owns and operates the special equipment or software that its customers must have and that, as a result, *Vonage* performs protocol conversions at its customer's locations and on its Internet servers which effectively "cancel each other out." The undisputed facts prove the PSC wrong. Whether the customer procures an ATA or softphone from Vonage or a third party provider, that "CPE" is owned and operated by Vonage's customer who uses it to convert her speech into IP packets and to convert the IP packets of the person with whom she is communicating into speech. No part of Vonage's service is performed at its customer's location – rather, Vonage's service is performed only on the Internet and provides the translation bridge between the incompatible protocols of the Internet and PSTN. Indeed, in its current Rulemaking proceeding where it is considering regulatory issues relating to a host of different VoIP services, the FCC has observed that what Vonage converts is <u>not</u> its customer's speech, but rather the IP packets that its customers send to it over the Internet: "When a Vonage customer communicates with a subscriber of ordinary telephone service, Vonage converts its customer's IP packets into the digital TDM (time division multiplexed) format for transfer through a media gateway to the PSTN, and vice versa." *IP Rulemaking Notice*, ¶ 15. As the FCC already has noted, Vonage's service provides a net protocol conversion and not two separate conversions that effectively cancel each other out.

2.    **The PSC is Preempted from Regulating Vonage Because Its Service is Jurisdictionally Interstate.**

Vonage provides an information service, not a telecommunications service. The PSC erred in concluding otherwise. But even if the PSC's determination that Vonage provides telephone service were correct, the PSC still would be preempted from regulating Vonage because Vonage clearly provides a jurisdictionally *interstate* service, over which the states have no regulatory authority.

a.    **The FCC Has Preempted State Regulation of Services That Are Inseparably Used for Both Interstate and Intrastate Communication.**

The Communications Act established "a system of dual state and federal regulation over telephone service." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 360 (1986). Although states retain authority over intrastate telecommunications, "questions concerning the duties, charges and liabilities of telegraph or telephone companies with respect to *interstate* communications service are to be governed solely by federal law and [] the states are precluded from acting in this area." *Ivy Broadcasting Co. v. Am. Tel. & Tel. Co.*, 391 F.2d 486, 491 (2d Cir. 1968) (emphasis added); *see also NARUC v. FCC*, 746 F.2d 1492, 1498 (D.C. Cir. 1984) ("Interstate communications are totally entrusted to the FCC ...."). The dividing line between the regulatory jurisdictions of the FCC and states depends on "the nature of the communications which pass through the facilities and not on the physical location of the lines." *Id.* (quotation and citations omitted, punctuation altered). As the Supreme Court held in *Louisiana*, preemption can occur "where compliance with both federal and state law is in effect physically impossible[.]" *Louisiana*, 476 U.S. at 368. "Thus purely intrastate facilities and services used to complete even a single interstate call may become subject to FCC regulation to the extent of their interstate use." *NARUC v. FCC*, 746 F.2d at 1498.

34

The FCC has adopted what is called a "mixed-use" doctrine to address the jurisdictional treatment of services whose interstate and intrastate components cannot be ascertained and segregated. Under this doctrine, unless the interstate use of a service is *de minimis*, state regulation of a mixed-use service is preempted. *See, e.g., Promotion of Competitive Networks in Local Telecommunications Markets*, 15 F.C.C.R. 22983, ¶ 107 (2000) ("[b]ecause fixed wireless antennas are used in interstate and foreign communications and their use in such communications is inseverable from their intrastate use, regulation of such antennas that is reasonably necessary to advance the purposes of the Act falls within the Commission's authority"); *Rules and Policies Regarding Calling Number Identification Service – Caller ID*, 10 F.C.C.R. 11700, ¶¶ 85-86 (1995) (California default line-blocking policy was preempted because it would preclude transmission of Caller ID numbers on interstate calls, and effect of the policy was inseverable); *MTS and WATS Market Structure*, 4 F.C.C.R. 5660, 5660-61, ¶¶ 6-9 & n.7 (1989) (FCC asserted jurisdiction over dedicated private lines carrying jurisdictionally mixed traffic because of the practical impossibility of measuring and billing separately for the portion of the line carrying intrastate traffic); *GTE Tel. Operating Cos. GTOC Transmittal No. 1147*, 13 F.C.C.R. 22466, ¶¶ 22, 25 (1998) (FCC determined that Internet access is interstate service because, even though some of the transmissions passing over an Internet access line may be intrastate in nature, the interstate component was not *de minimis)*.

