UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

VONAGE HOLDINGS CORPORATION, :

                             Plaintiff, :

            -against- :

THE NEW YORK STATE PUBLIC SERVICE :
COMMISSION, and WILLIAM M. FLYNN, :
LEONARD A. WEISS, THOMAS J. DUNLEAVY, :
and NEAL N. GALVIN in their official capacities :
as the Commissioners of the New York State :
Public Service Commission and not as individuals, :

                        Defendants. :

-----------------------------------------------------------------X

04 Civ. No. _____

**DECLARATION OF
YUN G. LEE**

YUN G. LEE, under penalty of perjury, hereby declares:

1.     I am a member of the Bar of this Court and an associate with the law firm of Swidler Berlin Shereff Friedman, LLP, attorneys for Plaintiff Vonage Holdings Corp. ("Vonage"). I respectfully submit this declaration in support of Plaintiff's Motion for Preliminary and Permanent Injunctive Relief.

2.     Attached hereto as Exhibit 1 is the Declaration of John Rego, Vonage's Chief Financial Officer. Five exhibits (identified as Exhibits A-E) are attached to Mr. Rego's Declaration.

3.     Also attached hereto as Exhibit 2 is a Westlaw printout of the decision of the United States District Court for the District of Minnesota in *Vonage Holdings Corp. v. The Minnesota Public Utilities Commission,* 290 F.Supp.2d 993, 999 (D. Minn. 2003), *appeal docketed*, Docket No. 04-1434 (8th Cir. Feb. 20, 2004).

I declare under penalty of perjury that the foregoing is true and correct.

Executed:  June 7, 2004.
           New York, New York

_____
                    Yun G. Lee (YL-5067)

Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

VONAGE HOLDINGS CORPORATION,       :

                                     :       04 Civ. No. _____

                   Plaintiff,     :

                                       :

           -against-          :

                                       :

THE NEW YORK STATE PUBLIC SERVICE   :

COMMISSION, and WILLIAM M. FLYNN,    :       **DECLARATION OF**

LEONARD A. WEISS, THOMAS J. DUNLEAVY, :      **JOHN REGO**

and NEAL N. GALVIN in their official capacities  :

as the Commissioners of the New York State    :

Public Service Commission and not as individuals,  :

                                       :

                  Defendants.   :

-------------------------------------------------------------X

     1.  My name is John Rego. I am over the age of 18 and competent to provide the testimony herein.

     2.  I have been employed by Vonage Holdings Corp. ("Vonage") as Chief Financial Officer since July 2002. I have extensive operational and management experience in both telecommunications and Internet-related industries. Prior to joining Vonage, I was Vice President of Finance for business operations at RCN Corporation from 2001 to 2002. RCN is a provider of local telephone and Internet services that competes head-to-head with incumbent telephone and cable companies such as Verizon and Time Warner. Prior to RCN, I spent 3 years at Winstar Communications in a variety of corporate and operational finance positions, including as Vice President of Finance for the General Business, Internet, Web Hosting and Professional Services divisions. Winstar is also a competitive telecommunications services provider, focusing on business customers. Prior to joining the communications industry, I spent over 14 years in

practice as a certified public accountant with international CPA firms. I hold a bachelor degree in accounting from Rutgers University. I have personal knowledge of the facts set forth herein.

### A.    Vonage's Service

3.  Vonage provides a service called DigitalVoice™ that enables its customers to have oral communications over the Internet that seem like ordinary telephone "calls".[1] Unlike traditional telephone service users, Vonage customers do not use telephones connected to the Public Switched Telephone Network ("PSTN") operated by local telephone companies, such as Verizon, the incumbent local exchange carrier ("LEC") in most of New York. Vonage customers can only access Vonage's service over the high-speed ("broadband") Internet connections provided by third-party cable modem, DSL, satellite, and other Internet Service Providers ("ISPs"). Vonage does not provide Internet access service. Voice communications to and from Vonage customers are routed over the Internet in the form of digital packets in Internet Protocol ("IP") standard used on the Internet.

4.  Vonage describes itself as the "Broadband Phone Company" but it does not actually provide phone service. Rather, the core service provided by Vonage is a translation or protocol conversion service that allows communications between users of the incompatible and unconnected networks of the Internet and the Public Switched Telephone Network ("PSTN"). Since consumers are accustomed to having oral communications by telephone, Vonage's service is designed to simulate phone service in order to enhance customer comfort. For instance, special equipment or software that a customer must own to access Vonage's service simulates dial tones

---

[1] As the author of the most popular telecom dictionary explains, "[e]veryone has a different definition for 'call.'" Harry Newton, *Newton's Telecom Dictionary* (15th Ed 1999) at 127 (definition of "call"). I use the term here to describe voice communication made possible by electronic equipment.

and dialing sounds which are otherwise absent when communications are conducted over the

Internet. Further, as I explain more fully below, Vonage customers are associated what appear to

be traditional ten-digit telephone numbers even though those numbers actually translate into the

IP address of the customer's portable computer equipment rather than the geographic location of

a home or business telephone connected to the PSTN.

5.  Voice Over Internet Protocol or "VoIP" is the generic term that describes the routing

of voice "signals" over the Internet. VoIP does not describe any particular kind of service or

technology. There are other providers of VoIP telephony whose service is configured and

provisioned very differently from Vonage's.

6.  Vonage customers must purchase special computer software and/or equipment that

permits them to place and receive communications over these broadband connections. This

equipment cannot be used to make phone calls from a telephone connected to the PSTN. The

necessary equipment includes a device called an Analog Telephone Adapter ("ATA"). The ATA

is a computer that converts analog voice signals into IP. Customers may procure ATAs from

third party vendors or, as an inducement to subscribe to its service, Vonage will provide one

ATA device to a customer for free. Currently, there are two types of ATA devices that are most

frequently used by customers to access Vonage service – the Cisco ATA-186 (made by Cisco) or

the Motorola VT1000v (made by Motorola). Customers can purchase these devices from other

vendors – in fact, I have seen many Cisco ATAs offered for sale on eBay. If Vonage provides the

ATA to its customer, Vonage does not retain ownership of the device. Rather, the customer takes

ownership and assumes responsibility for proper maintenance and operation of the device and, in

the event that the device breaks down (after a limited 30 day warranty supplied with the device),

the customer must procure repair or replacement at his or her own cost.

7. Instead of using an ATA device, a customer may purchase and download on to his or her computer certain software known as a "softphone." This software allows any personal computer to access the Vonage service, using the audio input and output jacks built in to the computer. Customers may purchase the Xten X-Pro softphone (made by Xten) or the softphone made by SJ Labs, either directly from Vonage or from third party vendors. Softphone software can be downloaded to any computer device, including a Personal Digital Assistant ("PDA") like a Pocket PC. As with the ATA, the softphone is the property of the customer, who has responsibility for its proper operation and for repair or replacement in the event of malfunction.

8. To access Vonage's service, a customer's computing equipment can be configured in many different ways. Two possible configurations are illustrated below:



9. In the first configuration, the customer has purchased and installed a router, which is plugged directly into the Internet access modem provided by the ISP. The customer's ATA converts the customer's outgoing analog voice signals into Internet Protocol ("IP") packets and converts incoming IP packets into analog voice signals, thus facilitating a two way oral communication using the Internet. Although a Vonage customer can attach a conventional telephone handset to the ATA and speak in to the handset, a customer can just as easily use the speakers and microphones installed in her home computer (demonstrated by the second configuration illustrated above, "Customer with Soft Phone"). In either case, these devices alone cannot be used to access Vonage's Internet-based service – the customer must have a high-speed connection to the Internet as well.

10. As the diagram indicates, the customer's ATA or softphone converts the electronic voice signals generated by the telephone handset or computer microphone into IP data "packets" (indicated as "1s" and "0s" in the diagram). Thus, all customer communications leave and enter the customer's premises in IP format and are transmitted over the third-party ISP's broadband Internet connection, and on the public Internet to or from one of Vonage's Internet servers where Vonage's service is performed. The Internet data packets that comprise communications from and to Vonage customers are indistinguishable from other Internet traffic, such as those carrying e-mail, chat, instant messaging, or other communications to and from servers on the World Wide Web.

11. Vonage customers can communicate directly with other Vonage customers on the Internet (just like e-mail or instant messaging), and with customers of some other VoIP services offered over the Internet. Such communications are known in the industry as "computer-to-computer calls" and never leave the Internet. Vonage customers' computer-to-computer calls are similar, albeit with some functional differences, to the Free World Dial-up service that a company called Pulver.com offers, as that service was described in the FCC's recent *Pulver.com* order.[2] Approximately 3 percent of all Vonage calls are computer-to-computer, and we expect this figure to rise as more and more consumers abandon traditional telephone service.

12. Vonage also offers a service that allows its customers to communicate with plain old telephone service ("POTS") users on the PSTN.[3] These "computer-to-phone" communications

---

[2] *Petition for Declaratory Ruling that Pulver.Com's Free World Dialup is Neither Telecommunications nor a Telecommunications Service*, 19 F.C.C.R. 3307 (2004).

[3] "Plain Old Telephone Service" typically refers to customers using traditional wired voice telephone service. Actually, our service allows our customers to communicate with any telephone device that has a telephone number, including wireless phones, fax machines, and other equipment. For purposes of the conversions I will describe, however, it does not matter

are serviced in one of two ways. If the communication is initiated by a Vonage customer over his or her Internet connection and directed to a PSTN user, then the IP data packets associated with the customer's conversation are sent, via the customer's broadband Internet connection, over the Internet to one of Vonage's Internet servers. Vonage currently operates three such servers around the country, including one in New York City. These servers are functionally similar to any other server computer on the Internet.

13. Data packets received by Vonage's Internet server are then routed to a special Vonage computer that transforms the IP data packets sent by the customer into the format (also known as "protocol") of the PSTN (known as "TDM" – the acronym for "time division multiplex" – which is a technique for transmitting a number of separate signals simultaneously over one, shared communications line). Vonage's special computer then "hands" the communication to a regulated telephone company (either a long-distance carrier or a local exchange carrier, depending on where Vonage's server is located and the communication is being directed) via dedicated lines that the carrier provides to Vonage.[4] This carrier retrieves the communication, transmits it in TDM format over the PSTN, and then "terminates" the call to the PSTN end-user, thus establishing the connection between Vonage's Internet customer on the Internet and the POTS end-user's telephone on the PSTN.

---

what service is at the non-Vonage end of the call, as long as it is accessible through the Public Switched Telephone Network.

[4] Vonage "hands off" communications to competitive local exchange carriers ("CLECs") in communities where Vonage is a customer of such companies. When calls are directed to end-users in communities where Vonage has no such customer relationships, communications are "handed-off" to long-distance carriers (technically known as "interexchange carriers," or IXCs).

14. If the communication is initiated by a non-Vonage customer on the PSTN to a Vonage customer on the Internet, the service works somewhat differently because PSTN users can not dial Internet IP addresses which are necessary to determine the "destination" of Internet communications. Vonage's service allows the PSTN user to dial what appears to be an ordinary 10-digit telephone number in order to place a "call" to a Vonage customer. Vonage obtains these ten-digit telephone numbers from regulated telephone companies in its capacity as a customer of those telephone companies, just like any large corporation or end-user. These numbers are then associated by Vonage to the IP addresses of its customers' computers on the Internet. IP addresses are not geographically assigned, but are allocated to the operators of computer networks (such as Internet service providers). An ISP can assign any of its IP address numbers to any of its users, regardless of location, and many ISPs assign these numbers "dynamically" so that the same customer can be assigned a different address each time they log on to their account. Also, a customer with a laptop or other portable computer can attach it to a different broadband connection at any time, thereby obtaining a new IP address for the duration of that connection. Thus, each time an ATA or softphone is activated, it signals Vonage's server and provides the IP address at which it is located *for the time being*. Vonage then stores this information in a database so that, when an inbound call is received on the telephone number associated with that equipment, signals can be transmitted over the Internet to the correct IP address.

15. As a consequence, the telephone number that Vonage associates with the IP address of a customer's computer is not associated with a physical address or geographic location. The telephone numbers of Vonage customers are "virtual numbers" only. This feature allows Vonage customers to obtain telephone numbers with "area codes" of their choosing. By contrast,

ordinary telephone service involves assignment of telephone numbers that are associated with physical addresses.

16. When an end-user on the PSTN places a call to a phone number assigned to a Vonage customer, the communication is transmitted over the facilities of the PSTN user's local carrier to a Competitive Local Exchange Carrier or CLEC (a regulated telephone company) that provides telecommunications services to Vonage. From the CLEC's perspective, the phone number dialed by the end user is one assigned to Vonage and, as a result, the CLEC transmits the PSTN user's communication to Vonage where it is delivered to a Vonage media gateway server. There, Vonage's media gateway server converts the content of the communication from the TDM format it receives into IP format for transmission on the Internet, and identifies the IP address associated with the computer of the Vonage customer to whom the communication is directed. To do this, Vonage populates and operates databases that allow for the instantaneous translation of the 10-digit "telephone number" into the IP address associated with the customer's computer. The Internet data stream is then routed by Vonage's server to the customer's IP address, via domain name system ("DNS") look-up functionality, in order for the communication to be sent over the Internet to the proper Vonage customer's computer and ATA or softphone.

17. Because Vonage's "virtual numbers" are associated with IP addresses and not geographic locations, Vonage customers can have numbers associated with communities other than their own. For example, a resident of New York City who would be assigned a PSTN telephone number beginning with the "212" area code can, under Vonage's service, be assigned a telephone number beginning with the "202" prefix associated with Washington, D.C. or the "213" area code associated with Los Angeles. Likewise, residents of these other communities can request a "212" or "646" number associated with Manhattan. Moreover, Vonage customers

can use these virtual numbers to engage in communications from any location that a broadband Internet connection is available. Thus, while a Vonage customer's computer may have a "212" area code, she can take her portable computer and ATA with her to Tampa, Florida and, over a broadband Internet connection there, can make and receive telephone calls from and to her "212" telephone number.

18. Vonage offers its service on an unlimited use basis or in packages which describe use as "local," "regional" or "long distance" calls.[5] However, since the telephone numbers with which Vonage customers' computers are associated have nothing to do with geographic location, whether a communication is billed as "local," "regional" or "long distance" is not dependent on the geographic location of the Vonage customer and the party with whom she is communicating. Instead, under Vonage's service contracts, for customers who choose service packages that distinguish between "local and regional" or "long distance" calls, the characterization for billing purposes depends solely on the telephone number assigned to the Vonage customer's computer and the telephone number of the other party to the communication. Thus, if a Vonage customer with a "212" area code communicates with a PSTN user in Manhattan, that communication will be billed by Vonage as a "local" call, even if the customer is in Los Angeles when she initiates the communication. Conversely, if a customer with a Washington, D.C. area code uses a high speed Internet connection in Manhattan to communicate with a PSTN user in Manhattan, that communication will be billed by Vonage as a "long distance" call.

19. Because Vonage customers access the service over the Internet, Vonage cannot determine its customers' actual physical location when they use its service. Thus, Vonage cannot

---

[5] Under Vonage's service contracts, "local" and "regional" calls fall into the same billing category. We use both terms in our marketing materials due to customer familiarity with them.

determine the jurisdictional nature of its customers' traffic – *e.g.,* whether calls are jurisdictionally "intra-state" (defined as calls between end-users in the same state), "inter-state" (defined as calls between end-users in different states), or "international."

20. Vonage's virtual numbering capability has proved enormously popular. Of its 32,649 "New York customers" (as of May 27, 2004), only 24,864 (or 76 percent) had *both* New York telephone numbers *and* billing addresses. Of the remaining 24 percent of customers, 4,889 have chosen New York numbers but have non-New York billing addresses, and another 2,896 have New York billing addresses but have chosen non-New York numbers.

21.     Vonage customers provide billing addresses for credit card validation purposes only. Vonage communicates with its customers via e-mail and sends no paper bill. Billing address are, therefore, only a proxy for its customers' physical residences but not their actual physical locations. Since the computers used to access Vonage's Internet service can be smaller than a lap top computer, and are therefore portable, Vonage customers can access the service from anywhere in the world with access to a high speed Internet connection. *See, e.g.,* John C. Dvorak, "Free Phone Calls," *PC Magazine*, July 2003 (describing how one Vonage customer used the service with a California telephone number while staying at a hotel in New York City) (attached hereto as Exh. A).

**B.    The New York Public Service Commission Order**

22. The New York PSC ruled in its order ("PSC Order"),[6] that Vonage "is a 'telephone corporation' as defined" by New York law and further found that state regulation of Vonage is not preempted by federal law. PSC Order at 2.

23. The PSC Order states that

> Vonage owns and manages equipment (a media gateway server) that is used to connect Vonage's customers to the customers of other telephone corporations via their public networks, as necessary. This equipment constitutes a "telephone line" under the PSL and is used to facilitate the provisioning by Vonage of telephonic communication to customers. Accordingly, Vonage is a "telephone corporation" under our jurisdiction.

PSC Order at 10. The PSC's Order further states that Vonage's gateway servers are just "special router[s] that connect[] an IP network to a traditional telephone network." *Id.* at n.11. This is incorrect. Vonage's servers are just like other Internet servers, but they also provide certain data processing functions that are unique to Vonage's service. The servers first establish an Internet connection with the Vonage customer and then authenticate the customer's right to access the service. This process involves querying various Vonage databases, and potentially re-routing the transmission to the appropriate server for servicing the communication.

24. Further, as its name indicates, the Vonage server is the access point to Vonage's service – the protocol conversion process. The server routes the IP packets generated by Vonage's customers to a protocol processor which then converts the IP data stream into the

---

[6] *Order Establishing Balanced Regulatory Framework for Vonage Holdings Corporation*, Complaint of Frontier Telephone of Rochester, Inc. Against Vonage Holdings Corporation Concerning Provision of Local Exchange and InterExchange Telephone Service in New York State in Violation of the Public Service Law, Case No. 03-C-1285 (N.Y. PSC May 21, 2004) (Attached as Exhibit B).

TDM format used on the PSTN. This net protocol conversion is not a service supplied by ordinary telephone companies on "telephone lines." After its conversion service is performed, Vonage "hands off" the communication to its telecommunications vendor and only then is the call carried on the PSTN and terminated by the telecommunications vendor who is subject to telephone regulation. Notably – and again contrary to the PSC's Order – *Vonage* is not connected to the PSTN. Vonage is the customer of telecommunications companies that are connected to the PSTN, but Vonage, itself, is not so connected. The PSC also mischaracterizes the nature of Vonage's relationship with its telecommunications providers, contending that Vonage is a "reseller" of "capabilities it acquires from the other, third party, telephone corporations." Vonage does not resell telecommunications services – it merely uses them as a customer in its own right as a means of effectuating its service, just as do thousands of other internet information service providers. As the PSC has used the term "reseller" here, any firm that uses the telecommunications services of another company to provide a value-added information service would be a reseller. For example, dial-up ISPs, such as AOL, use local carriers to terminate their Internet traffic, yet AOL is not considered a reseller of telecommunications service by the FCC or state regulators.

25. In claiming that Vonage's service is a telecommunications service rather than an information service under federal law, the PSC Order states that: "A Vonage customer's voice is transmitted between or among points specified by the customer, without any change in the form or content of the conversation." PSC Order at 12. The PSC is wrong. First, Vonage's service *does* make a "change in the form or content of the information as sent and received." Vonage customers send their communications to Vonage over the Internet in the form of IP packets and Vonage converts the IP packets into the TDM format used on the PSTN (and vice versa).

-13-

26. Second, Vonage's service does *not* transmit information "between or among *points* specified by the user." *See* 47 U.S.C. § 153(43). Rather, Vonage only routes traffic to IP addresses on the Internet, not from and to specific points. *See* The American Heritage College Dictionary (3rd Ed. 1997) at 1055 (defining "point" as "[a] place or locality considered with regard to its position ... a narrowly particularized and localized position or place; a spot"). As noted previously, Vonage cannot determine whether its customers are located in Timbuktu or Tennessee, much less transmit information to "a narrowly particularized and localized position." In the case of a computer-to-computer call, *neither* user can specify the "point" at which the other is located.

27. The PSC Order also states that Vonage "does not offer its customers a capability to manipulate or interact with stored data." PSC Order at 12. This, too, is wrong. Vonage must query databases, and thus "interact with stored data" in order to correlate the IP addresses associated with each Vonage customer's 10-digit "telephone number."

28. The PSC wrongly contends that Vonage's service involves no net protocol conversion because: "[Vonage's] adapter and/or software convert [*sic*] its customers' speech into the Internet protocol (IP) data format. Vonage's network subsequently converts IP packets back to TDM in order to facilitate calls between its customers and other carriers' telephone subscribers." PSC Order at 12-13. First, while the adapter or softphone does convert speech into IP data format and vice versa, this equipment belongs exclusively to the customer and the conversion is performed by the customer – not by Vonage. Second, there is no "Vonage network." Rather, Vonage customers need the high-speed Internet connections provided by third-party, broadband ISPs who own and operate the network Vonage customers use to access Vonage's service on the Internet. To the extent that Vonage customers communicate with PSTN users, the PSTN is an

altogether separate network that is owned and operated by regulated telephone companies and to which Vonage is not connected.

29. Third, and finally, communications "leave" the Vonage customer's premises in IP format and are received by PSTN users in TDM format. This transformation of the format of the communication during its transmission constitutes a net protocol conversion.

30. The PSC also erroneously suggests (without explanation) that Vonage's service is "phone-to-phone IP telephony." *See* PSC Order at 13. My understanding is that the FCC first defined "phone-to-phone" IP telephony in its 1998 Universal Service Report to Congress, where it described phone-to-phone IP telephony as calls that are both originated over a "*handset connected to the public switched network*" and that are likewise terminated "to … [an] ordinary telephone at the receiving end." *Universal Service Report* ¶ 84 (emphasis supplied).

31. Thus, phone-to-phone IP telephony is a traditional common carrier service performed by traditional common carriers using their underlying transport facilities to offer transmission with no net change in form or content. Because phone-to-phone IP telephony uses PSTN connections on both ends, every call enters the network in the same format (TDM) as it exits; the carrier temporarily converts the format of the communication, but returns it to the original format before delivery. Thus, phone-to-phone IP telephony does not produce a *net* protocol conversion characteristic of an information service.

32. Vonage's service is very different because, although Vonage customers may use ordinary telephone handsets, those devices are connected to a computer connected to the Internet, not to the PSTN. When the communication traverses the demarcation point between the customer's premises and the ISP's network, it is in the IP format used on the Internet. After the data packets reach one of Vonage's servers on the Internet, they are converted into TDM and

delivered to Vonage's telecommunications vendor for transmission and termination on the PSTN.

