IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VONAGE HOLDINGS CORPORATION,<br><br>          Plaintiff,<br><br>    - against -<br><br>THE NEW YORK STATE PUBLIC SERVICE COMMISSION, and WILLIAM M. FLYNN, THOMAS J. DUNLEAVY, LEONARD A. WEISS, and NEAL N. GALVIN, in their official capacities as the Commissioners of the Public Service Commission of the State of New York, and not as individuals,<br><br>          Defendants. | 04 Civ. No. 4306 (JGK)  (DFE)<br><br>DECLARATION OF CARL A. JOHNSON |

CARL A. JOHNSON, under penalty of perjury, hereby declares:

1. I am employed by the New York State Department of Public Service as a Utilities Supervisor (Telecommunications). I hereby submit this declaration on behalf of Defendants, the Public Service Commission of the State of New York and its individual commissioners, (hereafter "PSC" and "Commission") in opposition to Plaintiff's Motion for Preliminary and Permanent Injunctive Relief. I will (1) rebut a listing of alleged errors in the Commission's decision offered in the Declaration of John Rego; (2) show that there is no irreparable harm to Vonage in this matter justifying a preliminary injunction, and (3) describe the public interests that cut against granting any permanent injunction to Vonage.

2. I have been employed by the New York State Department of Public Service since 1979. During that time, I have been

responsible for a variety of regulatory matters involving the
technical, economic, legal, and public policy aspects of
telecommunications.  My current responsibilities include
telecommunications policy development and coordination with
other governmental entities involved in telecommunications
regulation at both the state and national levels.  I hold a B.S.
in Engineering from Cornell University and an MBA in Marketing
from the University at Albany.

## I.    ALLEGED ERRORS IN COMMISSION DECISION

3.    In an Order Establishing Balanced Regulatory Framework
for Vonage Holdings Corporation, issued May 21, 2004 in PSC Case
03-1285, (Exhibit A) the PSC asserted jurisdiction over
Plaintiff Vonage Holdings Corporation (Vonage).  In light of
this assertion of jurisdiction, the Commission required Vonage
to comply with New York statutory requirements and file a tariff
and obtain a Certificate of Public Convenience and Necessity
(CPCN) within 45 days (i.e., by July 6, 2004).  Vonage was also
invited to request waivers of Commission regulations. The
Commission also indicated that it would not enforce its rules
while it considered any such waiver requests.

4.    For a full statement of the facts I refer to the
Commission's decision.  This declaration will rebut Vonage's
claims of factual errors.

5.    Vonage first asserts (Rego ¶ 23) the Commission erred when it stated at page 10, note 11, that a media gateway server is a special router that connects an IP network to a traditional network.  Vonage claims its server performs certain data processing functions.  Vonage's contention does not show that the Commission's statement is incorrect; it merely points to additional functions performed by the server.

6.    The Rego Declaration (¶ 24) next contends that Vonage's server converts an Internet Protocol (IP) data stream into the time-division multiplexing (TDM) format used on what it refers to as the Public Switched Telephone Network (PSTN). Then, Vonage wrongly asserts (Rego ¶ 24), that protocol conversion is not a service provided by ordinary telephone companies on telephone lines. In fact, traditional telephone networks use a variety of formats or protocols to carry calls, including analog and digital formats, various wireless formats, and the TDM and IP formats to which Vonage refers.  Conversion from one of these formats or protocols to another to complete calls between different types of equipment and networks is, in fact, a routine aspect of providing of telephone service.  For example, most calls on wireline telephone networks begin as the caller's voice, which is converted to an analog signal by the telephone and transmitted along wires toward a telephone company switch.  At some point, this analog signal is converted to a digital TDM signal and transmitted through the company's network

- 3 -

via fiber optic cables or other media.  Ultimately, the call

will be reconverted back to an analog signal for completion to

the called party's telephone, which converts the analog signal

to sound (i.e., the caller's voice).  Similarly, when a cellular

customer calls a customer on a wired network the first

customer's phone transmits in a wireless format compatible with

her cellular provider's network (e.g., TDMA, CDMA, or GSM). That

transmission could be in either a digital or analog form,

depending on the customer's choice of service.  At some point

along the call's path, the cellular carrier will convert the

call to TDM format for transport over wired facilities and hand-

off to the receiving customer's wireline carrier. The receiving

carrier will deliver the call to its customer in whatever format

is consistent with that customer's service, which could be

either digital or analog, for example.  What starts as a

caller's voice is ultimately heard as that voice by the

recipient, despite what may be multiple changes along the way in

the format used to transmit the call.

        7.    The Rego Declaration (¶ 24) is further incorrect to

the extent it claims "notably" that Vonage is not connected to

the PSTN.  First, if Vonage were not connected in some fashion

to the other networks that constitute the PSTN it would not be

able to provide for the completion of calls on those networks.

Vonage does, however, make itself out as being able to complete

calls to those networks and thus, is directly or indirectly

connected to them. Indeed, ninety-seven percent (97%) of Vonage
calls are completed to customers on traditional telephone
networks. (See Rego ¶ 11)  Second, and more fundamentally,
Vonage mischaracterizes itself as being connected only to
"telecommunications companies that are connected to the PSTN"
(Rego ¶ 24).  The PSTN is the universe of lines used to provide
telecommunication service.[1]  Thus, the competitive local exchange
carriers and/or interexchange carriers to which Vonage connects
are, in fact, part of what is referred to as "the PSTN."

8.    The Rego Declaration (¶ 24) further contends that the
PSC "mischaracterizes the nature of Vonage's relationship with
its telephone providers" insofar as it concluded that Vonage is
a reseller.   Vonage contends that it merely uses
telecommunications services as a customer.  As I understand it,
Vonage uses those telecommunication services to complete its
customers' calls to and from customers of other carriers.
Whether it acquires services from another carrier as a retail
customer or as a wholesale customer, it acts as a reseller when
it uses such services to provide service to its own customers.

9.    Vonage argues that AOL is considered to be an
information provider, not a reseller of telecommunication
service, by state and federal regulators (¶24).  The Rego

---

[1] **"Public Switched Telephone Network** Usually refers to the worldwide voice
telephone network accessible to all those with telephones and access
privileges (i.e., In the US, it was formally called the Bell System network
or the AT&T long distance network)." Newton, Harry, Newton's Telecom
Dictionary 668 (20th ed 2004).

