UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

VONAGE HOLDINGS CORPORATION,           :
                                       :        04 Civ. No. 4360
                          Plaintiff,   :        (JGK) (DFE) (ECF CASE)
                                       :
            -against-                  :
                                       :
THE NEW YORK STATE PUBLIC SERVICE      :
COMMISSION, and WILLIAM M. FLYNN,      :
LEONARD A. WEISS, THOMAS J. DUNLEAVY, :
and NEAL N. GALVIN in their official capacities :
as the Commissioners of the New York State :
Public Service Commission and not as individuals, :
                                       :
                          Defendants.  :
-------------------------------------------------------------X


## REPLY BRIEF OF VONAGE HOLDINGS CORPORATION
## IN SUPPORT OF ITS MOTION FOR
## PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF


SWIDLER BERLIN SHEREFF FRIEDMAN, LLP
Ky E. Kirby
William B. Wilhelm
Michael C. Sloan
Yun Lee
The Chrysler Building
 405 Lexington Avenue
New York, New York  10174
(212) 973-0111
Counsel for Vonage Holdings Corporation

Dated: June 28, 2004
       New York, New York

# TABLE OF CONTENTS

Table of Authorities ................................................................................................... ii

Glossary ............................................................................................................... v

Introduction and Summary of the Argument ........................................................... 1

Argument ............................................................................................................... 9

POINT I. The Limitation on the PSC's Jurisdiction to Intra-state Communications Precludes
   its Regulation of Vonage .................................................................................. 9

POINT II. The PSC's Order Causes Irreparable Harm ........................................... 13

   A.  Vonage Cannot "Comply" with the PSC Order .......................................... 13

   B.  Vonage Satisfies the "Irreparable Harm" Requirement Necessary for an Injunction ...... 13

POINT III. The Court Should Enjoin the PSC's Authority to Regulate 911 wHILE the FCC
   Addresses the Issue ......................................................................................... 18

# TABLE OF AUTHORITIES
## FEDERAL CASES

*ASCAP v. Pataki*, 930 F. Supp. 873 (S.D.N.Y. 1996) .......................................................17

*Bell Atlantic Telegraph Cos. v. FCC*, 206 F.3d 1 (D.C. Cir. 2000)...................................12

*Brissett v. Ashcroft*, 363 F.3d 130 (2nd Cir. 2004) .............................................................2

*Computer II Further Reconsideration Order*, 88 F.C.C.2d 512 (1981) ............................4

*Condon v. Andino, Inc.*, 961 F. Supp. 323 (D. Maine 1997) ..............................................14

*Declaratory Ruling, Inter-Carrier Compensation for ISP-Bound Traffic*, 14
    F.C.C.R. 3689 (1999) ....................................................................................................12

*E911 Proceeding*, 11 F.C.C. Rcd 18676 (1996) ........................................................... 20-21

*Federal Maritime Commission v. Australia/U.S. Atlantic and Gulf Conference*,
    337 F. Supp. 1032 (S.D.N.Y. 1972)...............................................................................17

*Georgia Public Service Commission v. FCC*, 5 F.3d 1499 (1993)...................................12

*Independent Wireless One Corp. v. Town of Charlotte*, 242 F. Supp. 2d 409 (D.
    Vt. 2003) .........................................................................................................................16

*IP-Enabled Services Notice of Proposed Rulemaking, Docket No. 04-36*, 2004
    WL 439260 (rel. March 10, 2004) ...................................................................... passim

*Iowa Utilities Board v. FCC*, 109 F.3d 418 (8th Cir. 1996)..............................................17

*LTV Steel Co., Inc. v. Thomas*, 1988 WL. 121576 (N.D. Ill.) ...........................................14

*MCI Worldcom, Inc. v. FCC*, 209 F.3d 760 (D.C. Cir. 2000) ...........................................18

*Middle South Energy, Inc. v. Arkansas Public Serv. Commission*, 772 F.2d 404
    (8th Cir. 1985)................................................................................................................14

*New York Republican State Committee*, 1989 WL. 124206 (N.D.N.Y.)...........................14

*Northern States Power Co. v. Prairie Island Mdewakanton Sioux Indian
    Community*, 991 F.2d 458 (8th Cir. 1993) ....................................................................17

*Penn Central Co. v. Public Utilities Commission of Conn.*, 296 F. Supp. 893 (D.
    Conn. 1969).....................................................................................................................14

*Petition for Declaratory Ruling that Pulver.Com's Free World Dialup is Neither Telecommunications nor a Telecommunications Service*, 19 F.C.C.R. 3307 (2004)............................................................................................................2, 10

*Petition for Emergency Relief and Declaratory Ruling Filed by the BellSouth Corp., Memorandum Opinion and Order*, 7 F.C.C. Rcd 1619 (1992), *aff'd Georgia Public Servcie Commission v. FCC*, 5 F.3d 1499 (1993)..............................12

*Phase II Compliance Deadlines for Non-Nationwide CMRS Carriers*, 17 F.C.C. Rcd 14841 (2002) ......................................................................................................20

*Policy and Rules Concerning the Interstate, Interexchange Marketplace*, 14 F.C.C. Rcd 6004 (1999), *aff'd, MCI Worldcom, Inc. v. FCC*, 209 F.3d 760 (D.C. Cir. 2000) ........................................................................................................18

*Public Utilities Commission of Ohio v. United Fuel Gas Co.*, 317 U.S. 456 (1943) .. 13-14

*Request for Waiver by Cingular Wireless LLC*, 16 F.C.C. Rcd 18305 (2001).................20

*Reuters Limited v. UPI*, 903 F.2d 904 (2d Cir. 1990).........................................................16

*Revisions of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Systems*, 18 F.C.C. Rcd 25340 (2003) ................................... 20-21

*Rosso-Lino Beverage Distributings, Inc. v. Coca-Cola Bottling Co. of New York, Inc.*, 749 F.2d 124 (2d Cir. 1984) ...............................................................................15

*Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir. 1970)...........................15

*Standard & Poor's Corp., Inc. v. Commodity Exchange, Inc.*, 683 F.2d 704 (2d Cir. 1982) ...............................................................................................................17

