UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| VONAGE HOLDINGS CORPORATION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | 04 Civ. 4306 (JGK) (DFE) |
| - against - | : | |
| | : | |
| THE NEW YORK STATE PUBLIC SERVICE | : | |
| COMMISSION and WILLIAM M. FLYNN, | : | |
| THOMAS J. DUNLEAVY, LEONARD A. WEISS, | : | |
| and NEAL N. GALVIN, in their official capacities | : | |
| as the Commissioners of the Public Service | : | |
| Commission of the State of New York, | : | |
| and not as individuals, | : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BRIEF OF AMICI CURIAE THE UNITED STATES OF AMERICA AND THE FEDERAL
COMMUNICATIONS COMMISSION

PRELIMINARY STATEMENT

The United States of America and its agency, the Federal Communications

Commission ("FCC), (collectively, the "Government") respectfully submit this Statement of

Interest pursuant to 28 U.S.C. § 517,[1] and the attached brief filed in Vonage Holdings Corp. v.

Minnesota Pub. Utils. Comm'n, No. 04-1434 (8th Cir.) (oral argument not yet scheduled).  The

Government respectfully requests that it be treated as amicus curiae in the above-referenced

matter.  The Government submits these materials in support of its argument that this Court should

defer consideration of Vonage's claims pursuant to the doctrine of primary jurisdiction while the

FCC addresses the issues presented in this case.

---

[1] Pursuant to 28 U.S.C. § 517, the United States may appear in any court in the United States "to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

This case involves important and unresolved questions regarding the regulatory status of internet telephony services under the Communications Act of 1934 ("Communications Act") and the Telecommunications Act of 1996 ("Telecommunications Act"). The FCC has been charged by Congress with responsibility for administering these statutes. As discussed in detail in the Eighth Circuit brief, the FCC is currently engaged in administrative proceedings that will address Vonage's regulatory status in particular, and the regulatory status of internet telephony more generally. See U.S. Brief at 3-16. There is a significant public interest in ensuring that the FCC's regulatory authority is not impaired by premature judicial resolution of these issues. There is also a significant public interest in ensuring that courts have the benefit of the FCC's considered views regarding federal and state authority over internet telephony services before courts resolve the potentially far-reaching issues presented in this case. For these reasons, the United States and the FCC submit this amicus brief and the Eighth Circuit brief to urge the Court to defer its resolution of the issues presented in this case under the doctrine of primary jurisdiction until the FCC completes its own consideration of the same issues in pending administrative proceedings.

## BACKGROUND

A.    This Action

On or about June 7, 2004, Plaintiff Vonage Holdings Corporation ("Vonage"), filed this lawsuit against the New York State Public Service Commission ("PSC"), seeking declaratory and injunctive relief from the PSC's attempt to impose state regulatory requirements on Vonage's DigitalVoice™ service, an internet telephony service. Vonage has argued that under prevailing telecommunications law, it is an "information service," rather than a "telecommunications service," and therefore that the PSC's attempt to regulate it is preempted by federal law. In

2

addition, Vonage argues that any attempt to impose regulation by the PSC violates the Commerce Clause. In response, the PSC contends that federal law does not preempt state regulation of internet telephony and that the PSC's order at issue does not violate the Commerce Clause. The Court has scheduled a hearing on Vonage's motion for a preliminary injunction for June 30, 2004.

B.     Factual Background of Regulatory Proceedings

The Government takes no position on the merits of this action. However, the issues presented in this case are substantially similar to those presented in Vonage Holdings Corp. v. Minnesota Pub. Utils. Comm'n, No. 04-1434 (8th Cir.) (the "Minnesota case"). In the Minnesota case, the FCC and the United States filed the attached brief as amicus curiae, arguing that the Eighth Circuit should hold the case in abeyance for pending FCC proceedings. In the alternative, the Government urged that the Court remand the matter to the district court with instructions to preserve the status quo (under which Minnesota was enjoined from regulating Vonage), and refer the case to the FCC under the doctrine of primary jurisdiction.

The FCC noted the pendency before it of a petition (filed by Vonage) for a declaratory ruling that Vonage's DigitalVoice™ Service is an information service exempt from state telecommunications regulation (see Pleading Cycle Established for Comments on Vonage Petition for Declaratory Ruling, 18 FCC Rcd 19325 (2003)). In addition, the FCC cited the fact that it is currently engaged in an industry-wide rulemaking proceeding addressing the regulatory status of "Voice over Internet Protocol" ("VoIP") services (see IP-Enabled Services, 19 FCC Rcd 4863 (2003) ("IP Services NPRM")). Those proceedings are discussed on pages 9-11 and 18-19 of the Government's brief filed in the Eighth Circuit, and, as in the Minnesota case, counsel in favor of deferring judgment on Vonage's complaint here.

In the IP Services NPRM,  the FCC indicated its intent to address fundamental questions concerning the regulatory treatment of VoIP services, including, among other things, "[w]hich classes of [those] services, if any, are 'telecommunications services' under the Act" and "[w]hich, if any, are 'information services;'" how to allocate jurisdiction over such services between the FCC and the states; and whether, and how, traditional 911 regulation can be applied to VoIP services.  See 19 FCC Rcd at 4890-93 ¶¶ 38-43, 4897-901 ¶¶ 51-57.   The final round of public comment on the IP Services NPRM is scheduled to be complete on July 14, 2004.

In this case, the parties have addressed many of those same issues in their briefs, and clearly recognize the relevance of the FCC's pending proceedings to this matter.  See Vonage Brief at 14-15; PSC Brief at 40-41.  Although the FCC does not take a position at this time on the specific relief requested by Vonage, the Government adheres to the views stated in its Eighth Circuit filing concerning the appropriateness of deferring decision on this matter based upon the doctrine of primary jurisdiction, as the issues concerning the regulatory status of VoIP services are under consideration by the FCC in ongoing administrative proceedings.

## ARGUMENT

## THIS COURT SHOULD DEFER CONSIDERATION OF THE ISSUES PRESENTED IN THIS ACTION UNDER THE DOCTRINE OF PRIMARY JURISDICTION

Without repeating here the arguments on primary jurisdiction set forth in detail in the Eighth Circuit brief, the Government will briefly summarize those arguments, and direct the Court to the relevant case law from the Second Circuit.

When a court is presented with legal issues that are within the regulatory authority of a federal agency, the primary jurisdiction doctrine permits the court to defer resolution of the

issues while the agency addresses them in the first instance.  The primary jurisdiction doctrine

permits courts to avail themselves of the benefits of an agency's expertise and knowledge

regarding matters within its regulatory jurisdiction.  It recognizes the primacy of federal agencies

in the construction and application of statutes that they are charged with administering – such as

the Communications Act and the Telecommunications Act – while furthering the goals of

uniformity and consistency in federal regulation.

       As set forth more fully in the attached Eighth Circuit brief (U.S. Br. at 16-29), the

doctrine of primary jurisdiction "applies where a claim is originally cognizable in the courts, and

comes into play whenever enforcement of the claim requires the resolution of issues which, under

a regulatory scheme, have been placed within the special competence of an administrative body."