The PSC's Order wrongly concluded that the FCC's mixed-use rule does not apply to Vonage. PSC Order at 14. In doing so, it held, despite FCC precedent that clearly is to the contrary, that the FCC only has used its mixed-use rule for the purpose of allocating special access jurisdiction which Vonage's service does not implicate. That the PSC is wrong is best exemplified by this passage of the FCC's decision in the *Pulver Order:*

35

> ...FWD would be considered an interstate information service in accordance with our "mixed use" doctrine. Where separating interstate traffic from intrastate traffic is impossible or impractical, the Commission has declared such traffic to be interstate in nature. Based on the record in this proceeding, it is evident that it is impossible or impractical to attempt to separate FWD into interstate and intrastate components. This "impossibility" results from the global portability feature of a FWD member's unique identification number, enabling that member to initiate and receive on-line communications from anywhere in the world where it can access the Internet via a broadband connection. Moreover, FWD's technology does not enable Pulver to determine the actual physical location of an underlying IP address.

*Pulver Order* at 3321-22, ¶ 22. Thus, the FCC has made plain that the mixed-use doctrine applies for jurisdictional purposes to Internet based telephony.

### b. Vonage Cannot Separate Its Service Into Distinct Intrastate and Interstate Components.

Despite the PSC's assertions to the contrary, it is not technically possible to separate Vonage's service into distinct intrastate and interstate components. *See* PSC Order at 14. As the Minnesota federal court found, "the backbone of Vonage's service is the Internet." *Vonage Holdings*, 290 F.Supp.2d at 997. In the FCC's words: "As a truly global network providing instantaneous connectivity to individuals and services, *the Internet has transcended historical jurisdictional boundaries....*" *IP Rulemaking*, ¶ 1 (emphasis supplied). As a consequence, the FCC has concluded that "[t]he rise of IP ... challenges the key assumptions on which communications networks, and regulation of those networks, are predicated: Packets routed across a global network with multiple access points *defy jurisdictional boundaries.*" *IP Rulemaking Notice* ¶ 4 (emphasis supplied).

The circumstances that led the FCC to find Pulver.com's FWD service jurisdictionally interstate are present with Vonage's service as well. As in the *Pulver Order*, the portable nature of the equipment used to access Vonage's service makes it possible for a customer to use a New

36

577105v1

York telephone number to place and receive calls over a broadband Internet connection anywhere in the world without regard to her physical location. Like Pulver.com's service, Vonage's service is performed on the Internet which functions in a "virtual" world in which physical location is irrelevant and not possible to determine. And like Pulver.com's service, the telephone numbers used by Vonage's customers are associated with their computer IP addresses and not with an actual geographic location. These facts make it impossible for Vonage to determine where its customers are physically located when they use its service and therefore impossible to determine which communications might be interstate, intrastate, or international under traditional telephone regulation. Rego Decl. at 16, ¶ 34.

Moreover, Vonage's offering of an "Unlimited Local Plan," does not, as the PSC found, demonstrate that "it is not impossible to separate intrastate and interstate calls." PSC Order at 14. As the undisputed facts known to the PSC show, the notion of a "local" call by a Vonage customer is merely a contractual fiction used by Vonage for billing purposes and has nothing to do with where its customers are geographically located during a communication. Vonage has no idea of, nor need to know for billing purposes, the physical locations of its customers when they use the service – only their IP addresses are transmitted to Vonage. Instead, Vonage classifies a "call" as local or long-distance (for billing purposes) based on the area codes associated with its customers' computers, not the geographic endpoints of a communication. Thus, a Vonage customer with a "212" area code assigned to her computer can be physically located in Seattle or Singapore, but place "local" (for billing purposes) calls to other "212" numbers.

Importantly, Vonage cannot police this "interstate" versus "intrastate" use of its service, meaning that if Vonage were forced to tariff rates for "intra-state" communications, it could not ensure compliance because it cannot determine where its Internet calls are terminated or

originated, and thus cannot determine whether its calls are intra-state, inter-state, or international. Its New York customer base is illustrative. Vonage has 32,649 customers who have provided it with a New York billing address and/or have requested New York telephone numbers. Rego Decl. at 11, ¶ 20. One quarter of these customers either have chosen New York numbers but have non-New York billing addresses (which suggests they may be calling from outside the state of New York to persons located in New York) or have New York billing addresses but have chosen non-New York numbers (which suggests they may be placing their communications from locations within New York but calling persons located outside New York). Thus, if billing addresses are used as a proxy for a customer's physical location when accessing Vonage's service, approximately 25% of these "New York" communications are interstate in nature. Since the portability and virtual telephone number features of Vonage's service are among the most attractive, it reasonably can be assumed that customers with New York numbers and billing addresses use the service for interstate communications as well, although no proxy to determine the amount of such use can be identified.