33. Thus, Vonage's service originates on the Internet and (in this example) terminates on the PSTN. It requires the use of special customer premises equipment with enhanced functionality (*e.g.,* a computer so that the customer can access the Internet) and provides a net protocol conversion. These characteristics make it very different from the kind of services that the FCC has defined as phone-to-phone IP telephony.

34. Further, it is not technically possible to separate Vonage's service into distinct intrastate and interstate components. *See* PSC Order at 14. As explained at length above, Vonage's protocol translation service occurs on the Internet. Further, the portable nature of the equipment used to access Vonage's service (which makes it possible for a customer to use a New York telephone number to place and receive calls in Atlanta), the very nature of the Internet itself (which functions in a "virtual" world in which physical location is irrelevant and not possible to determine), and Vonage's unique service (which assigns 10-digit "telephone numbers" without regard to an end-user's actual geographic location), makes it impossible for Vonage to determine which communications are inter-state, intra-state, or international.

35. The PSC is likewise wrong that Vonage's offering of an "Unlimited Local Plan," demonstrates that "it is not impossible to separate intrastate and interstate calls." PSC Order at 14. As explained above, "local" calling is merely a contractual fiction used by Vonage for billing purposes and has nothing to do with where parties are geographically located during a communication. Vonage charges are based on the area codes associated with its customers's computers and have nothing to do with a customer's physical location. Thus, a customer with a "212" area code assigned to her computer can use her computer from Seattle to communicate

over a broadband Internet connection with a PSTN user who also has a "212" area code. From,

Vonage's billing standpoint, this would be a "local call." Vonage has no idea of, nor need to

know for billing purposes, the physical locations of its customers when they use broadband

Internet connections – only their IP addresses are transmitted. Importantly, if Vonage were

forced to tariff rates for intra-state calls, it could not ensure compliance with the tariff because

what Vonage refers to as a "local call" for purposes of ubiquitous Internet usage is not at all what

state telephone regulation means when it refers to a "local call." Vonage can not determine if any

particular communication from or to one of its customers occurs between geographic locations

that would be local or regional or long-distance under telephone company regulation.

36. Finally, Vonage disputes the PSC's apparent conclusion that regulation is warranted

because its "status" gives it a competitive advantage over regulated telephone companies and

endangers the "financial[] sustainability" of the PSTN. *See* PSC Order at 16. First, Vonage is a

customer of telecommunications carriers. Those carriers are subject to regulation and are

required to pay all applicable fees when they use the PSTN to deliver communications to

Vonage's servers and when they retrieve Internet communications from Vonage for delivery to

PSTN users. I understand that under applicable law, those carriers should pay into the universal

service fund based on their customers', including Vonage's, usage of service. Similarly, I

understand that under applicable law, carriers handling Vonage customer communications

should pay long-distance access charges and reciprocal compensation to terminate those

communications on the PSTN. I have no reason to believe that the carriers from which Vonage

purchases service are not actually paying these fees and charges. Thus, the notion that Vonage's

service threatens the financial "integrity" of the PSTN seems to be premised on the notion that

PSTN carriers should be allowed to enhance their financial stability by "double dipping" – once from Vonage's telecommunication vendor and then again from Vonage.

### C.    The PSC Proceedings

37. The PSC proceeding which led to the Order arose from a Complaint that Frontier Telephone of Rochester, Inc. ("Frontier") filed against Vonage before the PSC on September 10, 2003. (The Frontier Complaint is attached as Exh. C.)

38. The complaint alleged that Vonage was providing intrastate "telephone" services in New York without the PSC's authorization, *i.e.*, in violation of the Public Service Law ("PSL"). Under New York's Administrative Procedure Act, because Frontier's complaint initiated an adjudicatory proceeding, Vonage was entitled to a hearing and to present evidence. New York Administrative Law § 301(1) and (4).

39. On October 9, 2003 the PSC issued a *Notice Requesting Comments* (the "Notice") (Exh. D). Pursuant to the Notice, Vonage filed a Response and Motion to Dismiss the Frontier complaint on the basis that, *inter alia*, Vonage provides interstate information service over the Internet with respect to which state regulation is preempted and over which state regulation, if imposed, would impermissibly burden interstate commerce.

40. On October 15, 2003, the PSC published a notice of proposed rulemaking in the NYS Register in which it described Frontier's complaint proceeding as "Definition of Telephone Service by Frontier Telephone of Rochester, Inc." (Exh. E.) The notice stated: "Because this complaint raises generic concerns that could affect a number of entities, a notice requesting comments on the complaint has been issued. The commission will evaluate the comments received and may make determinations concerning the applicability of the Public Service Law to various forms of service, including voice over internet protocol (VOIP)." Thereafter, I

understand that commission staff members John Coleman and Saul Abrams invited Vonage's counsel to meet with them and further advised Vonage counsel that there need be no concerns about *ex parte* contacts because the complaint proceeding had been converted to a rulemaking proceeding. As a consequence, Vonage counsel did meet with those commission staff members. No hearing on the Frontier complaint ever was scheduled.

41. After receiving comments and reply comments, the PSC issued its Order on May 21, 2004, effective that same date. In the Order, the PSC did not adopt any generic rules or make generic determinations regarding various forms of service, but rather made Vonage the sole focus of its Order and made certain purported findings of fact with respect to Vonage and its service, despite the facts that no hearing had been held and no evidence taken. The PSC concluded that by offering and providing its DigitalVoice™ service in New York, Vonage was a "telephone corporation" as defined in the PSL and therefore subject to state regulation. The PSC ordered Vonage to (a) obtain a Certificate of Public Convenience and Necessity ("CPCN"); and (b) file a tariff, both within 45 days of the Order (*i.e.*, by July 5, 2004). Within the Order, the PSC also permitted Vonage to seek waiver of specific rules and regulations.

### D.    Consequences of the PSC's Unlawful Determination

42. New York's state telephone regulation relies primarily on customer physical locations for a host of issues from tariffing to emergency calling. The imposition of such regulation on Vonage's Internet service exposes it to significant risks of uncontrollable regulatory violations and ensuing penalties because the Internet nature of its service prevents determination of its customer's physical locations. As a consequence, Vonage cannot ascertain whether its customer's communications are interstate, intrastate, local or regional in the traditional geographic sense in which state telephone regulation was crafted to apply and cannot ensure that

geographically-based tariffing is properly applied. Moreover, Vonage cannot cure this inability

to comply merely by "withdrawing" its service from the State of New York because, as

explained above, access to Vonage service is portable. Vonage customers with area codes from

states other than New York can easily bring their computers to New York, plug in to a broadband

connection and, without Vonage's knowledge, communicate with New York PSTN users. Under

Vonage's billing plans, these would look like interstate "long distance" types of

communications, but under telephone regulation these communications would, according to the

PSC's order and notwithstanding their essential use of the Internet, be cast as "local" or intrastate

communications.

43. Based on my previous experience with RCN and Winstar, I have some general

understanding of how state regulation of telephone companies works, although I am not a

regulatory expert. I understand that regulated telephone companies are required to file "tariffs,"

which are legally binding statements of the rates, terms, and conditions governing their services;

and that the PSC has the authority to require changes in any terms that it finds unlawful or

unreasonable. Regulated telephone companies file separate tariffs for their interstate services

with the FCC (except in cases where the FCC has forborne from requiring tariffs), and for their

intrastate services with state commissions. Therefore, interstate and intrastate services may be

subject to different, and possibly inconsistent, legal requirements.

44. I cannot imagine how Vonage could possibly comply with the tariff requirements,

given that we cannot separately identify interstate and intrastate components of our service. We

could, of course, file a tariff with the PSC that is identical to the contract terms of service we

offer to all our customers nationwide. Those terms, however, include a single monthly rate for

the use of the service by each customer; not separate rates for intrastate and interstate use, like

typical telephone company tariffs. It is impossible for us to break down our charges in this way

since we cannot measure or even identify separate categories of usage. Moreover, if the PSC

requires any changes in our standard terms, we would have no way of applying those changes

only to New York intrastate services, because we have no way of identifying those services. The

only way we could avoid violating New York law would be to apply the modified terms to *all*

our contracts and all our customers, including customers located outside New York who may not

ever make a New York intrastate call. (Because, if one of those out-of-state customers stays in a

hotel in Manhattan and places a call over their Vonage service to Albany, they theoretically

could complain to the New York PSC if we failed to comply with some rule governing intrastate

calls.) This would effectively allow the New York PSC to dictate the terms under which we offer

interstate services, and even intrastate services in other jurisdictions. And, of course, if some

other state imposes *different* tariff requirements, we would be put in the awkward position of

having to violate either one or the other state's requirements, without ever being sure which set

of requirements applied to a particular service.

45. I also understand that New York PSC regulation requires that Vonage file annual

reports of intrastate revenues, operating expenses and billings. Again, since we cannot identify

when our service is being used strictly for an intrastate communication, it is impossible for us to

comply with this requirement.

46. It is my understanding that statutory penalties for noncompliance with regulations can

be imposed at up to $100,000 a day. The existence of regulatory violations by Vonage and the

imposition of any fines against Vonage for its inability to comply with regulations will have

immeasurable consequences that can not be remedied by monetary compensation. Vonage's

goodwill and business reputation will be damaged. Vonage's cost of business is certain to spiral

and its charges for its service will likewise have to spiral – all of which is highly likely to precipitate customer loss and threaten Vonage's viability. Lenders, investors and customers will become doubtful of Vonage's ability to maintain service in light of its inability to maintain regulatory compliance, its increased business costs and its customer loss – they are likely to withdraw their support and patronage from Vonage.

47. I have been informed that the PSC also is required by statute to review all contracts entered into by regulated telephone companies relating to their regulated services. Since the PSC believes that our Internet application is a regulated service, this statute apparently would require us to file all contracts we enter into with ISPs, telecommunications carriers, and other vendors. I believe that this requirement would make it far more difficult for us to negotiate commercially favorable contracts, since other parties would be reluctant to offer us their best terms if they expected the contracts to become public.

48. I also am aware that the PSC has authority over equity and debt financing of regulated telephone corporations; indeed, this is a subject that I dealt with extensively in my previous jobs. This prospect is very troublesome to Vonage. Vonage is a privately-held company that has grown through privately-negotiated debt and equity placements. If we had to obtain government approval before entering into any of these transactions, our access to capital would be impaired, as well as our ability to respond quickly to market conditions. Further, while the kind of funding Vonage has received is of short supply to start-up Internet companies in general, it is unavailable entirely to start-up regulated telephone companies in today's market. I am concerned that characterization of Vonage as a telephone company would, by itself, impair our access to financing because of the negative attitude of investors toward such companies.

49. If regulation is permitted and Vonage is prohibited from offering DigitalVoice service in New York, or is subjected to penalties for its inability to conform its Internet service offerings to geographically driven telephone regulations, Vonage can suffer irreparable harm to its business in the form of a significant loss of its customer base, loss of future financing, inability to fulfill its contracts as a customer of telecommunications carriers, loss of reputation and loss of the competitive advantage it has achieved over other providers of VoIP services.

50. No other application has been made for the relief requested herein.

Further declarant sayeth not.

I hereby affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

John Rego

Dated: June 7, 2004
          New York, New York

Exhibit A



**THE INDEPENDENT GUIDE TO TECHNOLOGY**



| HOME | REVIEWS | DOWNLOADS | SOLUTIONS | NEWS | OPINIONS | SHOP | DISCUSSIONS |

▶ **Michael J. Miller**    ▶ **Bill Machrone**    ▶ **John C. Dvorak**    ▶ **Inside Track**    ▶ **Bill Howard**

▶ **Lance Ulanoff**

My Account | Sign In  Not a member? Join now    **SEARCH**                    PC Magazine

**ADVERTISEMENT**



How secure are you in your network security?    CDW

More Info ▶

Home > Opinions > John C. Dvorak > **Free Phone Calls**

# Free Phone Calls

By John C. Dvorak

July 29, 2003

**Total posts: 40**

🖨 Print   ✉ Email   💾 Save   💬 Discuss   📑 Subscribe

**top sellers**

Digital Cameras

1. Nikon D70
2. Fuji Finepix S7000
3. Canon PowerShot A80
4. Nikon Coolpix 5700
5. Canon Digital Rebel / EOS-300D

more >

Recently, I packed up my little Cisco ATA 186 Analog Telephone Adapter, along with a compact D-Link DI-604 Ethernet Broadband Router, and checked in to my favorite small hotel in New York City: the Park South on 28th Street. This new boutique gem is located a few steps from a subway entrance and one block from PC Magazine's offices; it loans DVDs, has fabulous pillows, and has free T1 connections in the rooms.

**ADVERTISEMENT**



**Ingredient #1 for building business.**

**Business grows on smart IT solutions. And powerful solutions are built on Intel technology.**

ROLL OVER LOGOS TO LEARN MORE

centrino    intel inside pentium 4

intel inside XEON    intel inside ITANIUM 2

▶ For details, visit intel.com/info/enterprise    intel

**product guides**

Desktops
Digital Cameras
Displays
DVD Creation
Handhelds
MP3 Players
Notebooks
Printers
Wireless Networks
Windows XP

Click here for our full product guides list

It was this last amenity that got my attention when I first discovered the place. I decided to try to use the T1 line to make phone calls. I have Vonage VoIP phone service, which comes with a real phone number and links into telco networks via a broadband connection and the ATA 186.

When I arrived at the Park South Hotel, I plugged the D-Link hub into the RJ-45 jack and then plugged the ATA 186 into the hub. I plugged the hotel phone into the ATA 186; I was prepared to buy a small phone if I had to, but the hotel phone worked fine for this experiment.

I lifted the hook expecting to hear a normal dial tone. When you're using Vonage, you get a dial tone and would never know you were not using POTS. In this case, I got no dial tone. But when I plugged the laptop into the hub and went online, I tried again, and voilà! A dial tone.

I made a few calls. Perfect. In fact, the line was cleaner than the one I have at home. I could make unlimited calls from the hotel room. And I could receive calls as though I were at home.

Anyone who would use Vonage in a hotel has long since stopped using the hotel phone anyway. Most people use mobile phones when they travel. Even with the priciest roaming charges, mobile calling is cheaper than the horrid hotel phone rates. Only dummies use hotel phones.

I wonder what the Park South folks would think if they knew people could completely bypass the hotel's

**shop now**

Find great products and great deals.

**Shop for:**

(enter product name or keywords)

**in:**

All Categories

**discussions**

**Recent Discussions**

• Sony VAIO VGN-X505ZP
• Preview: Windows Media Player Version 10
• Linksys Wireless-B Music System
• Xanga

phone for all calls. I'm certain that both telco executives and hoteliers are going to be passing this column around with notes of concern scribbled in the margin. But smart hotel operators will see this as an opportunity. I'm a regular at the Park South because of the T1 connection. What's more important than a regular customer?

I suppose that a basic cell-phone plan would be cheaper than my Vonage lash-up. But I still prefer a land line—and this is it. The Vonage IP phone is just the beginning of a revolution in what the telcos call bypass. Within minutes of connecting, I got calls that were initially placed to my home phone and were routed to the Vonage phone. Here's where it gets interesting.

I have a summer house in Washington, and I like to forward my California number to the Washington number when I'm up there. This entails a long-distance charge each time a call is rerouted. But if I were to forward the call to my Vonage number (which is local), then forward the Vonage number to the Washington number, I'd pay no long-distance charges. The routing possibilities are endless.

Since I can take the ATA 186 and D-Link hub anywhere in the world, I can even go back to the Grand Hotel Union in Ljubljana, Slovenia, where I had a free T1 line in my room. There I could hook up and make calls to the U.S. from Europe at no charge. And I could receive calls as if I were at home in California. I have a friend in Paris who does this sort of thing already.

This is the future of telephony, although the telcos would prefer that nothing change. If they would simply bite the bullet and sell people connectivity to the network at a reasonable fee, they could collect money without having to deal with the idiosyncrasies and agonies of the voice call business. They could sell IP phones, too. I see no reason for Cisco not to make an IP phone with the ATA 186 built into a small handset that people could take anywhere, or to make a combo cell phone with this feature. Instead of an RJ-11 connection, it would have an RJ-45 connection.

The next phase of the experiment will be to see how such systems work over makeshift 802.11 wireless networks. What remains to be seen is whether the Web can absorb a lot of voice traffic, if this kind of system becomes popular. And I wonder what dirty tricks the telcos have up their sleeves to thwart such progress.

*Discuss this article in the forums.*

• Layout.dll

**Start a Discussion >**

**Find a Topic:**


View All >

**news**

OCD and the Cycle of Virus Doom

Gone Phishing—Yet Another Scam!

Why Are Virus Attacks Getting Worse?

The Big One

Fixing Comdex

View All >

**opinions**

Microsoft, Spend Your Money!

The Good News and the Bad News Department

What's Next for Digital Photography?

The Death of E-Mail

Punching Up High Tech

A Phone as Your Next Computer? Never.

View All >

**solutions**

Gone Phishing—Yet Another Scam!

Microsoft Antivirus Software?

Slowdown Lowdown

View All >

**new white papers**

Integrating Disk Backup into Your SAN from ADIC

Ease Backup & Recovery of Desktop & Mobile PC Data

Want to Let Customers Know Your Website is Safe?

All White Papers >

**ADVERTISEMENT**

Partner Services:

⊋ Dell Business Systems

⊋ Dell Home Systems

⊋ MPC (MicronPC)

**ZIFF DAVIS PARTNER SITES:**
Visual Studio & .Net Developer Center

**ZIFF DAVIS FEATURED SITES:**
IT Reseller News & Resources

▶▶ **SUBSCRIPTIONS**



**LIMITED TIME OFFER**
As an insider, you're entitled to one year of our digital format for just $9.99

**SUBSCRIPTION SERVICES**
+ Get Help with your Subscription
+ Renew - Give a Gift
+ About Our New Digital Format

**INSIDER'S SUBSCRIPTION ORDER FORM**
**PC MAGAZINE DIGITAL FOR JUST $9.99**

Name

Email (e.g. user@jsp.com)

Address

City

State          Postal Code

Click "Continue" to proceed to our secure server.



**newsletters**
Get PCMag.com's **FREE** email newsletters delivered to your inbox.

**1. Make your selections:**
☑ Inside PCMag.com

**2. Select email format:**
HTML

Exhibit B

STATE OF NEW YORK
PUBLIC SERVICE COMMISSION

At a session of the Public Service
Commission held in the City of
Rochester on May 19, 2004

COMMISSIONERS PRESENT:

William M. Flynn, Chairman
Thomas J. Dunleavy
Leonard A. Weiss
Neal N. Galvin

CASE 03-C-1285 - Complaint of Frontier Telephone of Rochester, Inc. Against Vonage
Holdings Corporation Concerning Provision of Local Exchange and
InterExchange Telephone Service in New York State in Violation
of the Public Service Law.

ORDER ESTABLISHING BALANCED REGULATORY
FRAMEWORK FOR VONAGE HOLDINGS CORPORATION

(Issued and Effective May 21, 2004)

BY THE COMMISSION:

## INTRODUCTION AND SUMMARY

In September 2003, Frontier Telephone of Rochester, Inc. (Frontier) filed a
complaint alleging that Vonage Holdings Corporation (Vonage) is a telephone
corporation under New York State Public Service Law (the PSL or Public Service Law),
but has not obtained the Certificate of Public Convenience and Necessity (CPCN)
required by PSL §99(1) and is violating various statutes, rules and Commission policies.
Frontier asks that we order Vonage to cease offering local exchange and intrastate long
distance services in New York until it has obtained a CPCN and complied with all
relevant state regulatory requirements.  Frontier also asks that Vonage be required to
route all "911" calls over dedicated "911" networks and participate fully in "enhanced
911" (E911) services where they are available.

CASE 03-C-1285

Vonage claims that it is not a telephone corporation as defined by the Public Service Law and that, as its service is an "information service" under federal law, state regulation is pre-empted. On October 9, 2003, noting that it "raises generic concerns that could affect a number of entities," we issued a notice requesting comments on the Frontier complaint.

Based on our review of the complaint and comments received, we find that in offering and providing its Digital Voice$^{SM}$ service in New York, Vonage is a "telephone corporation" as defined in the PSL and is, therefore, subject to basic statutory requirements. We also find that such state regulation is not pre-empted by current federal laws or rules, and that additional process is appropriate before establishing a balanced regulatory framework consistent with the competitive landscape in which Vonage's offering is provided.

Although the Commission has the authority to regulate telephone services, such as those provided by Vonage, we also have an interest in ensuring that such regulation does not needlessly impose costs that interfere with the rapid, widespread deployment of new technologies. We seek to maximize the benefits of new technologies, while minimizing the risks to the public interest, by imposing as little regulation as is necessary to ensure that our core public interest concerns, including most prominently public safety and network reliability, are addressed. In the past, we have achieved this balance by relaxing regulatory requirements, to the extent allowed by law, on entities lacking size or market power. For example, we have provided extensive pricing flexibility for competitive services and imposed minimal service quality and financial reporting requirements on small and non-dominant carriers, similar to Vonage. We will continue to use this approach in dealing with today's evolving technologies and markets.

Vonage is a relatively small competitive provider of local exchange and interexchange services that should be subject to, at most, the same limited regulatory regime to which comparable circuit switched competitive carriers are currently subject in New York. Vonage will be directed to obtain a CPCN (§99) and file a tariff (§92)[1] as

---

[1]   A model tariff is available on the Department's web site.

-2-

CASE 03-C-1285

required under the Public Service Law, within 45 days of this Order. It may also seek waiver of any Commission regulations it deems inappropriate.[2]

In making our decision, we determined that it is in the public interest to move cautiously in terms of defining a regulatory environment for Vonage's service. To that end, we are deferring any regulatory requirements for a reasonable period to permit Vonage to apply for a CPCN and file rate schedules. During this 45-day period, Vonage is also permitted to seek permanent and/or temporary waivers of any regulations it deems to be inappropriate in its circumstance, or with which it is not readily able to comply. Further, we will not enforce our rules and regulations with regard to Vonage's service pending our evaluation of Vonage's potential waiver requests.

The company is also encouraged to work with Staff to develop alternative means, where appropriate, of achieving necessary public safety and consumer protections. That process will allow development of a sufficient factual basis for us to ensure that our core public policy interests are satisfied without unnecessarily interfering with the development of new services and technology deployments.