- 5 -

Declaration (¶ 27) further disputes the PSC's conclusion that Vonage is not an information service, because it does not offer its customers the capability to manipulate or interact with stored data. These comparisons are inapt. Vonage contends that it interacts with stored data. However, Vonage does not offer its customer such capacity. A customer using AOL's service seeks to and obtains access to information provided by AOL and others on the Internet via telecommunications. A person using the Vonage service seeks and obtains not Vonage's information, but the ability to communicate the user's information (e.g., speech) to and from another user with the same objective. That Vonage uses stored information to enable those customers to complete such communications is no different than the standard practice of all other telephone carriers, which must access stored information in order to route telephone calls and provide services on their networks.

10. The Rego Declaration (¶ 25) also disputes the Commission's conclusion that the Vonage customer's voice is transmitted to points specified by the customer without any change in form or content. Vonage argues its conversion of IP packets sent by the customer into TDM or vice versa constitutes a change in form or content. The PSC statement is correct because from the customer's standpoint his or her speech or other information arrives at the called party as it was sent, in the same form (e.g., voice) and content. Even multiple

conversions in format or protocol along the call path, which are routine in the provision of telephone services, do not ultimately change the form or content of the information transmitted.

11.  Vonage also disputes the Commission's statement that it transmits information among points specified by the user, claiming it can only route traffic to IP addresses, not specific points (Rego ¶ 26).  Vonage errs in reading "point" as meaning a precise and known geographical location.  In this case, the "points" referred to in the Commission's order may be geographical and known (such as the residence of another individual) or they be unknown (at least to the caller), such as when one calls an "800" number or a wireless customer.  In the former case, the "800" number dialed by the customer is not attached to a particular location, but must be translated into one or more "normal" telephone numbers that are themselves associated with specific locations in order for such calls to be routed to the appropriate destination.[2]  In the latter case, the caller specifies a desire for the call to be transmitted to a particular wireless phone of the caller's choosing, regardless of where that phone may be physically located at the time. Indeed, the great value of wireless telephone services is that

---

[2] Such "800" numbers can be associated with multiple physical locations, so that, for example, calls to a company's "800" number are routed to its New York office from 8 am to 5 pm ET, but are routed to the company's West Coast office from then until 5pm PT, and then are routed to an overseas call center until 8 am ET the following morning when the are again routed to New York.

they do not require users to be in a particular pre-determined location in order to work.  Similarly, the Vonage service seeks to complete communications between users, even when one user's location may be unknown to the other or may change from time to time.

12.  Vonage further argues that it cannot determine the exact physical location of a customer (Rego ¶ 26).  As a theoretical matter, I believe that it would be possible to determine the locations of customers from the IP addresses involved, at least to a reasonable level of confidence as to what state or states the users are located in.  I do not suggest that Vonage now has that capability nor should expend any effort to acquire such capability.  As discussed below, it simply is not necessary to determine the exact locations of the endpoints of each call in order for Vonage to comply with state regulations.   In this regard, Vonage's situation is very similar to the situation of cellular service.  In particular, although a wireless call is being delivered to a particular point -- the user's cellular phone -- it may be difficult to track that physical location as the user moves.  And, in fact, although wireless carriers comply with both state and federal regulations, including the obligation to contribute to the federal universal service program based on their interstate revenues, I do not believe that wireless carriers routinely track and record such location information.  Instead, they make

reasonable estimates or approximations when jurisdictional distinctions are relevant.

13. Finally, the Rego Declaration argues that it is not technically possible to separate Vonage's service into distinct intrastate and interstate components (¶¶ 34, 35, and 36) because it cannot determine which specific communications are interstate, intrastate, or international. Even if this conclusion were true, it is irrelevant for regulatory purposes. Few regulations are applied on a call-specific basis that requires precise determination of the jurisdictional nature of individual calls. Indeed, the only instance where I believe such precision would be expected is when a carrier chooses or is required to charge different rates for interstate and intrastate calls (not at issue here). In all other instances, regulations are applied on the basis that the customer has accepted the provider's offer of service (e.g., he or she has an account with the provider). For example, requirements relating to the termination of a customer's service apply because the customer subscribes to the carrier's service, not because of the jurisdictional nature of any calls that the customer may have made. Indeed, no calls need to be made at all for such rules to apply and serve their consumer protection purposes. Furthermore, those few requirements that nominally depend on the jurisdictional nature of calls can be complied with by using reasonable proxies or estimates that obviate the need to

determine the endpoints of each call (e.g., the use of estimated percentage of interstate use (PIU) in determining appropriate access charge billing between carriers). Moreover, it still appears that the overwhelming bulk of Vonage's calls can be associated with a geographic location. Thus, Vonage points out that approximately 75% of its customers have selected an area code that reflects their billing location.(Rego ¶ 20)

## II.    IRREPARABLE HARM

14.   The Rego Declaration (¶ 43) claims on the basis of a "general understanding of how a state regulation of telephone companies works" that Vonage cannot possibly comply with the requirements that it file a tariff with the Public Service Commission.  However, the Rego Declaration (¶ 44) describes alleged impossibilities that simply do not exist.  Indeed, I am aware that at least two other carriers have filed tariffs with the Commission for the provision of IP-based telephone services in New York.[3]  First, the Rego Declaration states that Vonage would be unable to apply separate rates to interstate and intrastate calls.  A tariff that does not apply different rates to interstate and intrastate calls, as Vonage suggests is its normal practice, would, in my judgment, meet the rate requirements the Commission has imposed on competitive

---

[3] Case 04-C-0711 - Ordinary Tariff Filing of RNK, Inc. to introduce RNK Broadband Voice Services, Issued May 24, 2004,  Effective June 23, 2004

Case 04-C-0335 - Tariff Filing of Time Warner Rescom of New York d/b/a Time Warner Cable, P.S.C. No 3 - Digital Phone Service  - Issued March 2, 2004, Effective April 1, 2004

providers, such as Vonage. That tariff could include a single monthly rate for the use of the service by each customer, or Vonage could file its existing calling plans with the Commission. Those plans, as described in ¶ 18 of the Rego Declaration, are an unlimited use package or packages which describe usage as local, regional or long distance. Such plans seem unexceptionable to me and, indeed, similar bundled rate plans have already been filed in other carriers' tariffs.[4]

15. The Rego Declaration (¶ 44) further claims that Vonage has no way of applying any changes the PSC might require to Vonage's standard contract terms only to intrastate service within New York, again because of its alleged inability to determine when its service is used on an intrastate basis. This largely misconstrues the application of tariff terms and conditions, which rarely are dependent on determining the endpoints of a particular call. For example, rules requiring a carrier to provide advance notification of its intent to terminate service or requiring a carrier to comply with the state commission's complaint handling rules do not require determination of the jurisdictional nature of any particular call. Indeed, I am aware of no aspect of telephone service provision that requires determination of the endpoints of