*Tom Doherty Associates, Inc. v. Saban Entertainment*, 60 F.3d 27 (2d Cir. 1995)...........16

*Union Pacific Railroad Co. v. Las Vegas*, 747 F. Supp. 1402 (D. Nev. 1989) .................14

*United States Cellular Corp. v. FCC*, 254 F.3d 78 (DC Cir. 2001) ....................................9

*United States v. New Haven*, 447 F.2d 972 (2d Cir. 1971).................................................17

*United States v. New York*, 708 F.2d 92 (2d Cir. 1983).....................................................15

*Vonage Holdings Corp. v. Minnesota Public Utilities Commission*, 290 F. Supp. 2d 993 (D. Minn. 2003) ..................................................................................... *passim*

## STATE CASES

*RAM Mobile Data USA, L.P.*, 1995 WL. 363407 (N.Y.P.S.C.) .............................. 1, 11-12

## DOCKETED CASES

*Minnesota PUC v. Vonage Holdings Corp. (*8th Cir. No. 04-1434 ) (filed May 17, 2004) ...............................................................................................................3

*In re Vonage Holding Corporation Petition for Declaratory Ruling Concerning an Order of the Minnesota Public Utilities Commission*, FCC WC Docket No. 03-211 (filed Oct. 27, 2003) .................................................................................5, 6

## FEDERAL STATUTES

47 U.S.C. § 251(e)(3)........................................................................................21

47 U.S.C. § 230................................................................................................1,

## STATE STATUTES

N.Y. Pub. Serv. Law § 25(2) ...........................................................................13

# GLOSSARY

ALI:            Automatic Location Identification

ANI:            Automatic Number Identification

CPCN:           Certificate of Public Convenience and Necessity

E911:           Enhanced 911

FCC:            Federal Communications Commission

FWD:            Free World Dial-Up service by Pulver.com

IP:             Internet Protocol

MPUC:           Minnesota Public Utilities Commission

NENA:           National Emergency Number Association

PSAP:           Public Safety Answering Point

PSC:            New York Public Service Commission

PSTN:           Public Switched Telephone Network

TDM:            Time Division Multiplex

VoIP:           Voice over Internet Protocol

Plaintiff Vonage Holdings Corporation ("Vonage") respectfully submits this Reply to the Brief of the New York Public Service Commission ("PSC") in Opposition to Vonage's Motion for Preliminary and Permanent Injunctive Relief ("PSC Brief").

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The PSC's Brief clarifies that the agency's attempt to extend its regulatory authority to Vonage rests on a legally unsustainable fiction. While the PSC concedes that its authority is limited to intra-state communications, it denies that its Order has an "extraterritorial reach," because the Order purportedly seeks to "regulate only service provided to customers in New York." Br. at 25. But as Vonage has explained, there is no way to determine where its customers are geographically located and thus no way to comply with regulation directed "only" at "customers in New York." The PSC's blithe claim that there is "no regulatory need to identify where … calls originate or terminate," *id.* at 21, effectively strips the term "intra-state" of any meaning and conflicts with the PSC's own approach to determining the scope of its jurisdictional authority. *See, e.g., RAM Mobile Data USA, L.P.*, 1995 WL 363407 (N.Y.P.S.C.).

The PSC also denies that Vonage's service qualifies as an information service or, even if it does, that its Order is preempted. But the PSC's position exists in a vacuum; its Opposition Brief rarely makes the effort to respond directly to Vonage's arguments. For example, the PSC devotes four pages (at 14-17) to the straw man claim that Vonage inordinately relies on § 230 of the Communications Act ("Act"), when, in fact, Vonage has made only a few passing references to that statute. Section 230 *is* undeniably important; the Federal Communications Commission ("FCC") and numerous courts have cited and relied on the provision as standing for the principle that the Internet and information services should be exempted from state and federal common carrier regulation. The PSC's views on the meaning of § 230 simply cannot stand in the face of

-1-

FCC's prior pronouncements, which must be accorded *Chevron* deference. *See, e.g., Brissett v. Ashcroft*, 363 F.3d 130, 133 (2nd Cir. 2004).

The PSC's extended discourse on why Vonage "does not offer an information service, but a telecommunications service" (at 27-39), exhibits similar flaws. In fact, it contains many of the same arguments advanced by the Minnesota Public Utilities Commission ("MPUC") in defense of a nearly identical order that attempted to subject Vonage's service to telephone regulation in that state. And just as the federal district court in Minnesota rejected those arguments, this court should as well. *See Vonage Holdings Corp. v. Minnesota Public Utilities Commission*, 290 F.Supp.2d 993 (D. Minn. 2003). Thus, for example, the PSC incorrectly and irrelevantly focuses on the functional similarity between Vonage's service and ordinary telephone service. The FCC has recognized that information service offerings may resemble "telecommunications services" in many respects, but, nonetheless, do not lose their "information service" classification as a result of that resemblance. *See id.* at 999-1001.

The FCC reiterated this principle in its March 2004 *Pulver* order, where it found that Pulver.com's "Free World Dial-Up" service, which facilitates computer-to-computer voice communications over the Internet, is a statutory information service and, therefore exempt from state telephone regulation.[1] As Vonage explained in its Opening Brief, its service is identical to Pulver's in many respects, and therefore warrants the same regulatory classification. The PSC's attempt to distinguish *Pulver* on the grounds that Pulver's service is somehow "interactive," Br. at 17, is risible. Thus, the duck-test style of reasoning that the PSC admits to conducting (and defends; *e.g.*, at 31 n.19) has already been rejected by the FCC.

---

[1]    *Petition for Declaratory Ruling that Pulver.Com's Free World Dialup is Neither Telecommunications nor a Telecommunications Service*, 19 F.C.C.R. 3307, ¶¶ 20-25 (2004).