United States v. Western Pac. R.R., 352 U.S. 59, 64 (1956); Johnson v. Nyack Hosp., 964 F.2d

116, 122-23 (2d Cir. 1992) ("Primary jurisdiction allows an agency to pass on factual issues that

require specialized, technical knowledge.  Either a federal or state agency may have the requisite

competence to serve this purpose.").   In reliance on Supreme Court precedent, the Second Circuit

has recognized the importance of the doctrine of primary jurisdiction:

> [I]n cases raising issues of fact not within the conventional expertise of
> judges or cases requiring the exercise of administrative discretion, agencies
> created by Congress for regulating the subject matter should not be passed
> over.  This is so even though the facts after they have been appraised by
> specialized competence serve as a premise for legal consequences to be
> judicially defined.  Uniformity and consistency in the regulation of business
> entrusted to a particular agency are secured, and the limited functions of
> review by the judiciary are more rationally exercised, by preliminary resort
> for ascertaining and interpreting the circumstances underlying legal issues to
> agencies that are better equipped than courts by specialization, by insight
> gained through experience, and by more flexible procedure.

Danna v. Air France, 463 F.2d 407, 411 n.14 (2d Cir. 1972) (citing Far East Conference v. United

States, 342 U.S. 570, 574-75 (1952)).

The doctrine of primary jurisdiction is a "judge-made doctrine," which, over time, has come to serve two primary purposes:  (1) promoting uniformity; (2) deferring to agency expertise.  See Tassy v. Brunswick Hospital Center, 296 F.3d 65, 67-69 (2d Cir. 2002) (discussing history of the doctrine of primary jurisdiction).    The Second Circuit has explained that "in every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation."  Id. at 68 (citing Western Pac. R.R., 352 U.S. at 64).   The Court noted that the "concern for consistency and uniformity is more prevalent in cases involving issues of broad applicability."  Tassy, 296 F.3d at 69 (declining to apply doctrine of primary jurisdiction under the specific facts before it, where application of the doctrine would neither promote uniformity nor the resolution of technical questions of fact through the agency's expertise).

Thus, the Second Circuit has applied the doctrine of primary jurisdiction where the purposes of the doctrine was served through deferral to an agency's administrative expertise.  See, e.g., Golden Hill Paugussett Tribe of Indians v. Weicker, 39 F.3d 51, 60 (2d Cir. 1994) (applying doctrine of primary jurisdiction and deferring consideration of question regarding tribal status, because the Bureau of Indian Affairs' "resolution of . . . factual issues regarding tribal status will be of considerable assistance to the district court in ultimately deciding Golden Hill's Nonintercourse Act claims"); Johnson, 964 F.2d at 122  (applying doctrine of primary jurisdiction where plaintiff's legal claim depended upon a determination of whether his hospital privileges were improperly revoked – a factual medical question within the competence of a state administrative agency to determine in the first instance); Danna, 463 F.2d at 412 (applying

6

doctrine of primary jurisdiction to claim under Federal Aviation Act challenging reasonableness and discriminatory effect of airline's tariff, because the "examination of these fare systems requires the exercise of an expertise more heavily concentrated in the Administrative and Executive branches than in the federal judiciary;" and finding the question should be considered in the first instance by the Civil Aeronautics Board).

This action presents a compelling case for the invocation of the primary jurisdiction doctrine. The ultimate question before this court is whether federal law and regulatory policy preempt New York's authority to regulate Vonage's internet telephony service. That precise question is now before the FCC in Vonage's pending declaratory ruling petition, and the FCC is simultaneously engaged in a broader inquiry, through notice and comment rulemaking, into the general regulatory classification of internet telephony service providers and other providers of IP-enabled services. Indeed, deference is particularly appropriate here, where plaintiff Vonage has already invoked the FCC's authority. See Golden Hill, 29 F.3d at 60 ("deferral is fully warranted here where the plaintiff has already invoked the BIA's authority.").

Vonage's own regulatory status – as a "telecommunications service" or an "information service," under the Communications and Telecommunications Act, and the status of internet telephony services more generally, present complex questions of fact, policy and law that are uniquely within the expertise of the FCC. Allowing the FCC to address those questions in the first instance, in the context of a fully developed factual record and a complete airing of the relevant legal, factual and policy considerations, will significantly advance this Court's understanding of the issues. In addition, it will promote the uniform development and application of the law in the area – and avoid the risk of inconsistent rulings by different courts around the

7

country.  At the same time, allowing the FCC to exercise primary jurisdiction will assist the Court in evaluating the potential impact of the FCC's regulatory classification scheme in related areas, such as the obligation of providers like Vonage to assist in electronic surveillance under the Communications Assistance for Law Enforcement Act.[2]  Finally, waiting for the FCC to act will avoid unnecessarily restricting the FCC's own authority to administer the Communications Act and the Telecommunications Act, and to determine their applicability to entities such as Vonage. For all of these reasons, and for the reasons set forth in detail in the Government's Eighth Circuit brief, this Court should defer consideration of the merits of this case until the FCC has addressed these issues in pending administrative proceedings.

---

[2]  The instant proceeding implicates only the Communications Act and Telecommunications Act, and not the Communications Assistance to Law Enforcement Act ("CALEA").

CONCLUSION

For the foregoing reasons, the United States and the FCC respectfully submits that

this Court should defer consideration of the issues raised in this action until the FCC has addressed

them in pending administrative proceedings.

Dated:  New York, New York
        June 29, 2004

                                DAVID N. KELLEY
                                United States Attorney for the
                                Southern District of New York
                                Attorney for Amici Curiae the United States and
                                The Federal Communications Commission


                        By:     __/s/ Sarah E. Light_____
                                SARAH E. LIGHT (SL-9869)
                                Assistant United States Attorney
                                86 Chambers Street, 3rd Floor
                                New York, New York  10007
                                Tel.:  (212) 637-2774


Of Counsel:

JOHN A. ROGOVIN
General Counsel
Federal Communications Commission
445 12th Street, S.W.
Washington, DC 20554

Attorneys for the Federal Communications Commission

9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

VONAGE HOLDINGS CORPORATION,   :

                      :

           Plaintiff,   :

                      :     04 Civ. 4306 (JGK) (DFE)

   - against -   :

                      :

THE NEW YORK STATE PUBLIC SERVICE   :
COMMISSION and WILLIAM M. FLYNN,   :
THOMAS J. DUNLEAVY, LEONARD A. WEISS,   :
and NEAL N. GALVIN, in their official capacities   :
as the Commissioners of the Public Service   :
Commission of the State of New York,   :
and not as individuals,   :

                      :

          Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## BRIEF OF AMICI CURIAE THE THE UNITED STATES OF AMERICA AND THE FEDERAL COMMUNICATIONS COMMISSION

                                  DAVID N. KELLEY
                                  United States Attorney for the
                                  Southern District of New York
                                  86 Chambers Street, 3rd Floor
                                  New York, New York  10007
                                  Tel.:  (212) 637-2774
                                  Fax.: (212) 637-2686

SARAH E. LIGHT  (SL-9869)
Assistant United States Attorney

-  Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.     This Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.     Factual Background of Regulatory Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      THIS COURT SHOULD DEFER CONSIDERATION OF THE
      ISSUES PRESENTED IN THIS ACTION UNDER THE DOCTRINE
      OF PRIMARY JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

No. 04-1434

---

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
_____

VONAGE HOLDINGS CORPORATION,

Plaintiff - Appellee

MCI WORLDCOM COMMUNICATIONS, INC.; MCIMETRO ACCESS
TRANSMISSION SERVICES, INC.,

Intervenor Plaintiffs - Appellees

v.