Thus, Vonage cannot assure compliance with regulations designed to govern geographically intrastate communications. The PSC's statement that Vonage should be "subject to, at most, the same limited regulatory regime to which [relatively small], comparable circuit switched competitive carriers are currently subject in New York," PSC Order at 17, does nothing to cure the unlawfulness of its order. Vonage is not "comparable to any circuit switched competitive carrier" and no sound reason exists to apply to Vonage the telephone regulations that apply to those carriers. Rather, as the FCC observed in the *Pulver Order*, requiring an Internet-based service provider to locate its customer "for the purpose of adhering to a regulatory analysis that served another network would be forcing changes on th[e] service for the sake of regulation

38

itself, rather than for any particular policy purpose." *Pulver Order* ¶ 21. Any and all state telephone regulation of Vonage necessarily affects Vonage's inseverable interstate service. Under the FCC's mixed-use rule, Vonage's service is jurisdictionally interstate and not subject to PSC state telephone regulation. The inseverability doctrine mandates preemption here.

**B.    The PSC Order Violates the Commerce Clause.**

The Commerce Clause of the U.S. Constitution, Art. I, § 8, cl. 3, empowers Congress to regulate commerce among the states. It also confines the states' power to burden interstate commerce. *Oregon Waste Sys. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994). The "dormant" Commerce Clause operates in this latter capacity by denying "the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Id. See also C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1994). Thus, even if State regulation of Vonage's service were not preempted by the Communications Act, it would still be unconstitutional.

Under the Commerce Clause, State regulation is *per se* invalid when it has an "extraterritorial reach," that is, when the regulation has the practical effect of controlling conduct beyond the boundaries of the State. *See Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). The Dormant Commerce Clause also requires the striking of a State action if the burden it imposes upon interstate commerce is "clearly excessive in relation to the putative local benefits." *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

The PSC Order most certainly has the practical effect of controlling conduct beyond the boundaries of New York state. For instance the PSC Order requires Vonage to file a tariff for servicing "intrastate" communications. But since Vonage cannot discern whether a customer communication is intrastate or not, Vonage inevitably would have to apply New York tariffed

39

rates, terms and conditions to many physically (and legally) interstate communications and to customers who may not even reside in New York.

The PSC Order suggests that Vonage may apply for waivers of other regulatory requirements. However, the possibility of being granted waivers does not eliminate the PSC's Commerce Clause violation. As the U.S. Court of Appeals for the District of Columbia Circuit has explained, that the existence of a "safety valve" that permits a variance or waiver from a generally applicable regulatory scheme does not excuse an otherwise overbroad exercise of regulatory power. *See Association of Oil Pipe Lines v. F.E.R.C.*, 281 F.3d 239, 244 (D.C. Cir. 2002); *Time Warner v. FCC*, 56 F.3d 151 (D.C. Cir. 1995); *AllTel Corp. v. FCC*, 838 F.2d 551, 561 (D.C. Cir. 1988) (an agency "cannot save an irrational rule by tacking on a waiver procedure").

Moreover, enforcement of the PSC Order should be enjoined because the Order is "clearly excessive in relation to the putative local benefits." *See Pike*, 397 U.S. at 142. Because the PSC chose to ignore the impact its Order would have on interstate commerce, its Order describes no putative local benefits that will allegedly inure by its regulation of Vonage. To be sure, the PSC Order speaks generally of the state's interest in maintaining capable, robust and efficient telecommunications networks, with uninterrupted capabilities. However, Vonage neither owns nor operates a telecommunications network – its customer's Internet transmissions are carried over the series of interconnected computer networks that form the global Internet and over which Vonage has no physical control. To the extent that a Vonage customer's communication transits the PSTN, it does so over the facilities owned and operated by telephone companies that already are subject to regulation. State regulation of Vonage therefore adds no

40

identifiable putative local benefit, let alone a benefit that justifies the PSC's interference with interstate commerce.

The PSC Order also suggests that its regulation of Vonage is justified to ensure that Vonage is not given an unfair regulatory advantage that would threaten the "financial sustainability" of telecommunications network providers. PSC Order at 16. Yet the PSC identified no "unfair regulatory advantage" enjoyed by Vonage and no financial impairment that telecommunications providers have "suffered" because of Vonage's service. As the PSC Order points out, Vonage is a relatively small company whose Internet service is premised on emerging technology. Vonage's service is precisely the type of service that national policy proclaims should remained unfettered by State regulation. The PSC's regulation of Vonage, and its extraterritorial intrusion into interstate commerce, simply cannot be justified by its generic desire to ensure that providers of traditional telephone services remain "financially sustainable." Regulating Vonage most certainly is not essential to achievement of that goal. Accordingly, enforcement of the PSC Order should be enjoined as a constitutional violation of the Commerce Clause.