## DESCRIPTION OF THE SERVICE

Voice Over Internet Protocol

Voice over Internet Protocol (VoIP) is a technology developed to enable voice communication over networks, including the public Internet, that utilize the Internet Protocol (IP). VoIP converts voice conversations into digital packets that are transmitted over IP networks. It can be used in many configurations to provide telephone services. For example, VoIP has for several years been deployed in the network backbone and in private corporate networks allowing those network operators to achieve cost savings by converging voice and data traffic on one platform. Cable companies are using VoIP to roll out stand-alone telephone services over their existing fiber-coax cable

---

[2] The Commission is authorized to grant waivers of its rules and regulations pursuant to 16 NYCRR §3.3(c).

CASE 03-C-1285

networks.[3] Other companies, such as Vonage, use VoIP to provide voice communications over a customer's existing high-speed Internet access service, providing the customer a normal telephone number and the ability to call any phone in the world. Still others, such as Pulver and Skype, provide VoIP-based software to enable voice communications between member users on the Internet. Traditional telephone companies, such as AT&T, are also using VoIP technology to carry calls between switches on their long-haul networks. Even traditional local carriers, such as Verizon, can use VoIP technology for their interoffice traffic.

Vonage's Digital Voice[SM]

The Vonage Digital Voice[SM] service enables its subscribers to complete telephone calls to other Digital Voice[SM] subscribers over the public Internet and to users of any public telephone networks in the world. To place a call, a Vonage customer typically uses a normal telephone and dials a standard telephone number. The number and voice are "digitized" into IP packets by a Multimedia Terminal Adapter (MTA) and transmitted using VoIP and the customer's broadband Internet connection to a Vonage gateway server. If the call is to another Vonage customer, the call is completed to the called party over the Internet. If the call is to a non-Vonage customer, the Vonage server converts the packetized information into a Time Division Multiplexed (TDM) signal to enable completion to the called party via connections through one or more common carriers (incumbent and competitive local exchange carriers and/or interexchange carriers). When a non-Vonage customer calls a Vonage subscriber, the call is also dialed normally and then traverses the originating carrier's network and perhaps other carriers' networks (all typically using TDM) until it is passed to Vonage, which packetizes the signal and transmits it to the called Vonage customer. Given Vonage's current limited subscriber base, a vast majority of the calls are connected over other carriers' networks. [4]

---

[3] For example, Time Warner ResCom of New York, LLC began offering its Digital Phone service in parts of the state under a tariff effective April 1, 2004.

[4] Vonage has about 150,000 customers in the United States and estimates it will have 250,000 customers by the end of 2004. The company estimates it has approximately 10,500 customers with New York billing addresses. (Vonage Comments at p.5)

-4-

CASE 03-C-1285

## FRONTIER'S COMPLAINT AGAINST VONAGE

In September 2003, Frontier Telephone of Rochester, Inc. (Frontier) filed a complaint against Vonage[5] alleging that Vonage is providing intrastate telephone services in New York without the CPCN required by PSL §99(1) and is violating various statutes, rules and Commission policies by failing to comply with virtually any other regulatory requirements. Frontier further alleges that Vonage provides unsafe and inadequate emergency calling (911) in violation of PSL §97. Frontier asks the Commission to: (a) order Vonage to cease providing local exchange and intrastate long distance services within the State of New York until it obtains a CPCN and complies with the appropriate statutes, regulations and orders of the Commission for telephone corporations; and (b) direct Vonage to route all 911 calls over the dedicated 911 network without requiring a special 911 subscription and participate fully in "enhanced 911" (E911) services where they are available.

Frontier asserts that "Vonage is a 'telephone corporation' owning, operating or managing a 'telephone line' as defined in §2(17) and §2(18) of the Public Service Law because Vonage operates apparatus and property within the state to conduct the business of affording telephonic communication for hire."[6] In support of its claims, Frontier first cites Vonage's web site representations:

> Use Vonage like you use any telephone
>
> With Vonage, you pick up the phone, hear the dial tone and dial the telephone number of your choice. There are no extra numbers to dial and no special routines to follow. It's that simple. You don't have to be an engineer to use our service.
>
> You can be up and running within minutes of receiving your Vonage package. We send you everything you need to get Vonage phone service,

---

[5] Frontier's complaint against Vonage mirrors a similar complaint by the Minnesota Public Utilities Commission (MPUC) against Vonage in that state. A District Court decision in Minnesota which held that the MPUC was preempted by federal law (Vonage Holdings Corp. v. Minnesota Public Utilities Comm'n., 290 F. Supp. 2nd 993 (D. Minn. 2003)) is on appeal before the Eighth Circuit Court of Appeals (Docket No. 04-1434).

[6] Frontier Complaint at 2.

CASE 03-C-1285

> right down to the extra cable wire. Best of all, there's no technician, no wiring in the walls, and no technical experience needed! Setup usually takes less than 5 minutes.

Frontier then describes the routing of calls to and from a Vonage subscriber as generally discussed above. This, it avers, demonstrates that Vonage "directly owns, operates and manages telephone equipment," specifically the MTA at the subscriber's location and the Vonage gateway server or router. Further, the complaint asserts that "by reselling and integrating the switching and transmission functions of its associated carrier or carriers" to establish connectivity with non-Vonage customers, Vonage manages a "telephone line." Finally, Frontier argues that by porting numbers from other local carriers through its associated CLEC, "Vonage holds itself out to be a complete replacement for a subscriber's telephone service." Frontier notes that, except for mobile radio and cellular services (which Vonage does not claim to use), the PSL does not exempt telephone corporations from Commission authority on the basis of the technologies they use to provide service.

As it believes Vonage is a "telephone corporation" under the PSL, Frontier asserts that Vonage should be required to comply with a number of laws, rules, and orders, including but not limited to:

- the requirement to pay its share of Commission expenses (§18a);

- the requirement to file tariffs for local and intrastate long distance (§92(1));

- the requirement to obtain Commission approval to issue securities (§101 and 16 NYCRR Part 37);

- requirements to provide 911 emergency calling; [7]

- NYSPSC complaint procedures (16 NYCRR Part 12);

---

[7] Frontier references §97(2) in this regard suggesting the Vonage 911 Service is unsafe and inadequate. In sum, Frontier asks the Commission to confirm that Vonage is a telegraph corporation or telephone corporation and also to find that Vonage 911 service is inadequate pursuant to PSL §97(2).

CASE 03-C-1285

- rules covering provision, suspension and termination of service (16 NYCRR Part 609);

- the obligation to file NYPSC annual reports as a CLEC (16 NYCRR Part 641);

- the requirement to offer per-line or all-call Caller ID blocking;[8]

- The requirement to enter into traffic exchange agreements; [9]

- Sales tax and 911 surcharges (Tax Law §1105/County Law §305).

## COMMENTS

Seventeen parties filed comments and/or replies in response to our request for comment on the Frontier complaint.[10] Vonage and others recommending dismissal of Frontier's complaint focus less on the specific provisions of the Public Service Law than on the proper characterization of the Vonage service under federal law. They also assert that the interstate nature of the service leads to the conclusion that state regulation of this service is, or should be, preempted. These parties conclude that Vonage is not a telephone corporation, does not provide telecommunications service, and thus, is not subject to the various laws, regulations and Commission Orders cited by Frontier. Parties supporting the Frontier complaint generally confirm its claim that Vonage's service is a telephone service under state law and/or a telecommunications service under federal law. Further, a number of parties note that the Federal Communications Commission (FCC) is

---

[8]  Case 91-C-0428, Proceeding on Motion of the Commission to Investigate New York Telephone Company's Proposal to Institute Caller ID Service, Opinion 92-5 (issued April 9, 1992).

[9]  Case 00-C-0789, Proceeding on Motion of the Commission Pursuant to Section 97(2) of the Public Service Law to Institute an Omnibus Proceeding to Investigate the Interconnection  Arrangements Between Telephone Companies (Orders issued December 22, 2000, September 7, 2001 and August 16, 2002).

[10] Vonage, Frontier, Time Warner, MCI, AT&T, Level 3, Voice on the Net Coalition, Net2Phone, Point One, Global NAPS, Cablevision Systems Corporation, the Cable Television & Telecommunications Association of New York, Inc., NYSTA, CWA, Sprint, Verizon, and the New York State Attorney General.

CASE 03-C-1285

in the midst of a similar proceeding and that states (including New York) should not act in advance of the FCC's determination.

Vonage

Vonage argues that the Commission may not impose common carrier regulation on its Digital Voice$^{SM}$ because it is not a telecommunications service, but an information service, state regulation of which is preempted. Vonage asserts its service is an information service because it provides a net protocol conversion (from digital IP packets to digital TDM signals or vice versa) and because its subscribers must use "special" customer premises equipment (CPE) to convert acoustic sounds to IP packets (in this case a computer or MTA). Alternatively, Vonage describes its service as an Internet application, regulation of which it argues is forbidden by federal law and policy.

Turning to the state law, Vonage argues that it is not a telephone corporation under the PSL because it does not "own, operate or manage" a telephone line. It argues that it does not own or provide the wires and equipment by which the subscriber connects to the Internet and subsequently from the Internet to the Vonage service; those are provided by unaffiliated third parties. Nor does Vonage own, operate or manage the telephone lines of other common carriers from whom Vonage purchases services to provide its customers telephone numbers and connections to customers of other carriers. The company also asserts that it does not resell those services acquired from other carriers. It does own and operate a media gateway server in a data center in New York City to perform IP-TDM conversions, but argues that this should be treated not as telephone equipment, but as Internet Service Provider equipment.

Finally, Vonage argues that even if we determine it is a telephone corporation, state regulation is preempted because the interstate and intrastate aspects of its service cannot be segregated. This is so, the company maintains, because it is technically impossible to accurately determine whether a given call is interstate or intrastate in nature.

Other Parties

Generally, parties supporting Vonage contend that the service in question is not, or should not be, subject to state regulation. Some, such as the Voice on the Net

CASE 03-C-1285

(VON) Coalition and Net2Phone, argue that as a matter of policy new Internet-based services should remain relatively free of any regulation, particularly state regulation. Others, including Level 3, argue that the Vonage service is an "information service," not a "telecommunications service," and is, therefore, subject only to the federal jurisdiction.

At the other end of the spectrum, parties including CWA, NYSTA, and the New York State Attorney General argue that, as the functional equivalent of normal telephone service, Vonage's service is clearly telephone service, potentially subject to the full panoply of the Commission's regulations. Verizon contends that although the Vonage service is a telecommunications service, it is predominantly interstate and, therefore, not subject to this Commission's authority. Others, while not directly addressing the legal status of the service, counsel delay until the FCC acts (e.g., MCI) or taking a light-handed approach that recognizes the nascent nature of this new service offering (e.g., Cablevision and Time Warner).

## DISCUSSION

The threshold question is whether Vonage is a "telephone corporation" as defined by the Public Service Law. If it is not, the matter ends there; it would not be subject to state telephone regulation. If it is a telephone corporation, we must then examine whether Commission jurisdiction has been preempted. If it has not, we must then consider the appropriate regulatory framework to be applied in New York.

Vonage is a Telephone Corporation Under State Law

Vonage claims that it is not a telephone corporation under New York law because it alleges that it does not own, operate or manage the facilities it uses to provide telephone service. Rather, it claims that all the facilities used are provided by third parties, and the equipment it does own and uses to interconnect call to other carriers' networks does not constitute a "telephone line" under PSL §2(18).

Under the Public Service Law a "telephone corporation" is defined as "every corporation...owning, operating or managing any telephone line or part of telephone line used in the conduct of the business of affording telephonic communication for hire." (PSL §2(17)). The Public Service Law defines "telephone line" as including

CASE 03-C-1285

"receivers, transmitters, instruments, machines, appliances and all devices,...apparatus, property and routes used, operated or owned by any telephone corporation to facilitate the business of affording telephonic communication...." (PSL §2(18)).

The company is in the business of affording "telephonic communication for hire." Vonage's service allows subscribers to make and receive voice communications with any other telephone subscribers in the world, and its service is marketed as a substitute for "home phone service." Vonage owns and manages equipment (a media gateway server)[11] that is used to connect Vonage's customers to the customers of other telephone corporations via their public networks, as necessary. This equipment constitutes a "telephone line" under the PSL and is used to facilitate the provisioning by Vonage of telephonic communication to customers. Accordingly, Vonage is a "telephone corporation" under our jurisdiction.

Vonage interconnects with, and purchases services and the use of network facilities from other telephone corporations to enable its customers to place calls to, and receive calls from, telephone customers throughout the world. In so doing, Vonage is reselling[12] to its own customers capabilities it acquires from the other, third party, telephone corporations. We have previously determined that entities reselling telephone services are telephone corporations subject to our jurisdiction.[13]

New York's Regulation of Vonage's Service is Not Preempted

Vonage and others claim that state regulation of its service is preempted because: (1) Vonage offers information service under federal law; (2) state regulation of

---

[11] A media gateway server is a special router that connects an IP network to a traditional telephone network.

[12] "[A] *reseller of telephone services* is a telephone corporation as defined in the Public Service Law, which shall subscribe to communications services and facilities from a telephone corporation, and which shall re-offer communications services to the public for profit." (16 NYCRR §647.1)

[13] Case 27946, Proceeding on Motion of the Commission Concerning the Removal of Telephone Company Tariff Regulations Which Prohibit or Restrict the Resale and Shared Use of Telephone Services, Order Directing the Filing of Tariff Revisions and Requesting Comments (issued May 25, 1982), Attachment 1.

-10-

CASE 03-C-1285

information services and the Internet is inconsistent with federal law; and (3) the interstate and intrastate aspects of its service cannot be segregated; or (4) its service is an Internet application and Congress declared that the Internet should be free of regulation.

First, Vonage service is not an information service under federal law, despite claims to the contrary. The Telecommunications Act of 1996 [14] (the 1996 Act) defines "telecommunications" as "the transmission, between or among points specified by the user, of information of the user's choosing without change in the form or content of the information as sent and received."[15] The 1996 Act further defines "telecommunications service" as "offering of telecommunications for a fee directly to the public ... regardless of the facilities used."[16]

In contrast, "information service" is defined in the 1996 Act as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service."[17]

The FCC view of the differences between telecommunications services and information services was discussed in its April 10, 1998, Report to Congress on Universal Service.[18] The critical distinction drawn by the FCC in classifying a service as

---

[14] Pub. L. No. 104-104, 110 Stat. 56 (1996); encoded at 47 U.S.C. §§ 151 et seq.

[15] 47 U.S.C. §153 (43).

[16] Id., §153 (44).

[17] Id., §153(20).

[18] In the Matter of Federal-State Joint Board on Universal Service, 13 FCC Rcd 11501, CC Docket No. 96-45, FCC No. 98-67 (April 10, 1998) (FCC USF Report or Stevens Report).

CASE 03-C-1285

either information or telecommunications was whether the provider performed some function that modifies the information, or merely transmits it.[19]

A Vonage customer's voice is transmitted between or among points specified by the customer, without any change in the form or content of the conversation. Nothing is changed, added or subtracted to the conversation in any way. Moreover, its provision of analog-to-IP (and vice-versa) conversion equipment in order to utilize the Internet as a transmission medium ultimately changes neither the form nor content of the caller's information. Consequently, Vonage's service is a "telecommunications service" which can be regulated by the states.

Likewise, Vonage's service is not an information service. It does not offer its customers a capability to manipulate or interact with stored data. Vonage's service merely transmits its users' voices between and among endpoints chosen by the caller. With regard to its argument that it is an information service because it provides a net protocol conversion, the FCC has ruled that when there are protocol conversions at both ends of the call ("no net" protocol conversion), the service is a telecommunications service.[20] Vonage's service involves this type of "no net" protocol conversion. Its adapter and/or software convert its customers' speech into the Internet protocol (IP) data

---

[19] Id., at ¶39. The FCC's functional approach to statutory classification as either a telecommunications or information service is consistent with Congress' direction that a service's classification should not depend on the type of facilities used. (See definition in Act, §153 (44), supra). "Its classification depends rather on the nature of the service being offered to customers. Stated another way, if the user can receive nothing more than pure transmission, the service is a telecommunications service." Conversely, "[i]f the user can receive enhanced functionality, such as manipulation of information and interaction with stored data, the service is an information service" (¶ 59). In 2002, we used the FCC criteria to determine if a New York company was an information service provider or a telephone corporation (Case 01-C-1119, Complaint of Frontier Telephone of Rochester Against US DataNet Corporation Concerning Alleged Refusal to Pay Intrastate Carrier Access Charges, Order issued May 31, 2002).

[20] In the Matter of Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as amended, 11 FCC Rcd 21905, 21956, CC Docket No. 96-149, FCC 96-489, First Report and Order and Further Notice of Proposed Rulemaking, at ¶ 106 (December 24, 1996).

-12-

CASE 03-C-1285

format. Vonage's network subsequently converts IP packets back to TDM in order to facilitate calls between its customers and other carriers' telephone subscribers.

Second, neither Congress nor the FCC has preempted state law. Section 601 of the 1996 Act states that the 1996 Act "shall not be construed to modify, impair or supersede Federal, State or local law unless expressly so provided."[21] While Voice on the Net Coalition argues that §230(b)[22] of the Act preempts state regulation of IP telephony, this argument incorrectly states the intent of §230. Section 230 is entitled "Protection for private blocking and screening of offensive material," and is intended to address the content of speech transmitted over the Internet rather than traditional common carrier regulation.

Moreover, the FCC has not acted to preempt state law. While not binding, the FCC's report to Congress tentatively concluded that "phone-to-phone" IP telephony appears to be a telecommunications service.[23] It makes no definitive statements, however, as to the statutory classification of other types of IP telephony.[24] Instead, the FCC deferred classification of specific IP telephony services to further proceedings.[25] More recently, in a Notice of Proposed Rulemaking, the FCC initiated a global proceeding to investigate in detail the classification and appropriate regulation of the various forms of IP-enabled services, including Vonage-type services.[26] Thus, Vonage's argument that state regulation conflicts with FCC findings is, at best, premature.

---

[21] The 1996 Act, §601(c)(1); encoded at 47 U.S.C. §152 note, supra.

[22] "It is the policy of the United States—(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;"

[23] FCC USF Report, supra, at ¶ 90.

[24] Id., at ¶¶ 3, 83.

[25] Id., at ¶ 91.

[26] In the Matter of IP-Enabled Services, WC Docket No. 04-36, FCC No. 04-28 (March 10, 2004) (Notice of Proposed Rulemaking).

CASE 03-C-1285

Even if the FCC were to classify Vonage's service as an information service, the Commission would not be preempted from regulating its intrastate aspects. The Communications Act §152 (b) expressly preserves state jurisdiction over intrastate information services.[27]

Third, Vonage claims that the impossibility doctrine and the FCC's mixed use rule preempt state regulation of VoIP services such as those provided by Vonage. The impossibility doctrine holds that state jurisdiction over intrastate communications is preserved unless it is impossible to separate the interstate and intrastate aspects of a service, and state regulation would negate the FCC's lawful exercise of its authority over interstate communications.[28] The FCC has the burden of showing that its rules preempt only state rules that actually interfere with its goals.[29] It has made no such declaration.

Moreover, Vonage's claim that it is technically impossible to separate intrastate and interstate regulation of its services is incorrect. The company's "Unlimited Local Plan"[30] allows customers unlimited local and regional calling and up to 500 minutes of long distance calls. By implementing this plan, the company has shown that it can distinguish local calls from long distance calls. Consequently, it is not impossible to separate intrastate and interstate calls.

The FCC's mixed use rule also does not apply to Vonage. The FCC established the mixed use rule as a way to establish the appropriate jurisdiction over special access lines where it was impractical to determine the jurisdictional status of the

---

[27] California v. FCC, 905 F.2d 1217, 1240 (9th Cir. 1990). See also, In the Matter of Petition for Declaratory Ruling that pulver.com's Free World Dialup is Neither Telecommunications Nor a Telecommunications Service, WC Docket No. 03-45, FCC No. 04-27, n.72 (February 19, 2004) (Memorandum Opinion and Order) (Pulver),where the FCC stated that its regulation does not extend to "purely *intrastate*" information services.

[28] Louisiana Public Service Comm'n v. FCC, 476 U.S. 355, 375, n 4 (1986).

[29] California v FCC, supra., at 1243.

[30] Vonage web site at www.vonage.com.

-14-

CASE 03-C-1285

traffic.[31] It was not used by the FCC for any purpose other than allocating special access jurisdiction[32] and, therefore, is inapposite to Vonage's service.

Finally, the claim that our jurisdiction is preempted because Congress declared that the Internet should be free of regulation misreads the Act. As we stated above, §230 is aimed at the content of speech on the Internet and does not affect states' application of traditional common carrier regulation.

## APPROPRIATE REGULATORY FRAMEWORK

The state's interest in maintaining capable, robust, and efficient telecommunications networks is self-evident. Those networks enable communications that are vital in the provision of essential public services – e.g., public safety, security and health care. Telecommunications are essential in averting and responding to man-made and natural disasters. State and local emergency response organizations depend on reliable telecommunications to marshal resources and direct recovery efforts. Individuals rely on public communications networks for their own safety and peace of mind in emergency situations. The Commission also has a responsibility to ensure that the public has ubiquitous access to effective and efficient 911/E911 emergency calling capabilities that meet the needs of emergency response organizations. The events of September 11,

---

[31] See In the Matter of MTS and WATS Market Structure Amendment of Part 36 of the Commission's Rules and Establishment of a Joint Board, 4 FCC Rcd 5660 (July 20, 1989) (Decision and Order). The FCC found that the costs for these mixed use lines should be assigned to the state jurisdictions because the lines carried predominantly intrastate traffic, with only small amounts of interstate traffic. Rather than shifting the costs to the federal jurisdiction because of some interstate traffic, or allocating the costs by some burdensome verification requirements, the FCC adopted a rule that if the lines carried only *de minimis* (less than 10%) interstate traffic, their costs should be allocated to the state jurisdictions.

[32] Although Vonage cites GTE Tel. Operating Cos., GTOC Tariff No. 1, GTOC Transmittal No.1148, 13 FCC Rcd. 22466, CC Docket No. 98-79, FCC 98-292 (1998), this FCC decision also concerns special access lines. "GTE's ADSL service is a special access service, thus warranting federal regulation under the "ten percent" rule." (GTE Decision at ¶ 25).

2001 and the widespread blackout of August 2003 emphatically attest to the state's vital interest in maintaining reliable telecommunications networks.

Telecommunications are the lifeblood of this state's economy. Trillions of dollars of economic transactions that depend on telecommunications occur each day in New York. Those transactions are vital not only to New York's general economic health, but also to the financial integrity of state and local governments whose revenues are derived as a result of that economic activity. The state has a clear interest in maintaining uninterrupted telecommunications capabilities to preserve and advance the state's economic health.