---

[4] For example, AT&T Unlimited Plan and AT&T Personal Network Plan, both AT&T Communications of New York, P.S.C. No. 2 - Telephone; RNK Residential Package Plan, RNK, Inc., P.S.C. No. 1 - Telephone; Digital Phone Service, Time Warner ResCom of New York, LLC d/b/a Time Warner Cable, New York P.S.C. Telephone No. 3

specific calls, other than if the company chooses to apply
different rates to different types of calls (e.g., interstate,
intrastate, toll, or local). Nor, as Rego implies, would
application of NYPSC rules in New York dictate the company's
responsibilities or offerings in other jurisdictions. As
application of state-specific regulations are not contingent on
identifying call endpoints, Vonage is just as capable of
complying with different regulatory requirements in different
jurisdictions as are any of the hundreds of other multi-state
telephone corporations that already do so on a daily basis.

16. The Rego Declaration errs, moreover, to the extent it
assumes that the New York PSC has an interest in which calls are
intrastate and which calls are interstate. Carriers stating
different rates for interstate and intrastate service may have
an interest in identifying such calls for billing purposes.
However, the PSC does not require carriers to charge on such a
basis. Thus, the Rego Declaration is wrong when it contends
that New York State telephone regulation relies primarily on
physical customer locations for purposes of applying
regulations.

17. Vonage further contends (Rego ¶45) that the New York
PSC regulates and requires filings of intrastate revenues,
operating expenses and billing. Vonage contends that it cannot
comply with these requirements, but there is no reason why the
company cannot, as I believe many carriers do, develop

reasonable proxies for estimating intrastate revenues for

purposes of these reports.  I am not aware that the PSC requires

competitive carriers such as Vonage to report intrastate

expenses.

## III. POSSIBLE PUBLIC INTEREST IN REGULATING VONAGE

18.   While Vonage will not suffer irreparable harm as a

result of compliance with PSC tariff requirements, the public

interest will be harmed if Vonage is not required to make its

filing of tariffs and/or waiver requests.  Other providers of

IP-based telephone services have already filed tariffs for their

services and the Commission needs to proceed with possible

refinement of its regulatory framework.  The Commission has

three interests it seeks to protect in asserting jurisdiction

over Vonage's service.  Delaying filing of tariffs and/or waiver

requests will interfere with the Commission's consideration of

how to protect each of those interests in regulating the service

proposed by Vonage.

19.   The first interest the Commission must consider is

whether the Vonage service will adequately protect public

safety.  Traditional landline companies provide access to "E911"

service.  That service allows a caller to dial 911 in an

emergency, have the call routed automatically to an emergency

service dispatcher at the proper public safety answering point

(PSAP) for the caller's location, and have his or her location

(address) automatically identified to the dispatcher. The subscriber need take no action to enroll or opt into E911 service. The appropriate PSAP for each customer location is determined by local governments and public safety organizations, not by the phone company. Apparently, Vonage currently is unable to offer this service. It instead allows customers to opt into its emergency calling capability if they specify an address that may allow Vonage to route the customer's 911 calls to the appropriate public safety organization. Because it does not utilize the selective routing database used by other carriers to determine proper routing of 911 calls, Vonage must decide itself which PSAP is appropriate for the address provided by the customer.[5] In addition, it routes 911 emergency calls not over the circuits connected to the emergency dispatchers, but to the PSAPs' normal administrative phone lines, which may or may not be answered at all times (24/7/365) or may be busy when an emergency call comes in. The Commission must consider whether this Vonage offering adequately protects public safety in New York; Vonage should file the waiver request so the Commission can do so or work with Vonage to implement a workable alternative emergency calling procedure.

20. The second interest the Commission seeks to protect is that of ensuring a fair playing field for all telephone

---

[5] Street addresses that appear to be in one community may be served by fire or police organizations in a neighboring community or district. Only the public safety organizations involved can accurately determine which PSAP properly serves the customer's location.

providers in the State of New York. Vonage is offering its Digital Voice™ in competition with a variety of other telephone providers in New York. These providers include cable companies, other providers of IP-based telephone services, and providers using traditional circuit-switched networks. The Commission has applied the same regulatory requirements to all providers that enjoy equivalent market power in order to ensure fair treatment. Vonage now seeks to be exempt from regulation, thereby giving it a competitive advantage over other non-dominant providers of intrastate telephone service in the State of New York. Over the last quarter century, the Commission has continuously adjusted its regulatory requirements to reflect evolutions in the market. In light of the advent of new services, such as Vonage's, the Commission will again reconsider the requirements it has applied to competitive carriers. Vonage's filing of its proposed exemptions from PSC regulation, with the justifications therefor, would be an important step along the PSC's path toward adjusting its regulation of non-dominant carriers.

21. A related factor to be considered is whether and how carriers such as Vonage should compensate other network providers for the use of their networks. Typically, all telephone corporations pay either "access charges" or "reciprocal compensation," depending on the nature of the traffic transmitted, for the use of other telephone companies' networks. Vonage, however, does not make such payments for its

use of other carriers systems to complete calls, and it is not clear that the carriers from which Vonage purchases services are able to properly reimburse the other carriers to whom they deliver Vonage's traffic. One of the issues to be considered in the Commission's examination is whether all companies are paying appropriate intercarrier compensation. Vonage attempts to defeat the need for consideration of whether there should be competitive equality on this point by claiming that the carriers with which it does interconnect are paying all applicable fees for transmitting Vonage's customers' traffic to and from other carriers. (Rego ¶36) Interestingly, Vonage's belief that those carriers are paying the appropriate charges appears to be inconsistent with its claim that it cannot comply with state regulations because the endpoints of its calls cannot be identified, inasmuch as such information is a common means of determining appropriate intercarrier compensation. The Commission should be allowed to consider the extent to which Vonage or its underlying carriers should be required to pay such fees as well as how the appropriate payments should be estimated in the event precise determinations of the nature of Vonage's traffic cannot be made.

22. Third, the PSC has a vital interest in ensuring the reliability of the various telecommunications networks operating in New York. Those networks enable communications that are vital in the provision of essential public services (e.g.,

public safety, security, and healthcare) and to support private

sector interests (e.g., the financial community) critical to the

state's economic security. Telecommunications are essential to

the security of the state's citizens in averting and responding

to man-made and natural disasters. State and local law

enforcement and emergency response organizations depend on

reliable telecommunications to prevent incidents and protect the

public, and to marshal resources and direct recovery efforts.