The other arguments the PSC advances to cabin Vonage's service within the "telecommunications service" classification are similarly flawed. Try as it might, the PSC cannot escape the fact that Vonage performs a "net protocol conversion" between the Internet Protocol ("IP") format used on the Internet and the Time Division Multiplexed ("TDM") format used on the public switched telephone network ("PSTN"). This "net protocol conversion" performed by Vonage is the essence of the service that it provides its customers, and mandates that the service be classified as a statutory information service. Vonage's Brief (at 22-27) cited to and quoted numerous FCC orders which explained the regulatory framework for how protocol processing services should be evaluated and why Vonage's service qualifies. The PSC's response – that Vonage has somehow misread or misapplied these orders, or that its service falls into one of the protocol processing "exceptions" – is classic *ipse dixit*.[2]

The PSC takes a similar approach in responding to Vonage's claim that its service accesses and processes stored information in a manner identical to services that the FCC has classified as information services. *Cf.* Vonage Br. at 27-28 and PSC Br. at 33-36. Once again, the PSC has inappropriately substituted its view of what the federal statute means for the FCC's interpretations. Vonage has explained why the authority it cites is on-point with its service, and the PSC offers no explanation for why this authority is "not analogous." *See* PSC Br. at 35.

---

[2] Vonage explained at length in its brief to the 8th Circuit (at 28-33) why its service does not trigger any of the "exceptions" for when protocol processing services do not qualify as information services. *See* Brief for Appellee, Vonage Holdings Corp., *Minnesota PUC v. Vonage Holdings Corp.* (8th Cir. No. 04-1434) (filed May 17, 2004). These "exceptions" apply when a provider operates its own network. Vonage, of course, does not operate the Internet, nor does it control the operations of the CLEC and long-distance companies that are responsible for terminating Vonage's customers' communications on the PSTN.

The PSC's fall-back argument – that its Order is not preempted even if Vonage's service is classified as an information services (Br. at 14-20) – again fails to grapple with the controlling authority or, as noted above, relies on straw-man characterizations of Vonage's position. The FCC has expressly "preempted the states [from] … impos[ing] common carrier tariff regulation on a carrier's provision of enhanced services." *Computer II Further Reconsideration Order*, 88 F.C.C.2d 512, ¶ 83 n.34 (1981). The absence of any rejoinder to this and the other *Computer Inquiry* authority that Vonage cites is not surprising – the FCC has dispositively preempted the states from imposing common carrier or public utility regulation on information services. Thus, the PSC's reliance on the general principle that preemption is disfavored and must be stated with specificity overlooks FCC orders expressly doing so. The PSC's response – that its Order is limited to intrastate communications, which regulation it claims is not preempted – fails for the reason explained in the first paragraph of this Reply as well: Vonage cannot determine the jurisdictional use of its service.

The PSC also contends that compliance with its Order will not cause Vonage irreparable harm because Vonage can readily submit an application and file a tariff. But the PSC's argument misconstrues the standard. Whether Vonage can or cannot go through the motions of pretending "compliance" by surrendering to the PSC's attempt to regulate an interstate service is irrelevant. The Order conflicts with and is, therefore, preempted by federal law. Under the well-established case law of this and other circuits, the PSC's attempt to subject Vonage to its illegal Order causes irreparable harm, *per se*.

Moreover, as explained below, Vonage cannot, in fact, "comply with the Public Service Law obligations of telephone corporations," or file an application for authority to provide service, along with a tariff, that conform to state law. *See* Order at 18. This inevitable non-

compliance exposes Vonage to potential fines and penalties (and other intangible detriments), and, as a consequence, causes irreparable harm as defined by the Second Circuit. The PSC's offer that it *might* waive certain requirements does not save its otherwise impermissible Order.

To the extent that the PSC is displeased with the consequences that result from the appropriate regulatory classification of Vonage's service, it is free to take its concerns up with the FCC and Congress, as it has. Indeed, as the Court knows, the FCC is currently analyzing legal and policy issues presented by Internet Protocol ("IP") enabled services such as Vonage's.[3] In fact, the PSC urged the FCC to initiate that generic proceeding when it asked the FCC to refrain from considering Vonage's petition to preempt the Minnesota PUC's order.[4] Then the PSC argued:

> The Commission [*e.g.,* the FCC] should not entertain Vonage's request for a declaratory ruling that its IP telephony services are information services, not telecommunications. The larger issue of whether disparate regulatory treatment of different technologies is appropriate or sustainable in an increasingly competitive market should be addressed in a generic rulemaking. Rather than dealing with questions of jurisdiction on an individual company and service basis, the Commission should initiate a generic proceeding to make a finding on the proper regulatory classification of calls made by means of VOIP technologies. Should the Commission decide to address the merits of Vonage's petition, NYDPS asserts that the current record is insufficient to reach a determination as to whether Vonage is providing an information service.

*Id.* at 2-3. Having succeeded in its argument, the PSC Order at issue proceeded to do precisely what the PSC claimed should not be done – and on a far lesser record than the FCC accumulated.

---

[3] *IP-Enabled Services Notice of Proposed Rulemaking*, Docket No. 04-36, 2004 WL. 439260 (rel. March 10, 2004) ("*IP Services NPRM*").

[4] *See* Comments of the New York State Department of Public Service, *In re Vonage Holding Corporation Petition for Declaratory Ruling Concerning an Order of the Minnesota Public Utilities Commission,* FCC WC Docket No. 03-211 (filed Oct. 27, 2003) (Tab 1 to the attached Declaration of Michael C. Sloan ("Sloan Decl.")).

The PSC can hardly argue now that important public interests justify its action when, just recently, it argued the opposite position.

In its *IP Services NPRM*, the FCC stated that it would examine the need for uniform, national rules for services such as Vonage's, and that it would further address the health and safety concerns that the PSC cites in its brief (but which are conspicuously absent from its Order). Indeed, Vonage submits that the *IP Services NPRM* has expressly preempted state imposition of 911 calling requirements on voice over IP ("VoIP") services pending issuance of a subsequent FCC order. And there is no potential harm to the public in the meantime. As the PSC and the FCC both know, Vonage voluntarily initiated a 911 calling service a year and a half ago, and was the first VoIP provider of its kind to do so. Moreover, Vonage is one of several leading signatories to an agreement with the National Emergency Numbering Association ("NENA") on VoIP 911 implementation, and is actively involved in industry efforts to overcome the technological hurdles that currently prevent seamless compatibility between current 911 systems and internet services like Vonage's. *See generally* Supplemental Declaration of John Rego ("Rego Sup. Decl.") at ¶¶ 2-10 (attached to Sloan Decl. at Tab 2). Vonage will stipulate to continue providing that service  as a condition of the injunctive relief it seeks.