THE MINNESOTA PUBLIC UTILITIES COMMISSION; LEROY KOPPENDRAYER;
GREGORY SCOTT; PHYLLIS REHA; R. MARSHALL JOHNSON, in their official capacities
as the Commissioners of the Minnesota Public Utilities Commission and not as individuals,

Defendants - Appellants
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
_____

BRIEF FOR THE UNITED STATES AND THE
FEDERAL COMMUNICATIONS COMMISSION AS *AMICI CURIAE*
_____

JOHN A. ROGOVIN
 *General Counsel*

JACOB M. LEWIS
 *Associate General Counsel*

NANDAN M. JOSHI
 *Attorney*

*Federal Communications Commission*
*445 12th Street, SW*
*Washington, DC 20554*

GREGORY G. KATSAS
 *Deputy Assistant Attorney General*

THOMAS B. HEFFELFINGER
 *United States Attorney*

DOUGLAS N. LETTER
SCOTT R. McINTOSH
 *Attorneys, Appellate Staff*
*Civil Division, Department of Justice*
*601 D Street N.W., Room 9550*
*Washington, D.C. 20530*
*202-514-4052*

*Counsel for the United States*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.    Regulatory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     A.    Telecommunications Services and Information Services
          Under the Communications Act and the 1996 Act . . . . . . . . . . . . . . 3

     B.    Internet Telephony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.   The Present Controversy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     Judicial Consideration of Vonage's Federal Preemption Claim
     Should Be Deferred While the FCC Addresses the Preemption Issue . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                                                                 **Page**

*AT&T* v. *City of Portland*, 216 F.3d 871 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . 28

*Access Telecommunications* v. *Southwestern Bell Telephone Co.*,
137 F.3d 605 (8th Cir.), *cert. denied*, 525 U.S. 962 (1998) . . . . . . . . . . . 2, 21, 25

*Amendment of Section 64.702 of the Commission's Rules and Regulations*,
Final Decision, 77 FCC 2d 384 (1980), *aff'd sub nom. Computer and
Communications Industry Ass'n* v. *FCC*, 693 F.2d 198 (D.C. Cir. 1982) . . . . . . . 4

*American Automobile Manufacturers Ass'n* v. *Massachusetts Dep't of
Environmental Protection*, 163 F.3d 74 (1st Cir. 1998) . . . . . . . . . . . . . . . . . . . 21

*Atlantis Express, Inc.* v. *Standard Transportation Services*, 955 F.2d 529
(8th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Baltimore and Ohio Chicago Terminal RR* v. *Wisconsin Central Limited*,
154 F.3d 404 (7th Cir. 1998), *cert. denied*, 526 U.S. 1019 (1999) . . . . . . . . . . 21

*Brand X Internet Services* v. *FCC*, 345 F.3d 1120 (9th Cir. 2003),
*stay granted pending cert.* (April 9, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*California* v. *FCC*, 39 F.3d 919 (9th Cir. 1994), *cert. denied*,
514 U.S. 1050 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Carnation Co.* v. *Pacific Westbound Conference*, 383 U.S. 213 (1966) . . . . . . . 20

*Chevron U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Computer and Communications Industry Ass'n* v. *FCC*, 693 F.2d 198
(D.C. Cir. 1982), *cert. denied*, 461 U.S. 938 (1983) . . . . . . . . . . . . . . . . . . . . . . 4

*DeBruce Grain, Inc.* v. *Union Pacific RR Co.*, 149 F.3d 787
(8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 25

*Distrigas of Massachusetts Corp.* v. *Boston Gas Co.*, 693 F.2d 1113
(1st Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 29

*Far East Conference* v. *United States*, 342 U.S. 570 (1952) . . . . . . . . . . . . . . . 21

*Howard* v. *America Online, Inc.*, 208 F.3d 741 (9th Cir.),
*cert. denied*, 531 U.S. 828 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In the Matter of Federal-State Joint Board on Universal Service*,
Report to Congress, 13 F.C.C.R. 11501 (1998) . . . . . . . . . . . . . . . . . . 3, 4, 7, 8, 24

*In the Matter of IP-Enabled Services*, WC Docket No. 04-36,
Notice of Proposed Rulemaking, FCC 04-28
(released March 10, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11, 12, 19, 26

*In the Matter of Local Competition and Broadband Reporting*,
CC Docket No. 99-301, Report and Order, 15 F.C.C.R. 7717
(released March 30, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In the Matter of Inquiry Concerning the Deployment of Advanced
Telecommunications Capability to All Americans in a Reasonable
and Timely Fashion*, CC Docket No. 98-146, Report,
14 F.C.C.R. 2398 (released Feb. 2, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In the Matter of Petition for Declaratory Ruling that pulver.com's
Free World Dialup is Neither Telecommunications nor a
Telecommunications Service*, WC Docket No. 03-45, FCC 04-27
(released February 19, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Iowa Beef Processors, Inc.* v. *Illinois Central Gulf RR Co.*,
685 F.2d 255 (8th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Landis* v. *North American Co.*, 299 U.S. 248 (1936) . . . . . . . . . . . . . . . . . . . . . 28

*Red Lake Band of Chippewa Indians*, 846 F.2d 474
(8th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22

*Reiter* v. *Cooper*, 507 U.S. 258 (1993)    . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States* v. *Western Pacific RR*, 352 U.S. 59 (1956) . . . . . . . . . . . . . . . 2, 20

## Statutes and Rules

Communications Act of 1934, 47 U.S.C. §§ 151 *et seq.* . . . . . . . . . . . . . . . *passim*

Communications Assistance for Law Enforcement Act,
47 U.S.C. §§ 1001 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

Telecommunications Act of 1996, Pub. L. No. 104-104,
110 Stat. 56 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4

47 U.S.C. § 152(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
47 U.S.C. § 153(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
47 U.S.C. § 153(22) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
47 U.S.C. § 153(33) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
47 U.S.C. § 153(43) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5
47 U.S.C. § 153(52) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
47 U.S.C. §§ 201-276 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
47 U.S.C. § 230(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
47 U.S.C. § 1001(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27
47 U.S.C. § 1001(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
47 U.S.C. § 1001(8)(C)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
47 U.S.C. § 1002(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

Minn. Stat. § 237.07 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Minn. Stat. § 237.16(1)(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Minn. Stat. § 237.49 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Minn. Stat. § 237.74(12) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Minn. Rules § 7812.0200(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Minn. Rules § 7812.0550(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

47 C.F.R. § 1.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

69 Fed. Reg. 16193 (March 29, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

———————————

No. 04-1434

———————————

VONAGE HOLDINGS CORPORATION,

Plaintiff - Appellee

MCI WORLDCOM COMMUNICATIONS, INC.; MCIMETRO ACCESS
TRANSMISSION SERVICES, INC.,

Intervenor Plaintiffs - Appellees

v.