## II.
## VONAGE WILL SUFFER IRREPARABLE HARM IF THE ORDER IS ENFORCED

Enforcement of the PSC Order is certain to cause Vonage irreparable harm – both tangible and injurious to the company's reputation. First, the order imposes regulation on Vonage in violation of the Supremacy and Commerce clauses of the United States Constitution. Constitutional violations are often considered irreparable harm *per se*. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Brewer v. West Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744-45 (2d Cir. 2000); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2948 at 440 ("When an

41

alleged deprivation of a constitutional right is involved, most courts hold that no further showing

of irreparable injury is necessary.") (1973); *C & A Carbone, Inc. v. Town of Clarkstown*, 770

F.Supp. 848, 854 (S.D.N.Y. 1991) (local regulation that violates Commerce Clause

"unquestionably constitutes irreparable injury"); *Allen v. Minnesota*, 867 F.Supp. 853, 859

(D.Minn. 1994) (violation of Commerce and Contracts Clause constitutes irreparable harm);

*Citicorp Servs., Inc. v. Gillespie*, 712 F.Supp. 749, 753-54 (N.D.Cal. 1989) (Commerce Clause

violation "give[s] rise to a presumption of irreparable harm"); *Government Suppliers*

*Consolidating Servs., Inc. v. Bayh*, 734 F.Supp. 853 (S.D.Ind. 1990) (regulation which violates

Commerce Clause causes irreparable injury regardless of showing of economic harm). Thus, the

Supremacy and Commerce Clause violations detailed above unquestionably cause Vonage

irreparable injury mandating an injunction.

   Second, for the reasons that have been explained, it is impossible for Vonage's

information service to comply with state common carrier regulations that require

telecommunications providers to segregate, identify, tariff, report, and bill intrastate

communications.[18] Since Vonage can't identify which communications are intrastate, it can't

ascribe revenues, expenses and billing to intrastate services. Indeed, it is not possible for Vonage

to comply with *any* regulation that is premised in any way on knowing its customers' locations

when they use its service. Thus, the PSC's imposition of regulation over Vonage automatically

---

[18] *See, e.g.*, New York Public Service Law § 95 (filing of Annual Reports and Statement of Gross
Intrastate Operating Revenues); §641 (Telecommunications Competition Monitoring Report, which
includes information on such items as intrastate revenues, operating expenses and billing data); § 641
(Capital Program Report, requiring information on actual and budgeted capital expenditures); PSC
Opinion No. 96-13 (requiring, among other things, monthly submissions of "Customer Trouble Report
Rate Performance," periodic Emergency Plans Reports, and monthly Out-Of-Service Over 24 Hours and
Missed Repair Appointment Performance Reports).

places Vonage into a position where it will unavoidably and continually be in violation. The

attendant penalties are severe: up to $100,000 per day (New York Public Service Law, Chapter

48, Art. 1, § 25). The effect of such penalties would be to put Vonage out of business in New

York and possibly entirely, in short order. The existence of continuing but unavoidable

regulatory violations will cause grave harm to Vonage's business reputation – resulting in loss of

investors, financing and customers as Vonage's costs, and therefore service rates, skyrocket, and

as doubt increases in that community about Vonage's continued ability to provide service to New

York customers and, very possibly, to customers across the nation. These are immeasurable

injuries that cannot be remediated by monetary payments. Rather, as the Minnesota federal court

found, these consequences of state efforts to impose telephone regulation over Vonage's

Internet-based service are irreparable injuries on the basis of which an injunction should be

granted. *Vonage Holdings Corp.*, 290 F. Supp.2d at 1003; *see also JSG Trading Corp. v. Tray-*

*Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990).

   Even were it to *attempt* to withdraw from the New York market, there is no viable way

for Vonage to avoid these injuries if the PSC is allowed to enforce its order since customers from

other states travel to New York and use their equipment to call other persons located in New

York. Under such circumstances, Vonage will, according to the PSC's Order, be guilty of

providing telephone service in a manner that violates New York regulations. There is no

technology currently available by which Vonage can determine its customer's physical location

at all times in a manner sufficient to comply with the PSC's obligations. In effect, short of

ceasing business worldwide, the PSC's Order deprives Vonage of the right to provide its unique

service without subjecting itself to PSC penalties. Accordingly the New York State PSC's order

will damage Vonage's goodwill and ultimately can eliminate it from the market altogether. This

43

plainly is irreparable harm. *See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) (irreparable harm arises where loss of ability to market unique product damages company's prospective goodwill); *Register.Com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (same).

## CONCLUSION

For the foregoing reasons, Vonage respectfully requests that the Court enter a preliminary and a permanent injunction against enforcement of the PSC's Order seeking to impose state telephone regulation on Vonage.

SWIDLER BERLIN SHEREFF FRIEDMAN, LLP

By:_____

Ky E. Kirby
William B. Wilhelm
Michael C. Sloan
Yun G. Lee (YL 5067)
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 973-0111
*Attorneys for Vonage Holdings Corporation*

Dated: June 7, 2004
        New York, New York

577105v1