To remain available and reliable, the state's existing telecommunications network providers must remain financially sustainable. While the state does not guarantee the financial success of any provider in a competitive telecommunications market, neither should it perpetuate unfair regulatory advantages for some providers over others. Such inconsistent regulatory treatment could allow competitive success not on the basis of superior product or efficiency, but as a result of regulatory arbitrage. As such unfairly won success could threaten the financial sustainability of providers serving customers with limited competitive choices, the state has an interest in ensuring that all providers of like services are subject to appropriate regulatory requirements.

A number of parties express a reasonable concern that state regulation of services such as Vonage's may interfere with deployment of useful new services and applications. Although the Commission has the authority to regulate telephone services, we also have an interest in ensuring that such regulation does not needlessly interfere with the rapid, widespread deployment of new technologies. Any regulation imposes costs that may diminish the promise of new technologies. At the same time, our core public interest concerns, including most prominently public safety (e.g., 911 emergency services) and network reliability must be addressed. To be most effective, regulation should target core public policy concerns, while minimally impinging on the free flow of markets and development of technologies.

Where regulation is appropriate, it should maximize the benefits of new technologies, while minimizing the risks to the public interest. In the past, we have

CASE 03-C-1285

achieved this balance by relaxing regulatory requirements, to the extent allowed by law, on entities lacking size or market power. For example, we have provided extensive pricing flexibility for competitive services and have imposed minimal service quality and financial reporting requirements on small and non-dominant carriers, such as Vonage. We will continue this approach in dealing with today's evolving technologies and markets. We also note that the Department is reviewing all regulatory requirements currently applicable to providers of telecommunications in New York to ensure that those requirements remain appropriate as technologies and markets evolve.

As Vonage is a relatively small competitive provider of local exchange and interexchange services, it should be subject to, at most, the same limited regulatory regime to which comparable circuit switched competitive carriers are currently subject in New York. However, because we recognize the potential impact of this emerging technology on facilities-based competition, we will move cautiously, so as not to hinder its development. Consequently, the company may seek permanent or temporary waivers of any of those requirements it deems to be inappropriate in its circumstance or with which it is not readily able to comply.

In order to allow Vonage sufficient time to make the required statutory filings and assess which rules and regulations it deems inappropriate for its provision of adequate service, we will stay the application of the statutory requirements for a reasonable period to permit Vonage to comply. Vonage will be directed to make the CPCN and tariff filings within 45 days of this Order, and to also request within that period waivers as appropriate for rules and regulations. This process will be subject to the Secretary's oversight. Further, during the pendency of the evaluation of Vonage's potential waiver requests, we will not enforce our rules and regulations with regard to Vonage's compliance. The company also is encouraged to work with Staff to develop alternative means, where appropriate, of achieving necessary public safety and consumer protections. That process will allow development of a sufficient factual basis for us to ensure that our core public policy goals are met without unnecessarily interfering with the development of new services and technology deployments.

-17-

CASE 03-C-1285

The Commission orders:

      1. Vonage must comply with the Public Service Law obligations of telephone corporations and within 45 days of this Order, Vonage Holdings Corporation shall file an application for a Certificate of Public Convenience and Necessity and file a tariff.

      2. To the extent Vonage chooses to seek waiver of specific rules and regulations, as discussed in this Order, it shall file such requests within 45 days of this Order.

      3. This proceeding is continued.

                    By the Commission,

(SIGNED)                  JACLYN A. BRILLING
                                     Secretary

Exhibit C

## STATE OF NEW YORK
## PUBLIC SERVICE COMMISSION

|  |  |  |
|---|---|---|
| COMPLAINT OF FRONTIER TELEPHONE OF ROCHESTER, INC. AGAINST VONAGE HOLDINGS CORP. CONCERNING PROVISION OF LOCAL EXCHANGE AND INTEREXCHANGE TELEPHONE SERVICE IN NEW YORK STATE IN VIOLATION OF THE PUBLIC SERVICE LAW | )<br>)<br>)<br>)<br>)<br>) | Case 03-C-_____ |

### COMPLAINT OF FRONTIER TELEPHONE OF ROCHESTER, INC. AGAINST VONAGE HOLDINGS CORP. CONCERNING PROVISION OF LOCAL EXCHANGE AND INTEREXCHANGE TELEPHONE SERVICE IN NEW YORK STATE IN VIOLATION OF THE PUBLIC SERVICE LAW

Gregg C. Sayre
Associate General Counsel – Eastern Region
Frontier Telephone of Rochester, Inc.
180 South Clinton Avenue
Rochester, New York  14646-0700
(585) 777-7270
gregg.sayre@frontiercorp.com

DATE:    September 10, 2003

**STATE OF NEW YORK**
**PUBLIC SERVICE COMMISSION**

| | |
|---|---|
| COMPLAINT OF FRONTIER TELEPHONE OF ROCHESTER, INC. AGAINST VONAGE HOLDINGS CORP. CONCERNING PROVISION OF LOCAL EXCHANGE AND INTEREXCHANGE TELEPHONE SERVICE IN NEW YORK STATE IN VIOLATION OF THE PUBLIC SERVICE LAW ) ) ) ) ) ) | Case 03-C-_____ |

**COMPLAINT OF FRONTIER TELEPHONE OF ROCHESTER, INC.**
**AGAINST VONAGE HOLDINGS CORP. CONCERNING PROVISION OF LOCAL**
**EXCHANGE AND INTEREXCHANGE TELEPHONE SERVICE IN NEW YORK**
**STATE IN VIOLATION OF THE PUBLIC SERVICE LAW**

Frontier Telephone of Rochester, Inc. ("Frontier") hereby complains of the unlawful provision of local exchange and interexchange telephone services by Vonage Holdings Corp. ("Vonage") in Rochester and other locations in New York State in violation of the Public Service Law and other statutes, regulations and orders. In support of this Complaint, Frontier respectfully shows as follows:

**I.    Introduction and Summary.**

Frontier is the Incumbent Local Exchange Carrier ("ILEC") in the Rochester, New York area. Frontier provides local exchange telephone services as a "telephone corporation" as defined in §2(17) of the Public Service Law, subject to Commission regulation. Frontier files

2

this complaint on its own behalf and on behalf of its affiliated ILECs in New York State.[1]

Frontier believes that Vonage is providing local exchange telephone service not only in the

Rochester area but also in the operating areas of one or more of Frontier's affiliated ILECs

including but not necessarily limited to Ogden Telephone Company and Citizens

Telecommunications Company of New York, Inc.

This Complaint shows that Vonage is violating Public Service Law §99 along with many

other statutes, regulations and orders pertaining to the regulation of competitive local exchange

carriers ("CLECs") and interexchange carriers ("IXCs") by essentially failing to comply with

any regulatory requirements.

This Complaint further shows that Vonage is providing an unsafe and inadequate

implementation of 911 calling in violation of Public Service Law §97.

## II.    Vonage Is Violating Public Service Law §99.

1.    Vonage is a "telephone corporation" owning, operating or managing a "telephone

line" as defined in §§2(17) and 2(18) of the Public Service Law because Vonage operates

apparatus and property within the State to conduct the business of affording telephonic

communication for hire.  Attached as **Exhibit 1** are copies of Vonage's Internet web pages

making the following representations:

> Use Vonage like you use any telephone
>
> With Vonage, you pick up the phone, hear the dial tone and dial the telephone number of
> your choice.  There are no extra numbers to dial and no special routines to follow.  It's
> that simple.  You don't have to be an engineer to use our service.

---

[1]    Frontier's affiliated New York ILECs are Ogden Telephone Company, Citizens Telecommunications Company of New York, Inc., Frontier Communications of New York, Inc., Frontier Communications of Sylvan Lake, Inc., Frontier Communications of AuSable Valley, Inc. and Frontier Communications of Seneca-Gorham, Inc. Frontier and its affiliated New York ILECs are under the common ownership of Citizens Communications Company.

3

You can be up and running within minutes of receiving your Vonage package. We send you everything you need to get Vonage DigitalVoice phone service, right down to the extra cable wire. Best of all, there's no technician, no wiring in the walls, and no technical experience needed! Setup usually takes less than 5 minutes.

These representations establish that Vonage is both (1) offering and providing telephonic communication for hire and (2) using and providing apparatus and property within New York State to facilitate its business of providing telephonic communication. This is all the statute requires to trigger regulation of a service provider as a CLEC.

2. Vonage further owns, operates or manages router equipment in Rochester and other locations in New York that acts as a gateway between Internet and other long distance transmission facilities and the associated CLEC through which Vonage connects to the Public Switched Telephone Network ("PSTN"). By way of example, a local call placed by a Vonage customer to a Frontier customer progresses as follows:

(a) The customer picks up an ordinary analog telephone set, provided by the customer and connected to a telephone jack on a Vonage-provided router. This router converts the call from a POTS (Plain Old Telephone Service) signal to Internet Protocol ("IP").

(b) The Vonage router passes the call to a second router on the customer's premises that provides the broadband Internet connection that is required in order to subscribe to Vonage service. The customer may use either cable (e.g. Roadrunner) or Digital Subscriber Line (e.g. Frontier DSL) broadband service with Vonage service. Each form of broadband service uses a broadband router frequently but inaccurately referred to as a "cable modem" or "DSL modem."

(c) The call passes from the broadband router over the customer's broadband cable or DSL connection to the customer's broadband Internet Service Provider ("ISP"), and from there over the Internet to Vonage's gateway router in Rochester.

4

(d) Vonage converts the call back from IP to POTS and sends the call to another carrier that is connected to Frontier's network.

(e) The other carrier delivers the call to Frontier.

(f) Frontier completes the call to the end user on Frontier's network.

3. When a Frontier customer makes a local call to a Rochester Vonage customer, the call progresses in the reverse way: from Frontier's network, to a third party carrier, to Vonage's gateway router where the call is converted from POTS to IP, over the Internet to the customer's broadband ISP, over the customer's broadband connection to the customer's broadband router (or "modem"), then to the Vonage router where it is converted back from IP to POTS, and finally to the customer's ordinary analog telephone.

4. Vonage therefore directly owns, operates and manages telephone equipment, referred to in PSL §2(18) as a "telephone line," at two locations in Rochester – first at the subscriber's location, and second at the location of the gateway router.

5. Vonage further acts as a "telephone corporation" and as the manager of a "telephone line" by reselling and integrating the switching and transmission functions provided by its associated carrier or carriers, including but not limited to the cables, machines, devices and property of the associated carrier used to establish Vonage's connectivity with the PSTN and for number portability. In Rochester, this carrier is PaeTec Communications.

6. Attached as **Exhibit 2** are Vonage's web pages dealing with number portability. Vonage accomplishes number portability from other local carriers to Vonage through its associated CLEC, which ports numbers from other local carriers. Calls to Vonage subscribers from non-Vonage subscribers are sent, as instructed through the Number Portability Administration Center, to the associated CLEC, which then delivers the calls to Vonage's router.

5

By porting numbers, Vonage holds itself out to be a complete replacement for a subscriber's telephone service.

7.  The only distinction between Vonage's local exchange telephone service and any other provider's local exchange telephone service is the technology Vonage uses. The Public Service Law does not distinguish between local exchange telephone service technologies except for mobile radio and cellular telephone services, which are exempted from regulation pursuant to PSL §§5(3) and 5(6). Vonage does not use either mobile radio or cellular telephone technology.

8.  Vonage has placed television advertisements in the Rochester market that are airing in September 2003, describing Vonage as a "broadband telephone company."

9.  Vonage offers and provides intrastate long distance voice calls to its customers as part of its service packages.

10.  Vonage violated and continues to violate Public Service Law §99 by installing and operating "telephone lines" and by holding itself out as a provider of telephonic communication for hire without first obtaining a certificate of public convenience and necessity from the Commission.

11.  The issues raised by Frontier have recently been considered by the Minnesota Public Utilities Commission as the result of a complaint filed by the Minnesota Department of Commerce. Attached as **Exhibit 3** is the MPUC Staff's briefing paper on Vonage's service and its regulatory status as a competitive local exchange carrier. As noted by the MPUC Staff, Vonage provides the same service and the same experience to its subscriber when making or receiving a call compared to POTS, except that Vonage's 911 service in Minnesota as in Rochester is deficient. The subscriber picks up an ordinary telephone handset, dials POTS numbers, hears busy signals or ringing tones, and conducts conversations as with any other

6

POTS call. Incoming calls are also the same as POTS. The telephone rings, the subscriber picks up the handset and conversation ensues. The only difference is in the behind-the-scenes technology.

On August 13, 2003, the MPUC announced a decision that Vonage must seek a certificate, file a 911 plan and file tariffs as a regulated local exchange carrier. The MPUC rejected Vonage's position that it is an unregulated provider of "enhanced services." The MPUC order has not yet been released.

### III.  Vonage Is Violating Many Other Statutes, Regulations and Orders.

1.  Vonage fails to comply with numerous other statutes, regulations and orders of the Commission, including but not limited to:

(a) PSL §18-a – the requirement to pay its share of the Commission's costs and expenses;

(b) PSL §92(1) – the requirement to file tariffs for local exchange and intrastate long distance services;

(c) PSL §101 and 16 NYCRR Part 37 – the requirement to obtain Commission approval to issue securities;

(d) 16 NYCRR Part 12 – the Commission's consumer complaint procedures. Vonage's Terms of Service, a copy of which is attached as **Exhibit 4**, require mandatory arbitration of consumer disputes under the American Arbitration Association rules for commercial arbitration. These rules potentially require the customer to bear expenses of arbitration that could exceed the amount in dispute by several orders of magnitude. The Terms of Service further require the subscriber to submit to the personal and exclusive jurisdiction of the courts of New Jersey.

7

(e) 16 NYCRR Part 609 – rules for the provision, suspension and termination of service to residential customers;

(f) 16 NYCRR Part 641 – the requirement to file an annual report as a CLEC; and

(g) the requirement to offer per-line or all-call Caller ID blocking established in Case 90-C-0075, Proceeding on Motion of the Commission to Review Issues Concerning Privacy in Telecommunications (order issued Nov. 16, 1990). Vonage offers per-call Caller ID blocking but not per-line or all-call blocking that allows a customer to block transmission of Caller ID information on all calls unless the customer dials a per-call unblocking code.

2.  Vonage is also violating portions of 47 U.S.C. §§ 251 and 252 that are administered by the Commission by failing to request interconnection from Frontier, failing to initiate negotiations for an interconnection agreement with Frontier, and failing to file an interconnection agreement with the Commission.

3.  Vonage is further in violation of the Commission's orders in Case 00-C-0789, Proceeding on Motion of the Commission Pursuant to Section 97(2) of the Public Service Law to Institute an Omnibus Proceeding to Investigate the Interconnection Arrangements Between Telephone Companies (orders issued Dec. 22, 1990, Sept. 7, 2001 and Aug. 16, 2002) by failing to enter into traffic exchange agreements with other Incumbent Local Exchange Carriers, including Verizon New York, that have exchanges within the Extended Area Service ("EAS") calling area of Rochester where Vonage is assigning numbers.

4.  Vonage unfairly and unlawfully competes with Frontier and other local exchange carriers by failing to collect from customers and failing to remit to the appropriate authorities the applicable state and local sales taxes and the E-911 surcharge. This conduct is an "unreasonable practice" in violation of Public Service Law §97 as well as a violation of the sales tax and 911

8

surcharge statutes, NY Tax Law §1105 and NY County Law §305.  On information and belief,
Vonage also fails to remit gross revenue taxes to the State as required by NY Tax Law §186-e
and thereby obtains an unfair and unlawful advantage over other telephone corporations with
which it competes.

5.  Vonage does collect and remit the 3% Federal Excise Tax on telecommunications
services.  By doing so Vonage admits that it is a telecommunications carrier.

### IV.    Vonage's 911 Service Is Unsafe and Inadequate and Thereby Violates Public Service Law §97(2).

1.  Attached as **Exhibit 5** are Vonage's web pages describing how it implements 911
service.  As is apparent, Vonage's 911 service is distinctly inferior compared to the 911 service
provided by other local exchange carriers, in the following respects:

(a) Customers, and any other persons at a customer's location who may need emergency
services, have no 911 service at all unless the customer affirmatively subscribes to Vonage's 911
service.  All other LECs automatically provide 911 service.

(b) Vonage does not use the dedicated 911 network used by every other LEC.  Vonage
routes 911 calls to POTS numbers at a "local emergency personnel location" which may be only
a local fire or police station (see discussion of 911 service in the Minnesota Staff Briefing Papers
attached as Exhibit 3), not necessarily the designated Public Safety Answering Point (PSAP) set
up by most New York State counties including Monroe County to handle 911 calls.  Even if
Vonage routes the calls to the PSAP, the calls are not transmitted over dedicated 911 trunks and
are likely to receive lesser priority and a lower grade of service than emergency calls that other
carriers route over the dedicated 911 network.

9

(c) Vonage does not participate in Enhanced 911 ("E-911") service. It provides no Automatic Location Identification ("ALI") for its customers in areas such as Monroe County where E-911 is established. Because its 911 calls are not transmitted over the dedicated 911 network, there is no technical means of passing the caller's location to the PSAP. Emergency personnel therefore have no location information as they do with other 911 calls when E-911 is available. Emergency personnel may not even have a callback number depending upon whether Caller ID technology is used at the called party location and whether Caller ID information is available on a particular call.

(d) Vonage provides no backup routing in situations where the number it selects is busy, out-of-service or otherwise unavailable. PSAP operators including Monroe County typically have a secondary PSAP facility that would probably not be reached by a Vonage customer dialing 911 when the primary facility is not fully functional.

2. The shortcomings discussed above render Vonage's service unsafe to its subscribers and to other potential users in emergency situations. This situation is exacerbated by Vonage's promotion of its services as a complete replacement for POTS. Frontier submits that Vonage's service and practices with respect to 911 calls are inadequate and insufficient and therefore in violation of Public Service Law §97.

## V.  Conclusion and Requests for Relief.

Frontier has shown that Vonage is violating the Public Service Law and other statutes, regulations and orders in many respects, including the provision of unsafe and inadequate 911 service. Frontier therefore respectfully requests that the Commission order Vonage:

10

(a) immediately to cease providing local exchange and intrastate long distance services within the State of New York until it complies as a CLEC and as an IXC with the appropriate statutes, regulations and orders, including but not limited to obtaining a certificate of public convenience and necessity, filing tariffs, negotiating and filing appropriate interconnection and traffic exchange agreements, and charging and remitting appropriate taxes and 911 surcharges; and

(b) to route all 911 calls over the dedicated 911 network without requiring a special 911 subscription, and to participate fully in E-911 service where available.

Finally, Frontier requests that the Commission grant such other and further relief as the Commission may find appropriate.

Respectfully submitted,

Gregg C. Sayre
Associate General Counsel
Frontier Telephone of Rochester, Inc.
180 South Clinton Avenue
Rochester, New York  14646-0700

DATE:    September 10, 2003

Attachments:    Exhibit 1 –  Vonage Internet web pages re: use of service
Exhibit 2 –  Vonage web pages dealing with number portability
Exhibit 3 –  Minnesota Public Utilities Commission Staff Briefing Paper
Exhibit 4 – Vonage Terms of Service
Exhibit 5 – Vonage web pages describing its 911 service

Vonage Digital Voice ::: The BROADBAND Phone C....,any...

Exhibit 1

08/18/2003



## VONAGE®
THE BROADBAND PHONE COMPANY™

Username:
Password:

Forget Your Password?

* Introduction
* How It Works
* What's Included
* What Do I Need
* Installation

## Use Vonage like you use any telephone

With Vonage, you pick up the phone, hear the dial tone and dial the telephone number of your choice. There are no extra numbers to dial and no special routines to follow. It's that simple. You don't have to be an engineer to use our service.

You can be up and running within minutes of receiving your Vonage package. We send you everything you need to get Vonage DigitalVoice phone service, right down to the extra cable wire. Best of all, there's no technician, no wiring in the walls, and no technical experience needed! Setup usually takes less than 5 minutes.

## Easy Installation

Plug in your phone adapter (the ATA – Cisco ATA-186, analog to digital phone connector – that we send you for FREE) into your high speed Internet connection (cable modem). With a DSL modem, a basic router is required. So first plug your DSL modem into your router. If you don't have a router, we can send you an excellent Netgear router at the deeply discounted price of only $39.99.

Then take any standard telephone and plug it into the phone adapter.

## Surfing the web

INTERNET

DSL or CABLE MODEM

ROUTER

ATA

OVERSEAS PHONE

COMPUTER

http://www.vonage.com/learn_howitworks.php

Vonage Digital Voice ::: The BROADBAND Phone Company...

Exhibit 1

And if you'd like to surf the web and use your Vonage phone service at the same time, it's easy to setup too. You simply plug a networking router (use one you have, or buy one from us during the subscribe process at a 50% discounted rate) into your Cable modem or DSL modem. This allows you to 'share' your high speed Internet connection. Then plug your phone adapter and computer into the router. Talking on the phone and surfing the net with ease at the same time.

## How this lets your call travel

Vonage works just like the telephone you have in your home today. You pick up the phone, dial the number and it connects to whom you're calling.

In more technical terms Vonage uses the phone adapter that we send to you for free to convert your voice from an analog signal to a digital signal. The digital signal then can be sent over your high speed Internet connection because it is recognized as data and then is sent over the Internet.

When someone calls you, they dial your number. Behind the scenes, your number looks very much like an e-mail address. This number instructs the call to travel over the Internet and through our network to the phone adapter we sent you free. Your phone rings, and all you have to do is pick up and answer it.

>> Next >>

:: Corporate Information :: Site Map :: Contact Us :: Privacy Policy :: Terms Of Service :: Affiliate Program

Using the Vonage® mark and other Vonage Holdings Corp. intellectual property such as logos, slogans, trade dress, and graphic symbols on packaging, products, or services requires express written permission from Vonage Holdings Corp.. Use of confusingly similar or disparaging terms is a violation of our intellectual property rights.
©2001 - 2003, Vonage Holdings Corp., All Rights Reserved.

http://www.vonage.com/learn_how/how/he.htm

Exhibit 2

Page - of2

Vonage DigitalVoice :: The BROADBAND Phone Company...



**VONAGE**
THE BROADBAND PHONE COMPANY™

Username:
Password:
Forget Your Password?

**Quick Reference**

● It's Free

● Lets you move your current number to Vonage

● Moving your number can take several days, depending on your current telephone provider

● Learn If we can transfer your existing number here:

Please enter your area code and the first three digits of your phone number.