Individuals rely on public communications networks for their own

safety in emergency situations. On an on-going basis, the

Commission needs to monitor overall network reliability, which

it does in part by requiring carriers to report immediately

service outages affecting significant numbers of customers and

critical facilities. When disasters do occur the Commission

needs to be able to identify any affected carriers and help

coordinate cooperative relief efforts. To perform these

functions the PSC needs jurisdiction over all telecommunications

service providers.

23. Finally, the Commission has imposed limited consumer

protection requirements on competitive providers. Such consumer

protections are important aspects of telephone regulation. For

example, they protect customers from unjustified and/or sudden

termination of service and provide customers options for

resolving disputes with carriers. Vonage proposes to deny its

customers the right to these Commission protections and to

require that all customers' disputes with the company be arbitrated privately in New Jersey.  This proposed offer of consumer protection needs to be evaluated by the Commission in the context of a Vonage request for waiver of the PSC's rules.

Carl A. Johnson
Utilities Supervisor (Telecom)
Public Service Commission
 of the State of New York
Three Empire State Plaza
Albany, New York 12223
(518) 486-2832

DATED: June 25, 2004
       Albany, New York

- 18 -

STATE OF NEW YORK
PUBLIC SERVICE COMMISSION

At a session of the Public Service
Commission held in the City of
Rochester on May 19, 2004

COMMISSIONERS PRESENT:

William M. Flynn, Chairman
Thomas J. Dunleavy
Leonard A. Weiss
Neal N. Galvin

CASE 03-C-1285  -  Complaint of Frontier Telephone of Rochester, Inc. Against Vonage
Holdings Corporation Concerning Provision of Local Exchange and
InterExchange Telephone Service in New York State in Violation
of the Public Service Law.

ORDER ESTABLISHING BALANCED REGULATORY
FRAMEWORK FOR VONAGE HOLDINGS CORPORATION

(Issued and Effective May 21, 2004)

BY THE COMMISSION:

<u>INTRODUCTION AND SUMMARY</u>

In September 2003, Frontier Telephone of Rochester, Inc. (Frontier) filed a
complaint alleging that Vonage Holdings Corporation (Vonage) is a telephone
corporation under New York State Public Service Law (the PSL or Public Service Law),
but has not obtained the Certificate of Public Convenience and Necessity (CPCN)
required by PSL §99(1) and is violating various statutes, rules and Commission policies.
Frontier asks that we order Vonage to cease offering local exchange and intrastate long
distance services in New York until it has obtained a CPCN and complied with all
relevant state regulatory requirements.  Frontier also asks that Vonage be required to
route all "911" calls over dedicated "911" networks and participate fully in "enhanced
911" (E911) services where they are available.

CASE 03-C-1285

Vonage claims that it is not a telephone corporation as defined by the Public Service Law and that, as its service is an "information service" under federal law, state regulation is pre-empted. On October 9, 2003, noting that it "raises generic concerns that could affect a number of entities," we issued a notice requesting comments on the Frontier complaint.

Based on our review of the complaint and comments received, we find that in offering and providing its Digital Voice$^{SM}$ service in New York, Vonage is a "telephone corporation" as defined in the PSL and is, therefore, subject to basic statutory requirements.  We also find that such state regulation is not pre-empted by current federal laws or rules, and that additional process is appropriate before establishing a balanced regulatory framework consistent with the competitive landscape in which Vonage's offering is provided.

Although the Commission has the authority to regulate telephone services, such as those provided by Vonage, we also have an interest in ensuring that such regulation does not needlessly impose costs that interfere with the rapid, widespread deployment of new technologies.  We seek to maximize the benefits of new technologies, while minimizing the risks to the public interest, by imposing as little regulation as is necessary to ensure that our core public interest concerns, including most prominently public safety and network reliability, are addressed.  In the past, we have achieved this balance by relaxing regulatory requirements, to the extent allowed by law, on entities lacking size or market power.  For example, we have provided extensive pricing flexibility for competitive services and imposed minimal service quality and financial reporting requirements on small and non-dominant carriers, similar to Vonage.  We will continue to use this approach in dealing with today's evolving technologies and markets.

Vonage is a relatively small competitive provider of local exchange and interexchange services that should be subject to, at most, the same limited regulatory regime to which comparable circuit switched competitive carriers are currently subject in New York.  Vonage will be directed to obtain a CPCN (§99) and file a tariff (§92)[1] as

---

[1]   A model tariff is available on the Department's web site.

CASE 03-C-1285

required under the Public Service Law, within 45 days of this Order. It may also seek waiver of any Commission regulations it deems inappropriate.[2]

In making our decision, we determined that it is in the public interest to move cautiously in terms of defining a regulatory environment for Vonage's service. To that end, we are deferring any regulatory requirements for a reasonable period to permit Vonage to apply for a CPCN and file rate schedules. During this 45-day period, Vonage is also permitted to seek permanent and/or temporary waivers of any regulations it deems to be inappropriate in its circumstance, or with which it is not readily able to comply. Further, we will not enforce our rules and regulations with regard to Vonage's service pending our evaluation of Vonage's potential waiver requests.

The company is also encouraged to work with Staff to develop alternative means, where appropriate, of achieving necessary public safety and consumer protections. That process will allow development of a sufficient factual basis for us to ensure that our core public policy interests are satisfied without unnecessarily interfering with the development of new services and technology deployments.

## DESCRIPTION OF THE SERVICE

### Voice Over Internet Protocol

Voice over Internet Protocol (VoIP) is a technology developed to enable voice communication over networks, including the public Internet, that utilize the Internet Protocol (IP). VoIP converts voice conversations into digital packets that are transmitted over IP networks. It can be used in many configurations to provide telephone services. For example, VoIP has for several years been deployed in the network backbone and in private corporate networks allowing those network operators to achieve cost savings by converging voice and data traffic on one platform. Cable companies are using VoIP to roll out stand-alone telephone services over their existing fiber-coax cable

---

[2]  The Commission is authorized to grant waivers of its rules and regulations pursuant to 16 NYCRR §3.3(c).