Vonage submits that well-settled legal principles preclude the PSC's attempt to impose public utility regulation on Vonage and that this Court should follow the Minnesota court's lead and permanently enjoin the PSC Order.[5] In the alternative, and at a minimum, Vonage has demonstrated a likelihood of success and irreparable harm warranting a preliminary injunction

---

[5] The Court should note that the preemption Vonage seeks is narrowly defined, in conformance with the FCC's various preemption orders. An order from this Court preempting the PSC from imposing public utility and common carrier regulation would in no way prevent the state from enforcing other consumer protection or related laws.

against all regulatory efforts by the PSC. With a preliminary injunction in place, Vonage would not oppose a primary jurisdiction referral to the FCC, which would permit that agency to establish nationally uniform oversight of this inescapably interstate service, in an admittedly complex area of law and industrial policy.[6] In balancing the respective benefits and harms, as the Court must do in ruling on Vonage's injunction request, it should find that enforcement of the PSC's peremptory Order is unlawful given the FCC's efforts to chart the future path for this important and growing segment of the U.S. economy – just as the PSC argued to the FCC.

* * *

Vonage understands that the Court has devoted a great deal of time preparing for the June 30, 2004 preliminary injunction hearing, including reading not only Vonage's moving papers in this proceeding, but the various filings in the Eighth Circuit case, as well as comments filed with the FCC in its *IP Services NPRM* proceeding. This Reply, therefore, seeks to avoid repeating those arguments. Vonage does not enumerate every instance where the PSC has ignored or misrepresented a Vonage argument. Instead, the first part of the Argument, below, focuses on the main flaw with in the PSC's position – the premise that its regulation can be limited to Vonage's intra-state communications. The PSC is simply wrong that it can, for the sake of convenience, ignore the actual physical location of Vonage customers. The PSC's jurisdictional authority is not so elastic that it can be stretched to cover concededly interstate communications and does not extend to communications that are not identifiably intra-state.

---

[6] As the Court is aware, the FCC advocated a primary jurisdiction referral in the *Amicus Brief* it filed in the Eighth Circuit proceeding, so that it could resolve these issues in the context of its *IP Services NPRM* proceeding. Notably, the FCC urged the Court to maintain the injunction entered by the district court, and did not suggest that the Court should carve out an exception so that the Minnesota PUC could retain jurisdiction over VoIP 911 calling.

Part II of the Argument expands on the irreparable harm showing Vonage made in its Opening Brief. As demonstrated in the case law cited in Part II, Vonage suffers irreparable harm by virtue of the illegality of the PSC's Order and the harm it will to do Vonage's business and the public.

Finally, Part III addresses the emergency calling ("911") issues raised by the Court during the June 24, 2004 conference call. Vonage recognizes the important public policy concerns surrounding 911 services. Vonage was the first service provider of its kind to offer 911 service, both to direct attention to this important issue and kick-start industry efforts to resolve technological issues, and because it recognized that market forces would require development of suitable emergency calling capabilities. Rego Sup. Decl. ¶ 6.

For various reasons, as Mr. Rego explains, and as the FCC and NENA have recognized, Vonage cannot provide the same 911 service that traditional telephone companies provide their customers. *Id.* ¶ 7. But Vonage is constantly working to improve the service, and is currently involved in trials in Minnesota, Florida, Rhode Island, Texas and Washington. *Id.* ¶ 9. In addition to its agreement with NENA on 911 implementation, Vonage is working directly with that organization and others to set standards for a next generation IP enabled 911 system. Vonage's CEO has also testified before Congress and participated in two FCC "Solution Summits" regarding national solutions for VoIP 911. *Id.* Notably, while criticizing Vonage for litigating its rights, the PSC failed to tell the Court that Vonage met with the PSC to describe its 911 service and that Vonage has advised the PSC that it always is willing to discuss possible improvements. Nor has the PSC inquired about conducting a trial in New York similar to those underway in other states. *Id.* ¶ 10. (Instead, as the PSC admits, it has chosen to regulate first and

ask questions later.) Thus, it is clear that Vonage takes its role in providing emergency services to its customers seriously.

As Mr. Rego explains, the experience with developing wireless 911 provides a precedent for how the process with VoIP should proceed. There, the FCC established uniform guidelines, which the states have assisted in implementing. *See generally United States Cellular Corp. v. FCC*, 254 F.3d 78, 80-83 (DC Cir. 2001) (describing history of wireless 911 implementation). In its *IP Services NPRM* (at ¶ 53), the FCC has indicated that it plans to take the same approach towards VoIP 911. While the PSC will, undoubtedly, be called on to participate in this process, a fragmented state-by-state approach would be inappropriate and counter-productive. Accordingly, the Court should not craft an injunction that preserves the PSC's authority over 911. Indeed, the PSC has no specific 911 regulations – it merely requires telecommunications carriers to submit a plan describing how that service will be provided in their application for Certificates of Public Convenience and Necessity. Vonage already does that which is technologically possible, and there is no urgent public interest in having Vonage submit a plan merely describing what it already does.