THE MINNESOTA PUBLIC UTILITIES COMMISSION; LEROY
KOPPENDRAYER; GREGORY SCOTT; PHYLLIS REHA; R.
MARSHALL JOHNSON, in their official capacities as the Commissioners of
the Minnesota Public Utilities Commission and not as individuals,

Defendants - Appellants

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

———————————

BRIEF FOR THE UNITED STATES AND THE
FEDERAL COMMUNICATIONS COMMISSION AS *AMICI CURIAE*

———————————

STATEMENT OF INTEREST

This appeal involves important and unresolved questions regarding the regula-

tory status of Internet telephony services under the Communications Act of 1934

(Communications Act) and the Telecommunications Act of 1996 (1996 Act).  The

Federal Communications Commission (Commission or FCC) has been charged by

Congress with responsibility for administering these statutes.  As discussed further

below, the Commission is currently engaged in administrative proceedings that will

address Vonage's regulatory status in particular and the regulatory status of Internet

telephony services more generally.  There is a significant public interest in ensuring

that the FCC's regulatory authority is not impaired by premature judicial resolution

of these issues.  There is also a significant public interest in ensuring that courts have

the benefit of the FCC's considered views regarding federal and state authority over

Internet telephony services before the courts undertake to resolve the potentially far-

reaching issues presented in this case.  For these reasons, the United States and the

FCC submit this *amicus* brief to urge the Court to defer its resolution of this appeal

until the Commission completes its own consideration of the same issues in pending

administrative proceedings.   The United States and the FCC are authorized to

participate as *amici curiae* by Rule 29(a) of the Federal Rules of Appellate Procedure.

## STATEMENT OF ISSUES

In the proceeding below, the district court held that the Communications Act

preempts Minnesota's authority to regulate Vonage's Internet telephony service.  The

question addressed by the United States and the FCC in this brief is whether judicial

-2-

consideration of the preemption issue should be deferred, on the basis of the primary

jurisdiction doctrine, until the FCC addresses that issue in pending administrative

proceedings.  *United States* v. *Western Pacific RR*, 352 U.S. 59 (1956); *Access*

*Telecommunications* v. *Southwestern Bell Telephone Co.*, 137 F.3d 605 (8th Cir.),

*cert. denied*, 525 U.S. 962 (1998).

## STATEMENT OF THE CASE

I.    **Regulatory Background**

    A.    **Telecommunications Services and Information Services**
        **Under the Communications Act and the 1996 Act**

The Communications Act establishes a comprehensive federal regulatory

framework governing "all interstate and foreign communication by wire or radio

* * * ."  47 U.S.C. §§ 152(a), 153(7), 153(22), 153(33), 153(52).  As part of that

comprehensive scheme, Title II of the Communications Act, 47 U.S.C. §§ 201-276,

vests the FCC with extensive regulatory authority over "common carriers," a term that

encompasses "any person engaged as a common carrier for hire, in interstate or

foreign communication by wire or radio * * * ."  *Id.* § 153(10).

In implementing the common carrier requirements of Title II, the FCC has long

distinguished between "basic services," which offer pure transmission capacity for

the movement of information, and "enhanced services," which allow users to engage

in more sophisticated forms of information storage, retrieval, and processing. See FCC, *In the Matter of Federal-State Joint Board on Universal Service*, Report to Congress, 13 F.C.C.R. 11501 ¶¶23-27 (1998) (*Universal Service Report*) (reviewing history of regulatory distinction between basic services and enhanced services). Basic services traditionally have been offered on a common carrier basis, and providers of basic services therefore have always been subject to regulation under Title II of the Act. In contrast, the FCC determined in the *Computer II* proceeding that enhanced service providers are not common carriers for purposes of the Communications Act and therefore are not subject to regulation under Title II. See FCC, *Amendment of Section 64.702 of the Commission's Rules and Regulations*, Final Decision, 77 FCC 2d 384 (1980) (*Computer II*), *aff'd sub nom. Computer and Communications Industry Ass'n* v. *FCC*, 693 F.2d 198, 209-210 (D.C. Cir. 1982) (*CCIA*), *cert. denied*, 461 U.S. 938 (1983).

When Congress amended the Communications Act by enacting the 1996 Act, it adopted new nomenclature, but otherwise preserved and built on the regulatory distinction between basic services and enhanced services developed by the FCC. See *Universal Service Report* ¶¶ 30, 33, 39-45 (discussing impact of 1996 Act on basic and enhanced services). The Communications Act now uses the terms "telecommunications service" and "information service" to embody that distinction.

-4-

The Act defines "telecommunications" as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."  47 U.S.C. § 153(43). "Telecommunications service" is defined as "the offering of telecommunications for a fee directly to the public," while "information service" is "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications * * * ."  *Id.* §§ 153(20), 153(46).  Providers of telecommunications services are expressly made subject to common carrier regulation under Title II (see *id.* § 153(44)), while providers of information services are not.  See, *e.g.*, *Howard* v. *America Online, Inc.*, 208 F.3d 741, 752-53 (9th Cir.), *cert. denied*, 531 U.S. 828 (2000).

Whether a particular service is classified as a telecommunications service or an information service has consequences not only for federal regulation under the Communications Act, but also for the regulatory authority of the states.  Beginning with its decision in the *Computer II* proceeding, the Commission has pursued a general policy of deregulating information services, and that policy has led to the preemption of various efforts by states to regulate information services.  See, *e.g.*, *California* v. *FCC*, 39 F.3d 919, 931-33 (9th Cir. 1994) (*California III*), *cert. denied*, 514 U.S. 1050 (1995).  When Congress enacted the 1996 Act, it reinforced the

-5-

preemptive effect of the Commission's deregulatory policy by declaring that "the policy of the United States is * * * to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, *unfettered by Federal or State regulation*." 47 U.S.C. § 230(b)(2) (emphasis added).

### B.    Internet Telephony

Although the regulatory distinction between telecommunications services and information services is well established, the dividing line between the two categories of service is by no means clear, and determining on which side of the line a particular service falls is often difficult.  The proper classification of a service requires familiarity not only with the complexities of the underlying federal regulatory scheme, but also with the technical characteristics of the service itself and the network architecture on which it rests.  The classification process can be particularly complex when, as now, rapid changes in technology give rise to new services and displace previously settled service models.  In these circumstances, attempts to distinguish between information services and telecommunications services can have unforeseen and potentially damaging consequences if they are not informed by a full understanding of the relevant regulatory and technical considerations.

One category of services whose regulatory status has become increasingly important is Internet telephony.  Internet telephony, also referred to as "Voice over

IP" (VoIP) service, involves the real-time transmission of voice communications over the Internet. The traditional public switched telephone network (PSTN) employs circuit-mode technology, in which a dedicated circuit is set up for each call and is unavailable for other uses until the call is completed. In contrast, Internet telephony employs packet-mode technology, which allows voice communications to be broken down into packets that can be routed individually to their destination over networks that also carry data traffic.

Packet-mode technology has potentially significant advantages over circuit-mode technology as a means of transmitting voice communications. As a result, within the past decade, a growing number of firms have begun to offer Internet telephony services to the public. Today, Internet telephony services are being offered not only by new entrants, but also by such traditional telephone carriers as AT&T. See, *e.g.*, *AT&T Brings Internet Telephone Service to New Jersey*, New York Times, March 30, 2004 (AT&T plans to offer VoIP service to the 100 largest metropolitan markets by the end of 2004).