[____] - [____] - XXXX

● Download Letter of Authorization

**Keep Your Phone Number**
*Change Your Phone Company.*

**Transferring Your Phone Number Is Easy**

When Vonage offers your area code and your rate center (the first three digits of your number after the area code), there's a good chance we can help you keep your existing phone number.If you choose Vonage phone service. A handy tool, located in the Quick Reference section located to the right, can easily determine if we can help you keep your number.

**How To Transfer Your Number To Vonage**

1. Determine if your existing phone number can be transferred
2. Download a Transfer Authorization Form
3. Obtain the first page of your most recent phone bill with the number you wish transferred
4. Fax the completed form and phone bill toll free to 1-866-281-3308

**Transferring Your Number - The Timing**

Transferring your number can take at least 15 - 20 business days upon receipt of complete and correct paperwork. Vonage will keep you informed of the transfer process via email along the way. We'd like the process to go faster, but your existing phone company has to release the number first.

**What Happens While Your Number is Being Transferred**

While your number is being transferred, Vonage will assign you a temporary number that you can use for both incoming and outgoing calls. Then, when your number is transferred, we'll inform you via email and your number will be transferred seamlessly. Your temporary Vonage number then will be inactive.

http://www.vonage.com/area_codes_frm.vhm

Vonage DigitalVoice :::: The BROADBAND Phone Company...

Page 2 of 2

Exhibit 2

## What Happens If Your Number Cannot Be Transferred

If Vonage cannot transfer your number it still makes sense to get Vonage and start saving now. You may elect to get a new Vonage number in your area or elsewhere. Or, you may elect to keep your existing phone number with minimal service and add another Vonage number that will help you save big on outgoing calls. It's your choice, but if you are like most people you'll enjoy considerable savings.

## If you are a DSL Subscriber

DSL subscribers pose a special situation as they must keep their existing phone numbers to maintain a high speed connection to Vonage. In this instance, we will assign you a new Vonage number and you can begin enjoying the benefits of Vonage without delay.

::: Corporate Information ::: Site Map ::: Contact Us ::: Privacy Policy ::: Terms Of Service ::: Affiliates Program

Using the Vonage® mark and other Vonage Holdings Corp., intellectual property such as logos, slogans, trade dress, and graphic symbols on packaging, products, or services require express written permission from Vonage Holdings Corp.. Use of confusingly similar or disparaging terms is a violation of our intellectual property rights.
©2001 - 2003, Vonage Holdings Corp., All Rights Reserved.

http://www.vonage.com/area_codes_inn.nhm

Exhibit 3

# Minnesota Public Utilities Commission
## Staff Briefing Papers

**Meeting Date:** **Wednesday, August 13, 2003** . . . . . . . . . . . . . Agenda Item # **1**

**Company:**    Vonage Holdings Corporation

**Docket No.**    P-6214/C-03-108

In the Matter of the Complaint of the Minnesota Department of Commerce Against Vonage Holding Corp. Regarding Lack of Authority to Operate in Minnesota

**Issue(s):**    How shall the Commission proceed?

**Staff:**    Stuart Mitchell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 651-296-8662

   Karen Hammel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 651-297-1852

## Relevant Documents

Department Complaint (File #1) . . . . . . . . . . . . . . . . . . . . . . . . Received July 15, 2003
Vonage Answer and Motion to Dismiss (File #6) . . . . . . . . . . . Received July 30, 2003
Comments of MCI (File #7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . Received July 30, 2003
Letter of Level 3 Communications (File #10) . . . . . . . . . . . . . Received August 4, 2003

The attached materials are workpapers of the Commission Staff. They are intended for use by the Public Utilities Commission and are based upon information already in the record unless noted otherwise.

**This document can be made available in alternative formats (i.e., large print or audio tape) by calling (651) 297-4596 (voice), (651) 297-1200 (TTY), or 1-800-627-3529 (TTY relay service).**

August 6, 2003

1

### Statement of the Issue

How shall the Commission proceed?

### Background

On July 15, 2003 the Department of Commerce filed a complaint against Vonage Holdings Corporation with the Commission. The Department alleged three violations by the Company:

1.  Vonage has offered and continues to offer telephone services in Minnesota, including local exchange service and long distance service, without first obtaining a certificate under Minn. Stats. §§ 237.16 and 237.74.

2.  The local telephone service offered by Vonage violates Minnesota law in that it fails to provide adequate 911 service.

3.  Vonage has not filed a tariff containing all terms and conditions of its service.

In its filing, the Department requested temporary relief, and an expedited proceeding.

On July 23, 2003 Vonage filed its response to the request for temporary relief.

On July 24, 2003 the Commission deliberated the question of temporary relief and determined it was not necessary. The Commission's Order Denying Temporary Relief was issued on August 1, 2003.

On July 30, 2003 Vonage filed its answer and motion to dismiss. Also on that date MCI and AT&T filed petitions to intervene, and MCI filed comments.

On August 4, 2003 the Commission received a letter from Level 3 Communications, Inc., requesting designation as a "Participant" in these proceedings.

Minn. Rules, part 7829.0800 provides that a petition to intervene in a Commission proceeding may be considered granted if there has been no objection within ten days of the filing of the petition. As of August 13, the date of the Commission meeting, the clock will have run out on the AT&T and MCI petitions; it will have one more day for Level 3. Staff is aware at this time of no objections to any of the petitions.

### Party Positions

## Department of Commerce

The Department alleged that by not obtaining a certificate of authority from the Commission for providing telephone service, Vonage has violated Minn. Stat. § 237.16, subd. 1(b) and 237.74, subd. 12, and Minn. Rules, part 7812.0200, subp. 1. The essence of the Department's argument

is that Minnesota law requires companies providing telephone service in Minnesota to be certificated by the Commission.

With respect to 911 service, the Department said Vonage's failure to have a Commission-approved 911 plan (or to submit one for review and approval) violates Minn. Rules, part 7812.0550, subp. 1. In addition, the Department said Vonage has failed to pay the 911 fees required to be collected from telephone subscribers and remitted to the Department of Administration. This violates Minn. Stat. § 237.49.

The Department said Vonage has failed to file a tariff for charges and prices of service, nor rules or classifications used by it in the conduct of telephone business. This failure violates Minn. Stat. § 237.07.

The Department asked the Commission to take action to remedy the problem posed by Vonage in the following ways:

- Issue an Order finding that Vonage has knowingly and intentionally violated Minnesota Rules and Statutes.
- Order Vonage to fully comply with all Minnesota Statutes and Rules relating to the offering of telephone service in Minnesota within 30 days of the Commission's Order.
- Order Vonage to remit 911 fees to the Minnesota Department of Administration for the period when it served Minnesota customers but did not pay such fees.
- Assess penalties under Minn. Stat. § 237.461 or .462.
- Grant such other and further relief as the Commission may deem just and reasonable.

## Vonage Holdings Corporation

Vonage asked that the complaint be dismissed. Vonage said it is an "information services" provider, not a "telecommunications services" provider, and is not subject to the jurisdiction of the Commission. Because it does not provide telephone services or telecommunications services, it hasn't violated any Minnesota statutes or rules.

Vonage admitted it has no certificate of authority from the Commission, but said as an information service provider, it is not required to obtain a certificate before offering services in Minnesota.

Similarly, Vonage admitted that it has not submitted a 911 plan, but denied that it is required to do so. It denied that it is required to collect 911 fees, but said as an information service provider that purchases telecommunications services, it has paid 911 fees to telecommunications carriers.

Vonage admitted that it has not filed any tariffs in Minnesota, but said it is not subject to tariff requirements applicable to telephone companies.

Vonage asked the Commission to dismiss the complaint in its entirety, and to open a Voice over IP workshop. At a minimum, it said, the Commission should stay this proceeding until it conducts a VoIP workshop. Other states are doing this now.

## MCImetro Access Transmission Services, LLC

MCI said the issue of VoIP regulation is extremely complex and has far-reaching implications. A determination by the Commission to regulate VoIP service will likely affect Universal Service Fund issues, intercarrier compensation issues, and carrier obligations under § 251 of the Federal Telecommunications Act of 1996, and will affect parties other than those that are the subject of this complaint.

MCI said the Commission must make a threshold finding that it has jurisdiction over the complaint, if it is to move forward. In this case, it said, the finding is not simple, as no state or federal entity has made a finding as to whether the VoIP services constitute a "telecommunications service" or an "information service." MCI said the Commission may only assert regulatory jurisdiction if it determines that the Vonage service meets the Act's definition of a "telecommunications service."

MCI suggested that the Commission:

1.  Dismiss the Vonage complaint on the basis that the Department failed to state a claim upon which relief can be granted.
2.  Open an investigation on the Commission's own motion to determine the threshold issue of whether the VoIP service offered by Vonage constitutes either a telecommunications service or an information/enhanced service as defined by the Act.
3.  Refer this question to the Office of Administrative Hearings for record development and proposed findings on the proper classification of the Vonage service.
4.  Provide notice of this proceeding to all parties currently listed on the Commission's general telecommunications list.

### Staff Analysis

There are two broad types of action the Commission may take today to act upon this complaint and response. First, the Commission may determine it needs a more extensive record to resolve the case. If so, it can order a contested case hearing, or an expedited case hearing, or it could take the suggestion of Vonage and MCI and convene a VoIP workshop.

The expansion of the record afforded by these types of proceedings is especially useful when there are facts material to the disposition of the complaint which are in dispute. If, on the other hand, the facts are undisputed, then really only policy and law need resolution, and there are less expensive means of doing so.

The second type of action is to deal directly with the matter, on the basis of the record as it stands. If the facts are undisputed, and the law or policy is clear, then the Commission may proceed to put this matter to rest immediately. As will be shown, staff thinks this is the appropriate approach to take.

Imagine the following conversation between the Department and Vonage:

Department:    "You don't have a certificate of authority from the Commission."

Vonage:        "That's correct."

Department:    "You have no approved 911 plan."

Vonage:        "That's correct."

Department:    "You have no Commission-approved tariff on file."

Vonage:        "That's correct."

Department:    "You're providing telephone service."

Vonage:        "No, I'm not."

That little conversation (in deathless prose) sums up the record in this case. The dispute is not over the facts, but over whether Vonage is providing telephone service. That question, it turns out, is a matter of law.

Minn. Stat. § 237.01, subd. 7 states:

> "Telephone company," means and applies to any person, firm, association or any corporation, private or municipal, owning or operating any telephone line or telephone exchange for hire, wholly or partly within this state, or furnishing any telephone service to the public.

Minn. Stat. § 237.16, subd. 1 (b) reads as follows:

> No person shall provide telephone service in Minnesota without first obtaining a determination that the person possesses the technical, managerial, and financial resources to provide the proposed telephone services and a certificate of authority from the commission under terms and conditions the commission finds to be consistent with fair and reasonable competition, universal service, the provision of affordable telephone service at a quality consistent with commission rules, and the commission's rules.

The term "telephone service" is not defined in Minnesota statutes.

In <u>Minnesota Microwave, Inc. v. Public Service Commission</u>, 291 Minn. 241, 190 N.W.2d 661 (1971), the Minnesota Supreme Court considered whether a private company providing unidirectional, closed-circuit, microwave facilities was subject to the jurisdiction of the Commission as a "telephone company" or a supplier of "telephone service." The Court stated:

[W]hether appellant is supplying "telephone service" is a question of law to be determined on the basis of the operative facts determined by the commission.

Id. at 245, 190 N.W. 2d at 664.

The Court continued (admonishing the Commission):

> While it is undoubtedly true that administrative interpretations may in certain instances be entitled to great weight, it is clear that such is not here the case. **The statutory language here under consideration is not exceedingly technical in nature, such that only specialized agencies may be thought able to understand it. Instead, the statute is phrased in common terms, and thus affords no good reason for deferring to administrative expertise for its interpretation.** Moreover, the fact that the question now before this court is one which the agency has not had occasion to consider prior to the instant case weighs against placing much weight on the commission's interpretation. (Emphasis added.)

Id., 190 N.W. 2d at 665.

The Court noted:

> It appears that for the most part the term "telephone service" refers to the supplying of facilities for two-way communications.

Id. at 247, 190 N.W.2d at 665.

What the Supreme Court was saying, in other words, is that it is up to the Commission to decide what constitutes "telephone service," and that making such a determination is not rocket science.

What is it that Vonage offers? Let's look first at what Vonage says it offers (taken from Vonage's web site at http://www.vonage.com/learn_tour.php, Exhibit 1 of the Department's complaint):

> Vonage DigitalVoice is an all-inclusive home phone service that replaces your current phone company.
>
> This is like the home phone service you have today – only better!
>
> Vonage combines domestic US local, long distance, and Canada calls for one flat price because it runs over your high speed Internet connection. Say goodbye to confusing bills and surprising charges. With Vonage DigitalVoice you get unlimited local and long distance calling, Canadian calling, plus great features like Caller ID, Call Waiting and Voicemail. Best of all you only pay one low price.

To use Vonage, a subscriber must have either a cable modem or a DSL modem and Internet service. The subscriber's ordinary touch-tone phone plugs into a "black box" (an MTA or a router) which itself is plugged into the modem.

In order to determine whether Vonage offers "telephone service," lets compare Plain Old Telephone Service (POTS) and the service offered by Vonage:

|  |  |  |
|---|---|---|
| Subscriber picks up ordinary telephone handset. | Subscriber hears dial tone. | Subscriber hears dial tone. |
| Subscriber dials an assigned telephone number. | Gets connected or hears busy signal. | Gets connected or hears busy signal. |
| Subscriber speaks. | Call recipient hears voice. | Call recipient hears voice. |
| Call recipient speaks. | Subscriber hears voice. | Subscriber hears voice. |
| Caller dials subscriber's phone. | Ordinary telephone rings. | Ordinary telephone rings. |
| Subscriber responds to the call, picking up the handset. | Conversation ensues. | Conversation ensues. |

Are there any differences between the service offered by Vonage and POTS? Yes. For example, a Vonage subscriber can connect his or her telephone and black box to another similar high-speed Internet connection in another North American location. It will work just fine. Not so with POTS. Here are some other differences:

|  |  |  |
|---|---|---|
| Subscriber dials 911 | Call is routed to the nearest 911 center | a. If subscriber hasn't set up the service, there is no connection.<br><br>b. If subscriber has set up the service, call is routed to an administrative number at a fire or police station near the location given by the subscriber when setting up the service. |
| Subscriber disputes a portion of the bill. | Subscriber may pay the disputed amount into an escrow account. | Subscriber must pay Vonage the disputed amount. |

This list could go on. It demonstrates that in the areas identified by the Department, Vonage is not complying with Minnesota regulation of telephone companies that provide telephone service.

So what should the Commission do about the Department's complaint? Here is what is known: Under Minnesota law, any company providing "telephone service" is regulated by the Commission. The Commission is to interpret the term "telephone service," and the Minnesota

Supreme Court said that "for the most part" telephone service is not a technical term, but has a common meaning which, among other things, refers to two-way communication. Vonage tells anyone visiting its web site that it offers "home phone service that replaces your current phone company." In the ordinary course of phone usage there is no difference in functionality to the subscriber whether he or she uses POTS or Vonage. And in unusual circumstances, i.e., 911 calls or disputes with the provider, subscribers will find that Vonage departs from expectations because the Company does not comply with Minnesota protections found in statutes, rules, and Commission-authorized tariffs.

Staff maintains that the Commission can decide whether Vonage is supplying "telephone service" within the meaning of Minnesota statutes on the basis of the record before it right now.

But what about the Telecommunications Act of 1996? What about the distinction, under the Act, between "telecommunications service" and "information service?" What about the apparent "special status" of the VoIP technology?

As the parties have pointed out, these questions are being addressed in many proceedings, both at the FCC and in various states. None of these proceedings has yet reached a conclusion, let alone one that has been tested through the courts.

Staff maintains the Commission need not reach these questions now. Staff notes that it agrees absolutely with MCI in framing the Commission's jurisdiction as a "threshold issue." However, MCI was mistaken when it said that issue must be resolved by determining whether the VoIP product Vonage offers is a "telecommunications service" or an "information/enhanced service." No, instead jurisdiction is reached through application of the facts of the case to Minnesota law. The Commission is not here regulating a VoIP technology, but, if it fits the Commission's definition, a telephone service. This is squarely what it has been charged to do by the legislature.

It may come to pass, some time in the future, that a court or other competent body finds that Minnesota regulation in this area is pre-empted by federal action. We know that, if and when it happens, interstate regulation trumps intrastate regulation. That can be addressed then. It need not be now.

If the Commission finds that Vonage is providing "telephone service" under Minnesota law, it then would need to determine whether the violation is knowing and intentional. Because the dispute centers around which law is applicable, staff's view is that any violation is unintentional. Should the Commission reach the opposite conclusion, staff recommends the Commission establish a sequence of briefs or comments and replies, and then meet in further hearing to determine penalties under Minn. Stat. § 237.461 or .462.

Staff has listed six mutually exclusive alternatives below. Numbers one through three imply that the current record is sufficient for the Commission's decision. Numbers four through six imply that the Commission needs more information to determine this matter.

### Alternatives

The threshold question whether the Commission has jurisdiction to address the complaint is determined by answering the question whether Vonage provides "telephone service" pursuant to Minnesota law. If the answer to the latter is yes, then the Commission has jurisdiction to address the complaint under Minnesota statutes unless state law is preempted by federal law. In this case there appears to be no clear preemption of state law.

1.  Find that Vonage is offering "telephone service" within the meaning of Minn. Stat. §§ 237.01, subd. 7, and 237.16, subd. 1 (b). Conclude that the complaint is justified and

    a.  Order Vonage to fully comply with all Minnesota Statutes and Rules relating to the offering of telephone service in Minnesota within 30 days of the Commission's Order.
    b.  Order Vonage to remit 911 fees to the Minnesota Department of Administration for the period when it served Minnesota customers but did not pay such fees.
    c.  Grant such other and further relief as the Commission may deem just and reasonable.

2.  Find that Vonage is offering "telephone service" within the meaning of Minn. Stat. §§ 237.01, subd. 7, and 237.16, subd. 1 (b). Conclude that the complaint is justified and

    a.  Issue an Order finding that Vonage has knowingly and intentionally violated Minnesota Rules and Statutes.
    b.  Order Vonage to fully comply with all Minnesota Statutes and Rules relating to the offering of telephone service in Minnesota within 30 days of the Commission's Order.
    c.  Order Vonage to remit 911 fees to the Minnesota Department of Administration for the period when it served Minnesota customers but did not pay such fees.
    d.  Establish a sequence of briefs or comments and replies, followed by a further hearing to assess penalties under Minn. Stat. § 237.461 or .462.
    e.  Grant such other and further relief as the Commission may deem just and reasonable.

3.  Find that Vonage is not offering "telephone service" within the meaning of Minn. Stat. §§ 237.01, subd. 7, and 237.16, subd. 1 (b). Dismiss the complaint.

4.  Order a contested case hearing to examine the issues raised by the Department's complaint.

5.  Schedule an expedited hearing to examine the issues raised by the Department's complaint.

6.  Table the complaint until after holding a workshop on the VoIP technology.

### Recommendation

Staff recommends Alternative 1.

Exhibit 4
Page 1

This agreement ("Agreement") is between Vonage Holdings Corp. ("we," "us" or "Vonage") and the user ("you," "user" or "Customer") of Vonage's enhanced Small Business communications services and any related products or services ("Service"). This Agreement governs both the Service and any devices, such as an IP phone, Multimedia Terminal Adapter, Analog Telephone Adapter, Cisco ATA - 186 or any other IP connection device ("Device"), used in conjunction with the Service. By activating the Service, you acknowledge that you have read and understood, and you agree, to the terms and conditions of this Agreement, and you represent that you are of legal age to enter this Agreement and become bound by its terms.

## 1. SERVICE

### 1.1 Term

Service is offered on a monthly basis for a term which begins on the date that Vonage activates your Service and ends on the day before the same date in the following month. Subsequent terms of this Agreement automatically renew on a monthly basis without further action by you unless you give Vonage written notice of non-renewal at least ten [10] days before the end of the monthly term in which the notice is given. You are purchasing the Service for full monthly terms, meaning that if you attempt to terminate Service prior to the end of a monthly term, you will be responsible for the full month's charges to the end of the then-current term, including without limitation unbilled charges, plus a disconnect fee, all of which immediately become due and payable. Expiration of the term or termination of Service does not excuse the Customer from paying all unpaid, accrued charges due in relation to the Agreement.

### 1.2 Residential Use of Service and Device

The Service and Device are provided to you as a residential user, for your personal, residential, non-business and non-professional use. This means that you are not using them for any commercial or governmental activities, profit-making or non-profit, including but not limited to home office, business, sales, tele-commuting, tele-marketing, continuous autodialing, fax broadcast, fax blasting or any other activity that would be inconsistent with normal residential usage patterns. This also means that you are not to resell or transfer the Service or the Device to any other person for any purpose, or make any charge for the use of the Service, without express written permission from Vonage in advance. You agree that your use of the Service and/or Device, or the use of the Service and/or Device provided to you by any other person for any commercial or governmental purpose will obligate you to pay Vonage's higher rates for commercial service on account of all periods, including past periods, in which you use, or used, the Service for commercial or governmental purposes. Vonage reserves the right to immediately terminate or modify the Service, if Vonage determines, in its sole discretion, that Customer's Service is being used for non-residential or commercial use.

### 1.3 Lawful Use of Service and Device

### 1.3.1 Prohibited Uses:

You agree to use the Service and Device only for lawful purposes. This means that you agree not to use them for transmitting or receiving any illegal, harmful, threatening, abusive, harassing, defamatory, obscene, sexually explicit, profane, racially or ethnically disparaging remarks or otherwise objectionable material of any kind, including but not limited to any material that encourages conduct that would constitute a criminal offense, give rise to a civil liability, or otherwise violate any applicable local, state, national or international law. Vonage reserves the right to terminate your service immediately and without advance notice if Vonage, in its sole discretion, believes that you have violated the above restrictions, leaving you responsible for the full month's charges to the end of the current term, including without limitation unbilled charges, plus a disconnect fee, all of which immediately become due and payable. You are liable for any and all use of the Service and/or Device by any person making use of the Service or Device provided to you. If Vonage, in its sole discretion believes that you have violated the above restrictions, Vonage may forward the objectionable material, as well as your communications with Vonage and your personally identifiable information to the appropriate authorities for investigation and prosecution.