CASE 03-C-1285

networks.[3]  Other companies, such as Vonage, use VoIP to provide voice communications over a customer's existing high-speed Internet access service, providing the customer a normal telephone number and the ability to call any phone in the world. Still others, such as Pulver and Skype, provide VoIP-based software to enable voice communications between member users on the Internet.  Traditional telephone companies, such as AT&T, are also using VoIP technology to carry calls between switches on their long-haul networks.  Even traditional local carriers, such as Verizon, can use VoIP technology for their interoffice traffic.

Vonage's Digital Voice[SM]

The Vonage Digital Voice[SM] service enables its subscribers to complete telephone calls to other Digital Voice[SM] subscribers over the public Internet and to users of any public telephone networks in the world.  To place a call, a Vonage customer typically uses a normal telephone and dials a standard telephone number.  The number and voice are "digitized" into IP packets by a Multimedia Terminal Adapter (MTA) and transmitted using VoIP and the customer's broadband Internet connection to a Vonage gateway server.  If the call is to another Vonage customer, the call is completed to the called party over the Internet.  If the call is to a non-Vonage customer, the Vonage server converts the packetized information into a Time Division Multiplexed (TDM) signal to enable completion to the called party via connections through one or more common carriers (incumbent and competitive local exchange carriers and/or interexchange carriers).  When a non-Vonage customer calls a Vonage subscriber, the call is also dialed normally and then traverses the originating carrier's network and perhaps other carriers' networks (all typically using TDM) until it is passed to Vonage, which packetizes the signal and transmits it to the called Vonage customer.  Given Vonage's current limited subscriber base, a vast majority of the calls are connected over other carriers' networks.[4]

---

[3]  For example, Time Warner ResCom of New York, LLC began offering its Digital Phone service in parts of the state under a tariff effective April 1, 2004.

[4]  Vonage has about 150,000 customers in the United States and estimates it will have 250,000 customers by the end of 2004.  The company estimates it has approximately 10,500 customers with New York billing addresses.  (Vonage Comments at p.5)

CASE 03-C-1285

## FRONTIER'S COMPLAINT AGAINST VONAGE

In September 2003, Frontier Telephone of Rochester, Inc. (Frontier) filed a complaint against Vonage[5] alleging that Vonage is providing intrastate telephone services in New York without the CPCN required by PSL §99(1) and is violating various statutes, rules and Commission policies by failing to comply with virtually any other regulatory requirements. Frontier further alleges that Vonage provides unsafe and inadequate emergency calling (911) in violation of PSL §97. Frontier asks the Commission to: (a) order Vonage to cease providing local exchange and intrastate long distance services within the State of New York until it obtains a CPCN and complies with the appropriate statutes, regulations and orders of the Commission for telephone corporations; and (b) direct Vonage to route all 911 calls over the dedicated 911 network without requiring a special 911 subscription and participate fully in "enhanced 911" (E911) services where they are available.

Frontier asserts that "Vonage is a 'telephone corporation' owning, operating or managing a 'telephone line' as defined in §2(17) and §2(18) of the Public Service Law because Vonage operates apparatus and property within the state to conduct the business of affording telephonic communication for hire."[6] In support of its claims, Frontier first cites Vonage's web site representations:

Use Vonage like you use any telephone

With Vonage, you pick up the phone, hear the dial tone and dial the telephone number of your choice. There are no extra numbers to dial and no special routines to follow. It's that simple. You don't have to be an engineer to use our service.

You can be up and running within minutes of receiving your Vonage package. We send you everything you need to get Vonage phone service,

---

[5]  Frontier's complaint against Vonage mirrors a similar complaint by the Minnesota Public Utilities Commission (MPUC) against Vonage in that state. A District Court decision in Minnesota which held that the MPUC was preempted by federal law (Vonage Holdings Corp. v. Minnesota Public Utilities Comm'n., 290 F. Supp. 2nd 993 (D. Minn. 2003)) is on appeal before the Eighth Circuit Court of Appeals (Docket No. 04-1434).

[6]  Frontier Complaint at 2.

CASE 03-C-1285

> right down to the extra cable wire. Best of all, there's no technician, no wiring in the walls, and no technical experience needed! Setup usually takes less than 5 minutes.

Frontier then describes the routing of calls to and from a Vonage subscriber as generally discussed above. This, it avers, demonstrates that Vonage "directly owns, operates and manages telephone equipment," specifically the MTA at the subscriber's location and the Vonage gateway server or router. Further, the complaint asserts that "by reselling and integrating the switching and transmission functions of its associated carrier or carriers" to establish connectivity with non-Vonage customers, Vonage manages a "telephone line." Finally, Frontier argues that by porting numbers from other local carriers through its associated CLEC, "Vonage holds itself out to be a complete replacement for a subscriber's telephone service." Frontier notes that, except for mobile radio and cellular services (which Vonage does not claim to use), the PSL does not exempt telephone corporations from Commission authority on the basis of the technologies they use to provide service.

As it believes Vonage is a "telephone corporation" under the PSL, Frontier asserts that Vonage should be required to comply with a number of laws, rules, and orders, including but not limited to:

- the requirement to pay its share of Commission expenses (§18a);

- the requirement to file tariffs for local and intrastate long distance (§92(1));

- the requirement to obtain Commission approval to issue securities (§101 and 16 NYCRR Part 37);

- requirements to provide 911 emergency calling; [7]

- NYSPSC complaint procedures (16 NYCRR Part 12);

---

[7]    Frontier references §97(2) in this regard suggesting the Vonage 911 Service is unsafe and inadequate. In sum, Frontier asks the Commission to confirm that Vonage is a telegraph corporation or telephone corporation and also to find that Vonage 911 service is inadequate pursuant to PSL §97(2).

CASE 03-C-1285

- rules covering provision, suspension and termination of service (16 NYCRR Part 609);

- the obligation to file NYPSC annual reports  as a CLEC (16 NYCRR Part 641);

- the requirement to offer per-line or all-call Caller ID blocking;[8]

- The requirement to enter into traffic exchange agreements; [9]

- Sales tax and 911 surcharges (Tax Law §1105/County Law §305).

## COMMENTS

Seventeen parties filed comments and/or replies in response to our request for comment on the Frontier complaint.[10] Vonage and others recommending dismissal of Frontier's complaint focus less on the specific provisions of the Public Service Law than on the proper characterization of the Vonage service under federal law. They also assert that the interstate nature of the service leads to the conclusion that state regulation of this service is, or should be, preempted. These parties conclude that Vonage is not a telephone corporation, does not provide telecommunications service, and thus, is not subject to the various laws, regulations and Commission Orders cited by Frontier. Parties supporting the Frontier complaint generally confirm its claim that Vonage's service is a telephone service under state law and/or a telecommunications service under federal law. Further, a number of parties note that the Federal Communications Commission (FCC) is

---

[8]    Case 91-C-0428, Proceeding on Motion of the Commission to Investigate New York Telephone Company's Proposal to Institute Caller ID Service, Opinion 92-5 (issued April 9, 1992).