## ARGUMENT

### POINT I.
### THE LIMITATION ON THE PSC'S JURISDICTION TO INTRA-STATE COMMUNICATIONS PRECLUDES ITS REGULATION OF VONAGE

The PSC claims repeatedly that its Order is limited to Vonage's customers' "intra-state" communications, which the PSC contends saves the order from preemption by the

Communications Act or invalidation under the Commerce Clause.[7] The PSC's position is absurd. Vonage customers access the service over the Internet and do so using pocket sized equipment that can be taken anywhere in the world. As Vonage has explained, and as the FCC has recognized, Vonage cannot determine where its customers are geographically located. As a consequence, there is no way that the service, or any component of it, can be classified as purely intrastate. As the FCC found in its recent *Pulver Order* (¶ 20), "it would be impractical to determine whether there was any intrastate component to FWD given the fact that FWD's information service as provided to its members occurs solely within the confines of the Internet." Moreover, "even if the members' locations were somehow relevant to their use of FWD, FWD's portable nature without fixed geographic origination or termination points means that no one but the members themselves know where the end points are." *Id.* ¶ 21. Vonage's service is functionally identical and must likewise be considered jurisdictionally interstate, and thus outside the PSC's jurisdictional authority. *See id.* ¶¶ 23-25.[8]

Notwithstanding this clear authority, the PSC nonetheless claims that the lack of any reliable means for determining the jurisdictional nature of Vonage's traffic does not bar "the regulation the Commission is interested in applying to Vonage, which will be service-based, not

---

[7] The PSC's Commerce Clause argument also claims that local "benefits" arising from its Order – namely health and safety and consumer protection interests – outweigh any adverse impact on interstate commerce. These arguments are addressed in Point III, below.

[8] In so ruling, the FCC relied both on its "mixed use" and "impossibility" doctrines, which the PSC accuses Vonage of conflating. *See* PSC Br. at 22 and n.11. Vonage has made no such error, as the *Pulver Order* (at ¶ 22) makes clear: "We find that even if some form of an end-to-end analysis were deemed applicable to FWD, FWD would be considered an interstate information service in accordance with our 'mixed use' doctrine. Where separating interstate traffic from intrastate traffic is impossible or impractical, the Commission has declared such traffic to be interstate in nature."

call-based." PSC Br. at 22. Whatever the distinction between "service-based" and "call-based" regulation means (the undersigned have never heard of it before), it provides no basis for expanding the PSC's jurisdictional authority to interstate communications, which the PSC has recognized in previous orders it has no authority to regulate. For example, in *RAM Mobile Data*, the PSC considered RAM's petition seeking to have wireless carriers file intra-state tariffs for services in which calls were routed first over a wireless network and then over a dedicated landline to an out-of-state destination.[9] The PSC declined to do so, finding that RAM had failed to prove that the calls had a "distinct" intrastate component, and, further, that the burden of proof was squarely on RAM to make that showing: "If RAM cannot *prove* that the calls at issue have a discrete intrastate portion, its argument fails … for it is clear that intrastate portions of the facilities and services used to complete interstate calls are subject to federal jurisdiction. That indeed is the case." *Id.* at *3 (emphasis supplied). Thus, the PSC recognized that *potentially* interstate calls were outside its jurisdiction despite the absence of any federal tariff affirmatively preempting its authority.

*RAM Mobile Data* also illustrates why the PSC's contention that Vonage is subject to its jurisdiction as a telecommunications reseller is off-base. As the PSC correctly noted then, "the critical issue here is whether the calls are continuous or whether the intrastate portion is somehow discrete." *Id.* In determining that, for jurisdictional purposes, communications must be evaluated on an "end-to-end" basis, *e.g.,* where the call originates and terminates, the PSC was

---

[9] *See* Complaint of RAM Mobile Data USA, L.P. Against Multiple Cellular Telephone Companies Concerning the Services Provided to United Parcel Service (Case 93-C-0181 NY PSC Jan. 12, 1995), 1995 WL 363407 (N.Y.P.S.C.). Although *RAM Mobile* involved a wireless service, the PSC did not base its finding that it lacked jurisdiction on that fact.

applying the FCC's long-standing approach to jurisdictional analysis.[10] Thus, the PSC's contention today that Vonage is reselling service used to terminate service on the PSTN impermissibly "chops" the "end-to-end" communication into two distinct components – the Internet leg of the communication and the PSTN leg. Moreover, even if Vonage was reselling telecommunications service, it would be impossible to determine whether the entire end-to-end transmission was intra-state, and therefore subject to the PSC's jurisdiction.[11]

While the PSC contends that Vonage's billing procedures constitute a reasonable proxy, that is simply not true. Vonage's "local" and "long-distance" pricing differences are based on the telephone number assigned to the customer, not the customer's physical location. Vonage cannot "prove" whether its customers' communications are intrastate, interstate, or international. Thus, under the PSC's *RAM Mobile Data* precedent and the FCC's well established approach, the PSC's attempt to impose distinct "intrastate" regulation would be inappropriate.

---

[10] *See Declaratory Ruling*, Inter-Carrier Compensation for ISP-Bound Traffic, 14 F.C.C.R. 3689, ¶ 10 (1999), vacated and remanded on other grounds by, *Bell Atlantic Tel. Cos. v. FCC*, 206 F.3d 1 (D.C. Cir. 2000) ("the Commission traditionally has determined the jurisdictional nature of communications by the end points of the communication and consistently has rejected attempts to divide communications at any intermediate points of switching or exchanges between carriers").

[11] Indeed, Vonage's service is an interstate service, and thus exempt from the PSC's regulatory authority, regardless of whether it is classified as a telecommunications service or information service. *See Petition for Emergency Relief and Declaratory Ruling Filed by the BellSouth Corp.*, Memorandum Opinion and Order, 7 F.C.C. Rcd 1619, 1622¶15, n. 44 (1992), *aff'd Georgia Public Service Commission v. FCC*, 5 F.3d 1499 (1993) (observing that there is "no critical distinction between preemption by Title II regulation and preemption by the exercise of ancillary jurisdiction" (quotation omitted)).

**POINT II.**
**THE PSC'S ORDER CAUSES IRREPARABLE HARM.**

**A.    Vonage Cannot "Comply" with the PSC Order**

The PSC Order requires Vonage to "comply with the Public Service Law obligations of telephone corporations and within 45 days of this Order … file an application for a Certificate of Public Convenience and Necessity ["CPCN"] and file a tariff." Order at 18. Although the PSC characterizes its CPCN application as a simple information gathering device, the application actually requires Vonage to stipulate to services that Vonage either does not or cannot offer. The specific requirements with which Vonage cannot comply are detailed in John Rego's Supplemental Declaration (at ¶¶ 11-17). Even if the PSC intends to waive many of these requirements, its offer to consider waiver applications cannot save its illegal order. *See* Vonage Br. at 40.