The FCC first addressed the regulatory status of Internet telephony in 1998 as part of its *Universal Service Report*. See *Universal Service Report* ¶¶ 83-93. The Commission framed the issue by asking "whether any company offers a[n] [Internet telephony] service that provides users with pure 'telecommunications.'" *Id.* ¶ 86. In

-7-

answering that question, the Commission tentatively distinguished between "computer-to-computer" Internet telephony, which the Commission did not regard as a telecommunications service, and "phone-to-phone" Internet telephony services, which "appear to present a different case." *Id.* ¶ 87-88. The Commission expressed the tentative view that a provider of phone-to-phone Internet telephony service is providing a telecommunications service, rather than an information service, if: (1) the provider "holds itself out as providing voice telephony or facsimile transmission service"; (2) it "does not require the customer to use CPE [customer premises equipment] different from that CPE necessary to place an ordinary touch-tone call"; (3) it allows the customer to call telephone numbers assigned in accordance with the North American Numbering Plan [NANP]; and (4) it "transmits customer information without net change in form or content." *Id.* ¶ 88.

However, the Commission deliberately confined itself to a tentative assessment of the regulatory status of Internet telephony services. "[I]n the absence of a more complete record focused on individual service offerings," the Commission found it inappropriate to make any "definitive pronouncements":

> Because of the wide range of services that can be provided using packetized voice and innovative CPE, we will need, before making definitive pronouncements, to consider whether our tentative definition of phone-to-phone IP telephony accurately distinguishes between phone-to-phone and other forms of IP telephony, and is not likely to be

quickly overcome by changes in technology. We defer a more definitive resolution of these issues pending the development of a more fully-developed record because we recognize the need, when dealing with emerging services and technologies in environments as dynamic as today's Internet and telecommunications markets, to have as complete information and input as possible.

*Id.* ¶ 90.

The FCC recently has undertaken a new rulemaking inquiry that is intended to enable the Commission to make more definitive judgments about the regulatory status of Internet telephony services. On March 10, 2004, the Commission released a notice of proposed rulemaking (NPRM) regarding "IP-enabled services" – "services and applications making use of Internet Protocol (IP), including but not limited to voice over IP (VoIP) services." *In the Matter of IP-Enabled Services*, WC Docket No. 04-36, Notice of Proposed Rulemaking, FCC 04-28 ¶ 1 (released March 10, 2004) (IP Services NPRM).[1] The NPRM identifies a wide range of legal and technical issues relating to the appropriate regulatory framework for Internet telephony and other IP-enabled services, and invites public comments on each of those issues.

The NPRM specifically invites comments on "the proper legal classification and appropriate regulatory treatment of each specific class of IP-enabled services

---

[1]    The IP Services NPRM is available online at http://hraunfoss.fcc.gov/edocs_public/attachmatch/FCC-04-28A1.pdf.    A synopsis of the NPRM has been published at 69 Fed. Reg. 16193 (March 29, 2004).

* * * ." IP Services NPRM ¶ 42.  As part of this inquiry, the NPRM seeks comments

on "[w]hich classes of IP-enabled services, if any, are 'telecommunications services'

under the Act" and "[w]hich, if any, are 'information services.'" *Id.* ¶ 43.  The NPRM

also seeks comments on "whether new and evolving technologies and services raise

the possibility that a single IP-enabled communications might comprise both an

'information service' component and a 'telecommunications service' component."

*Ibid.*

      In connection with this inquiry, the NPRM invites commenters to address

"how, if at all, we should differentiate among various IP-enabled services to ensure

that any regulations applied to such services are limited to those cases in which they

are appropriate." *Id.* ¶ 35.  The NPRM offers a non-exhaustive list of "functional and

economic factors" that might be used to differentiate among IP-enabled services, and

invites commenters to address the relevance of those factors and to suggest additional

factors that may be relevant.  ¶¶ 36-37.  For example, the NPRM asks commenters to

address the potential significance of the "functional equivalence" of particular IP-

enabled services to traditional telephony; the substitutability of IP-enabled services

for traditional telephony; whether a particular service offers interconnection with the

PSTN and/or utilizes traditional (NANP) telephone numbers; whether the service

relies on peer-to-peer networking or the provider's own centralized servers; and

whether regulatory requirements should differentiate among different "layers." *Id.* ¶ 37.

The NPRM also seeks comments on the allocation of jurisdiction between the Commission and the states over IP-enabled services. The NPRM notes that "courts have recognized the preeminence of federal authority in the area of information services, particularly in the area [of] the Internet and other interactive computer services." *Id.* ¶ 38. The NPRM therefore seeks comments on whether, and on what grounds, particular classes of IP-enabled services "should be deemed subject to *exclusive* federal jurisdiction with regard to traditional common carrier regulation." *Id.* ¶ 41 (emphasis in original). More generally, the NPRM invites commenters to address the role that states can play in the federal regulatory regime and whether "there [are] categories of IP-enabled services that can be regulated at both the state and federal level without interfering with valid Commission policy." *Ibid.*

In addition to the ongoing IP Services NPRM, the Commission has recently issued a declaratory order addressing the regulatory status of an Internet telephony service provided by another firm, pulver.com (Pulver). *In the Matter of Petition for Declaratory Ruling that pulver.com's Free World Dialup is Neither Telecommunications nor a Telecommunications Service*, WC Docket No. 03-45, FCC 04-27 (released February 19, 2004). Pulver provides a peer-to-peer service that

allows customers equipped with special CPE or "soft phones" to place calls over the Internet to other Pulver customers, using Pulver-assigned numbers rather than conventional NANP telephone numbers. *Id.* ¶¶ 3-6. Pulver does not itself offer any transmission service or transmission capability. *Id.* ¶ 3. In its declaratory ruling, the Commission determined that Pulver's service is an unregulated information service and that "any state regulations that seek to treat [the service] as a telecommunications service or otherwise subject it to public-utility type regulation would almost certainly pose a conflict with our policy of nonregulation" of information services. *Id.* ¶ 15. The Commission expressly limited its ruling to "Pulver's present * * * offering" and "specifically decline[d] to extend our classification holding" to "communications that originate or terminate on the public switched telephone network * * * ." *Id.* ¶¶ 2 n.3, 15 n.55. In the IP Services NPRM, the Commission has invited comments on whether the findings in the Pulver declaratory ruling should be extended to other IP-enabled services. IP Services NPRM ¶ 40.

## II.    The Present Controversy

Vonage offers an Internet telephony service called DigitalVoice that enables subscribers with broadband Internet connections to make and receive telephone calls

over the Internet.[2]  290 F. Supp. 2d 993, 994-95.  Vonage does not itself provide

broadband access; persons who wish to use Vonage's service must obtain broadband

connections from Internet access providers, such as their cable company or phone

company.  *Id.* at 995.  A Vonage subscriber may use a conventional telephone, which

is connected to a device that converts audio signals into digital packets, or the

subscriber may place a call through his or her computer, using "soft phone" software

provided by Vonage that performs the same processing function.   Appellants'

Separate Appendix (SA) 17-18.  In either case, the subscriber's outgoing calls are

routed over the Internet to Vonage's servers.  If the destination is another Vonage

customer, the server routes the packets to the called party over the Internet itself; if

the destination is a telephone attached to the PSTN, the server converts the packets

into appropriate digital audio signals and connects them to the PSTN using the

services of telephone common carriers.  *Ibid.*

---

[2]  A broadband Internet connection is one that allows the transfer of data to and
from the subscriber at speeds significantly greater than traditional "dial-up" Internet
connections.  There is no universally accepted definition of how fast a connection
must be in order to be denominated as "broadband."  The FCC generally uses "broad-
band" nomenclature to refer to services and facilities that  permit data to be
transferred at more than 200 kilobits per second.  See, *e.g.*, *In the Matter of Local
Competition and Broadband Reporting*, CC Docket No. 99-301, Report and Order,
15 F.C.C.R. 7717 ¶ 22 n.68 (released March 30, 2000); *In the Matter of Inquiry
Concerning the Deployment of Advanced Telecommunications Capability to All
Americans in a Reasonable and Timely Fashion*, CC Docket No. 98-146, Report, 14
F.C.C.R. 2398 ¶ 20 (released Feb. 2, 1999).