### 1.3.2 Use of Service and Device by Customers Outside the United States:

Exhibit 4
Page 2

While we encourage use of the Service for calls from the United States to other countries, Vonage does not presently offer the Service to customers located in other countries. If you remove the Device to a country other than the United States and use the Service from there, you do so at your own risk, including the risk that such activity violates local laws in the country where you do so.    Vonage reserves the right to terminate your service immediately and without advance notice if Vonage, in its sole discretion, believes that you have violated the above restrictions or if you use or attempt to use the Service from any country other than the United States, leaving you responsible for the full month's charges to the end of the current term, including without limitation unbilled charges, plus a disconnect fee, all of which immediately become due and payable.  You are liable for any and all use of the Service and/or Device by any person making use of the Service or Device provided to you.

### 1.4 Loss of Service Due to Power Failure
You acknowledge and understand that the Service does not function in the event of power failure.  Should there be an interruption in the power supply, the Service will not function until power is restored.  A power failure or disruption may require the Customer to reset or reconfigure equipment prior to utilizing the Service.  Power disruptions or failures will also prevent dialing to emergency service numbers including 911.

### 1.5 Copyright / Trademark / Unauthorized Usage of Device, Firmware or Software
The Service and Device and any firmware or software used to provide the Service or provided to Customer in conjunction with providing the Service, or embedded in the Device, and all Services, information, documents and materials on Vonage's website(s) are protected by trademark, copyright or other intellectual property laws and international treaty provisions.  All websites, corporate names, service marks, trademarks, trade names, logos and domain names (collectively "marks") of Vonage are and shall remain the exclusive property of Vonage and nothing in this Agreement shall grant you the right to right or license to use such marks.  You acknowledge that you are not given any license to use the firmware or software used to provide the Service or provided to Customer in conjunction with providing the Service, or embedded in the Device, other than a nontransferable, revocable license to use such firmware or software (without making any modification thereto) strictly in accordance with the terms and conditions of this Agreement, and that the Device is exclusively for use in connection with the Service.  If you decide to use the Service through an interface device not provided by Vonage, which Vonage reserves the right to prohibit in particular cases or generally, you warrant and represent that you possess all required rights, including software and/or firmware licenses, to use that interface device with the Service and you will indemnify and hold harmless Vonage against any and all liability arising out of your use of such interface device with the Service.

### 1.6 Tampering with the Device
You agree not to change the electronic serial number or equipment identifier of the Device, or to perform a factory reset of the Device, without express permission from Vonage in each instance.  Vonage reserves the right to terminate your Service should you tamper with the Device, leaving you responsible for the full month's charges to the end of the current term, including without limitation unbilled charges, plus a disconnect fee, all of which immediately become due and payable.

### 1.7 Theft of Service
You agree to notify Vonage immediately, in writing or by calling the Vonage customer support line, if the Device is stolen or if you become aware at any time that your Service is being stolen or fraudulently used.  When you call or write, you must provide your account number and a detailed description of the circumstances of the Device theft or fraudulent use of Service.  Failure to do so in a timely manner may result in the termination of your Service and additional charges to you.  You will be liable for all use of the Service using a Device stolen from you and any and all stolen Service or fraudulent use of the Service.

### 1.8 Return of Device
The Device may be returned to Vonage within fourteen (14) days of the line termination to receive a credit for the $39.99 disconnect fee  (refer to section 4.6 of this document regarding termination fees), provided:(i) Customer retained proof of purchase and original packaging and (ii) contents are undamaged

Exhibit 4
Page 3

and in original condition and (iii) and all documentation and packaging materials are returned. If Customer receives cartons and/or Devices that are visibly damaged, please note the damage on the carrier's freight bill or receipt and keep a copy. Keep the original carton, all packing materials and parts intact and contact Vonage's customer care department immediately. Warranty coverage varies depending on the type of Device that Customer chooses. Please refer to the Vonage warranty materials included in the packaging of your Device(s).

### 1.9 Number Transfer on Service Termination

Vonage may, at the Company's discretion, release the telephone number used in connection with your Service provisioned by Vonage to your new service provider, if they are able to accept it, upon your termination of the Service. Vonage will do so provided (i) your account has been terminated and (ii) your Vonage account is completely current including payment for all charges and disconnect fees and (iii) you request the transfer upon terminating your account.

## 2. EMERGENCY SERVICES- 911 DIALING

### 2.1 Non-Availability of Traditional 911 or E911 Dialing Service:

You acknowledge and understand that the Service does NOT support traditional 911 or E911 access to emergency services. The Company does offer a limited 911-type service as described herein, but you acknowledge and understand that 911-type dialing is NOT automatic -- you must separately activate such 911-type dialing capabilities and that such 911-type dialing is different in a number of important ways from traditional 911 service, as described herein. You agree to inform any household residents, guests and other third persons who may be present at the physical location where you utilize the Service as to the non-availability of traditional 911 or E911 dialing from your Vonage Service and Device(s). If you activate Vonage 911-type dialing service, you agree to inform any household residents, guests and other third persons who may be present at the physical location where you utilize the Service as to the important differences and limitations of Vonage 911 dialing service as compared with traditional 911 or E911 dialing, as set forth in this Agreement.

### 2.2 Description of 911-Type Dialing Capabilities - Activation Required

The Company does offer a 911-type dialing service that is different in a number of important ways from traditional 911 service. You acknowledge and understand that 911-type dialing is NOT automatic. You must successfully activate the 911 dialing feature by following the instructions from the "Dial 911" link on your dashboard. You acknowledge and understand that you cannot dial 911 from this line unless and until you have received a confirming email. Once you have received a confirming email that 911 dialing has been successfully activated, you may dial 911 as needed. When you dial 911, your call is routed from the Vonage network to the Public Safety Answering Point (PSAP) or local emergency service personnel designated for the address that you listed at the time of activation. You acknowledge and understand that when you dial 911 from your Vonage equipment you will be routed to the general telephone number for the PSAP or local emergency service provider, and may not be routed to the 911 dispatcher(s) who are specifically designated to receive incoming 911 calls using traditional 911 dialing. As described herein, this 911-type dialing currently is NOT the same as traditional 911 or E911 dialing, and at this time, does not necessarily include all of the capabilities of traditional 911 dialing.

### 2.3 Service Outage:

#### 2.3.1 Power Outage

You acknowledge and understand that 911 dialing does not function in the event of a power failure. Should there be an interruption in the power supply, the Service and 911 dialing will not function until power is restored. A power failure or disruption may require the Customer to reset or reconfigure equipment prior to utilizing the Service or 911 dialing.

#### 2.3.2 Broadband Service Outage

Exhibit 4
Page 4

You acknowledge and understand that service outages by your broadband provider will prevent ALL calls, including 911 dialing.

### 2.3.3 Service Outage Due to Suspension of Your Account
You acknowledge and understand that service outages due to suspension of your account as a result of billing issues will prevent ALL calls, including 911 dialing.

### 2.3.4 Other Service Outages
You acknowledge and understand that if there is a service outage for ANY reason, such outage will prevent ALL calls, including 911 dialing. Such outages may occur for a variety of reasons, including, but not limited to those reasons described elsewhere in this Agreement.

### 2.3.5 Limitation of Liability and Indemnification
You acknowledge and understand that the Company's liability is limited for any Service outage and/or inability to dial 911 from your line or to access emergency service personnel, as set forth in this document. You agree to defend, indemnify, and hold harmless Vonage, its officers, directors, employees, affiliates and agents and any other service provider who furnishes services to Customer in connection with this Agreement or the Service, from any and all claims, losses, damages, fines, penalties, costs and expenses (including, without limitation, reasonable attorneys fees) by, or on behalf of, Customer or any third party or user of Customer's Service relating to the absence, failure or outage of the Service, including 911 dialing and/or inability of Customer or any third person or party or user of Customer's Service to be able to dial 911 or to access emergency service personnel.

### 2.4 Requires Activation:
You acknowledge and understand that 911 dialing does not function unless you have successfully activated the 911 dialing feature by following the instructions from the "Dial 911" link on your dashboard, and until such later date that such activation has been confirmed to you through a confirming email. You acknowledge and understand that you cannot dial 911 from this line unless and until you have received a confirming email.

### 2.5 Failure to Designate the Correct Physical Address When Activating 911 Dialing:
Failure to provide the current and correct physical address and location of your Vonage equipment will result in any 911 call you may make being routed to the incorrect local emergency service provider.

### 2.6 Requires Re-Activation if You Change Your Number:
You acknowledge and understand that 911 dialing does not function if you change your phone number unless and until you have successfully activated the 911 dialing feature following the instructions from the "Dial 911" link on your dashboard, and until such later date that such activation has been confirmed to you through a confirming email. 911 dialing must be re-activated. Although you may have activated 911 dialing with your former Vonage phone number, you must separately activate 911 dialing for any new number.

### 2.7 Change of Physical Location of Vonage Equipment:
You acknowledge and understand that 911 dialing does not function properly or may not function at all if you take your equipment with you away from the address or physical location that you have designated.

### 2.8 Requires Re-Activation if You Move:
You acknowledge and understand that 911 dialing does not function properly or at all if you move or change the physical location of your Vonage equipment to a different street address, unless and until you have successfully activated the 911 dialing feature following the instructions from the "Dial 911" link on your dashboard, and until such later date that such activation has been confirmed to you through a confirming email. 911 dialing must be re-activated although you may have activated 911 dialing using your former address, and you must separately activate 911 dialing for any new physical address. Failure to provide the current and correct physical address and location of your Vonage equipment will result in any 911 dialing you may make being routed to the incorrect local emergency service provider

Exhibit 4
Page 5

**2.9 Possibility of Network Congestion and/or Reduced Speed for Routing 911 Calls:**
Due to the manner in which it is technically possible to provide the 911 dialing feature for Vonage DigitalVoice calls at this time, you acknowledge and understand that there is a greater possibility of network congestion and/or reduced speed in the routing of a 911 call made utilizing your Vonage equipment as compared to traditional 911 dialing over traditional public telephone networks. You acknowledge and understand that 911 dialing calls from your Vonage equipment will be routed to the general telephone number for the local emergency service provider, and will not be routed to the 911 dispatcher(s) who are specifically designated to receive incoming 911 calls at such local provider's facilities when such calls are routed using traditional 911 dialing. You acknowledge and understand that there may be a greater possibility that the general telephone number for the local emergency service provider will produce a busy signal or will take longer to answer, as compared to those 911 calls routed to the 911 dispatcher(s) who are specifically designated to receive incoming 911 calls using traditional 911 dialing.

**2.10 Automated Number Identification:**
At this time in the technical development of Vonage 911 dialing, it may or may not be possible for the Public Safety Answering Point (PSAP) and the local emergency personnel to identify your phone number when you dial 911. Vonage's system is configured in most instances to send the automated number identification information along with the call; however, the phone system that transmits the call to the PSAP and the PSAP itself must be able to receive the information and pass it along properly, and they are not yet always technically capable of doing so. You acknowledge and understand that PSAP and emergency personnel may or may not be able to identify your phone number in order to call you back if the call is unable to be completed, is dropped or disconnected, or if you are unable to speak to tell them your phone number and/or if the Service is not operational for any reason, including without limitation those listed elsewhere in this Agreement.

**2.11 Automated Location Identification:**
At this time in the technical development of Vonage 911 Dialing, it is not possible to transmit identification of the address that you have listed to the Public Safety Answering Point (PSAP) and local emergency personnel for your area when you dial 911. You acknowledge and understand that you will need to state the nature of your emergency promptly and clearly, including your location, as PSAP personnel will NOT have this information. You acknowledge and understand that PSAP and emergency personnel will not be able to find your location if the call is unable to be completed, is dropped or disconnected, if you are unable to speak to tell them your location and/or if the Service is not operational for any reason, including without limitation those listed elsewhere in this Agreement.

**3. CHANGES TO THIS AGREEMENT**
Vonage may change the terms and conditions of this Agreement from time to time. Notices will be considered given and effective on the date posted. Agreement posted supercedes all previously agreed to electronic and written Terms of Service.

**4. CHARGES / PAYMENTS / DEFAULT / TAXES / TERMINATION**

**4.1 Billing**
You must give us a valid credit card number when the Service is activated. If the card expires, you close your account or your billing address changes, or the card is cancelled and replaced owing to loss or theft, you must advise Vonage at once. We will bill all charges monthly to your credit card, including but not limited to: activation fees, monthly Service fees, international usage charges, advanced feature charges, equipment purchases and shipping and handling charges. Vonage reserves the right to bill at more frequent intervals if the amount due at any time exceeds $50.

**4.2 Billing Disputes**

Exhibit 4
Page 6

You must notify Vonage in writing within 7 days after receiving your credit card statement if you dispute any Vonage charges on that statement or such dispute will be deemed waived. Billing disputes should be notified to the following address:

Customer Care Billing Department
Vonage Holdings
2147 Route 27
Edison, NJ 08817
or
billing@customercare.com
or
1-VONAGE-HELP

**4.3 Payment**
Vonage only accepts payments by credit card. Your initial use of the Service authorizes Vonage to charge the credit card account number on file with Vonage, including any changed information given Vonage if the card expires or is replaced, for Vonage charges that accrue during the billing cycle. This authorization will remain valid until 30 days after Vonage receives your written notice terminating Vonage's authority to charge your credit card. Vonage may terminate your Service at any time in its sole discretion, if any charge to your credit card on file with Vonage is declined or reversed or in case of any other non-payment of account charges. Termination of Service for declined card, reversed charges or non-payment leaves you FULLY LIABLE to Vonage for ALL CHARGES ACCRUED BEFORE TERMINATION and for charges incurred by Vonage owing to your non-payment, such as (but not limited to) collection costs and attorney's fees.

**4.4 Termination/Discontinuance of Service**
Vonage reserves the right to suspend or discontinue providing the Service generally, or to terminate your Service, at any time in its sole discretion. If Vonage discontinues providing the Service generally, or terminates your Service in its discretion without a stated reason, you will only be responsible for charges accrued through the date of termination, including a pro-rated portion of the final month's charges. If your Service is terminated for any stated reason, including without limitation violation of this Agreement, or because of any improper use of the Service or Device (such as, but not limited to, your attempts to hack, disrupt, or misuse the Service), you will be responsible for the full month's charges to the end of the current term, including without limitation unbilled charges, plus a disconnect fee, all of which immediately become due and payable.

**4.5 Taxes**
Customer is responsible for, and shall pay any applicable federal, state, municipal, local or other governmental sales, use, excise, value-added, personal property, public utility or other taxes, fees or charges now in force or enacted in the future, that arise from or as a result of Customer's subscription or use or payment for the Service or a Device. Such amounts are in addition to payment for the Service or Devices and will be billed to your account. If Customer is exempt from payment of such taxes, it will provide Vonage with an original government-issued certificate attesting to tax-exempt status. Tax exemption will only apply from and after the date Vonage receives the Tax Exempt Document.

**4.6 Disconnect Fee**
You will be charged a disconnect fee of $39.99 per voice line upon any termination of your Service. The disconnect fee becomes due and payable immediately upon termination and will billed directly to your credit card. If you have multiple lines, you will be charged a disconnect fee of $39.99 per line for each line you disconnect. To receive a credit for the disconnect fee, you may return your Device within fourteen (14) days of termination, provided: (i) Customer retained proof of purchase and original packaging, (ii) contents are undamaged and in original condition and (iii) all documentation and packaging materials are returned. In the event you disconnect multiple lines, Vonage will issue you a credit for all disconnect fees upon receipt of all Devices (Multimedia Terminal Adapters, etc.) within 14 days of termination.

Exhibit 4
Page 7

### 4.7 Money Back Guarantee

Vonage offers a 14-day money back guarantee, applicable to one primary line per account, not additional or secondary lines. Under terms of the money back guarantee, Vonage refunds the activation fee, first month of service, shipping charges and waives the disconnect fee. Vonage reserves the right to terminate or revoke the Money-Back Guarantee at any time, without prior notice.

User must cancel service within 14 days of the account activation. Equipment must be returned within 14 days. Usage must not exceed 250 minutes within the first 14 days of service. User is responsible for any charges for overage, international or directory assistance calls. Accounts exceeding 250 minutes of usage are not eligible for refund.

All returned equipment must be in the original packaging with the UPC or bar code intact. All components, manuals and registration card(s) must be included. Equipment must be returned with a valid return authorization number obtained from Vonage Customer Care. User is responsible for return shipping of equipment. The money back guarantee will not be honored if user fails to meet all above requirements.

To obtain a return authorization number, user must contact billing@vonage.com or 1-VONAGE-HELP.

## 5. WARRANTY and LIABILITY LIMITATIONS / INDEMNIFICATION

### 5.1 Limitation of Liability

Vonage shall not be liable for any delay or failure to provide the Service, including 911 dialing, at any time or from time to time, or any interruption or degradation of voice quality that is caused by any of the following:
1.) act or omission of an underlying carrier, service provider, vendor or other third party;
2.) equipment, network or facility failure;
3.) equipment, network or facility upgrade or modification;
4.) force majeure events such as (but not limited to) acts of god; strikes; fire; war; riot; government actions;
5.) equipment, network or facility shortage;
6.) equipment or facility relocation;
7.) service, equipment, network or facility failure caused by the loss of power to Customer; or
8.) any other cause that is beyond Vonage's control, including without limitation the failure of an incoming or outgoing call to be connected or completed, including 911 dialing, or degradation of voice quality.
Vonage's liability for any failure or mistake shall in no event exceed Service charges with respect to the affected time period.

### 5.2 No Consequential Damages

In no event shall Vonage, its officers, directors, employees, affiliates or agents or any other service provider who furnishes services to Customer in connection with this Agreement or the Service be liable for any incidental, indirect, special, punitive, exemplary or consequential damages, or for any damages, including but not limited to loss of data, loss of revenue or profits, or arising out of or in connection with the use or inability to use the Service, including inability to be able to dial 911 or to access emergency service personnel through the Service. The limitations set forth herein apply to claims founded in breach of contract, breach of warranty, products liability, tort and any and all other theories of liability and apply whether or not Vonage was informed of the likelihood of any particular type of damages.

### 5.3 Indemnification

Customer agrees to defend, indemnify, and hold harmless Vonage, its officers, directors, employees, affiliates and agents and any other service provider who furnishes services to Customer in connection with this Agreement or the Service, from any and all claims, losses, damages, fines, penalties, costs and expenses (including, without limitation, reasonable attorneys fees) by, or on behalf of, Customer or any third party or user of Customer's Service, relating to this Agreement, the Services, including 911 dialing, or the Device. This paragraph shall survive termination of this Agreement.

Exhibit 4
Page 8

### 5.4 No Warranties on Service

Vonage makes no warranties, express or implied, including but not limited to, any implied warranties of merchantability or fitness of the Service or the Device for a particular purpose. Vonage does not warrant that the Service will be without Service failure, delay, interruption, error, degradation of voice quality or loss of content, data or information. Neither Vonage nor its officers, directors, employees, affiliates or agents or any other service provider or vendor who furnishes services or products to Customer in connection with this Agreement or the Service will be liable for unauthorized access to Vonage's or Customer's transmission facilities or premises equipment or for unauthorized access to, or alteration, theft or destruction of, Customer's data files, programs, procedures or information through accident, fraudulent means or devices or any other method, regardless of whether such damage occurs as a result of Vonage's or its service provider's or vendors' negligence. Statements and descriptions concerning the Service or Device, if any, by Vonage or Vonage's agents or installers are informational and are not given as a warranty of any kind.

### 5.5 No Warranties, or Limited Warranties, for Devices

If Customer purchased the Device new from Vonage and the Device included a limited warranty at the time of purchase, Customer must refer to the separate limited warranty document for information on the limitation and disclaimer of certain warranties. If Customer's Device did not include a limited warranty from Vonage at the time of purchase, Customer agrees that it accepts its Device "as is" and that Customer is not entitled to replacement or refund in the event of any defect.

### 5.6 No Third Party Beneficiaries

No provision of this Agreement provides any person or entity not a party to this Agreement with any remedy, claim, liability, reimbursement, or cause of action or creates any other third party beneficiary rights.

### 5.7 Content

You are liable for any and all liability that may arise out of the content transmitted by or to you or Users using the Services. You shall assure that your or User's use of the Services and content will at all times comply with all applicable laws, regulations and written and electronic instructions for use. Vonage reserves the right to terminate or suspend affected Services, and/or remove Your or Users' content from the Services, if Vonage determines that such use or content does not conform with the requirements set forth in this Agreement or interferes with Vonage's ability to provide Services to you or others or receives notice from anyone that Your or Users' use or Content may violate any laws or regulations. Vonage's actions or inaction under this Section shall not constitute review or approval of Your or Users' use or Content. You will indemnify and hold Vonage against any and all liability arising from the content transmitted by or to you or to Users using the Services. A "User" means any person, whether authorized or unauthorized, using the Service and/or Device provided to you.

## 6. GOVERNING LAW / RESOLUTION OF DISPUTES

### 6.1 Mandatory Arbitration

Any dispute or claim between Customer and Vonage arising out of or relating to the Service or Device provided in connection with this Agreement shall be resolved by arbitration before a single arbitrator administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules. The arbitrator's decision shall follow the plain meaning of the relevant documents, and shall be final and binding. Without limiting the foregoing, the parties agree that no arbitrator has the authority to: (i) award relief in excess of what this Agreement provides; or (ii) award punitive or exemplary damages. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. All claims shall be arbitrated individually and Customer will not bring, or join a punitive or certified class action to arbitration or seek to consolidate or bring previously consolidated claims in arbitration. Customer acknowledges that this arbitration provision constitutes a waiver of any right to a jury trial.

Exhibit 4
Page 9

**6.2 Governing Law**
The Agreement and the relationship between you and Vonage shall be governed by the laws of the State of New Jersey without regard to its conflict of law provisions. You and Vonage agree to submit to the personal and exclusive jurisdiction of the courts located within the state of New Jersey. The failure of Vonage to exercise or enforce any right or provision of the Agreement shall not constitute a waiver of such right or provision. If any provision of the Agreement is found by a court of competent jurisdiction to be invalid, the parties nevertheless agree that the court should endeavor to give effect to the parties' intentions as reflected in the provision, and the other provisions of the Agreement remain in full force and effect. You agree that regardless of any statute or law to the contrary, any claim or cause of action arising out of or related to use of the Service or the Agreement must be filed within one (1) year after such claim or cause of action arose or be forever barred.

**6.3 Entire Agreement**
This Agreement and the rates for Services found on Vonage's website constitute the entire agreement between you and Vonage and govern your use of the Service, superseding any prior agreements between you and Vonage and any and all prior or contemporaneous statements, understandings, writings, commitments, or representations concerning its subject matter. No amendment to this Agreement shall be binding upon Vonage unless and until posted in accordance with Section 3 hereof.