[9]    Case 00-C-0789, Proceeding on Motion of the Commission Pursuant to Section 97(2) of the Public Service Law to Institute an Omnibus Proceeding to Investigate the Interconnection   Arrangements Between Telephone Companies (Orders issued December 22, 2000, September 7, 2001 and August 16, 2002).

[10] Vonage, Frontier, Time Warner, MCI, AT&T, Level 3, Voice on the Net Coalition, Net2Phone, Point One, Global NAPS, Cablevision Systems Corporation, the Cable Television & Telecommunications Association of New York, Inc., NYSTA, CWA, Sprint, Verizon, and the New York State Attorney General.

CASE 03-C-1285

in the midst of a similar proceeding and that states (including New York) should not act in advance of the FCC's determination.

Vonage

Vonage argues that the Commission may not impose common carrier regulation on its Digital Voice$^{SM}$ because it is not a telecommunications service, but an information service, state regulation of which is preempted. Vonage asserts its service is an information service because it provides a net protocol conversion (from digital IP packets to digital TDM signals or vice versa) and because its subscribers must use "special" customer premises equipment (CPE) to convert acoustic sounds to IP packets (in this case a computer or MTA). Alternatively, Vonage describes its service as an Internet application, regulation of which it argues is forbidden by federal law and policy.

Turning to the state law, Vonage argues that it is not a telephone corporation under the PSL because it does not "own, operate or manage" a telephone line. It argues that it does not own or provide the wires and equipment by which the subscriber connects to the Internet and subsequently from the Internet to the Vonage service; those are provided by unaffiliated third parties. Nor does Vonage own, operate or manage the telephone lines of other common carriers from whom Vonage purchases services to provide its customers telephone numbers and connections to customers of other carriers. The company also asserts that it does not resell those services acquired from other carriers. It does own and operate a media gateway server in a data center in New York City to perform IP-TDM conversions, but argues that this should be treated not as telephone equipment, but as Internet Service Provider equipment.

Finally, Vonage argues that even if we determine it is a telephone corporation, state regulation is preempted because the interstate and intrastate aspects of its service cannot be segregated. This is so, the company maintains, because it is technically impossible to accurately determine whether a given call is interstate or intrastate in nature.

Other Parties

Generally, parties supporting Vonage contend that the service in question is not, or should not be, subject to state regulation. Some, such as the Voice on the Net

-8-

CASE 03-C-1285

(VON) Coalition and Net2Phone, argue that as a matter of policy new Internet-based services should remain relatively free of any regulation, particularly state regulation. Others, including Level 3, argue that the Vonage service is an "information service," not a "telecommunications service," and is, therefore, subject only to the federal jurisdiction.

At the other end of the spectrum, parties including CWA, NYSTA, and the New York State Attorney General argue that, as the functional equivalent of normal telephone service, Vonage's service is clearly telephone service, potentially subject to the full panoply of the Commission's regulations. Verizon contends that although the Vonage service is a telecommunications service, it is predominantly interstate and, therefore, not subject to this Commission's authority. Others, while not directly addressing the legal status of the service, counsel delay until the FCC acts (e.g., MCI) or taking a light-handed approach that recognizes the nascent nature of this new service offering (e.g., Cablevision and Time Warner).

## DISCUSSION

The threshold question is whether Vonage is a "telephone corporation" as defined by the Public Service Law. If it is not, the matter ends there; it would not be subject to state telephone regulation. If it is a telephone corporation, we must then examine whether Commission jurisdiction has been preempted. If it has not, we must then consider the appropriate regulatory framework to be applied in New York.

Vonage is a Telephone Corporation Under State Law

Vonage claims that it is not a telephone corporation under New York law because it alleges that it does not own, operate or manage the facilities it uses to provide telephone service. Rather, it claims that all the facilities used are provided by third parties, and the equipment it does own and uses to interconnect call to other carriers' networks does not constitute a "telephone line" under PSL §2(18).

Under the Public Service Law a "telephone corporation" is defined as "every corporation...owning, operating or managing any telephone line or part of telephone line used in the conduct of the business of affording telephonic communication for hire." (PSL §2(17)). The Public Service Law defines "telephone line" as including

-9-

CASE 03-C-1285

"receivers, transmitters, instruments, machines, appliances and all devices,...apparatus, property and routes used, operated or owned by any telephone corporation to facilitate the business of affording telephonic communication...." (PSL §2(18)).

The company is in the business of affording "telephonic communication for hire." Vonage's service allows subscribers to make and receive voice communications with any other telephone subscribers in the world, and its service is marketed as a substitute for "home phone service." Vonage owns and manages equipment (a media gateway server)[11] that is used to connect Vonage's customers to the customers of other telephone corporations via their public networks, as necessary. This equipment constitutes a "telephone line" under the PSL and is used to facilitate the provisioning by Vonage of telephonic communication to customers. Accordingly, Vonage is a "telephone corporation" under our jurisdiction.

Vonage interconnects with, and purchases services and the use of network facilities from other telephone corporations to enable its customers to place calls to, and receive calls from, telephone customers throughout the world. In so doing, Vonage is reselling[12] to its own customers capabilities it acquires from the other, third party, telephone corporations. We have previously determined that entities reselling telephone services are telephone corporations subject to our jurisdiction.[13]

New York's Regulation of Vonage's Service is Not Preempted

Vonage and others claim that state regulation of its service is preempted because: (1) Vonage offers information service under federal law; (2) state regulation of

---

[11] A media gateway server is a special router that connects an IP network to a traditional telephone network.

[12] "[A] *reseller of telephone services* is a telephone corporation as defined in the Public Service Law, which shall subscribe to communications services and facilities from a telephone corporation, and which shall re-offer communications services to the public for profit." (16 NYCRR §647.1)

[13] Case 27946, Proceeding on Motion of the Commission Concerning the Removal of Telephone Company Tariff Regulations Which Prohibit or Restrict the Resale and Shared Use of Telephone Services, Order Directing the Filing of Tariff Revisions and Requesting Comments (issued May 25, 1982), Attachment 1.