Vonage could not "comply" with the PSC's Order even if it decided to withdraw from the state entirely, for a Vonage customer from another state could always take his or her equipment into New York and place "calls" to New York residents that the PSC views as jurisdictionally intrastate. Thus, however Vonage proceeds, it is potentially subject to the PSC's jurisdiction and the hefty penal authority made available to it by the legislature. *See* N.Y. Pub. Serv. Law § 25(2) (authorizing $100,000 per offense, per day fines for violating PSC orders).

**B.    Vonage Satisfies the "Irreparable Harm" Requirement Necessary for an Injunction**

As Vonage has explained, the unconstitutional nature of the PSC's Order causes irreparable harm *per se*, whether it could technically comply with the Order or not. *See* Vonage Br. at 41-42. First, the fines and penalties the PSC could potentially impose constitutes irreparable harm. Thus, in *Public Utilities Comm'n of Ohio v. United Fuel Gas Co.*, 317 U.S. 456, 458 (1943), the Supreme Court found irreparable harm when the Ohio PUC declared that

the delivery of gas by United, a West Virginia company, into Ohio, for resale by third-parties to Ohio consumers, was subject to the PUC's regulatory authority. The Court found that the PUC's order violated the Commerce Clause, and that if United were forced to comply, it would incur expenses that the consuming public might ultimately have to bear – exactly the result Congress sought to avoid by giving exclusive jurisdiction to the FPC. *Id*. at 467-68. Moreover, the Court found that United faced exactly the dilemma that Vonage faces: failure to comply with the PUC's orders presented the risk of heavy fines and penalties, or at least the expense of needless litigation. "[I]n either event, the enforcement of the commission's orders would work injury not assessable in money damages, not only to the appellee but to the public interest which Congress deemed it wise to safeguard by enacting the Natural Gas Act." *Id*. at 469.[12] Here, likewise, Vonage and the public suffer irreparable harm from the very fact that the PSC is seeking to regulate an area over which Congress and the FCC have stated it has no jurisdiction.[13]

---

[12] *See also Condon v. Andino, Inc.*, 961 F. Supp. 323, 331 (D. Maine 1997) (finding irreparable harm where plaintiff's two choices were complying with an unconstitutional town ordinance, where such compliance would injure his business, or violating his town's laws, and risking fines or other penalties); *Union Pacific Railroad Co. v. Las Vegas*, 747 F. Supp. 1402, 1403 (D. Nev. 1989) (irreparable harm from an unconstitutional local ordinance that was preempted by the Federal Hazardous Materials Transportation Act, where the plaintiff railroad company "would be subject to criminal sanctions and interruption of its rail operations if it violates an Ordinance with which it can not comply while still being in compliance with Federal regulations"); *Penn Central Co. v. Public Utils. Comm'n of Conn.*, 296 F. Supp. 893, 898 (D. Conn. 1969) (irreparable harm from PUC order where railroad faced lost revenue, "possibility of fines and other harassment," and the inconvenience of altering its business plans); *LTV Steel Co., Inc. v. Thomas*, 1988 WL 121576 (N.D. Ill.) (complaint made sufficient showing of irreparable harm where company faced heavy EPA fines and penalties if it did not comply with EPA order requiring it to build waste treatment facility at a significant cost); *New York Republican State Comm.*, 1989 WL 124206 (N.D.N.Y.) (irreparable harm where party had to choose between obeying New York State law, which would require it to disclose information it sought to keep private thereby rendering relief moot, or defying law thereby facing the imposition of a civil penalty or misdemeanor criminal prosecution).

[13] *See Middle South Energy, Inc. v. Arkansas Public Serv. Comm'n*, 772 F.2d 404, 418 (8th Cir. 1985) (the expense associated with complying with a state agency order that is (continued)

And, of course, Vonage's expenses in attempting to comply are not recoverable in light of the PSC's sovereign immunity in state court and its Eleventh Amendment immunity in federal court. While mere pecuniary losses normally do not constitute irreparable harm, an exception to this rule applies when those pecuniary damages are unrecoverable. *See United States v. New York*, 708 F.2d 92, 94 (2d Cir. 1983). The bottom line is that when faced with the prospect of illegal government conduct, the law does not require private parties to navigate the Scylla and Charybdis path between compliance and non-compliance. Instead, those illegal state orders are enjoined, as should the Order at issue here seeking to regulate Vonage.

The potential harm to Vonage's business also constitutes irreparable harm, as the Second Circuit found in *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir. 1970). In *Semmes*, the defendant Ford Motor Co. argued that a dealership it sought to terminate was not entitled to an injunction because its losses were measurable and therefore compensable at law. While there was no doubt regarding Ford's ability to pay, the Court recognized the "right to continue a business … is not measurable entirely in monetary terms." *Id.* at 1205; *accord Rosso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of New York, Inc.*, 749 F.2d 124, 125-126 (2d Cir. 1984) ("The loss of [plaintiff's] distributorship, an ongoing business representing many years of effort … constitutes irreparable harm, and "cannot be fully compensated by subsequent monetary damages"). Vonage wants to sell its unique product to the citizens of New

---

preempted by federal law "is among the contingencies against which Congress sought to guard in creating exclusive federal jurisdiction" and that "the mere assertion of jurisdiction by the [state] had a negative impact on [plaintiff's] ability to obtain investors and complete its project, thus similarly interfering with the exclusive federal scheme for governing interstate power transmission and sales").

York and, because of the impossibility of compliance, faces the loss of its entire business. This type of loss constitutes irreparable harm.