In July 2003, the Minnesota Department of Commerce filed an administrative complaint against Vonage, asserting that Vonage is providing telephone service in Minnesota and is subject to state laws and regulations governing telephone companies and telecommunications carriers. Among other things, the laws and regulations in question require carriers to obtain operating licenses, file tariffs, and provide and fund 911 services. See Minn. Stat. §§ 237.07, 237.16(1)(d), 237.49, 237.74(12); Minn. Rules §§ 7812.0200(1), 7812.0550(1). The Minnesota Department of Commerce sought an administrative order from the Minnesota Public Utilities Commission (MPUC) compelling Vonage to comply with the foregoing state regulatory requirements.

In response to the administrative complaint, Vonage argued that the state laws and regulations in question do not apply to it and that, if they do, they are preempted by the Communications Act. Vonage's preemption argument rests primarily on the contention that Vonage's Internet telephony service constitutes an information service under the Act.

In September 2003, the MPUC issued an order asserting regulatory jurisdiction over Vonage and requiring the company to comply with all state statutes and regulations relating to the offering of telephone service in Minnesota. In so holding,

-14-

the MPUC declined to decide whether Vonage's Internet telephony service is a telecommunications service or an information service under the Communications Act.

In response, Vonage filed suit against the MPUC in the District Court for the District of Minnesota. Vonage renewed its argument that, as applied to its service, the Minnesota laws in question are preempted by the Communications Act. Vonage argued that it is providing an information service that is not subject to state regulation and that, even if it were providing a telecommunications service, state regulation would still be preempted because Vonage's service cannot be separated into distinct intrastate and interstate components. At the same time, Vonage also sought relief from the FCC by filing a petition for a declaratory ruling of preemption. See 47 C.F.R. § 1.2 (Commission "may, * * * on motion or on its own motion[,] issue a declaratory ruling terminating a controversy or removing uncertainty"). Vonage's petition currently remains pending before the Commission.

Vonage asked the district court to issue a preliminary injunction against the enforcement of the MPUC's order. Vonage initially suggested that, once the status quo had been preserved through the entry of a preliminary injunction, the district court could refer the preemption controversy to the primary jurisdiction of the FCC. See Memorandum in Support of Vonage Holdings Corporation's Motion for Preliminary Injunction, at 2 (filed Sept. 24, 2003) (after issuing preliminary

-15-

injunction, district court "could, thereafter, address the merits of Vonage's claims, or refer the matter to the FCC"). The MPUC agreed that referral to the FCC was an appropriate disposition of the case. See Response of Minnesota Public Utilities Commission to Vonage Motion for a Preliminary Injunction at 2, 4-6 (filed Oct. 3, 2003). Subsequently, however, Vonage requested a permanent injunction and did not further address whether the matter should be referred to the FCC.

In October 2003, the district court entered a permanent injunction in favor of Vonage. 290 F. Supp. 2d 993. The court determined that Vonage is providing an information service under the Communications Act and that the Act preempts Minnesota's authority to subject Vonage to common carrier regulation. *Id.* at 996-1003. In January 2004, the court denied a motion by the MPUC for reconsideration, and the present appeal followed.

## SUMMARY OF ARGUMENT

When a court finds itself presented with legal issues that are within the regulatory authority of a federal agency, the primary jurisdiction doctrine permits the court to postpone its resolution of the issues while the agency addresses them in the first instance. The primary jurisdiction doctrine allows courts to avail themselves of the benefits of an agency's expertise and knowledge regarding matters within its regulatory jurisdiction. It recognizes the primacy of federal agencies in the

construction and application of the statutes that they are charged with administering, while furthering the goals of uniformity and consistency in federal regulation. The primary jurisdiction doctrine may be invoked by a court *sua sponte* and may be raised on appeal as well as before the district court.

This appeal presents a compelling case for the invocation of the primary jurisdiction doctrine. The ultimate question before this Court on appeal is whether federal law and regulatory policy preempt Minnesota's authority to regulate Vonage's Internet telephony service. That question is now before the FCC in Vonage's pending declaratory ruling petition, and the FCC is simultaneously engaged in a broader inquiry into the general regulatory classification of Internet telephony service providers and other providers of IP-enabled services. Vonage's own regulatory status, and the status of Internet telephony services more generally, present complex questions of law, fact, and policy that are uniquely within the expertise of the FCC. Allowing the Commission to address those questions in the first instance, in the context of a fully developed factual record and a complete airing of the relevant legal considerations, will significantly advance this Court's own understanding of the issues and will promote the uniform development and application of the law in this area. At the same time, allowing the FCC to exercise primary jurisdiction will assist the Court in evaluating the potential impact of the Commission's regulatory

-17-

classification scheme in related areas, such as the obligations of providers like Vonage to assist in electronic surveillance under the Communications Assistance for Law Enforcement Act. Finally, waiting for the FCC to act will avoid unnecessarily restricting the FCC's own authority to administer the Communications Act and determine its applicability to entities such as Vonage. For all of these reasons, this Court should postpone its consideration of the merits of this appeal until the FCC has acted.

## ARGUMENT

### Judicial Consideration of Vonage's Federal Preemption Claim Should Be Deferred While the FCC Addresses the Preemption Issue

The underlying question in this case is whether federal communications law and federal regulatory policy preempt Minnesota's authority to regulate Vonage's Internet telephony service. That question is currently pending not only before this Court, but also before the FCC. As explained above, the Commission is considering a petition by Vonage for a declaratory ruling of preemption, which calls on the Commission to address the same statutory, regulatory, and technical questions that are being presented to this Court in the present appeal. At the same time, the Commission is engaged in a broader rulemaking proceeding that will address fundamental questions about the regulatory status of Internet telephony providers and

-18-

the allocation of regulatory authority over Internet telephony between the Commission and the states.  The answers to those questions will provide a critical regulatory context for the more specific issues raised by Vonage's preemption claim. Indeed, the issues raised by Vonage's petition are largely incorporated into the industry-wide IP Services NPRM, which expressly notes that "the record developed here could influence [the Commission's] disposition" of Vonage's provider-specific petition.  IP Services NPRM ¶ 32.

This Court thus finds itself considering issues that not only are within the regulatory jurisdiction of a federal agency, but that already have been presented to the agency and are under the agency's active consideration.  The question that presents itself is whether and how this Court should coordinate its own consideration of those issues with the deliberations of the FCC.  The answer to that question is provided by the primary jurisdiction doctrine.