**6.4 Severability**
If any part of this Agreement is legally declared invalid or unenforceable, all other parts of this Agreement are still valid and enforceable. Such invalidity or non-enforceability will not invalidate or render unenforceable any other portion of this Agreement.

**7. PRIVACY**

Vonage Service utilizes, in whole or in part, the public Internet and third party networks to transmit voice and other communications. Vonage is not liable for any lack of privacy which may be experienced with regard to the Service. Please refer to our Privacy Policy at www.vonage.com for additional information.

**8. NOTICES**
Notices to Customer shall either (i) be made by posting to the "Service Announcements" section of our Web Site, and/or (ii) be sent to the email address on file for Customer at Vonage. You are responsible for notifying us of any changes in your email address by e-mailing us at customercare@vonage.com, and we may continue to use your previous e-mail address unless and until we have received your notice of address change. Notices will be considered given on the date posted or sent by Vonage.

Last Updated: August 13, 2003

Pa   of 2

Vonage DigitalVoice ::: The BROADBAND Phone Company...

Exhibit 5



# VONAGE
## THE BROADBAND PHONE COMPANY™

Username:
Password:

Forget Your Password?

## Vonage 911

### Vonage Lets You Dial 911

**Prior Activation Required.**
Your Safety Is Important.
Vonage is proud to offer 911 emergency dialing. When you dial 911, your call is routed from the Vonage network to the Public Safety Answering Point (PSAP) for your area. There are several important differences between our Emergency Services dialing and traditional 911 dialing that you need to know.

**You Must Pre-designate the Physical Location of Your Vonage Line for 911 Dialing to Function.**

- Remember that unlike traditional phone lines, Vonage service is portable to any location with broadband Internet access. For example, you can have a New York number and receive calls in Texas. You can also take your equipment with you on a trip but, when you travel, 911 Dialing will automatically route your call to the address on file, not your temporary personal location for the address on file, not your temporary location.

- When you sign up for Vonage Dialing 911 service, you fill out a short form that tells us your actual physical address. When you dial 911, the call is routed to the local emergency personnel location designated for the address you register on the form.

- When you move, you MUST provide your new location. You can conveniently update your new location online. It may take several days to update your record.

- Since your 911 call could be from anywhere, we need you to verify the physical location of your phone in order to activate this 911 dialing feature from your phone.

## Quick Reference

- Dialing 911 is an optional feature

- Dialing 911 is free

- Dialing 911 is available anywhere in the United States

- Dialing 911 requires prior activation on your part

- 911 Dialing and Vonage Service DO NOT function During a Power Outage.

Exhibit 5

Vonage DigitalVoice :: The BROADBAND Phone    ...pany...

Page :2

**911 Dialing Isn't Automatic. You Must Pre-Activate 911 Dialing. You May Decline 911 Dialing.**

- We STRONGLY urge you to activate 911 Dialing. Even if you don't plan to make 911 calls from your Vonage line, there may be others who do. You can't plan in advance for all situations. For example, a residential line could be used by babysitters, young children, infants, and others who may not know that you don't want to make 911 calls. If you decline 911 from Vonage, you or others will not be able to call 911 from this Vonage line. Don't play games with your safety. Register today.

**Your Call Will Go To A General Access Line at the Public Safety Answering Point (PSAP). This is different from the 911 Emergency Response Center where traditional 911 calls go.**

- This means your call goes to a different phone number than traditional 911 calls. Also, you will need to state the nature of your emergency promptly and clearly, including your location and telephone number, as PSAP personnel will NOT have this information at hand.

**Service Outages Can Prevent 911 Dialing.**

- 911 Dialing and Vonage Service DO NOT function during an electrical power or broadband provider outage.

**Important Note**
Please refer to the Dialing 911 section in our Terms of Service for important information on potential limitations of this 911 feature, including the differences between our 911 Dialing feature and traditional 911 dialing.

:: Corporate Information :: Site Map :: Contact Us :: Privacy Policy :: Terms of Service :: Affiliate Program

Using the Vonage® mark and other Vonage Holdings Corp. intellectual property such as logos, slogans, trade dress, and graphic symbols on packaging, products, or services requires express written permission from Vonage Holdings Corp. Use of confusingly similar or disparaging terms is a violation of our intellectual property rights.
©2001 - 2003, Vonage Holdings Corp. All Rights Reserved.

http://www.vonage.com/features_911.php

09/16/2003

## CERTIFICATE OF SERVICE

### Frontier Telephone of Rochester, Inc.
### Case No. 03-C-_____

I hereby certify that, on this 10th day of September 2003, copies of the foregoing Complaint of Frontier Telephone of Rochester, Inc. in the above-referenced proceeding were placed in the U.S. Mail to the following:

Corporation Service Corp.
2711 Centerville Road
Wilmington, DE  19808

J.T. Ambrosi
PaeTec Communications, Inc.
290 Woodcliff Drive
Fairport, NY 14450

Jeffrey Citron
President and CEO
Vonage Holdings Corp.
2147 Route 27
Edison, NJ  08817

Holly M. James
Holly M. James

Exhibit D

STATE OF NEW YORK
PUBLIC SERVICE COMMISSION


CASE 03-C-1285  - Complaint of Frontier Telephone of Rochester, Inc. Against Vonage
Holding Corp. Concerning Provision of Local Exchange and Inter-
Exchange Telephone Service in New York State in Violation of the
Public Service Law.


NOTICE REQUESTING COMMENTS

(Issued October 9, 2003)


The Commission has received a complaint from Frontier Telephone of Rochester, Inc. (Frontier) against Vonage Holdings Corp. (Vonage) alleging that Vonage is providing telephone service in New York State without complying with the Public Service Law and Commission regulation.

Because this complaint raises generic concerns that could affect a number of entities, we are seeking comments on the complaint. Ten copies of comments on the complaint should be sent to Jaclyn A. Brilling, Acting Secretary, New York State Public Service Commission, Three Empire State Plaza, Albany, New York 12223-1350 by October 31, 2003 and served on all parties to this proceeding. Ten copies of reply comments should be filed with the Acting Secretary and served on all parties by November 14, 2003.

Any party wishing to receive comments should notify the Acting Secretary before October 22, 2003 so that a service list can be created. The service list will be posted on the Commission's web site at www.dps.state.ny.us. The complaint may be downloaded from http://www.frontieronline.com/pdf/VonageComplaint.pdf.


(SIGNED)                              JACLYN A. BRILLING
                                     Acting Secretary

Exhibit E

**NYS Register/October 15, 2003**                    **Rule Making Activities**

## PROPOSED RULE MAKING
## NO HEARING(S) SCHEDULED

**Alleged Violation of the Public Service Law by Champlain Telephone Company**

**I.D. No. PSC-41-03-00006-P**

PURSUANT TO THE PROVISIONS OF THE State Administrative Procedure Act, NOTICE is hereby given of the following proposed rule:

*Proposed action:* The commission is considering actions related to Champlain Telephone Company's alleged violation of the Public Service Law, sections 107 and 110 and the company's failure to comply with commission rules relating to cost allocation, among other matters. The commission may require Champlain Telephone Company to take corrective actions including, but not limited to, refunds and accounting treatments.

*Statutory authority:* Public Service Law, section 94(2)

*Subject:* Alleged violation of the Public Service Law and related matters.

*Purpose:* To consider actions regarding Champlain Telephone Company.

*Substance of proposed rule:* The Commission is considering actions related to Champlain Telephone Company's alleged violation of the Public Service Law, §§ 107 and 110 and the company's failure to comply with Commission rules relating to cost allocation, among other matters. The Commission may require Champlain Telephone Company to take corrective actions including, but not limited to, refunds and accounting treatments.

*Text of proposed rule may be obtained from:* Margaret Maguire, Public Service Commission, Bldg. 3, Empire State Plaza, Albany, NY 12223, (518) 474-3204

*Data, views or arguments may be submitted to:* Jaclyn A. Brilling, Acting Secretary, Public Service Commission, Bldg. 3, Empire State Plaza, Albany, NY 12223-1350, (518) 474-6530

*Public comment will be received until:* 45 days after publication of this notice.

*Regulatory Impact Statement, Regulatory Flexibility Analysis, Rural Area Flexibility Analysis and Job Impact Statement*
Statements and analyses are not submitted with this notice because the proposed rule is within the definition contained in section 102(2)(a)(ii) of the State Administrative Procedure Act.
(94-C-0095SA25)

## PROPOSED RULE MAKING
## NO HEARING(S) SCHEDULED

**Definition of Telephone Service by Frontier Telephone of Rochester, Inc.**

**I.D. No. PSC-41-03-00007-P**

PURSUANT TO THE PROVISIONS OF THE State Administrative Procedure Act, NOTICE is hereby given of the following proposed rule:

*Proposed action:* The Public Service Commission has received a complaint from Frontier Telephone of Rochester, Inc. against Vonage Holdings Corp. alleging that Vonage is providing telephone service in New York State without complying with the Public Service Law and commission regulation. Because this complaint raises generic concerns that could affect a number of entities, a notice requesting comments on the complaint has been issued. The commission will evaluate the comments received and may make determinations concerning the applicability of the Public Service Law to various forms of service, including voice over internet protocol (VOIP).

*Statutory authority:* Public Service Law, sections 2, 90 and 96

*Subject:* Definition of telephone service pursuant to the Public Service Law.

*Purpose:* To investigate and determine whether various forms of service and telephone service.

*Substance of proposed rule:* The Commission has received a complaint from Frontier Telephone of Rochester, Inc. against Vonage Holdings Corp. alleging that Vonage is providing telephone service in New York State without complying with the Public Service Law and Commission regulation. Because this complaint raises generic concerns that could affect a number of entities, a Notice Requesting Comments on the complaint has been issued. The Commission will evaluate the comments received and may make determinations concerning the applicability of the Public Ser-

vice Law to various forms of service, including Voice Over Internet Protocol (VOIP).

*Text of proposed rule may be obtained from:* Margaret Maguire, Public Service Commission, Bldg. 3, Empire State Plaza, Albany, NY 12223, (518) 474-3204

*Data, views or arguments may be submitted to:* Jaclyn A. Brilling, Acting Secretary, Public Service Commission, Bldg. 3, Empire State Plaza, Albany, NY 12223-1350, (518) 474-6530

*Public comment will be received until:* 45 days after publication of this notice.

*Regulatory Impact Statement, Regulatory Flexibility Analysis, Rural Area Flexibility Analysis and Job Impact Statement*
Statements and analyses are not submitted with this notice because the proposed rule is within the definition contained in section 102(2)(a)(ii) of the State Administrative Procedure Act.
(03-C-1285SA1)

## PROPOSED RULE MAKING
## NO HEARING(S) SCHEDULED

**Lightened Regulation by Sterling Power Partners, L.P.**

**I.D. No. PSC-41-03-00008-P**

PURSUANT TO THE PROVISIONS OF THE State Administrative Procedure Act, NOTICE is hereby given of the following proposed rule:

*Proposed action:* The Public Service Commission is considering a petition from Sterling Power Partners, L.P. seeking lightened regulation of its electric generation facility that will sell its output into competitive wholesale markets.

*Statutory authority:* Public Service Law, sections 2(13), 5(b), 64, 65, 66, 67, 68, 69, 69-a, 70, 71, 72, 72-a, 75, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 114-a, 115, 117, 118, 119-b, 119-c

*Subject:* Lightened regulation.

*Purpose:* To consider granting lightened regulation to Sterling Power Partners, L.P.

*Substance of proposed rule:* The Public Service Commission is considering a request from Sterling Power Partners, L.P. seeking lightened regulation of its electric generation facility that will sell its output into competitive wholesale markets. The Commission may grant, reject or modify, in whole or in part, the relief requested.

*Text of proposed rule may be obtained from:* Margaret Maguire, Public Service Commission, Bldg. 3, Empire State Plaza, Albany, NY 12223, (518) 474-3204

*Data, views or arguments may be submitted to:* Jaclyn A. Brilling, Acting Secretary, Public Service Commission, Bldg. 3, Empire State Plaza, Albany, NY 12223-1350, (518) 474-6530

*Public comment will be received until:* 45 days after publication of this notice.

*Regulatory Impact Statement, Regulatory Flexibility Analysis, Rural Area Flexibility Analysis and Job Impact Statement*
Statements and analyses are not submitted with this notice because the proposed rule is within the definition contained in section 102(2)(a)(ii) of the State Administrative Procedure Act.
(03-E-1304SA1)

## PROPOSED RULE MAKING
## NO HEARING(S) SCHEDULED

**Economic Development by Consolidated Edison Company of New York, Inc.**

**I.D. No. PSC-41-03-00009-P**

PURSUANT TO THE PROVISIONS OF THE State Administrative Procedure Act, NOTICE is hereby given of the following proposed rule:

*Proposed action:* The Public Service Commission is considering whether to approve or reject, in whole or in part, or modify, a proposal filed by Consolidated Edison Company of New York, Inc. to make various changes in the rates, charges, rules and regulations contained in its tariff schedules, P.S.C. No. 2—Retail Access, P.S.C. No. 9—Electricity, EDDS No. 2 and PASNY No. 4 to become effective Dec. 22, 2003.

*Statutory authority:* Public Service Law, section 66(12)

*Subject:* Economic development.

Exhibit 2

Westlaw.

290 F.Supp.2d 993
(Cite as: 290 F.Supp.2d 993)

**H**

United States District Court,
D. Minnesota.

VONAGE HOLDINGS CORPORATION, Plaintiff,
v.
THE MINNESOTA PUBLIC UTILITIES
COMMISSION, and Leroy Koppendrayer, Gregory
Scott, Phyllis Reha, and R. Marshall Johnson, in their
official capacities as
the commissioners of the Minnesota Public Utilities
Commission and not as
individuals, Defendants.

No. CIV.03-5287 (MJD/JGL).

Oct. 16, 2003.

Marketer of service permitting computer-to-computer and computer-to-phone voice calls using Voice over Internet Protocol (VoIP) sought injunctive relief from state utility regulatory commission's order that provider comply with state laws regulating telephone companies. The District Court, Davis, J., held that VoIP service was "information service" rather than telecommunications service under Telecommunications Act, precluding state commission's effort to subject marketer to state telecommunications laws.

Permanent injunction granted.

West Headnotes

**[1] Injunction** 🔑 **138.1**
212k138.1 Most Cited Cases

Factors in determining motion for preliminary injunction are: (1) movant's probability of success on merits; (2) threat of irreparable harm to movant; (3) balance between this harm and injury that granting injunction will inflict on other interested parties; and (4) public interest in issuance of injunction.

**[2] Injunction** 🔑 **106**
212k106 Most Cited Cases

Where parties only disagree on questions of law, motion for preliminary injunction may be considered as one for permanent injunction.

**[3] Injunction** 🔑 **9**
212k9 Most Cited Cases

Standard for permanent injunction is same as that for preliminary injunction except that movant must show actual success on merits.

**[4] States** 🔑 **18.3**
360k18.3 Most Cited Cases

Preemption of state law occurs when: (1) Congress enacts federal statute that expresses its clear intent to preempt state law; (2) there is conflict between federal and state law; (3) compliance with both federal and state law is in effect physically impossible; (4) federal law contains implicit barrier to state regulation; (5) comprehensive congressional legislation occupies entire field of regulation; or (6) state law is obstacle to accomplishment and execution of full objectives of Congress. U.S.C.A. Const. Art. 6, cl. 2.

**[5] States** 🔑 **18.9**
360k18.9 Most Cited Cases

Federal agency acting within scope of its congressionally delegated authority may preempt state regulation. U.S.C.A. Const. Art. 6, cl. 2.

**[6] Telecommunications** 🔑 **461.15**
372k461.15 Most Cited Cases

"Information services" are not subject to telecommunications regulation. 47 U.S.C.A. § 153(20); 47 C.F.R. § 64.702(a).

**[7] States** 🔑 **18.81**
360k18.81 Most Cited Cases

**[7] Telecommunications** 🔑 **461.15**
372k461.15 Most Cited Cases

Service utilizing Voice over Internet Protocol (VoIP), which allowed those with access to high-speed Internet connection to make and receive computer-to-computer and computer-to-phone voice calls, was "information service" rather than telecommunications service under Telecommunications Act, precluding state utility regulatory commission from subjecting

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

290 F.Supp.2d 993
(Cite as: 290 F.Supp.2d 993)

marketer of VoIP service to state laws regulating telephone companies; marketer, which was not an internet service provider (ISP) and never provided phone-to-phone IP telephony, was user rather than provider of telecommunications services. Communications Act of 1934, § § 3(20, 46), 230(b), as amended, 47 U.S.C.A. § § 153(20, 46), 230(b); 47 C.F.R. § 64.702(a); M.S.A. § § 237.16 sub. 1(b), 237.74 subd. 12.

[8] States ☞18.3
360k18.3 Most Cited Cases

Where federal policy is to encourage certain conduct, state law discouraging that conduct must be preempted.

West Codenotes

Preempted

Minn.Stat. § 237.16

Minn.Stat. § 237.74

**994** Ky E. Kirby, Russell M. Blau (pro hac vice), Swidler Berlin Shereff Friedman, LLP, Adam M. Nathe, Gray, Plant, Mooty, Mooty & Bennett, P.A., for Plaintiff.

Steven H. Alpert, Assistant Minnesota Attorney General, for Defendant.

## MEMORANDUM AND ORDER

DAVIS, District Court Judge.

### I. SUMMARY

This case illustrates the impact of emerging technologies evolving ahead of the regulatory scheme intended to address them. The issue before the Court is tied to the evolution of the Internet and the expansion of its capability to transmit voice communications. Despite its continued growth and development, the Internet remains in its infancy, and is an uncharted frontier with vast unknowns left to explore. Congress has expressed a clear intent to leave the Internet free from undue regulation so that this growth and exploration may continue. Congress also differentiated between "telecommunications services," which may be regulated, and "information services," which like the Internet, may not.

Plaintiff Vonage Holdings Corporation ("Vonage")

provides a service that permits voice communications over the Internet. The Minnesota Public Utilities Commission ("MPUC") issued an order requiring Vonage to comply with Minnesota laws that regulate telephone companies. Vonage has asked this Court to enjoin the MPUC, arguing that it provides information services, and not telecommunications services.

The Court concludes that Vonage is an information service provider. In its role as an interpreter of legislative intent, the Court applies federal law demonstrating Congress's desire that information services such as those provided by Vonage must not be regulated by state law enforced by the MPUC. State regulation would effectively decimate Congress's mandate that the Internet remain unfettered by regulation. The Court therefore grants Vonage's request for injunctive relief.

### II. INTRODUCTION

This matter is before the Court on Vonage's motion for a preliminary injunction seeking to prevent enforcement of the MPUC's September 11, 2003 order. As detailed below, because the facts of this case are not in dispute, the Court will address Vonage's motion as one for a permanent injunction.

### III. FACTUAL BACKGROUND

Vonage markets and sells Vonage DigitalVoice, a service that permits voice communication via a high-speed ("broadband") Internet connection. [FN1] Vonage's service **995** uses a technology called Voice over Internet Protocol ("VoIP"), which allows customers to place and receive voice transmissions routed over the Internet.

> FN1. In addition to broadband access via cable or DSL service, wireless broadband connections are becoming more widely available to consumers. *See* Yardena Arar, *DSL Speeds, Cellular Coverage,* PC World, Oct. 2003, at 30. The Court notes that such innovations may have unknown implications for communications as we now know them and the manner in which they are regulated.

Traditional telephone companies use circuit-switched technology. Chérie R. Kiser & Angela F. Collins, *Regulation On The Horizon: Are Regulators Poised To Address the Status of IP Telephony?,* 11 CommLaw Conspectus 19, 20-21 (2003). A person

using a traditional telephone, or plain old telephone service ("POTS"), is connected to the public switched telephone network ("PSTN"), which is operated by local telephone companies. Voice communication using the Internet has been called Internet Protocol ("IP") telephony, and rather than using circuit switching, it utilizes "packet switching," a process of breaking down data into packets of digital bits and transmitting them over the Internet. *Id.* at 21.

Essential to using Vonage's services is that a third-party Internet service provider ("ISP"), provides a broadband Internet connection. Vonage does not function as an ISP for its customers. A Vonage customer may make and receive computer-to-computer calls. With another person connected to the PSTN, a Vonage customer may make computer-to-phone calls and receive phone-to-computer calls. During computer-to-computer calls, via a broadband Internet connection, an outgoing voice communication is converted into IP data packets which then travel the Internet to the person using a second computer.

For computer-to-phone calls and phone-to-computer calls, Vonage uses a computer to transform the IP data packets into a format compatible with the PSTN, and vice versa. Rather than using the POTS equipment, Vonage's customers use special customer premises equipment ("CPE") that enables voice communication over the Internet.

Vonage obtains ten-digit telephone numbers from telephone companies that it then uses to provide service to its customers. PSTN users may dial that ten-digit number and reach one of Vonage's customers. A telephone number associated with a Vonage customer is not associated with that customer's physical location. The number is instead associated with the customer's computer. Vonage's customers may use Vonage's services at any geographic location where they can access a broadband Internet connection. Thus, a customer could make and receive calls anywhere in the world where broadband access is available. Vonage is not capable of determining the geographic location from which its customers access its service.

Vonage has approximately 500 customers with billing addresses in Minnesota. It also has thirty-eight customers with Minnesota billing addresses who have requested telephone numbers with area codes not geographically situated within Minnesota, and eighty-eight customers with billing addresses outside of Minnesota who have requested telephone numbers geographically situated within Minnesota.

Because Vonage is unable to determine the geographic location of its customers, it requires customers to register their location before they can dial "911" for public safety purposes.

The Minnesota Department of Commerce ("MDOC") investigated Vonage's services and on July 15, 2003, filed a complaint with the MPUC. The complaint alleged that Vonage failed to (1) obtain a *996 proper certificate of authority required to provide telephone service in Minnesota; (2) submit a required 911 service plan; (3) pay 911 fees; and (4) file a tariff. MDOC also requested temporary relief; asserting that Vonage should be (1) prohibited from marketing to potential customers; (2) required to notify its Minnesota customers regarding the issues before the MPUC; and (3) required to submit a 911 plan. The MPUC denied the request for temporary relief.