CASE 03-C-1285

information services and the Internet is inconsistent with federal law; and (3) the interstate and intrastate aspects of its service cannot be segregated; or (4) its service is an Internet application and Congress declared that the Internet should be free of regulation.

First, Vonage service is not an information service under federal law, despite claims to the contrary. The Telecommunications Act of 1996 [14] (the 1996 Act) defines "telecommunications" as "the transmission, between or among points specified by the user, of information of the user's choosing without change in the form or content of the information as sent and received."[15] The 1996 Act further defines "telecommunications service" as "offering of telecommunications for a fee directly to the public ... regardless of the facilities used."[16]

In contrast, "information service" is defined in the 1996 Act as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." [17]

The FCC view of the differences between telecommunications services and information services was discussed in its April 10, 1998, Report to Congress on Universal Service.[18] The critical distinction drawn by the FCC in classifying a service as

---

[14] Pub. L. No. 104-104, 110 Stat. 56 (1996); encoded at 47 U.S.C. §§ 151 et seq.

[15] 47 U.S.C. §153 (43).

[16] Id., §153 (44).

[17] Id., §153(20).

[18] In the Matter of Federal-State Joint Board on Universal Service, 13 FCC Rcd 11501, CC Docket No. 96-45, FCC No. 98-67 (April 10, 1998) (FCC USF Report or Stevens Report).

-11-

either information or telecommunications was whether the provider performed some function that modifies the information, or merely transmits it.[19]

A Vonage customer's voice is transmitted between or among points specified by the customer, without any change in the form or content of the conversation. Nothing is changed, added or subtracted to the conversation in any way. Moreover, its provision of analog-to-IP (and vice-versa) conversion equipment in order to utilize the Internet as a transmission medium ultimately changes neither the form nor content of the caller's information. Consequently, Vonage's service is a "telecommunications service" which can be regulated by the states.

Likewise, Vonage's service is not an information service. It does not offer its customers a capability to manipulate or interact with stored data. Vonage's service merely transmits its users' voices between and among endpoints chosen by the caller. With regard to its argument that it is an information service because it provides a net protocol conversion, the FCC has ruled that when there are protocol conversions at both ends of the call ("no net" protocol conversion), the service is a telecommunications service.[20] Vonage's service involves this type of "no net" protocol conversion. Its adapter and/or software convert its customers' speech into the Internet protocol (IP) data

---

[19] Id., at ¶39. The FCC's functional approach to statutory classification as either a telecommunications or information service is consistent with Congress' direction that a service's classification should not depend on the type of facilities used. (See definition in Act, §153 (44), supra). "Its classification depends rather on the nature of the service being offered to customers. Stated another way, if the user can receive nothing more than pure transmission, the service is a telecommunications service." Conversely, "[i]f the user can receive enhanced functionality, such as manipulation of information and interaction with stored data, the service is an information service" (¶ 59). In 2002, we used the FCC criteria to determine if a New York company was an information service provider or a telephone corporation (Case 01-C-1119, Complaint of Frontier Telephone of Rochester Against US DataNet Corporation Concerning Alleged Refusal to Pay Intrastate Carrier Access Charges, Order issued May 31, 2002).

[20] In the Matter of Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as amended, 11 FCC Rcd 21905, 21956, CC Docket No. 96-149, FCC 96-489, First Report and Order and Further Notice of Proposed Rulemaking, at ¶ 106 (December 24, 1996).

format.  Vonage's network subsequently converts IP packets back to TDM in order to facilitate calls between its customers and other carriers' telephone subscribers.

Second, neither Congress nor the FCC has preempted state law.  Section 601 of the 1996 Act states that the 1996 Act "shall not be construed to modify, impair or supersede Federal, State or local law unless expressly so provided."[21]  While Voice on the Net Coalition argues that §230(b)[22] of the Act preempts state regulation of IP telephony, this argument incorrectly states the intent of §230.  Section 230 is entitled "Protection for private blocking and screening of offensive material," and is intended to address the content of speech transmitted over the Internet rather than traditional common carrier regulation.

Moreover, the FCC has not acted to preempt state law.  While not binding, the FCC's report to Congress tentatively concluded that "phone-to-phone" IP telephony appears to be a telecommunications service.[23]  It makes no definitive statements, however, as to the statutory classification of other types of IP telephony.[24]  Instead, the FCC deferred classification of specific IP telephony services to further proceedings.[25]  More recently, in a Notice of Proposed Rulemaking, the FCC initiated a global proceeding to investigate in detail the classification and appropriate regulation of the various forms of IP-enabled services, including Vonage-type services.[26]  Thus, Vonage's argument that state regulation conflicts with FCC findings is, at best, premature.

---

[21] The 1996 Act, §601(c)(1); encoded at 47 U.S.C. §152 note, supra.

[22] "It is the policy of the United States—(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;"

[23] FCC USF Report, supra, at ¶ 90.

[24] Id., at ¶¶ 3, 83.

[25] Id., at ¶ 91.

[26] In the Matter of IP-Enabled Services, WC Docket No. 04-36, FCC No. 04-28 (March 10, 2004) (Notice of Proposed Rulemaking).

-13-

CASE 03-C-1285

Even if the FCC were to classify Vonage's service as an information service, the Commission would not be preempted from regulating its intrastate aspects. The Communications Act §152 (b) expressly preserves state jurisdiction over intrastate information services.[27]

Third, Vonage claims that the impossibility doctrine and the FCC's mixed use rule preempt state regulation of VoIP services such as those provided by Vonage. The impossibility doctrine holds that state jurisdiction over intrastate communications is preserved unless it is impossible to separate the interstate and intrastate aspects of a service, and state regulation would negate the FCC's lawful exercise of its authority over interstate communications.[28] The FCC has the burden of showing that its rules preempt only state rules that actually interfere with its goals.[29] It has made no such declaration.

Moreover, Vonage's claim that it is technically impossible to separate intrastate and interstate regulation of its services is incorrect. The company's "Unlimited Local Plan"[30] allows customers unlimited local and regional calling and up to 500 minutes of long distance calls. By implementing this plan, the company has shown that it can distinguish local calls from long distance calls. Consequently, it is not impossible to separate intrastate and interstate calls.

The FCC's mixed use rule also does not apply to Vonage. The FCC established the mixed use rule as a way to establish the appropriate jurisdiction over special access lines where it was impractical to determine the jurisdictional status of the

---

[27] California v. FCC, 905 F.2d 1217, 1240 (9th Cir. 1990). See also, In the Matter of Petition for Declaratory Ruling that pulver.com's Free World Dialup is Neither Telecommunications Nor a Telecommunications Service, WC Docket No. 03-45, FCC No. 04-27, n.72 (February 19, 2004) (Memorandum Opinion and Order) (Pulver),where the FCC stated that its regulation does not extend to "purely *intrastate*" information services.