The Order also causes Vonage irreparable harm by virtue of the harm to the goodwill it has generated as the pioneer of Internet-based VoIP services. It is settled that "the loss of goodwill and potential loss of current and future customers can constitute irreparable harm." *Independent Wireless One Corp. v. Town of Charlotte*, 242 F.Supp.2d 409, 410-411 (D. Vt. 2003) (*citing Tom Doherty Assocs., Inc. v. Saban Entm't*, 60 F.3d 27, 30 (2d Cir. 1995). The Second Circuit has further explained that the loss of the ability to provide a unique product "almost inevitably creates irreparable damage to the good will of the distributor." *Reuters Limited v. UPI*, 903 F.2d 904, 907-08 (2d Cir. 1990). *Tom Doherty Assocs.*, *supra*, states the governing principle:

> Where the availability of a product is essential to the life of the business *or* increases business of the plaintiff beyond the sales of that product … the damages caused by loss of the product will be far more difficult to quantify than where sales of one of many products is the sole loss. In such cases, injunctive relief is appropriate ….Where the loss of a product will cause the destruction of a business itself or indeterminate losses in other business, the availability of money damages may be a hollow promise and a preliminary injunction appropriate.

*Doherty,* 60 F.3d at 38 (emphasis in original).

In *Independent Wireless One Corp*, 242 F.Supp.2d 409 (D. Vt. 2003), a district court in the Second Circuit applied this rule in the context of the Communications Act. In requiring the Town to grant applications by a wireless carrier to install antennas on privately owned silos in the town, the court observed that, "[e]very day that Plaintiff's special permit is denied is a day Plaintiff loses against its major competitors …. In today's quickly advancing world of telecommunications services, the costs of delay cannot be understated." *Id*. at 416. Vonage is in the same position. Vonage's service is a unique product that is the centerpiece of its business. In

-16-

the absence of injunctive relief, Vonage's "first mover" advantage in the nascent VoIP market place will be lost forever – a harm that can never be compensated, even if it ultimately prevails on the merits at trial.[14]

The court may also grant an injunction when such relief is necessary to prevent harm to the public interest. The Second Circuit has "recognized that, as a court of equity, [it] 'may go much further both to give or to withhold relief in furtherance of the public interest than where only private interests are involved.'" *Standard & Poor's Corp., Inc. v. Commodity Exchange, Inc.*, 683 F.2d 704, 711 (2d Cir. 1982) (irreparable harm to public if illegal futures trading was permitted). Similarly, in *United States v. New Haven*, 447 F.2d 972, 973 (2d Cir. 1971), the Second Circuit upheld the issuance of an order enjoining enforcement of state orders that attempted to regulate aircraft flights engaged in interstate commerce and to close a portion of a runway. The court found the state orders were preempted by the Federal Aviation Act, and that the interference created by the state's order constituted an irreparable public injury by interfering with the commercial use of navigable air space. Courts have also granted injunctive relief based on the public interest in the orderly administration of Congressional statutes.[15]

---

[14]  *See also Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 425-26 (8th Cir. 1996) (telecommunications companies would suffer irreparable harm if FCC's rules were allowed to go into effect because the regulatory landscape would be permanently altered); *ASCAP v. Pataki*, 930 F.Supp. 873, 880-81 (S.D.N.Y. 1996) ( "it is impossible to determine with reasonable certainty how many licenses plaintiffs could have negotiated or infringement remedies they could have recovered had they not been deterred from investigation. Because plaintiffs' monetary loss cannot be calculated with a reasonable degree of certainty, their monetary harm is irreparable").

[15]  *See e.g.*, *Federal Mar. Comm'n v. Australia/U.S. Atlantic and Gulf Conference*, 337 F.Supp. 1032, 1038 (S.D.N.Y. 1972) (finding Congressional policy in enforcing maritime statute would be frustrated in the absence of injunctive relief); *Northern States Power Co. v. Prairie Island Mdewakanton Sioux Indian Cmty.*, 991 F.2d 458, 464 (8th Cir. 1993) (granting injunction based on finding that tribal ordinance preempted by federal law and public interest furthered by (continued)

In the present case, allowing the Commission's Order to go into effect will irreparably harm Vonage customers who rely on Vonage's unique service for business and personal needs. In the case of the customer who travels around the world using a New York telephone number, while placing and receiving calls to New York numbers as if situated locally in New York, no other service is available as an adequate substitute. Similarly, the public interest in the orderly administration of the federal Communications Act, which prohibits the PSC's Order, warrants an injunction in this case.[16]

### POINT III.
### THE COURT SHOULD ENJOIN THE PSC'S AUTHORITY TO REGULATE 911 WHILE THE FCC ADDRESSES THE ISSUE

Traditional landline 911 calling routes emergency calls over dedicated circuits directly to the appropriate Public Safety Answering Point ("PSAP") associated with each end-user on the PSTN. "Enhanced 911" ("E911"), which is provided in most local telephone companies, routes to the PSAP additional information, including the emergency caller's telephone number and geographic location.[17] *See* Rego Sup. Decl. ¶¶ 2-4. These forms of 911 service work for calls

---

encouraging uniformity in the regulation of radioactive materials and by enhancing safety at power plant).

[16] The PSC argues that its Order serves the public interest because its tariff requirements protect consumers. The PSC's position is at odds with federal policy on this point. The FCC has found that tariffs do not, on balance, benefit the public. Rather, finding that tariffs actually harm consumers in many instances, the FCC embarked on a scheme under which detariffing of interstate telecommunications services to consumers became mandatory. *See Policy and Rules Concerning the Interstate, Interexchange Marketplace*, 14 FCC Rcd. 6004, ¶ 2 (1999), *aff'd, MCI Worldcom, Inc. v. FCC*, 209 F.3d 760 (D.C. Cir. 2000). This is a perfect example of the impossibility of complying with both Federal and State policies where a service has no identifiably separate intra-state component.

[17] The caller's telephone number is provided to the PSAP operator via Automatic Number Identification ("ANI") functionality, which is similar to "Caller-ID." Automatic Location Identification ("ALI") provides the caller's geographic location. This information is provided by databases that are directly connected to E911 switching equipment. *See id.* ¶ 3.

made on the PSTN because consumers' phone numbers are associated with fixed geographic locations. The traditional 911 system is not yet compatible with IP format and cannot service calls that use virtual phone numbers. *See id.* ¶ 7.