The primary jurisdiction doctrine is a "common law doctrine used to coordinate administrative and judicial decisionmaking."  *Red Lake Band of Chippewa Indians*, 846 F.2d 474, 476 (8th Cir. 1989).  It "comes into play whenever enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body * * * ."  *United States* v. *Western Pacific RR*, 352 U.S. 59, 64

-19-

(1956); *Reiter* v. *Cooper*, 507 U.S. 258, 268 (1993). The doctrine permits federal courts to postpone their own consideration of such issues while the litigants present the issues to the administrative agency for its consideration. The court allows the parties to invoke the agency's adjudicatory procedures, while the court itself either holds the judicial proceeding in abeyance or dismisses the suit without prejudice. See *Reiter*, 507 U.S. at 268 n.3; *Carnation Co.* v. *Pacific Westbound Conference*, 383 U.S. 213, 222-23 (1966).

The primary jurisdiction doctrine provides a mechanism for federal courts to "obtain the benefit of an agency's expertise and experience" regarding issues within the agency's regulatory jurisdiction. *Access Telecommunications*, 137 F.3d at 608; *Red Lake*, 846 F.2d at 476. The doctrine also promotes "[u]niformity and consistency in the regulation of business entrusted to a particular agency." *Far East Conference* v. *United States*, 342 U.S. 570, 574 (1952); *Atlantis Express, Inc.* v. *Standard Transportation Services*, 955 F.2d 529, 532 (8th Cir. 1992) (primary jurisdiction doctrine promotes "uniformity in statutory and regulatory construction"); *DeBruce Grain, Inc.* v. *Union Pacific RR Co.*, 149 F.3d 787, 789 (8th Cir. 1998) (primary jurisdiction doctrine applies when issue "involves the special expertise of the agency and would impact the uniformity of the regulated

-20-

field"). The doctrine also provides a mechanism for obtaining an agency's views regarding issues of statutory interpretation where the agency's views would potentially be entitled to *Chevron* deference. Compare *American Automobile Manufacturers Ass'n* v. *Massachusetts Dep't of Environmental Protection*, 163 F.3d 74, 81 (1st Cir. 1998), with *Baltimore and Ohio Chicago Terminal RR* v. *Wisconsin Central Limited*, 154 F.3d 404, 411 (7th Cir. 1998), *cert. denied*, 526 U.S. 1019 (1999).

Because the doctrine "exists for the proper distribution of power between judicial and administrative bodies and not for the convenience of the parties," it is not subject to waiver by the parties. *Red Lake*, 846 F.2d at 476; *Atlantis Express*, 955 F.2d at 532. Instead, it may be raised by a court *sua sponte* at any point in the proceeding, even on appeal. See, *e.g.*, *Distrigas of Massachusetts Corp.* v. *Boston Gas Co.*, 693 F.2d 1113, 1117 (1st Cir. 1982) (invoking primary jurisdiction *sua sponte* on appeal).

This litigation presents a quintessential case for invocation of the primary jurisdiction doctrine. Whether Vonage's Internet telephony service constitutes an information service or a telecommunications service under the Communications Act requires close consideration of complex statutory, regulatory, and technical questions. The full range of considerations that may bear on Vonage's regulatory status is

suggested by the Commission's IP Services NPRM.  As noted above, the NPRM identifies a host of factors that may (or may not) prove germane in classifying and regulating Vonage and other Internet telephony providers under the Communications Act.  See p. 10 *supra*.  Evaluating the significance of those factors, and determining how they apply to the specific Internet telephony service being offered by Vonage, is a complex inquiry, one that calls for intimate familiarity with the regulatory and technical aspects of Internet telephony and the potentially far-reaching consequences of the classification process.

The FCC is uniquely situated to provide guidance regarding these issues.  Unlike the courts, the Commission has direct and ongoing responsibility for administering the Communications Act and evaluating the often complex interactions between law and technology that the Act's regulatory scheme entails.  The Commission is intimately familiar with the existing architecture and ongoing evolution of the Internet.  This expertise gives it special insight into how the distinction between information services and telecommunications services can best be applied to Internet telephony services like the one provided by Vonage.  The Commission's views in this area are entitled to particular weight, not only under accepted principles of administrative law, see *Chevron U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), but also because the statutory divide between information

-22-

services and telecommunications services derives from the Commission's own longstanding regulatory distinction between basic and enhanced services. See pp. 3-4 *supra*. When a court is called on to determine on which side of the line a particular service falls, the views of the agency that originally drew the line should be heard before the court acts. The Commission is also uniquely situated to address the policy and technical questions raised by Vonage's alternative argument (see pp. 14-15 *supra*) that the interstate and intrastate components of its service are so intertwined that state regulation is subject to federal preemption even if Vonage is providing a telecommunications service rather than an information service.

Allowing the FCC to address the preemption issues in this case in the first instance will also give this Court a better understanding of the relevant facts regarding Internet telephony in general and Vonage's service in particular. In the *Universal Service Report*, the Commission declined to take any conclusive position regarding the classification of Internet telephony services because it lacked an adequate record. The Commission reasoned that, "when dealing with emerging services and technologies in environments as dynamic as today's Internet and telecommunications markets," it is vital "to have as complete information and input

as possible." *Universal Service Report* ¶ 90.[3] Unlike the *Universal Service Report* proceeding, and unlike the expedited proceedings before the district court in this case, which produced only a limited record regarding Vonage's service, the Commission's current rulemaking proceeding regarding IP-enabled services appears to provide a suitable mechanism for developing the "information and input" needed to make informed judgments about the regulatory status of Internet telephony services and the distinctions, if any, that should be drawn among different providers of such services. This Court's consideration of Vonage's claim can only benefit from the factual, legal, and policy illumination that the Commission's undertaking will provide.

At the same time, invocation of the primary jurisdiction doctrine will serve the goal of "promot[ing] uniformity and consistency within the particular field of regulation." *Access Telecommunications*, 137 F.3d at 608. Uniformity and consistency are particularly important in the regulatory treatment of Internet services because of the Internet's interstate (and international) architecture and the lack of any necessary correlation between service provider and customer facilities and particular

---

[3] Although the district court acknowledged that the FCC's views in the *Universal Service Report* were tentative, the court nevertheless relied heavily on those views in its assessment of Vonage's service. See, *e.g.*, 290 F. Supp. 2d at 1000-1001. In so doing, the district court appears to have placed greater reliance on the FCC's tentative views than the FCC itself was prepared to do, without the benefit of the kind of comprehensive record that the *Universal Service Report* envisioned.

-24-

physical locations.  Here, for example, Vonage specifically asserts that its customers may use its service "virtually anywhere in the world so long as they have access to a broadband Internet connection," and that it cannot "independently determine the physical location of its customers."  290 F. Supp. 2d at 995.  This Court has previously invoked the primary jurisdiction doctrine in order to serve "the need for a uniform response to maintain regulatory uniformity."  *DeBruin Grain*, 149 F.3d at 789-90.  Here, the interstate and international dimensions of the Internet make regulatory uniformity imperative.