Vonage then moved to dismiss the MDOC complaint. The MPUC issued a notice on August 1, 2003 stating that it would address two procedural matters at an August 13, 2003 meeting, but did not indicate that the MPUC would be hearing the merits of the case. Four days later, the MPUC changed course, and asked the parties to address the merits. Vonage and several other parties seeking to intervene or participate appeared for oral argument on August 13, 2003. At the hearing, Vonage's representative requested that a contested proceeding be held, so that facts could be developed. The MPUC declined this request. After issuing an oral decision on the hearing date, the MPUC issued a nine-page order on September 11, 2003 concluding that, within thirty days, Vonage was required to comply with Minnesota statutes and rules regarding the offering of telephone service. *See In the Matter of the Complaint of the Minnesota Department of Commerce Against Vonage Holding Corp Regarding Lack of Authority to Operate in Minnesota,* Docket No. P-6214/C-03-108 (Minn. Pub. Utils. Comm'n Sept. 11, 2003) (order finding jurisdiction and requiring compliance). Vonage then filed a complaint with this Court seeking a preliminary injunction.

## IV. DISCUSSION

[1][2][3] When deciding a motion for a preliminary injunction, the Court should consider: (1) the moving party's probability of success on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) the public interest in the issuance of

the injunction. *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 114 (8th Cir.1981) (en banc). "None of these factors by itself is determinative; rather, in each case the four factors must be balanced to determine whether they tilt toward or away from granting a preliminary injunction." *West Publishing Co. v. Mead Data Central, Inc.,* 799 F.2d 1219, 1222 (8th Cir.1986) (citing *Dataphase,* 640 F.2d at 113). The party requesting injunctive relief bears the "complete burden" of proving all the factors. *Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir.1987). Where the parties only disagree on questions of law, a motion for a preliminary injunction may be considered as one for a permanent injunction. *See Bank One v. Guttau,* 190 F.3d 844, 847 (8th Cir.1999) (reviewing preliminary injunction as permanent injunction where only issues were questions of law). The parties do not dispute fact issues, and thus the Court will consider Vonage's motion as one for a permanent injunction. The standard is the same for a permanent injunction except that the movant must show actual success on the merits. *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987).

## A. Success on the Merits

The issue before the Court is whether Vonage may be regulated under Minnesota law that requires telephone companies to obtain certification authorizing them to provide telephone service. *See* Minn.Stat. § 237.16, subd. 1(b) (providing that in order to obtain certificate, person must possess "the technical, managerial, and financial resources to provide the proposed *997 telephone services"); *see also* Minn.Stat. § 237.74, subd. 12 (requiring certificate of territorial authority); Minn. R. 7812.0200, subp. 1 (requiring certificate). Vonage asserts that the Communications Act of 1934, as amended by the Communications Act of 1996, 47 U.S.C. §§ 151-615 ("the Communications Act") pre-empts the state authority upon which the MPUC's order relies. In addition to other arguments supporting pre-emption, Vonage asserts that because its services are "information services," which are not subject to regulation, rather than "telecommunications services," which may be regulated. Vonage further argues that the MPUC's order is unconstitutional because it violates the Commerce Clause and the Due Process Clause.

[4][5] The Supremacy Clause of Art. VI of the Constitution empowers Congress to pre-empt state law. *Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). Pre-emption occurs when (1) Congress enacts a federal statute that expresses its clear intent to pre-empt state law; (2) there is a conflict between federal and state law; (3) "compliance with both federal and state law is in effect physically impossible;" (4) federal law contains an implicit barrier to state regulation; (5) comprehensive congressional legislation occupies the entire field of regulation; or (6) state law is an obstacle to the "accomplishment and execution of the full objectives of Congress." *Louisiana PSC,* 476 U.S. at 368-69, 106 S.Ct. at 1898. Moreover, "a state agency acting within the scope of its congressionally delegated authority may pre-empt state regulation." *Id.* at 369, 106 S.Ct. at 1898-99.

At the outset, the Court must note that the backbone of Vonage's service is the Internet. Congress has spoken with unmistakable clarity on the issue of regulating the Internet: "It is the policy of the United States ... to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C. § 230(b); *see also Southwestern Bell Tel. Co. v. FCC,* 153 F.3d 523, 544 (8th Cir.1998) (concluding that, based on Congress's intent to leave Internet unregulated, ISPs should be excluded from the imposition of interstate access charges); *Zeran v. America Online, Inc.,* 129 F.3d 327, 330 (4th Cir.1997) (recognizing that "Congress acted to keep government regulation of the Internet to a minimum").

In addressing the parties' arguments, the Court must also examine the recent history of the regulatory scheme governing the telecommunications industry. The growing capability of the computer and its interaction with telecommunications technology presented challenges acknowledged by the Federal Communications Commission ("FCC") over twenty years ago. In 1980, recognizing the computer's involvement with telecommunications, the FCC distinguished between "basic services" and "enhanced services." *See In the Matter of Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry),* 77 FCC 2d 384, ¶ 5 (1980) (Final Decision) ("Second Computer Inquiry"). [FN2] After making this distinction, *998 the FCC noted that basic services offered by a common carrier would continue to be regulated by Title II of the Communications Act, but that

FN2. The FCC stated:
[W]e adopt a regulatory scheme that

290 F.Supp.2d 993
(Cite as: 290 F.Supp.2d 993)

Page 5

distinguishes between the common carrier offering of basic transmission services and the offering of enhanced services ... We find that basic service is limited to the common carrier offering of transmission capacity for the movement of information, whereas enhanced service combines basic service with computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information, or provide the subscriber additional, different, or restructured information, or involve subscriber interaction with stored information.

Second Computer Inquiry ¶ 5.

regulation of enhanced services is not required in furtherance of some overall statutory objective. In fact, the absence of traditional public utility regulation of enhanced services offers the greatest potential for efficient utilization and full exploitation of the interstate telecommunications network.

*Id.* ¶ 7, at 387. [FN3]

FN3. Later, as the FCC went further to protect enhanced services from regulation it discussed a theory of "contamination" whereby "[t]he enhanced component of [service providers'] offerings 'contaminates' the basic component, and the entire offering is therefore considered to be enhanced." *In re Amendment to Sections 64.702 of the Commission's Rules and Regulations* (Third Computer Inquiry), 3 FCC Rcd. 11501, 1170 n. 23 (1988).

The line demarcating basic services from enhanced services became more defined when, in passing the Communications Act of 1996, Congress defined the terms "telecommunications," [FN4] "telecommunications services" [FN5] and "information services." [FN6] *See* 47 U.S.C. § 153.

FN4. "The term 'telecommunications' means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(43).

FN5. "Telecommunications service" is "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. § 153(46).

FN6. "Information service" is defined as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." 47 U.S.C. § 153(20).

[6] In a report to Congress regarding universal service that addressed many of the issues before the Court in this matter, the FCC explained that the new terms it adopted to describe different types of communications services were comparable to the old. *In re Federal-State Joint Board on Universal Service,* 13 FCC Rcd. ¶ 21, at 11511 (April 10, 1998) (Report to Congress) ("*Universal Service Report* "). [FN7] The court has examined both the legislative history of the Communications Act of 1996 and the *Universal Service Report,* and agrees with the FCC's interpretation of congressional intent. The *Universal Service Report* provided enhanced clarity with regard to the distinction between traditional telephone services offered by common carriers, and the continuously growing universe of information services. It also solidified and added a supportive layer to the historical architecture of the as yet largely unregulated universe of information services. The FCC noted the "intention of the drafters of both the House and Senate bills that the two categories be separate and distinct, and that information service providers not be subject to telecommunications *999 regulation." *Id.* ¶ 43, at 11523. In addition to the positions taken by the FCC, Congress has expressly stated that enhanced services [FN8] are not to be regulated under Title II of the Telecommunications Act. 47 C.F.R. § 64.702(a).

FN7. "Specifically, we find that Congress intended the categories of 'telecommunications service' and 'information service' to parallel the definitions of 'basic service' and 'enhanced

service.' " *In re Federal- State Joint Board on Universal Service,* 13 FCC Rcd. ¶ 21, at 11511 (April 10, 1998) (Report to Congress) ("*Universal Service Report* "). Further, the FCC found that "[t]he language and legislative history of both the House and Senate bills [which became the Communications Act of 1996] indicate that the drafters of each bill regarded telecommunications services and information services as mutually exclusive categories." *Id.* ¶ 43, at 11521-22.

FN8. Enhanced services are defined as "services, offered over common carrier transmission facilities used in interstate communications, which employ computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information." 47 C.F.R. § 64.702(a); *Universal Service Report,* 13 FCC Rcd. ¶ 21, at 11511 (stating that the definition for enhanced services parallels the definition of information services).

[7] Examining the statutory language of the Communications Act, the Court concludes that the VoIP service provided by Vonage constitutes an information service because it offers the "capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications." 47 U.S.C. § 153(20). The process of transmitting customer calls over the Internet requires Vonage to "act on" the format and protocol of the information. 47 C.F.R. § 64.702(a). For calls originating with one of Vonage's customers, calls in the VoIP format must be transformed into the format of the PSTN before a POTS user can receive the call. For calls originating from a POTS user, the process of acting on the format and protocol is reversed. The Court concludes that Vonage's activities fit within the definition of information services. Vonage's services are closely tied to the provision of telecommunications services as defined by Congress, the courts and the FCC, but this Court finds that Vonage *uses* telecommunications services, rather than provides them.

Looking beyond the plain statutory language, the Court also examines the nature of IP telephony, a subject that by its very nature calls into question the telecommunications services/information services

distinction adopted by the 1996 Communications Act. [FN9] At issue is whether Vonage's IP telephony service constitutes a telecommunications service or an information service.

FN9. There are three types of IP telephony: computer-to-computer telephony, telephone-to-computer telephony, and telephone-to-telephone telephony. Kiser & Collins, *supra,* at 21. Vonage's services encompass only the first two.

In the *Universal Service Report,* the FCC examined two types of IP telephony: phone-to-phone and computer-to-computer. The FCC refrained from explicitly classifying either type as a telecommunications service or an information service. [FN10] The FCC tentatively concluded that phone-to-phone IP telephony "lacks the characteristics that would render them 'information services' within the meaning of the statute, and instead bear the characteristics of 'telecommunications services." *Universal Service Report,* 13 FCC Rcd. ¶ 89, at 11544. The FCC devised a set of conditions used to determine whether a provider's offering constituted phone-to-phone IP telephony.

FN10. The FCC concluded that with regard to phone-to-phone IP telephony it was not "appropriate to make any definitive pronouncements in the absence of a more complete record focused on individual service offerings." *Universal Service Report,* 13 FCC Rcd. ¶ 3, at 11503.

In using the term 'phone-to-phone' IP telephony, we tentatively intend to refer to services in which the provider meets the following conditions: (1) it holds itself out as providing voice telephony or facsimile transmission service; (2) it does not require the customer to use CPE different from that CPE necessary *1000 to place an ordinary touch-tone call (or facsimile transmission) over the public switched telephone network; (3) it allows the customer to call telephone numbers assigned in accordance with the North American Numbering Plan, and associated international agreements; and (4) it transmits customer information without net change in form or content.
*Id.* ¶ 88, at 11543-44.

In applying the FCC's four phone-to-phone IP

290 F.Supp.2d 993
(Cite as: 290 F.Supp.2d 993)

telephony conditions to Vonage, it is clear that Vonage does not provide phone-to-phone IP telephony service. Vonage's services do not meet the second and fourth requirements. Use of Vonage's service requires CPE different than what a person connected to the PSTN uses to make a touch-tone call. Further, a net change in form and content occurs when Vonage's customers place a call. If the end user is connected to the PSTN, the information transmitted over the Internet is converted from IP into a format compatible with the PSTN. Vonage's service is not a telecommunications service because "from the user's standpoint" the form of a transmission undergoes a "net change." *Id.* ¶ 89, at 11544.

With regard to computer-to-computer IP telephony, the FCC declined to decide whether "'telecommunications' is taking place in the transmission of computer-to-computer IP telephony." *Id.* ¶ 87, at 11543. When Vonage's users communicate with other customers in computer-to-computer IP telephony, the two customers are again using the Internet to transmit data packets which, by their very nature change form and do not come in contact with the regulated PSTN. Vonage's service effectively carves out a role in the communications scheme that distinguishes it from telecommunications services.

In addition to a generic analysis of the varying forms of IP telephony, the FCC examined whether three classes of providers that facilitate IP telephony provide telecommunications services. First, the FCC stated that "[c]ompanies that only provide software and hardware installed at customer premises do not fall within [the telecommunications provider] category, because they do not transmit information." *Id.* ¶ 86, at 11543. Second, it concluded that ISPs did "not appear to be 'provid[ing]' telecommunications to its subscribers." *Id.* ¶ 87, at 11543 (alteration in original) (quotation omitted).

Third, it addressed the role of "an IP telephony service provider [that] deploys a gateway within the network to enable phone-to-phone service." "[G]ateways" are "computers that transform the circuit-switched voice signal into IP packets, and vice versa, and perform associated [signaling], control, and address translation functions." *Id.* ¶ 84, at 11541. The FCC concluded that such services possessed "the characteristics of 'telecommunications services.' " *Id.* ¶ 89, at 11544. The FCC's conclusion focused on gateway providers that provide phone-to-phone IP telephony services. The FCC noted that from a "functional standpoint," the

users were only receiving voice transmission, and not information services. *Id.* In other words, because a person using a POTS telephone was on either end of the call, even if the call was routed over the Internet, there was no form change sufficient to constitute information services.

Vonage is unlike the first two classes of providers discussed by the FCC; it does more than merely provide software and hardware, and is not an ISP. Vonage does, however, provide gateways that translate IP format into a format compatible with the PSTN. Because Vonage never provides phone-to-phone IP telephony (it only provides computer-to-phone or phone-to-computer IP telephony), from a "functional standpoint," Vonage's service is distinguishable **\*1001** from the scenario the FCC considered to be telecommunications services.

The FCC was aware of the relationship that information services providers often have with providers of telecommunications services, but recognized that the two should remain distinguishable. "[W]hen an entity offers transmission incorporating the 'capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information,' it does not offer telecommunications. Rather, it offers an 'information service' *even though it uses telecommunications to do so. Id.* ¶ 39, at 11520 (emphasis added). Further, the FCC recognized that the architecture of information services would be built on top of existing telecommunications services infrastructure, but, in terms of regulation, would still remain separate for strong policy purposes.

*The Internet and other enhanced services have been able to grow rapidly in part because the Commission concluded that enhanced service providers were not common carriers within the meaning of the Act.* This policy of distinguishing competitive technologies from regulated services not yet subject to full competition remains viable. Communications networks function as overlapping layers, with multiple providers often leveraging a common infrastructure. As long as the underlying market for provision of transmission facilities is competitive or is subject to sufficient pro-competitive safeguards, *we see no need to regulate the enhanced functionalities that can be built on top of those facilities.* We believe that Congress, by distinguishing 'telecommunications service' from 'information service,' and by stating a policy goal of preventing the Internet from being fettered by state or federal regulation, endorsed this general approach. *Limiting carrier regulation to those*

companies that provide the underlying transport ensures that regulation is minimized and is targeted to markets where full competition has not emerged. As an empirical matter, the level of competition, innovation, investment, and growth in the enhanced services industry over the past two decades provides a strong endorsement for such an approach.
Id. ¶ 95, 11546 (emphasis added) (footnotes omitted). "Congress intended to maintain a regime in which information service providers are not subject to regulation as common carriers merely because they provide their services 'via telecommunications.' " Id. ¶ 21, at 11511. The Court acknowledges the attractiveness of the MPUC's simplistic "quacks like a duck" argument, essentially holding that because Vonage's customers make phone calls, Vonage's services must be telecommunications services. However, this simplifies the issue to the detriment of an accurate understanding of this complex question. The Court must follow the statutory intent expressed by Congress, and interpreted by the FCC. Short of explicit statutory language, the Court can find no stronger guidance for determining that Vonage's service is an information service, as defined by Congress and interpreted by the FCC.

Having determined that Vonage's services constitute information services, the Court next examines Congress's intent with regard to state regulation of information services, to determine whether the MPUC's order is pre-empted. By clearly separating information services from telecommunications services, the Court finds ample support for the proposition that Congress intended to keep the Internet and information services unregulated.

Because Congress has expressed an intent that services like Vonage's must remain unregulated by the Communications Act, and because the MPUC has exercised state authority to regulate Vonage's service, *1002 the Court concludes that that state and federal laws conflict, and pre-emption is necessary. Louisiana PSC, 476 U.S. at 368, 106 S.Ct. at 1898.

[8] Where federal policy is to encourage certain conduct, state law discouraging that conduct must be pre-empted. See Xerox Corp. v. County of Harris, 459 U.S. 145, 151-53, 103 S.Ct. 523, 527-29, 74 L.Ed.2d 323 (1982) (holding state tax could not be imposed on Mexican-manufactured goods shipped to the United states where Congress clearly intended to create a duty- free enclave to encourage merchants to use American ports); see also 1 Laurence H. Tribe, American Constitutional Law § 6-29, at 1181-82 (3d ed.2000) ("state action must ordinarily be invalidated

if its manifest effect is to penalize or discourage conduct that federal law specifically seeks to encourage").

In the Universal Service Report, the FCC explained that policy considerations required keeping the definition of telecommunications services distinct from information services so that information services would be open to healthy competition. Its discussion demonstrates the FCC's reluctance to permit state regulation of information services providers, foreshadowing the very issue before the Court today:

An approach in which a broad range of information service providers are simultaneously classed as telecommunications carriers, and thus presumptively subject to the broad range of Title II constraints, could seriously curtail the regulatory freedom that the Commission concluded in Computer II was important to the healthy and competitive development of the enhanced-services industry.... The classification of information service providers as telecommunications carriers, moreover, could encourage states to impose common- carrier regulation on such providers.... State requirements for telecommunications carriers vary from jurisdiction to jurisdiction, but include certification, tariff filing, and various reporting requirements and fees.
Universal Service Report, 13 FCC Rcd. ¶ 46, at 11524. The Court thus concludes that Minnesota regulations that have the effect of regulating information services are in conflict with federal law and must be pre-empted.

The MPUC argues that the true issue in this case is whether it is possible to comply with both federal and state laws. According to the MPUC, there is no conflict between state and federal law, and compliance with both is possible. The MPUC further asserts that the FCC has not yet exercised its authority to regulate VoIP services, and has not prevented the states from doing so. The Court respectfully disagrees. VoIP services necessarily are information services, and state regulation over VoIP services is not permissible because of the recognizable congressional intent to leave the Internet and information services largely unregulated.

The Court also concludes that Congress's expression of its intent to not have Title II apply to enhanced services demonstrates its intent to occupy the field of regulation of information services. 47 C.F.R. § 64.702(a); Louisiana PSC, 476 U.S. at 368, 106 S.Ct. at 1898 (providing for pre-emption where comprehensive congressional legislation occupies the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

entire field of regulation).

[I]n very narrow circumstances, when the federal government has withdrawn from a field and indicated an intent to ensure that a vacuum be left behind, at least some state laws--even if generally applicable and seemingly unrelated to the vacated field--might become unenforceable. Still, the supposed preemptive effects of *de* regulation remain a matter of congressional intent to continue **\*1003** to occupy the field, but to do so with a vacuum.

Tribe, *supra* § 6-31, at 1207 (emphasis original).

We believe that Congress, by distinguishing 'telecommunications service' from 'information service,' and by stating a policy goal of preventing the Internet from being fettered by state or federal regulation, endorsed this general approach. Limiting carrier regulation to those companies that provide the underlying transport ensures that regulation is minimized and is targeted to markets where full competition has not emerged.

*Universal Service Report,* 13 FCC Rcd. ¶ 95, at 11546 (footnote omitted). Considering this expression of congressional intent, the MPUC's order would be an obstacle to the "accomplishment and execution of the full objectives of Congress." Louisiana PSC, 476 U.S. at 368-69, 106 S.Ct. at 1898. The Court understands the MPUC's position, but that position will have the unintended consequence of retarding the expansion of the Internet.

To summarize, it is clear that Congress has distinguished telecommunications services from information services. The purpose of Title II is to regulate telecommunications services, and Congress has clearly stated that it does not intend to regulate the Internet and information services. Vonage's services do not constitute a telecommunications service. It only uses telecommunications, and does not provide them. The Court can find no statutory intent to regulate VoIP, and until Congress speaks more clearly on this issue, Minnesota may not regulate an information services provider such as Vonage as if it were a telecommunications provider. What Vonage provides is essentially the enhanced functionality on top of the underlying network, which the FCC has explained should be left alone. *Universal Service Report,* 13 FCC Rcd. ¶ 95, at 11546.

Because the Court concludes that the MPUC's order is pre-empted for the previously-stated reasons, it need not reach Vonage's remaining arguments regarding pre-emption, or its Commerce Clause and Due Process arguments. Accordingly, the Court

concludes that Vonage's argument that the MPUC's order is pre-empted will succeed on the merits.

**B. Irreparable Harm**

Vonage contends that the MPUC's order will cause it irreparable harm because it will be forced to stop serving customers in Minnesota and stop soliciting new business. Vonage claims that even a brief shutdown of its service to Minnesota customers could prevent it from staying the leader of its business niche, and damage its reputation and goodwill. Loss of intangible assets such as reputation and goodwill can constitute irreparable injury. *See General Mills, Inc. v. Kellogg Co.,* 824 F.2d 622, 625 (8th Cir.1987). The Court finds that enforcing the MPUC order will result in irreparable harm to Vonage.

**C. Balance of Harms**

According to Vonage, with approximately 500 customers with Minnesota billing addresses, continuing to service those customers cannot create any harm to the health and safety of Minnesota consumers. The Court concludes that permitting Vonage to continue operations in Minnesota and solicit new customers poses little risk of harm to the interests the MPUC represents. Enforcing the MPUC's order, however, would pose a disproportionate harm upon Vonage. The balance of harms weighs in favor of Vonage.

**D. Public interest**

Vonage contends that it is in the public's interest that a preliminary/permanent **\*1004** injunction be granted, because customers can benefit from its product. Defendants respond that Vonage's failure to comply with the 911 plan is not in the public's interest, and that other companies who do comply with Minnesota law are at a competitive disadvantage. The Court concludes that based on the previously-discussed congressional intent to leave Internet and information services unregulated, granting an injunction is in the public interest.

Having satisfied the *Dataphase* elements, the court concludes that a permanent injunction preventing enforcement of the MPUC's September 11, 2003 order is proper.

Accordingly, based on all the files, records and proceedings herein, IT IS HEREBY ORDERED that Vonage's motion for preliminary injunction, which the Court considers a motion for permanent injunction is GRANTED.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

290 F.Supp.2d 993
(Cite as: 290 F.Supp.2d 993)

290 F.Supp.2d 993

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works