[28] Louisiana Public Service Comm'n v. FCC, 476 U.S. 355, 375, n 4 (1986).

[29] California v FCC, supra., at 1243.

[30] Vonage web site at www.vonage.com.

CASE 03-C-1285

traffic.[31] It was not used by the FCC for any purpose other than allocating special access jurisdiction[32] and, therefore, is inapposite to Vonage's service.

Finally, the claim that our jurisdiction is preempted because Congress declared that the Internet should be free of regulation misreads the Act. As we stated above, §230 is aimed at the content of speech on the Internet and does not affect states' application of traditional common carrier regulation.

## APPROPRIATE REGULATORY FRAMEWORK

The state's interest in maintaining capable, robust, and efficient telecommunications networks is self-evident. Those networks enable communications that are vital in the provision of essential public services – e.g., public safety, security and health care. Telecommunications are essential in averting and responding to man-made and natural disasters. State and local emergency response organizations depend on reliable telecommunications to marshal resources and direct recovery efforts. Individuals rely on public communications networks for their own safety and peace of mind in emergency situations. The Commission also has a responsibility to ensure that the public has ubiquitous access to effective and efficient 911/E911 emergency calling capabilities that meet the needs of emergency response organizations. The events of September 11,

---

[31] See In the Matter of MTS and WATS Market Structure Amendment of Part 36 of the Commission's Rules and Establishment of a Joint Board, 4 FCC Rcd 5660 (July 20, 1989) (Decision and Order). The FCC found that the costs for these mixed use lines should be assigned to the state jurisdictions because the lines carried predominantly intrastate traffic, with only small amounts of interstate traffic. Rather than shifting the costs to the federal jurisdiction because of some interstate traffic, or allocating the costs by some burdensome verification requirements, the FCC adopted a rule that if the lines carried only de minimis (less than 10%) interstate traffic, their costs should be allocated to the state jurisdictions.

[32] Although Vonage cites GTE Tel. Operating Cos., GTOC Tariff No. 1, GTOC Transmittal No.1148, 13 FCC Rcd. 22466, CC Docket No. 98-79, FCC 98-292 (1998), this FCC decision also concerns special access lines. "GTE's ADSL service is a special access service, thus warranting federal regulation under the "ten percent" rule." (GTE Decision at ¶ 25).

CASE 03-C-1285

2001 and the widespread blackout of August 2003 emphatically attest to the state's vital interest in maintaining reliable telecommunications networks.

Telecommunications are the lifeblood of this state's economy. Trillions of dollars of economic transactions that depend on telecommunications occur each day in New York. Those transactions are vital not only to New York's general economic health, but also to the financial integrity of state and local governments whose revenues are derived as a result of that economic activity. The state has a clear interest in maintaining uninterrupted telecommunications capabilities to preserve and advance the state's economic health.

To remain available and reliable, the state's existing telecommunications network providers must remain financially sustainable. While the state does not guarantee the financial success of any provider in a competitive telecommunications market, neither should it perpetuate unfair regulatory advantages for some providers over others. Such inconsistent regulatory treatment could allow competitive success not on the basis of superior product or efficiency, but as a result of regulatory arbitrage. As such unfairly won success could threaten the financial sustainability of providers serving customers with limited competitive choices, the state has an interest in ensuring that all providers of like services are subject to appropriate regulatory requirements.

A number of parties express a reasonable concern that state regulation of services such as Vonage's may interfere with deployment of useful new services and applications. Although the Commission has the authority to regulate telephone services, we also have an interest in ensuring that such regulation does not needlessly interfere with the rapid, widespread deployment of new technologies. Any regulation imposes costs that may diminish the promise of new technologies. At the same time, our core public interest concerns, including most prominently public safety (e.g., 911 emergency services) and network reliability must be addressed. To be most effective, regulation should target core public policy concerns, while minimally impinging on the free flow of markets and development of technologies.

Where regulation is appropriate, it should maximize the benefits of new technologies, while minimizing the risks to the public interest. In the past, we have

-16-

CASE 03-C-1285

achieved this balance by relaxing regulatory requirements, to the extent allowed by law, on entities lacking size or market power. For example, we have provided extensive pricing flexibility for competitive services and have imposed minimal service quality and financial reporting requirements on small and non-dominant carriers, such as Vonage. We will continue this approach in dealing with today's evolving technologies and markets. We also note that the Department is reviewing all regulatory requirements currently applicable to providers of telecommunications in New York to ensure that those requirements remain appropriate as technologies and markets evolve.

As Vonage is a relatively small competitive provider of local exchange and interexchange services, it should be subject to, at most, the same limited regulatory regime to which comparable circuit switched competitive carriers are currently subject in New York. However, because we recognize the potential impact of this emerging technology on facilities-based competition, we will move cautiously, so as not to hinder its development. Consequently, the company may seek permanent or temporary waivers of any of those requirements it deems to be inappropriate in its circumstance or with which it is not readily able to comply.

In order to allow Vonage sufficient time to make the required statutory filings and assess which rules and regulations it deems inappropriate for its provision of adequate service, we will stay the application of the statutory requirements for a reasonable period to permit Vonage to comply. Vonage will be directed to make the CPCN and tariff filings within 45 days of this Order, and to also request within that period waivers as appropriate for rules and regulations. This process will be subject to the Secretary's oversight. Further, during the pendency of the evaluation of Vonage's potential waiver requests, we will not enforce our rules and regulations with regard to Vonage's compliance. The company also is encouraged to work with Staff to develop alternative means, where appropriate, of achieving necessary public safety and consumer protections. That process will allow development of a sufficient factual basis for us to ensure that our core public policy goals are met without unnecessarily interfering with the development of new services and technology deployments.

-17-

CASE 03-C-1285

The Commission orders:

      1. Vonage must comply with the Public Service Law obligations of telephone corporations and within 45 days of this Order, Vonage Holdings Corporation shall file an application for a Certificate of Public Convenience and Necessity and file a tariff.

      2. To the extent Vonage chooses to seek waiver of specific rules and regulations, as discussed in this Order, it shall file such requests within 45 days of this Order.

      3. This proceeding is continued.

By the Commission,


(SIGNED)                        JACLYN A. BRILLING
                                     Secretary