Vonage, nonetheless, offers its customers 911 calling capabilities. For this purpose, Vonage has engaged Intrado, a company with 25 years of experience providing 911 database services that map PSTN and wireless calls to the appropriate PSAP. With Vonage's service, however, 911 calls are not routed over dedicated circuits to the PSAP, but are instead routed over the PSTN by a Competitive Local Exchange Carrier to the appropriate PSAP's 10-digit phone number. Also, because calls made using Vonage's service are not routed over E911 dedicated trunks, Vonage can not currently provide ALI or ANI to the PSAP operator. Vonage fully discloses these limitations to its customers, who may opt in to use of the 911 service and must supply a new address for each location to which they move if they wish to use the service.[18] *Id.* ¶ 8.

Vonage repeatedly has been hailed as the industry leader in developing VoIP 911 solutions and is committed to the development of a VoIP E911 that is every bit as robust and feature-laden as that offered on the PSTN. Vonage is a signatory to the National Emergency Number Association's ("NENA's") Statement of Principles with respect to the development of VoIP 911. *Id.* ¶ 9 and ¶ 6. But Vonage also agrees with NENA's opposition to "the fragmentation of 911" and agrees "that consumer expectations for 911 are national and therefore

---

[18] Until technology evolves to the point where precise locations can be determined either from an IP address or by using other technological means, the success of VoIP 911 service will depend on the willingness of customers to provide accurate and updated location information.

-19-

require jurisdictional leadership and resources from the Federal Government."[19]  In its *IP Service NPRM*, the FCC stated that it would provide that leadership, indicating its intent to preempt the disparate state approaches against which Vonage and NENA have advocated.

Vonage expects that the FCC will approach the development of VoIP E911 just as it has overseen the national deployment of E911 for commercial mobile radio service ("CMRS" – e.g., cellular phones). The FCC has recognized that the application of 911 services to new technologies can be a daunting task. The FCC has generally taken the position that new technologies need an opportunity to establish a foothold in the marketplace before regulatory mandates are applied and that such mandates, when applied, should not cripple the technology out of existence. The FCC has therefore given service providers a reasonable period of time to phase in 911 services in a manner that is technically and economically feasible.

For example, when the FCC established regulations for the provision of enhanced 911 services by CMRS carriers, the FCC required the carriers to implement the services in phases and provided what at the time appeared to be reasonable periods of time for implementation of each phase.[20] As the CMRS carriers faced technical difficulties during the implementation process, the FCC permitted additional time, and full implementation of wireless enhanced 911 location technology will not take place until the end of 2005, and, even then, only where the PSAPs are prepared to receive ALI and ANI information.[21]

---

[19] Testimony of NENA's First Vice President, David F. Jones, before the United States Senate Commerce, Science and Transportation Committee regarding "The VoIP Regulatory Freedom Act of 2004" (S 2281) <http://www.nena.org/> (visited June 26, 2004).

[20] *See, e.g., Phase II Compliance Deadlines for Non-Nationwide CMRS Carriers,* 17 FCC Rcd 14841 (2002); *Request for Waiver by Cingular Wireless LLC,* 16 FCC Rcd 18305 (2001).

[21] The establishment of 911 for mobile satellite service ("MSS") is illustrative of the FCC's approach. The FCC ruled in 1996 that it would not then impose 911 requirements on MSS (continued)

The FCC's pronouncement, in its *IP Services NPRM*, that it will determine whether and how 911 requirements will apply to VoIP service is in keeping with its broad statutory authority over 911 calling. *See* 47 U.S.C. § 251(e)(3) ("The *Commission* and any agency or entity to which the *Commission* has delegated authority under this subsection shall designate 9-1-1 as the universal emergency telephone number within the United States for reporting an emergency to appropriate authorities and requesting assistance.") (emphasis supplied). Pursuant to its mandate, the FCC is currently considering:

> the potential applicability of 911, E911, and related critical infrastructure regulation to VoIP and other IP enabled services. As an initial matter, we have previously found in the E-911 Scope Order[22] that the Commission has statutory authority under Sections 1, 4(i) and 251(e)(3) of the Act to determine what entities should be subject to the Commission's 911 and E911 rules. However, in deciding whether to exercise our regulatory authority in the context of IP-enabled services, we are mindful that development and deployment of these services is in its early stages, that these services are fast-changing and likely to evolve in ways that we cannot anticipate, and that imposition of regulatory mandates, particularly those that impose technical mandates, should be undertaken with caution.

*IP Services NPRM*, ¶ 53.

The FCC, Vonage and the industry are well into efforts to address VoIP 911 and E911 issues. The Court must take with a grain of salt, therefore, the PSC's contention that immediate PSC oversight of VoIP 911 is necessary. Quite simply, the PSC can proffer no evidence that 911 services are imperiled – because they are not.

---

due to technological impediments and the coordination of international standards. *E911 Proceeding*, 11 F.C.C. Rcd 18676, ¶ 83 (1996). It was not until 2003 that the FCC established the first 911 service requirements for MSS, and E911 requirements are years away. *See Revisions of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Systems,* 18 FCC Rcd 25340, ¶¶ 20-49 (2003).

[22] *Revisions of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Systems,* Report and Order and Second Further Notice of Proposed Rulemaking, 18 FCC Rcd 25340, ¶¶ 20-49 (2003).

**CONCLUSION**

For the foregoing reasons, Vonage respectfully requests that the Court enter a preliminary and a permanent injunction against enforcement of the PSC's Order seeking to impose state telephone regulation on Vonage.

SWIDLER BERLIN SHEREFF FRIEDMAN, LLP

By: _/s/ *Ky E. Kirby*_____
      Ky E. Kirby (admitted *pro hac vice*)
      William B. Wilhelm
      Michael C. Sloan (admitted *pro hac vice*)
      Yun G. Lee (YL 5067)
The Chrysler Building
 405 Lexington Avenue
New York, New York 10174
(212) 973-0111
*Attorneys for Vonage Holdings Corporation*

Dated: June 28, 2004
      New York, New York