Deferring to the Commission's pending proceedings will also minimize the risk that this Court's decision will have unforeseen legal consequences beyond the immediate confines of this litigation.  For example, the Communications Assistance for Law Enforcement Act (CALEA), a federal statute that obligates telecommunications carriers to develop technical capabilities to assist in authorized electronic surveillance, employs regulatory distinctions that are similar (although not identical) to the Communications Act's distinction between information services and telecommunications services.  See 47 U.S.C. §§ 1001(6), 1001(8), 1002(a).  The Commission is presently entertaining a CALEA rulemaking petition that invites the Commission, *inter alia*, to address the relationship between CALEA and the Communications Act with regard to broadband Internet telephony.  The Commission

has stated that it "plans to initiate a rulemaking proceeding in the near future to address" those issues and that it "will closely coordinate our efforts in these two dockets."  IP Services NPRM ¶ 50 n.158.  The Commission is thus in a unique position to consider how line-drawing exercises under the Communications Act may affect the ability of federal, state, and local law enforcement agencies to carry out critical surveillance under CALEA.  If this Court were to undertake to classify Vonage's Internet telephony service without the benefit of the Commission's views, it could profoundly, albeit inadvertently, upset the separate statutory scheme established by Congress to effectuate federal and state electronic surveillance laws.[4] Staying the present proceedings will ensure that the Commission can make a decision about the classification of Vonage's service with full consideration of the Commission's statutory responsibilities for the implementation of CALEA.

Finally, allowing the Commission to formulate and present its views regarding the preemption issues not only will assist this Court in its own deliberations, but also

---

[4] CALEA's assistance obligations apply to "telecommunications carriers." See 47 U.S.C. § 1002(a). CALEA's definition of "telecommunications carrier" "does not include * * * persons or entities insofar as they are engaged in providing information services." *Id.* § 1001(8)(C)(i). CALEA's definition of "information services," in turn, is similar to the definition of "information service" in the Communications Act. See *id.* § 1001(6). Accordingly, a holding by this Court that Vonage's service is an information service under the Communications Act could prejudge the outcome of the Commission's inquiry into whether entities such as Vonage are subject to CALEA.

-26-

will protect the regulatory responsibilities entrusted to the Commission by Congress. If this Court were to address Vonage's regulatory status and the scope of Minnesota's regulatory authority before the Commission acts in its pending proceedings, and the Commission's subsequent views proved to be inconsistent with this Court's decision, the Commission could find itself deprived of an adequate opportunity to defend the merits of its position in the courts, and the Commission's regulatory role would be correspondingly compromised.[5]

For all of the foregoing reasons, this is an appropriate case – indeed, a compelling one – for invocation of the primary jurisdiction doctrine. If this Court agrees with that assessment, the simplest way for the Court to proceed is to hold the

---

[5]   The ongoing *Brand X* litigation in the Ninth Circuit provides an example of the potential procedural consequences that can arise when a court addresses questions within the FCC's regulatory jurisdiction before the agency itself has an opportunity to do so.  See *Brand X Internet Services* v. *FCC*, 345 F.3d 1120 (9th Cir. 2003) (*per curiam*), *stay granted pending cert.* (April 9, 2004).  In *Brand X*, the FCC issued a declaratory ruling that cable modem service is exclusively an information service for purposes of the Communications Act.  Petitions for review were consolidated in the Ninth Circuit, which had itself addressed the regulatory classification of cable modem service previously in *AT&T* v. *City of Portland*, 216 F.3d 871 (2000).  In *City of Portland*, the Ninth Circuit had concluded – without the benefit of the FCC's views – that cable modem service entails both an information service *and* a telecommunications service.  When the Ninth Circuit was presented with the Commission's contrary position in *Brand X*, the court concluded that it was bound by its prior decision in *City of Portland*, and therefore refused to consider the grounds for the Commission's decision or the record on which the Commission's determination rested.  See 216 F.3d at 1128-32.

present appeal in abeyance pending the completion of the Commission's proceedings.

"[T]he power to stay proceedings is incidental to the power inherent in every court

to control the disposition of the causes on its docket with economy of time and effort

for itself, for counsel, and for litigants." *Landis* v. *North American Co.*, 299 U.S.

248, 254 (1936). The Court therefore is free to stay this appeal until the Commission

completes its own deliberations. *Cf. Distrigas*, 693 F.2d at 1117-19 (invoking

primary jurisdiction but retaining appellate jurisdiction). Once the Commission has

acted, the appeal can resume before this Court with the benefit of the Commission's

intervening decisions, and the parties can address the impact of those decisions on the

appeal.

Alternatively, if the Court prefers not to maintain this appeal on its docket

while waiting for the Commission to act, the Court may vacate the decision of the

district court and remand with directions for the district court itself to await the

Commission's exercise of its primary jurisdiction. See, *e.g.*, *Iowa Beef Processors,*

*Inc.* v. *Illinois Central Gulf RR Co.*, 685 F.2d 255 (8th Cir. 1982) (vacating district

court order and directing the district court on remand to refer the case to the ICC).

Under this alternative approach, the district court would hold its own proceedings in

abeyance pending completion of the FCC's proceedings, and would then address the

consequences of the Commission's action on Vonage's claim in the first instance. If

-28-

the Court chooses this path, however, it should take care to preserve the status quo by directing the district court to issue appropriate interim injunctive relief prohibiting the imposition of Minnesota's regulatory requirements *pendente lite*. The same legal and technical complexities that justify referring this controversy to the Commission make it appropriate for the district court to preserve the status quo, rather than permit the unilateral imposition of new state regulatory requirements, while the Commission addresses the controversy.

## CONCLUSION

For the foregoing reasons, this appeal should be held in abeyance pending the FCC's disposition of Vonage's pending petition for declaratory ruling and the IP Services proceeding. Alternatively, the decision below should be vacated and the case remanded to the district court for entry of an appropriate order preserving the status quo and staying the suit pending the FCC's disposition of those proceedings.

Respectfully submitted,

JOHN A. ROGOVIN
 *General Counsel*

JACOB M. LEWIS
 *Associate General Counsel*

NANDAN M. JOSHI
 *Attorney*

GREGORY G. KATSAS
 *Deputy Assistant Attorney General*

THOMAS B. HEFFELFINGER
 *United States Attorney*

DOUGLAS N. LETTER
SCOTT R. McINTOSH
 *Attorneys, Appellate Staff*

-29-

*Federal Communications Commission*
*445 12th Street, SW*
*Washington, DC 20554*

*Civil Division, Department of Justice*
*601 D Street N.W., Room 9550*
*Washington, D.C. 20530*
*202-514-4052*

*Counsel for the United States*

April 21, 2004

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation in Rules 29(d) and 32(a)(7)(B) of the Federal Rules of Civil Procedure.  The brief contains 6,409 words, as determined by Corel WordPerfect 9.

_____

Scott R. McIntosh

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2004, I filed and served the foregoing BRIEF

FOR THE UNITED STATES AND THE FEDERAL COMMUNICATIONS

COMMISSION AS *AMICI CURIAE* by causing the required number of copies of the

brief to filed with clerk of the court and served on the following counsel by first-class

mail:

Steven H. Alpert
Brian H. Sande
Office of the Attorney General
445 Minnesota Street, Suite 1100
St. Paul, MN 55101-2128

Gregory R. Merz
Gray & Plant
80 S. Eighth Street
500 IDS Center
Minneapolis, MN 55402

Mark D. Schneider
Cynthia J. Robertson
Jenner & Block
601 13th Street, N.W.
Suite 1200
Washington, DC 20005

Russell M. Blau
Ky E. Kirby
William B. Wilhelm
Michael C. Sloan
Swidler & Berlin
3000 K Street, N.W.
Suite 300
Washington, DC 20007

Jeffrey Alan Rackow
Worldcom, Inc.
1133 19th Street, N.W.
Washington, DC 20036

_____
Scott R. McIntosh