UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

VONAGE HOLDINGS CORPORATION,      :

      :    04 Civ. 4306 (DFE) (ECF CASE)

      Plaintiff,      :

      :

      -against-      :

      :

THE NEW YORK STATE PUBLIC SERVICE      :    **DECLARATION OF**
COMMISSION, and WILLIAM M. FLYNN,      :    **CHRISTOPHER J. CARNEY**
LEONARD A. WEISS, THOMAS J. DUNLEAVY, :
and NEAL N. GALVIN in their official capacities      :
as the Commissioners of the New York State      :
Public Service Commission and not as individuals,      :

      :

      Defendants.      :

-------------------------------------------------------------X

CHRISTOPHER J. CARNEY, under penalty of perjury, hereby declares:

1.      I am a member of the Bar of this Court and an associate with the law firm of Swidler

Berlin Shereff Friedman, LLP, attorneys for Plaintiff Vonage Holdings Corp.

("Vonage"). I respectfully submit this declaration in support of Plaintiff's Motion for

Permanent Injunctive Relief.

2.      Attached hereto as Exhibit 1 is the New York Public Service Commission Order: Order

Establishing Balanced Regulatory Framework for Vonage Holdings Corporation,

*Complaint of Frontier Telephone of Rochester, Inc. Against Vonage Holdings*

*Corporation Concerning Provision of Local Exchange and InterExchange Telephone*

*Service in New York State in Violation of the Public Service Law*, Case No. 03-C-1285

(N.Y. PSC May 21, 2004).

3.      Attached hereto as Exhibit 2 is the FCC Declaratory Ruling: Memorandum Opinion and

Order, *In the Matter of Vonage Holdings Corporation Petition for Declaratory Ruling*

*Concerning an Order of the Minnesota Public Utilities Commission*, WC Docket No. 03-211, FCC 04-267 (FCC Nov. 12, 2004).

4.    Attached hereto as Exhibit 3 is the New York Public Service Commission's Application Form A for Certification as a Common Carrier, downloaded from the New York Department of Public Service's website.

5.    Attached hereto as Exhibit 4 are pages 30-31 of the PSC's Order in Case 94-C-0095, issued May 22, 1996, also downloaded from the New York Department of Public Service's website.


I declare under penalty of perjury that the foregoing is true and correct.

Executed December 20, 2004

Washington D.C.

_____
Christopher J. Carney (CC0388)

STATE OF NEW YORK
PUBLIC SERVICE COMMISSION

At a session of the Public Service
Commission held in the City of
Rochester on May 19, 2004

COMMISSIONERS PRESENT:

William M. Flynn, Chairman
Thomas J. Dunleavy
Leonard A. Weiss
Neal N. Galvin

CASE 03-C-1285  -  Complaint of Frontier Telephone of Rochester, Inc. Against Vonage
Holdings Corporation Concerning Provision of Local Exchange and
InterExchange Telephone Service in New York State in Violation
of the Public Service Law.

ORDER ESTABLISHING BALANCED REGULATORY
FRAMEWORK FOR VONAGE HOLDINGS CORPORATION

(Issued and Effective May 21, 2004)

BY THE COMMISSION:

<u>INTRODUCTION AND SUMMARY</u>

In September 2003, Frontier Telephone of Rochester, Inc. (Frontier) filed a
complaint alleging that Vonage Holdings Corporation (Vonage) is a telephone
corporation under New York State Public Service Law (the PSL or Public Service Law),
but has not obtained the Certificate of Public Convenience and Necessity (CPCN)
required by PSL §99(1) and is violating various statutes, rules and Commission policies.
Frontier asks that we order Vonage to cease offering local exchange and intrastate long
distance services in New York until it has obtained a CPCN and complied with all
relevant state regulatory requirements.  Frontier also asks that Vonage be required to
route all "911" calls over dedicated "911" networks and participate fully in "enhanced
911" (E911) services where they are available.

CASE 03-C-1285

Vonage claims that it is not a telephone corporation as defined by the Public Service Law and that, as its service is an "information service" under federal law, state regulation is pre-empted. On October 9, 2003, noting that it "raises generic concerns that could affect a number of entities," we issued a notice requesting comments on the Frontier complaint.

Based on our review of the complaint and comments received, we find that in offering and providing its Digital Voice$^{SM}$ service in New York, Vonage is a "telephone corporation" as defined in the PSL and is, therefore, subject to basic statutory requirements. We also find that such state regulation is not pre-empted by current federal laws or rules, and that additional process is appropriate before establishing a balanced regulatory framework consistent with the competitive landscape in which Vonage's offering is provided.

Although the Commission has the authority to regulate telephone services, such as those provided by Vonage, we also have an interest in ensuring that such regulation does not needlessly impose costs that interfere with the rapid, widespread deployment of new technologies. We seek to maximize the benefits of new technologies, while minimizing the risks to the public interest, by imposing as little regulation as is necessary to ensure that our core public interest concerns, including most prominently public safety and network reliability, are addressed. In the past, we have achieved this balance by relaxing regulatory requirements, to the extent allowed by law, on entities lacking size or market power. For example, we have provided extensive pricing flexibility for competitive services and imposed minimal service quality and financial reporting requirements on small and non-dominant carriers, similar to Vonage. We will continue to use this approach in dealing with today's evolving technologies and markets.

Vonage is a relatively small competitive provider of local exchange and interexchange services that should be subject to, at most, the same limited regulatory regime to which comparable circuit switched competitive carriers are currently subject in New York. Vonage will be directed to obtain a CPCN (§99) and file a tariff (§92)[1] as

---

[1] A model tariff is available on the Department's web site.

CASE 03-C-1285

required under the Public Service Law, within 45 days of this Order.  It may also seek waiver of any Commission regulations it deems inappropriate.[2]

In making our decision, we determined that it is in the public interest to move cautiously in terms of defining a regulatory environment for Vonage's service.  To that end, we are deferring any regulatory requirements for a reasonable period to permit Vonage to apply for a CPCN and file rate schedules.  During this 45-day period, Vonage is also permitted to seek permanent and/or temporary waivers of any regulations it deems to be inappropriate in its circumstance, or with which it is not readily able to comply.  Further, we will not enforce our rules and regulations with regard to Vonage's service pending our evaluation of Vonage's potential waiver requests.

The company is also encouraged to work with Staff to develop alternative means, where appropriate, of achieving necessary public safety and consumer protections.  That process will allow development of a sufficient factual basis for us to ensure that our core public policy interests are satisfied without unnecessarily interfering with the development of new services and technology deployments.

<u>DESCRIPTION OF THE SERVICE</u>

<u>Voice Over Internet Protocol</u>

Voice over Internet Protocol (VoIP) is a technology developed to enable voice communication over networks, including the public Internet, that utilize the Internet Protocol (IP).  VoIP converts voice conversations into digital packets that are transmitted over IP networks.  It can be used in many configurations to provide telephone services.  For example, VoIP has for several years been deployed in the network backbone and in private corporate networks allowing those network operators to achieve cost savings by converging voice and data traffic on one platform.  Cable companies are using VoIP to roll out stand-alone telephone services over their existing fiber-coax cable

---

[2]    The Commission is authorized to grant waivers of its rules and regulations pursuant to 16 NYCRR §3.3(c).

CASE 03-C-1285

networks.[3]  Other companies, such as Vonage, use VoIP to provide voice communications over a customer's existing high-speed Internet access service, providing the customer a normal telephone number and the ability to call any phone in the world. Still others, such as Pulver and Skype, provide VoIP-based software to enable voice communications between member users on the Internet.  Traditional telephone companies, such as AT&T, are also using VoIP technology to carry calls between switches on their long-haul networks.  Even traditional local carriers, such as Verizon, can use VoIP technology for their interoffice traffic.

Vonage's Digital Voice[SM]

The Vonage Digital Voice[SM] service enables its subscribers to complete telephone calls to other Digital Voice[SM] subscribers over the public Internet and to users of any public telephone networks in the world.  To place a call, a Vonage customer typically uses a normal telephone and dials a standard telephone number.  The number and voice are "digitized" into IP packets by a Multimedia Terminal Adapter (MTA) and transmitted using VoIP and the customer's broadband Internet connection to a Vonage gateway server.  If the call is to another Vonage customer, the call is completed to the called party over the Internet.  If the call is to a non-Vonage customer, the Vonage server converts the packetized information into a Time Division Multiplexed (TDM) signal to enable completion to the called party via connections through one or more common carriers (incumbent and competitive local exchange carriers and/or interexchange carriers).  When a non-Vonage customer calls a Vonage subscriber, the call is also dialed normally and then traverses the originating carrier's network and perhaps other carriers' networks (all typically using TDM) until it is passed to Vonage, which packetizes the signal and transmits it to the called Vonage customer.  Given Vonage's current limited subscriber base, a vast majority of the calls are connected over other carriers' networks. [4]

---

[3]  For example, Time Warner ResCom of New York, LLC began offering its Digital Phone service in parts of the state under a tariff effective April 1, 2004.

[4]  Vonage has about 150,000 customers in the United States and estimates it will have 250,000 customers by the end of 2004.  The company estimates it has approximately 10,500 customers with New York billing addresses.  (Vonage Comments at p.5)

CASE 03-C-1285

FRONTIER'S COMPLAINT AGAINST VONAGE

In September 2003, Frontier Telephone of Rochester, Inc. (Frontier) filed a
complaint against Vonage[5] alleging that Vonage is providing intrastate telephone services
in New York without the CPCN required by PSL §99(1) and is violating various statutes,
rules and Commission policies by failing to comply with virtually any other regulatory
requirements.  Frontier further alleges that Vonage provides unsafe and inadequate
emergency calling (911) in violation of PSL §97.  Frontier asks the Commission to:
(a) order Vonage to cease providing local exchange and intrastate long distance services
within the State of New York until it obtains a CPCN and complies with the appropriate
statutes, regulations and orders of the Commission for telephone corporations; and
(b) direct Vonage to route all 911 calls over the dedicated 911 network without requiring
a special 911 subscription and participate fully in "enhanced 911" (E911) services where
they are available.

Frontier asserts that "Vonage is a 'telephone corporation' owning,
operating or managing a 'telephone line' as defined in §2(17) and §2(18) of the Public
Service Law because Vonage operates apparatus and property within the state to conduct
the business of affording telephonic communication for hire."[6]  In support of its claims,
Frontier first cites Vonage's web site representations:

> Use Vonage like you use any telephone
>
> With Vonage, you pick up the phone, hear the dial tone and dial the
> telephone number of your choice.  There are no extra numbers to dial and
> no special routines to follow. It's that simple.  You don't have to be an
> engineer to use our service.
>
> You can be up and running within minutes of receiving your Vonage
> package.  We send you everything you need to get Vonage phone service,

---

[5]  Frontier's complaint against Vonage mirrors a similar complaint by the Minnesota
Public Utilities Commission (MPUC) against Vonage in that state.  A District Court
decision in Minnesota which held that the MPUC was preempted by federal law
(<u>Vonage Holdings Corp. v. Minnesota Public Utilities Comm'n.</u>, 290 F. Supp. 2nd 993
(D. Minn. 2003)) is on appeal before the Eighth Circuit Court of Appeals (Docket No.
04-1434).

[6]  Frontier Complaint at 2.

CASE 03-C-1285

> right down to the extra cable wire.  Best of all, there's no technician, no
> wiring in the walls, and no technical experience needed!  Setup usually
> takes less than 5 minutes.

Frontier then describes the routing of calls to and from a Vonage subscriber as generally discussed above.  This, it avers, demonstrates that Vonage "directly owns, operates and manages telephone equipment," specifically the MTA at the subscriber's location and the Vonage gateway server or router.  Further, the complaint asserts that "by reselling and integrating the switching and transmission functions of its associated carrier or carriers" to establish connectivity with non-Vonage customers, Vonage manages a "telephone line."  Finally, Frontier argues that by porting numbers from other local carriers through its associated CLEC, "Vonage holds itself out to be a complete replacement for a subscriber's telephone service."  Frontier notes that, except for mobile radio and cellular services (which Vonage does not claim to use), the PSL does not exempt telephone corporations from Commission authority on the basis of the technologies they use to provide service.

As it believes Vonage is a "telephone corporation" under the PSL, Frontier asserts that Vonage should be required to comply with a number of laws, rules, and orders, including but not limited to:

- the requirement to pay its share of Commission expenses (§18a);

- the requirement to file tariffs for local and intrastate long distance (§92(1));

- the requirement to obtain Commission approval to issue securities (§101 and 16 NYCRR Part 37);

- requirements to provide 911 emergency calling; [7]

- NYSPSC complaint procedures (16 NYCRR Part 12);

---

[7]  Frontier references §97(2) in this regard suggesting the Vonage 911 Service is unsafe and inadequate.  In sum, Frontier asks the Commission to confirm that Vonage is a telegraph corporation or telephone corporation and also to find that Vonage 911 service is inadequate pursuant to PSL §97(2).

CASE 03-C-1285

- rules covering provision, suspension and termination of service (16 NYCRR Part 609);

- the obligation to file NYPSC annual reports  as a CLEC (16 NYCRR Part 641);

- the requirement to offer per-line or all-call Caller ID blocking;[8]

- The requirement to enter into traffic exchange agreements; [9]

- Sales tax and 911 surcharges (Tax Law §1105/County Law §305).

## COMMENTS

Seventeen parties filed comments and/or replies in response to our request for comment on the Frontier complaint.[10]  Vonage and others recommending dismissal of Frontier's complaint focus less on the specific provisions of the Public Service Law than on the proper characterization of the Vonage service under federal law.  They also assert that the interstate nature of the service leads to the conclusion that state regulation of this service is, or should be, preempted.  These parties conclude that Vonage is not a telephone corporation, does not provide telecommunications service, and thus, is not subject to the various laws, regulations and Commission Orders cited by Frontier.  Parties supporting the Frontier complaint generally confirm its claim that Vonage's service is a telephone service under state law and/or a telecommunications service under federal law.  Further, a number of parties note that the Federal Communications Commission (FCC) is

---

[8]  Case 91-C-0428, Proceeding on Motion of the Commission to Investigate New York Telephone Company's Proposal to Institute Caller ID Service, Opinion 92-5 (issued April 9, 1992).

[9]  Case 00-C-0789, Proceeding on Motion of the Commission Pursuant to Section 97(2) of the Public Service Law to Institute an Omnibus Proceeding to Investigate the Interconnection    Arrangements Between Telephone Companies (Orders issued December 22, 2000, September 7, 2001 and August 16, 2002).

[10]  Vonage, Frontier, Time Warner, MCI, AT&T, Level 3, Voice on the Net Coalition, Net2Phone, Point One, Global NAPS, Cablevision Systems Corporation, the Cable Television & Telecommunications Association of New York, Inc., NYSTA, CWA, Sprint, Verizon, and the New York State Attorney General.

CASE 03-C-1285

in the midst of a similar proceeding and that states (including New York) should not act in advance of the FCC's determination.

<u>Vonage</u>

Vonage argues that the Commission may not impose common carrier regulation on its Digital Voice[SM] because it is not a telecommunications service, but an information service, state regulation of which is preempted. Vonage asserts its service is an information service because it provides a net protocol conversion (from digital IP packets to digital TDM signals or vice versa) and because its subscribers must use "special" customer premises equipment (CPE) to convert acoustic sounds to IP packets (in this case a computer or MTA). Alternatively, Vonage describes its service as an Internet application, regulation of which it argues is forbidden by federal law and policy.

Turning to the state law, Vonage argues that it is not a telephone corporation under the PSL because it does not "own, operate or manage" a telephone line. It argues that it does not own or provide the wires and equipment by which the subscriber connects to the Internet and subsequently from the Internet to the Vonage service; those are provided by unaffiliated third parties. Nor does Vonage own, operate or manage the telephone lines of other common carriers from whom Vonage purchases services to provide its customers telephone numbers and connections to customers of other carriers. The company also asserts that it does not resell those services acquired from other carriers. It does own and operate a media gateway server in a data center in New York City to perform IP-TDM conversions, but argues that this should be treated not as telephone equipment, but as Internet Service Provider equipment.

Finally, Vonage argues that even if we determine it is a telephone corporation, state regulation is preempted because the interstate and intrastate aspects of its service cannot be segregated. This is so, the company maintains, because it is technically impossible to accurately determine whether a given call is interstate or intrastate in nature.

<u>Other Parties</u>

Generally, parties supporting Vonage contend that the service in question is not, or should not be, subject to state regulation. Some, such as the Voice on the Net

CASE 03-C-1285

(VON) Coalition and Net2Phone, argue that as a matter of policy new Internet-based services should remain relatively free of any regulation, particularly state regulation. Others, including Level 3, argue that the Vonage service is an "information service," not a "telecommunications service," and is, therefore, subject only to the federal jurisdiction.

At the other end of the spectrum, parties including CWA, NYSTA, and the New York State Attorney General argue that, as the functional equivalent of normal telephone service, Vonage's service is clearly telephone service, potentially subject to the full panoply of the Commission's regulations. Verizon contends that although the Vonage service is a telecommunications service, it is predominantly interstate and, therefore, not subject to this Commission's authority. Others, while not directly addressing the legal status of the service, counsel delay until the FCC acts (e.g., MCI) or taking a light-handed approach that recognizes the nascent nature of this new service offering (e.g., Cablevision and Time Warner).

## DISCUSSION

The threshold question is whether Vonage is a "telephone corporation" as defined by the Public Service Law. If it is not, the matter ends there; it would not be subject to state telephone regulation. If it is a telephone corporation, we must then examine whether Commission jurisdiction has been preempted. If it has not, we must then consider the appropriate regulatory framework to be applied in New York.

Vonage is a Telephone Corporation Under State Law

Vonage claims that it is not a telephone corporation under New York law because it alleges that it does not own, operate or manage the facilities it uses to provide telephone service. Rather, it claims that all the facilities used are provided by third parties, and the equipment it does own and uses to interconnect call to other carriers' networks does not constitute a "telephone line" under PSL §2(18).

Under the Public Service Law a "telephone corporation" is defined as "every corporation...owning, operating or managing any telephone line or part of telephone line used in the conduct of the business of affording telephonic communication for hire." (PSL §2(17)). The Public Service Law defines "telephone line" as including

CASE 03-C-1285

"receivers, transmitters, instruments, machines, appliances and all devices,...apparatus, property and routes used, operated or owned by any telephone corporation to facilitate the business of affording telephonic communication...."  (PSL §2(18)).

The company is in the business of affording "telephonic communication for hire."  Vonage's service allows subscribers to make and receive voice communications with any other telephone subscribers in the world, and its service is marketed as a substitute for "home phone service."  Vonage owns and manages equipment (a media gateway server)[11] that is used to connect Vonage's customers to the customers of other telephone corporations via their public networks, as necessary.  This equipment constitutes a "telephone line" under the PSL and is used to facilitate the provisioning by Vonage of telephonic communication to customers.  Accordingly, Vonage is a "telephone corporation" under our jurisdiction.

Vonage interconnects with, and purchases services and the use of network facilities from other telephone corporations to enable its customers to place calls to, and receive calls from, telephone customers throughout the world.  In so doing, Vonage is reselling[12] to its own customers capabilities it acquires from the other, third party, telephone corporations.  We have previously determined that entities reselling telephone services are telephone corporations subject to our jurisdiction.[13]

New York's Regulation of Vonage's Service is Not Preempted

Vonage and others claim that state regulation of its service is preempted because: (1) Vonage offers information service under federal law; (2) state regulation of

---

[11] A media gateway server is a special router that connects an IP network to a traditional telephone network.

[12] "[A] *reseller of telephone services* is a telephone corporation as defined in the Public Service Law, which shall subscribe to communications services and facilities from a telephone corporation, and which shall re-offer communications services to the public for profit." (16 NYCRR §647.1)

[13] Case 27946, Proceeding on Motion of the Commission Concerning the Removal of Telephone Company Tariff Regulations Which Prohibit or Restrict the Resale and Shared Use of Telephone Services, Order Directing the Filing of Tariff Revisions and Requesting Comments (issued May 25, 1982), Attachment 1.

CASE 03-C-1285

information services and the Internet is inconsistent with federal law; and (3) the interstate and intrastate aspects of its service cannot be segregated; or (4) its service is an Internet application and Congress declared that the Internet should be free of regulation.

First, Vonage service is not an information service under federal law, despite claims to the contrary.  The Telecommunications Act of 1996 [14] (the 1996 Act) defines "telecommunications" as "the transmission, between or among points specified by the user, of information of the user's choosing without change in the form or content of the information as sent and received."[15]  The 1996 Act further defines "telecommunications service" as "offering of telecommunications for a fee directly to the public … regardless of the facilities used."[16]

In contrast, "information service" is defined in the 1996 Act as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." [17]

The FCC view of the differences between telecommunications services and information services was discussed in its April 10, 1998, Report to Congress on Universal Service.[18]  The critical distinction drawn by the FCC in classifying a service as

---

[14] Pub. L. No. 104-104, 110 Stat. 56 (1996); encoded at 47 U.S.C. §§ 151 et seq.

[15] 47 U.S.C. §153 (43).

[16] Id., §153 (44).

[17]  Id., §153(20).

[18] In the Matter of Federal-State Joint Board on Universal Service, 13 FCC Rcd 11501, CC Docket No. 96-45, FCC No. 98-67 (April 10, 1998) (FCC USF Report or Stevens Report).

CASE 03-C-1285

either information or telecommunications was whether the provider performed some function that modifies the information, or merely transmits it.[19]

       A Vonage customer's voice is transmitted between or among points specified by the customer, without any change in the form or content of the conversation. Nothing is changed, added or subtracted to the conversation in any way. Moreover, its provision of analog-to-IP (and vice-versa) conversion equipment in order to utilize the Internet as a transmission medium ultimately changes neither the form nor content of the caller's information. Consequently, Vonage's service is a "telecommunications service" which can be regulated by the states.

       Likewise, Vonage's service is not an information service. It does not offer its customers a capability to manipulate or interact with stored data. Vonage's service merely transmits its users' voices between and among endpoints chosen by the caller. With regard to its argument that it is an information service because it provides a net protocol conversion, the FCC has ruled that when there are protocol conversions at both ends of the call ("no net" protocol conversion), the service is a telecommunications service.[20] Vonage's service involves this type of "no net" protocol conversion. Its adapter and/or software convert its customers' speech into the Internet protocol (IP) data

---

[19] Id., at ¶39. The FCC's functional approach to statutory classification as either a telecommunications or information service is consistent with Congress' direction that a service's classification should not depend on the type of facilities used. (See definition in Act, §153 (44), supra). "Its classification depends rather on the nature of the service being offered to customers. Stated another way, if the user can receive nothing more than pure transmission, the service is a telecommunications service." Conversely, "[i]f the user can receive enhanced functionality, such as manipulation of information and interaction with stored data, the service is an information service" (¶ 59). In 2002, we used the FCC criteria to determine if a New York company was an information service provider or a telephone corporation (Case 01-C-1119, Complaint of Frontier Telephone of Rochester Against US DataNet Corporation Concerning Alleged Refusal to Pay Intrastate Carrier Access Charges, Order issued May 31, 2002).

[20] In the Matter of Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as amended, 11 FCC Rcd 21905, 21956, CC Docket No. 96-149, FCC 96-489, First Report and Order and Further Notice of Proposed Rulemaking, at ¶ 106 (December 24, 1996).

CASE 03-C-1285

format.  Vonage's network subsequently converts IP packets back to TDM in order to facilitate calls between its customers and other carriers' telephone subscribers.

Second, neither Congress nor the FCC has preempted state law.  Section 601 of the 1996 Act states that the 1996 Act "shall not be construed to modify, impair or supersede Federal, State or local law unless expressly so provided."[21]  While Voice on the Net Coalition argues that §230(b)[22] of the Act preempts state regulation of IP telephony, this argument incorrectly states the intent of §230.  Section 230 is entitled "Protection for private blocking and screening of offensive material," and is intended to address the content of speech transmitted over the Internet rather than traditional common carrier regulation.

Moreover, the FCC has not acted to preempt state law.  While not binding, the FCC's report to Congress tentatively concluded that "phone-to-phone" IP telephony appears to be a telecommunications service.[23]  It makes no definitive statements, however, as to the statutory classification of other types of IP telephony.[24]  Instead, the FCC deferred classification of specific IP telephony services to further proceedings.[25] More recently, in a Notice of Proposed Rulemaking, the FCC initiated a global proceeding to investigate in detail the classification and appropriate regulation of the various forms of IP-enabled services, including Vonage-type services.[26]  Thus, Vonage's argument that state regulation conflicts with FCC findings is, at best, premature.

---

[21] The 1996 Act, §601(c)(1); encoded at 47 U.S.C. §152 note, supra.

[22] "It is the policy of the United States—(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;"

[23] FCC USF Report, supra, at ¶ 90.

[24] Id., at ¶¶ 3, 83.

[25] Id., at ¶ 91.

[26] In the Matter of IP-Enabled Services, WC Docket No. 04-36, FCC No. 04-28 (March 10, 2004) (Notice of Proposed Rulemaking).

CASE 03-C-1285

Even if the FCC were to classify Vonage's service as an information service, the Commission would not be preempted from regulating its intrastate aspects. The Communications Act §152 (b) expressly preserves state jurisdiction over intrastate information services.[27]

Third, Vonage claims that the impossibility doctrine and the FCC's mixed use rule preempt state regulation of VoIP services such as those provided by Vonage. The impossibility doctrine holds that state jurisdiction over intrastate communications is preserved unless it is impossible to separate the interstate and intrastate aspects of a service, and state regulation would negate the FCC's lawful exercise of its authority over interstate communications.[28] The FCC has the burden of showing that its rules preempt only state rules that actually interfere with its goals.[29] It has made no such declaration.

Moreover, Vonage's claim that it is technically impossible to separate intrastate and interstate regulation of its services is incorrect. The company's "Unlimited Local Plan"[30] allows customers unlimited local and regional calling and up to 500 minutes of long distance calls. By implementing this plan, the company has shown that it can distinguish local calls from long distance calls. Consequently, it is not impossible to separate intrastate and interstate calls.

The FCC's mixed use rule also does not apply to Vonage. The FCC established the mixed use rule as a way to establish the appropriate jurisdiction over special access lines where it was impractical to determine the jurisdictional status of the

---

[27] California v. FCC, 905 F.2d 1217, 1240 (9th Cir. 1990). See also, In the Matter of Petition for Declaratory Ruling that pulver.com's Free World Dialup is Neither Telecommunications Nor a Telecommunications Service, WC Docket No. 03-45, FCC No. 04-27, n.72 (February 19, 2004) (Memorandum Opinion and Order) (Pulver),where the FCC stated that its regulation does not extend to "purely *intrastate*" information services.

[28] Louisiana Public Service Comm'n v. FCC, 476 U.S. 355, 375, n 4 (1986).

[29] California v FCC, supra., at 1243.

[30] Vonage web site at www.vonage.com.

CASE 03-C-1285

traffic.[31]  It was not used by the FCC for any purpose other than allocating special access jurisdiction[32] and, therefore, is inapposite to Vonage's service.

Finally, the claim that our jurisdiction is preempted because Congress declared that the Internet should be free of regulation misreads the Act.  As we stated above, §230 is aimed at the content of speech on the Internet and does not affect states' application of traditional common carrier regulation.


## APPROPRIATE REGULATORY FRAMEWORK

The state's interest in maintaining capable, robust, and efficient telecommunications networks is self-evident.  Those networks enable communications that are vital in the provision of essential public services – e.g., public safety, security and health care.  Telecommunications are essential in averting and responding to man-made and natural disasters.  State and local emergency response organizations depend on reliable telecommunications to marshal resources and direct recovery efforts.  Individuals rely on public communications networks for their own safety and peace of mind in emergency situations.  The Commission also has a responsibility to ensure that the public has ubiquitous access to effective and efficient 911/E911 emergency calling capabilities that meet the needs of emergency response organizations.  The events of September 11,

---

[31] See In the Matter of MTS and WATS Market Structure Amendment of Part 36 of the Commission's Rules and Establishment of a Joint Board, 4 FCC Rcd 5660 (July 20, 1989) (Decision and Order).  The FCC found that the costs for these mixed use lines should be assigned to the state jurisdictions because the lines carried predominantly intrastate traffic, with only small amounts of interstate traffic.  Rather than shifting the costs to the federal jurisdiction because of some interstate traffic, or allocating the costs by some burdensome verification requirements, the FCC adopted a rule that if the lines carried only *de minimis* (less than 10%) interstate traffic, their costs should be allocated to the state jurisdictions.

[32] Although Vonage cites GTE Tel. Operating Cos., GTOC Tariff No. 1, GTOC Transmittal No.1148, 13 FCC Rcd. 22466, CC Docket No. 98-79, FCC 98-292 (1998), this FCC decision also concerns special access lines.  "GTE's ADSL service is a special access service, thus warranting federal regulation under the "ten percent" rule." (GTE Decision at ¶ 25).

CASE 03-C-1285

2001 and the widespread blackout of August 2003 emphatically attest to the state's vital interest in maintaining reliable telecommunications networks.

Telecommunications are the lifeblood of this state's economy. Trillions of dollars of economic transactions that depend on telecommunications occur each day in New York. Those transactions are vital not only to New York's general economic health, but also to the financial integrity of state and local governments whose revenues are derived as a result of that economic activity. The state has a clear interest in maintaining uninterrupted telecommunications capabilities to preserve and advance the state's economic health.

To remain available and reliable, the state's existing telecommunications network providers must remain financially sustainable. While the state does not guarantee the financial success of any provider in a competitive telecommunications market, neither should it perpetuate unfair regulatory advantages for some providers over others. Such inconsistent regulatory treatment could allow competitive success not on the basis of superior product or efficiency, but as a result of regulatory arbitrage. As such unfairly won success could threaten the financial sustainability of providers serving customers with limited competitive choices, the state has an interest in ensuring that all providers of like services are subject to appropriate regulatory requirements.

A number of parties express a reasonable concern that state regulation of services such as Vonage's may interfere with deployment of useful new services and applications. Although the Commission has the authority to regulate telephone services, we also have an interest in ensuring that such regulation does not needlessly interfere with the rapid, widespread deployment of new technologies. Any regulation imposes costs that may diminish the promise of new technologies. At the same time, our core public interest concerns, including most prominently public safety (e.g., 911 emergency services) and network reliability must be addressed. To be most effective, regulation should target core public policy concerns, while minimally impinging on the free flow of markets and development of technologies.

Where regulation is appropriate, it should maximize the benefits of new technologies, while minimizing the risks to the public interest. In the past, we have

-16-

CASE 03-C-1285

achieved this balance by relaxing regulatory requirements, to the extent allowed by law, on entities lacking size or market power. For example, we have provided extensive pricing flexibility for competitive services and have imposed minimal service quality and financial reporting requirements on small and non-dominant carriers, such as Vonage. We will continue this approach in dealing with today's evolving technologies and markets. We also note that the Department is reviewing all regulatory requirements currently applicable to providers of telecommunications in New York to ensure that those requirements remain appropriate as technologies and markets evolve.

As Vonage is a relatively small competitive provider of local exchange and interexchange services, it should be subject to, at most, the same limited regulatory regime to which comparable circuit switched competitive carriers are currently subject in New York. However, because we recognize the potential impact of this emerging technology on facilities-based competition, we will move cautiously, so as not to hinder its development. Consequently, the company may seek permanent or temporary waivers of any of those requirements it deems to be inappropriate in its circumstance or with which it is not readily able to comply.

In order to allow Vonage sufficient time to make the required statutory filings and assess which rules and regulations it deems inappropriate for its provision of adequate service, we will stay the application of the statutory requirements for a reasonable period to permit Vonage to comply. Vonage will be directed to make the CPCN and tariff filings within 45 days of this Order, and to also request within that period waivers as appropriate for rules and regulations. This process will be subject to the Secretary's oversight. Further, during the pendency of the evaluation of Vonage's potential waiver requests, we will not enforce our rules and regulations with regard to Vonage's compliance. The company also is encouraged to work with Staff to develop alternative means, where appropriate, of achieving necessary public safety and consumer protections. That process will allow development of a sufficient factual basis for us to ensure that our core public policy goals are met without unnecessarily interfering with the development of new services and technology deployments.

-17-

CASE 03-C-1285

<u>The Commission orders</u>:

      1.  Vonage must comply with the Public Service Law obligations of telephone corporations and within 45 days of this Order, Vonage Holdings Corporation shall file an application for a Certificate of Public Convenience and Necessity and file a tariff.

      2.  To the extent Vonage chooses to seek waiver of specific rules and regulations, as discussed in this Order, it shall file such requests within 45 days of this Order.

      3.  This proceeding is continued.

                  By the Commission,


      (SIGNED)                  JACLYN A. BRILLING
                                 Secretary

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Vonage Holdings Corporation | **)** | WC Docket No. 03-211 |
| Petition for Declaratory Ruling Concerning an | **)** | |
| Order of the Minnesota Public Utilities | **)** | |
| Commission | **)** | |

**MEMORANDUM OPINION AND ORDER**

**Adopted:  November 9, 2004**                    **Released:  November 12, 2004**

By the Commission:  Chairman Powell and Commissioner Abernathy issuing separate statements;
Commissioners Copps and Adelstein concurring and issuing separate statements.

**TABLE OF CONTENTS**

**Paragraph**

I.    **INTRODUCTION**................................................................................................................1
II.   **BACKGROUND**...............................................................................................................3
     A.   Vonage's DigitalVoice Service ..............................................................................4
     B.   History of Vonage's Petition ...............................................................................10
III.  **DISCUSSION**...............................................................................................................14
     A.   Preemption of the *Minnesota Vonage Order* .....................................................15
          1.   Commission Jurisdiction over DigitalVoice...............................................16
          2.   Commission Authority To Preempt State Regulations ................................19
          3.   Conflict With Commission Rules and Policies............................................20
          4.   Preemption Based on "Impossibility"........................................................23
          5.   Policies and Goals of the 1996 Act Consistent With Preemption of Minnesota's
              Regulations.........................................................................................33
     B.   Commerce Clause .............................................................................................38
     C.   Public Safety Issues...........................................................................................42
IV.  **CONCLUSION**............................................................................................................46
V.   **ORDERING CLAUSES**................................................................................................47
**APPENDIX – LIST OF COMMENTERS**

**I.   INTRODUCTION**

   1.    In this Memorandum Opinion and Order (Order), we preempt an order of the Minnesota Public
Utilities Commission (Minnesota Commission) applying its traditional "telephone company" regulations
to Vonage's DigitalVoice service, which provides voice over Internet protocol (VoIP) service and other
communications capabilities.  We conclude that DigitalVoice cannot be separated into interstate and
intrastate communications for compliance with Minnesota's requirements without negating valid federal
policies and rules.  In so doing, we add to the regulatory certainty we began building with other orders

adopted this year regarding VoIP – the *Pulver Declaratory Ruling*[1] and the *AT&T Declaratory Ruling*[2] – by making clear that this Commission, not the state commissions, has the responsibility and obligation to decide whether certain regulations apply to DigitalVoice and other IP-enabled services having the same capabilities. For such services, comparable regulations of other states must likewise yield to important federal objectives. Similarly, to the extent that other VoIP services are not the same as Vonage's but share similar basic characteristics, we believe it highly unlikely that the Commission would fail to preempt state regulation of those services to the same extent.[3] We express no opinion here on the applicability to Vonage of Minnesota's general laws governing entities conducting business within the state, such as laws concerning taxation; fraud; general commercial dealings; and marketing, advertising, and other business practices. We expect, however, that as we move forward in establishing policy and rules for DigitalVoice and other IP-enabled services, states will continue to play their vital role in protecting consumers from fraud, enforcing fair business practices, for example, in advertising and billing, and generally responding to consumer inquiries and complaints.

2.    Our decision today will permit the industry participants and our colleagues at the state commissions to direct their resources toward helping us answer the questions that remain after today's Order – questions regarding the regulatory obligations of providers of IP-enabled services. We plan to address these questions in our *IP-Enabled Services Proceeding*[4] in a manner that fulfills Congress's directions "to promote the continued development of the Internet"[5] and to "encourage the deployment" of advanced telecommunications capabilities.[6] Meanwhile, this Order clears the way for increased investment and innovation in services like Vonage's to the benefit of American consumers.

## II.  BACKGROUND

3.    On September 22, 2003, Vonage filed a petition for declaratory ruling[7] requesting that the Commission preempt an order of the Minnesota Commission imposing regulations applicable to providers of telephone service on Vonage's DigitalVoice.[8]

---

[1] *Petition for Declaratory Ruling that pulver.com's Free World Dialup is Neither Telecommunications Nor a Telecommunications Service*, WC Docket No. 03-45, Memorandum Opinion and Order, 19 FCC Rcd 3307 (2004) (*Pulver Declaratory Ruling* or *Pulver*).

[2] *Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services are Exempt from Access Charges*, WC Docket No. 02-361, Order, 19 FCC Rcd 7457 (2004) (*AT&T Declaratory Ruling*).

[3] *See infra* para. 31 and notes 93, 113 (referring to VoIP services of other providers, including facilities-based providers).

[4] *IP-Enabled Services*, WC Docket No. 04-36, Notice of Proposed Rulemaking, 19 FCC Rcd 4863 (2004) (*IP-Enabled Services Proceeding*).

[5] 47 U.S.C. § 230(b)(1).

[6] 47 U.S.C. § 157 nt. (incorporating section 706 of the Telecommunications Act of 1996 (1996 Act)).

[7] *See* Vonage Holdings Corporation Petition for Declaratory Ruling Concerning an Order of the Minnesota Public Utilities Commission, WC 03-211 (filed Sept. 22, 2003) (Vonage Petition). The Commission requested and received comment on the Vonage Petition. *See Pleading Cycle Established for Comments on Vonage Petition for Declaratory Ruling*, WC Docket No. 03-211, Public Notice, 18 FCC Rcd 19325 (2003). See Appendix for a list of commenters.

### A. Vonage's DigitalVoice Service

4.    DigitalVoice is a service[9] that enables subscribers to originate and receive voice communications and provides a host of other features and capabilities that allow subscribers to manage their personal communications over the Internet.[10]  By enabling the sending and receiving of voice communications and providing certain familiar enhancements like voicemail, DigitalVoice resembles the telephone service provided by the circuit-switched network.  But as described in detail here, there are fundamental differences between the two types of service.

5.    First, Vonage customers must have access to a broadband connection to the Internet to use the service.[11]  Because Vonage does not offer Internet access services, DigitalVoice customers must obtain a broadband connection to the Internet from another provider.[12]  In marked contrast to traditional circuit-switched telephony, however, it is not relevant where that broadband connection is located or even whether it is the same broadband connection every time the subscriber accesses the service.  Rather, Vonage's service is fully portable; customers may use the service anywhere in the world where they can find a broadband connection to the Internet.[13]  According to Vonage, it does not know where in the world its users are when using DigitalVoice.[14]

---

[8]*In the Matter of Complaint of the Minnesota Department of Commerce Against Vonage Holding Corp. Regarding Lack of Authority to Operate in Minnesota*, Docket No. P-6214/C-03-108, Order Finding Jurisdiction and Requiring Compliance (issued Sept. 11, 2003) (*Minnesota Vonage Order*).

[9]DigitalVoice provides VoIP, among other capabilities.  Although the Commission has adopted no formal definition of "VoIP," we use the term generally to include any IP-enabled services offering real-time, multidirectional voice functionality, including, but not limited to, services that mimic traditional telephony.  *See IP-Enabled Services Proceeding*, 19 FCC at 4866, para. 3 n.7.  VoIP services are available in a number of different forms.  *See, e.g.*, Minnesota Commission Reply at 3 ("[VoIP] is a technology that has many current applications and potentially many more future applications."); *see also Availability of Advanced Telecommunications Capability in the United States*, GN Docket No. 04-54, Fourth Report to Congress, FCC 04-208, at 24-26 (rel. Sept. 9, 2004) (*Fourth Section 706 Report*) (describing VoIP services generally).

[10]We use the term "Internet" in this Order similarly to how the Commission has used it previously, inclusive of interconnected public, private, managed, and non-managed IP networks.  *See, e.g., Pulver*, 19 FCC Rcd at 3309, para. 4 (citing *GTE Telephone Operating Cos., GTE Tariff No. 1, GTOC Transmittal No. 1148*, CC Docket No. 98-79, Memorandum Opinion and Order, 13 FCC Rcd 22466, 22468, para. 5 (1998) (*GTE ADSL Order*)); *see also Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities; Internet Over Cable Declaratory Ruling; Appropriate Regulatory Treatment for Broadband Access to the Internet Over Cable Facilities*, GN Docket No. 00-185; CS Docket No. 02-52, Declaratory Ruling and Notice of Proposed Rulemaking, 17 FCC Rcd 4798, 4799 n.1 (2002) (*Cable Modem Declaratory Ruling*), *aff'd in part, vacated in part, and remanded, Brand X Internet Services v. FCC*, 345 F.3d 1120 (9th Cir. 2003), *stay granted pending cert.* (April 9, 2004), *petitions for cert. filed*, Nos. 04-277 (Aug. 30, 2004), 04-281 (Aug. 27, 2004).

[11]*See* Vonage Petition at 4; Letter from William B. Wilhelm, Jr., Counsel for Vonage, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 03-211, at 2 (filed Oct. 1, 2004) (Vonage Oct. 1 *Ex Parte* Letter) (suggesting a minimum upstream connection speed of 128k).

[12]*See* Vonage Petition at 7, 15; Vonage Reply at 8.  According to Vonage, its service operates with any type of broadband connection (*e.g.*, cable modem, digital subscriber line, or satellite), but will not work with dial-up Internet access.  *See* Vonage Petition at 4.

[13]*See* Vonage Petition at 4; Vonage Oct. 1 *Ex Parte* Letter at 2.

[14]*See* Vonage Petition at 2, 5, 28-29.

6.    Second, Vonage indicates that DigitalVoice requires customers to use specialized customer premises equipment (CPE).[15]  Customers may choose among several different types of specialized CPE: (1) a Multimedia Terminal Adapter (MTA), which contains a digital signal processing unit that performs digital-to-audio and audio-to-digital conversion and has a standard telephone jack connection; (2) a native Internet Protocol (IP) phone; or (3) a personal computer with a microphone and speakers, and software to perform the conversion (softphone).[16]  Although customers may in some cases attach conventional telephones to the specialized CPE that transmits and receives these IP packets, a conventional telephone alone will not work with Vonage's service.[17]

7.    Third, DigitalVoice offers customers a suite of integrated capabilities and features that allows the user to manage personal communications dynamically, including but not limited to real-time, multidirectional voice functionality.[18]  In addition to voice, these features include voicemail, three-way calling, online account and voicemail management, and geographically independent "telephone" numbers.[19]  Vonage's Real-Time Online Account Management feature allows customers to access their accounts 24 hours a day through an Internet web page to manage their communications by configuring service features, handling voicemail, and editing user information.[20]  At the user's discretion, the user may, among other options, play voicemails back through a computer or receive them in e-mails with the actual message attached as a sound file.[21]  Using other features, users may request that DigitalVoice ring simultaneously the user's Vonage number plus any other number in the United States or Canada regardless of who provides the service connected with that other number.[22]

8.    Among these features, DigitalVoice provides the capability to originate and terminate real-time voice communications.  Once the CPE and software are installed and configured, the customer may place or receive calls over the Internet to or from anyone with a telephone number – including another Vonage customer, a customer of another VoIP provider, a customer of a commercial mobile radio service (CMRS) provider, or a user reachable only through the public switched telephone network (PSTN).[23]  In any case,

---

[15]*See id.* at 5.

[16]*See id.* at 5; Vonage Reply at 8-9; *see also* 8x8 Comments at 8-10.  Vonage states that most of its customers use an MTA.  In addition to the CPE to convert voice signals, as a practical matter, most users also require a router.  *See* Vonage Petition at 5.

[17]*See* Vonage Petition at 5; Vonage Reply at 8 ("[A]n analog telephone device is neither necessary nor sufficient for use with Vonage's service."); *see also* 8x8 Comments at 9.

[18]*See* Vonage Petition at 4; *see also IP-Enabled Services Proceeding*, 19 FCC Rcd at 4866, para. 3 n.7.

[19]*See, e.g.,* Vonage Oct. 1 *Ex Parte* Letter at 4-5; Vonage, *Take Your Number With You* (visited Oct. 28, 2004) <http://www.vonage.com/features.php?feature=traveling>.

[20]*See* Vonage Oct. 1 *Ex Parte* Letter at 4; *see also* Vonage, *Real-Time Online Account Management* (visited Oct. 28, 2004) <http://www.vonage.com/features.php?feature=online_account_mgt>.  For example, the voicemail service integrated into DigitalVoice allows the user to access voicemail and select delivery options through interaction with the customer's web account on the Internet.

[21]Vonage is currently adding functionality so that users may customize voicemail controls by scheduling recorded greetings for different hours of the day and different days of the year.  *See* Oct. 1 *Ex Parte* Letter at 5; *see also* Vonage, *Voicemail Plus* (visited Oct. 28, 2004) <http://www.vonage.com/features.php?feature=voicemail>.

[22]*See, e.g.,* Vonage, *Call Forwarding* (visited Oct. 28, 2004) <http://www.vonage.com/features.php?feature=call_forwarding>.

[23]*See* Vonage Petition at 6.

the subscriber's outgoing calls originate on the Internet and are routed over the Internet to Vonage's servers.  If the destination is another Vonage customer or a user on a peered service, the server routes the packets to the called party over the Internet and the communication also terminates via the Internet.[24]  If the destination is a telephone attached to the PSTN, the server converts the IP packets into appropriate digital audio signals and connects them to the PSTN using the services of telecommunications carriers interconnected to the PSTN.  If a PSTN user originates a call to a Vonage customer, the call is connected, using the services of telecommunications carriers interconnected to the PSTN, to the Vonage server, which then converts the audio signals into IP packets and routes them to the Vonage user over the Internet.[25]  Together, these integrated features and capabilities allow customers to control their communications needs by determining for themselves how, when, and where communications will be sent, received, saved, stored, forwarded, and organized.

9.    Fourth, although Vonage's service uses North American Numbering Plan (NANP) numbers as the identification mechanism for the user's IP address, the NANP number is not necessarily tied to the user's physical location for either assignment or use, in contrast to most wireline circuit-switched calls.[26]  Rather, as Vonage explains, the number correlates to the user's digital signal processor to facilitate the exchange of calls between the Internet and the PSTN using a convenient mechanism with which users are familiar to identify the user's IP address.[27]  In other words, and again in marked contrast to traditional circuit-switched telephony, a call to a Vonage customer's NANP number can reach that customer anywhere in the world and does not require the user to remain at a single location.

### B.  History of Vonage's Petition

10.    In July 2003, the Minnesota Department of Commerce filed an administrative complaint against Vonage with the Minnesota Commission, asserting that Vonage was providing telephone exchange service in Minnesota and was thus subject to state laws and regulations governing a "telephone company."  Among other things, the laws and regulations in question require such companies to obtain operating authority, file tariffs, and provide and fund 911 emergency services.[28]  The Minnesota Department of Commerce sought an administrative order from the Minnesota Commission to compel Vonage to comply with these state regulatory requirements.  In response to the administrative complaint,

---

[24]Vonage-to-Vonage calls are not transmitted over the PSTN.  *See id.* at 7.  Calls from Vonage customers to customers of certain other IP service providers with which Vonage has a peering arrangement also are not transmitted over the PSTN, but solely over the Internet.  *See* Vonage Oct. 1 *Ex Parte* Letter at 3-4.  In this respect, the communication is similar to communications that occur over Pulver's Free World Dialup (FWD) service between FWD members.  *See Pulver*, 19 FCC Rcd at 3309-10, paras. 5-6.  If Vonage does not have a peering arrangement with a particular VoIP provider, calls between users of the two services are routed in part over the PSTN but originate and terminate via the Internet.  *See* Vonage Oct. 1 *Ex Parte* Letter at 4.

[25]*See* Vonage Petition at 5-8; *see also* 8x8 Comments at 10.

[26]*See* Vonage Petition at 8.

[27]For calls to and from other VoIP users, Vonage could choose to use other identifiers to match the IP address.  NANP numbers are not necessarily required for VoIP calls that remain on the Internet and do not connect with the PSTN.  *See Pulver*, 19 FCC Rcd at 3309, para. 5 (explaining that Pulver's FWD service uses five or six digit FWD identification numbers rather than NANP numbers); *see also* Vonage Petition at 7-8; Vonage Oct. 1 *Ex Parte* Letter at 3-5.

[28]*See* Minn. Stat. §§ 237.07, 237.16, 237.49, 237.74(12); Minn. Rules §§ 7812.0200(1), 7812.0550(1).

Vonage argued that these state laws and regulations do not apply to it and that, even if they do, they are preempted by the Communications Act of 1934, as amended (Communications Act or Act).[29]

11.   In September 2003, the Minnesota Commission issued an order asserting regulatory jurisdiction over Vonage and ordering the company to comply with all state statutes and regulations relating to the offering of telephone service in Minnesota.[30]  In so holding, the Minnesota Commission declined to decide whether Vonage's service is a telecommunications service or an information service under the Act. Instead, it found DigitalVoice to be a "telephone service" as defined by Minnesota law, thus subjecting Vonage to the state requirements for offering such a service.  In response, Vonage filed suit against the Minnesota Commission in the U.S. District Court for the District of Minnesota.  In October 2003, the district court entered a permanent injunction in favor of Vonage.[31]  The court determined that Vonage is providing an information service under the Act and that the Act preempts the Minnesota Commission's authority to subject such a service to common carrier regulation.[32]  The court concluded that "VoIP services necessarily are information services, and state regulation over VoIP services is not permissible because of the recognizable congressional intent to leave the Internet and information services largely unregulated."[33]  In January 2004, the court denied a motion by the Minnesota Commission for reconsideration, and an appeal to the U.S. Court of Appeals for the Eighth Circuit followed.  The appeal remains pending.[34]

---

[29]*See* Vonage Oct. 1 *Ex Parte* Letter, Exh. 3 at 5-12.

[30]*See, e.g., Minnesota Vonage Order* at 8.  While the order states "the Commission will require that Vonage comply with Minnesota Statutes and Rules, including certification requirements and the provisioning of 911 service," the order does not enumerate the statutory and rule provisions to which it is referring other than those specifically listed in note 27 above.  *See supra* note 28.  We will refer to these requirements, collectively, throughout this Order as either "telephone company regulations" or "economic regulations."  It appears, however, that many Minnesota Commission rules other than those specifically mentioned in the *Minnesota Vonage Order* would only apply to Vonage as a result of its status as a certificated entity in Minnesota.  *See* Minn. Stat. § 237.16(a).  As a result, because, as described below, we specifically preempt Minnesota's certification requirements for DigitalVoice in this Order, regulations applicable to certificated entities would not be applicable to Vonage for DigitalVoice.

[31]*See Vonage Holding Corp. v. Minnesota Pub. Utils. Comm'n*, 290 F. Supp. 2d 993 (D. Minn. 2003), *appeal pending*, *Vonage Holdings Corp. v. Minnesota Pub. Utils. Comm'n*, No. 04-1434 (8th Cir.).  We reject commenters' contentions that we should dismiss the Vonage Petition as moot because the Minnesota district court granted a permanent injunction.  *See, e.g.*, Minnesota Commission Comments at 4; Qwest Comments at 2; New York State AG Reply at 3.  The Minnesota district court's permanent injunction is currently subject to appeal, and other courts and state commissions have open proceedings considering these issues.  Accordingly, we find that this petition continues to present a "controversy" or "uncertainty" regarding the jurisdictional nature of DigitalVoice that may be addressed in a declaratory ruling.  *See* 47 C.F.R. § 1.2.  We also disagree that these issues are not ripe because Vonage can seek waivers of the Minnesota requirements.  *See, e.g.*, MTA Comments at 8.  The Minnesota order directs Vonage to comply with Minnesota Statutes and Rules within 30 days without mentioning the possibility of waiver.  *See Minnesota Vonage Order* at 9.  The possibility of waiver, however, does not eliminate the conflict with our rules and policies.

[32]*See Vonage Holding Corp. v. Minnesota Pub. Utils. Comm'n*, 290 F. Supp. 2d at 996-1003.

[33]*Id.* at 1002.

[34]*See Vonage Holdings Corp. v. Minnesota Pub. Utils. Comm'n*, No. 04-1434 (8th Cir.).  The Commission sought a primary jurisdiction referral from the Eighth Circuit on the issues presented in this case.  *See* Brief for the United States and the Federal Communications Commission as *Amici Curiae*, *Vonage Holdings Corp. v. Minnesota Pub.*

12.    At the same time that it filed suit in the district court in Minnesota, Vonage filed the instant petition with the Commission.  Specifically, Vonage's petition for declaratory ruling requests that the Commission preempt the Minnesota Commission's order and find that (1) Vonage is a provider of "information services," and is not a "telecommunications carrier," as those terms are defined in the Act,[35] and (2) state regulation of this service would unavoidably conflict "with the national policy of promoting unregulated competition in the Internet and information service market."[36]  In the alternative, Vonage seeks a determination that the Minnesota Commission's order is preempted because it is impossible to separate this service, regardless of its regulatory classification, into distinct interstate and intrastate communications.[37]  Vonage also seeks a ruling that certain specific E911 requirements imposed by the Minnesota Commission are in conflict with federal policies.[38]  On August 13, 2004, Vonage submitted additional information to the Commission in this matter, requesting that we act expeditiously on its pending petition insofar as it concerned the jurisdictional nature of the service, explaining that such a determination could be rendered independent of the statutory classification of the service.[39]

13.    Since Vonage filed its petition, a number of other states have opened proceedings to examine the jurisdictional nature of VoIP services offered in their states.[40]  For example, in May 2004, the New York State Public Service Commission (New York Commission) adopted an order finding that Vonage, in offering and providing DigitalVoice in New York, is a "telephone corporation" as defined by New York state law, and is therefore subject to certain requirements.[41]  The New York Commission asserted jurisdiction over Vonage and ordered it to obtain state certification and to file a tariff, but permitted Vonage to seek waivers of New York regulations that it deemed inappropriate or with which it was not readily able to comply.[42]  Vonage sought, and in July the U.S. District Court for the Southern District of New York granted, a preliminary injunction of the *New York Vonage Order*.[43]  The court held that

---

*Utils. Comm'n*, No. 04-1434 (8th Cir. filed Apr. 21, 2004) (requesting a primary jurisdiction referral).  The Eighth Circuit has not yet ruled on the primary jurisdiction referral.  Oral argument is scheduled for November 17, 2004.

[35] *See* 47 U.S.C. § 153(20) (defining "information service"); 47 U.S.C. § 153(43) (defining "telecommunications"); 47 U.S.C. § 153(44) (defining "telecommunications carrier"); 47 U.S.C. § 153(46) (defining "telecommunications service").

[36] *See* Vonage Petition at 1.

[37] *Id.*

[38] *Id.*; *see also* 8x8 Comments at 15-17.

[39] *See* Letter from William B. Wilhelm, Jr., Counsel for Vonage, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 03-211, 04-36, at 1-2 (filed Aug. 13, 2004) (Vonage Aug. 13 *Ex Parte* Letter).

[40] *See, e.g., Order Instituting Investigation on the Commission's Own Motion to Determine the Extent to Which the Public Utility Telephone Service Known as Voice over Internet Protocol Should Be Exempted from Regulatory Requirements*, Investigation 04-02-007, Order Instituting Investigation (issued Feb. 11, 2004) (initiating a proceeding by the California Public Utilities Commission to investigate VoIP services).

[41] *See Complaint of Frontier Telephone of Rochester, Inc. against Vonage Holdings Corporation Concerning Provision of Local Exchange and Interexchange Telephone Service in New York State in Violation of the Public Service Law*, Case 03-C-1285, Order Establishing Balanced Regulatory Framework for Vonage Holdings Corporation at 10 (issued May 21, 2004) (*New York Vonage Order*).

[42] *See id.* at 17.

[43] *See Vonage Holdings Corp. v. New York State Public Service Comm'n,* 04 Civ. 4306 (DFE) (S.D.N.Y. July 16, 2004) (Order of Magistrate Judge Eaton) (*New York Preliminary Injunction*) (entering a preliminary injunction against the New York Commission's order).

"Vonage has shown that it is likely to succeed on the merits of its claim that the [*New York Vonage Order*] is preempted by federal law"; that "Vonage has demonstrated that the [*New York Vonage Order*] will interfere with interstate commerce"; and that this Commission's guidance, via orders in the *IP-Enabled Services Proceeding* or the instant proceeding, "may aid in final resolution of the matter."[44] The court has scheduled a status conference on December 13, 2004 to consider whether there is a need for further proceedings in this matter, including a determination on Vonage's request for permanent injunctive relief.[45]

## III. DISCUSSION

14.    We grant Vonage's petition in part[46] and preempt the *Minnesota Vonage Order*.[47]   We find that the characteristics of DigitalVoice preclude any practical identification of, and separation into, interstate and intrastate communications for purposes of effectuating a dual federal/state regulatory scheme, and that permitting Minnesota's regulations would thwart federal law and policy.   We reach this decision irrespective of the definitional classification of DigitalVoice under the Act, *i.e.*, telecommunications or information service, a determination we do not reach in this Order.   Although Congress did not explicitly prescribe the regulatory framework for Internet-based communications like DigitalVoice when it

---

[44]*Id.* at 2-3.

[45]*See id.* at 3.

[46]We do not determine the statutory classification of DigitalVoice under the Communications Act, and thus do not decide here the appropriate federal regulations, if any, that will govern this service in the future.  These issues are currently the subject of our *IP-Enabled Services Proceeding* where the Commission is comprehensively examining numerous types of IP-enabled services, including services like DigitalVoice.  *See generally IP-Enabled Services Proceeding*, 19 FCC Rcd 4863.  That proceeding will resolve important regulatory matters with respect to IP-enabled services generally, including services such as DigitalVoice, concerning issues such as the Universal Service Fund, intercarrier compensation, 911/E911, consumer protection, disability access requirements, and the extent to which states have a role in such matters.  In addition, the Commission recently initiated a rulemaking proceeding to address law enforcement's needs relative to the Communications Assistance for Law Enforcement Act (CALEA), including the scope of services that are covered, who bears responsibility for compliance, the wiretap capabilities required by law enforcement, and acceptable compliance standards.  Our decision in this Order does not prejudice the outcome of our proceeding on CALEA.  *See Communications Assistance for Law Enforcement Act and Broadband Access and Services*, ET Docket No. 04-295; RM-10865, Notice of Proposed Rulemaking and Declaratory Ruling, 19 FCC Rcd 15676 (2004); *see also* DOJ/FBI Comments at 10-13; DOJ/FBI Reply at 7-10.  These issues are complex and critically important matters.  While these matters are being comprehensively addressed, however, it is essential that we take action to bring some greater measure of certainty to the industry to permit services like DigitalVoice to evolve.  By ruling on the narrow jurisdictional question here, we enable this Commission and the states to focus resources in working together along with the industry to address the numerous other unresolved issues related to this and other IP-enabled and advanced communications services that are of paramount importance to the future of the communications industry.  *See, e.g.*, PacWest/RCN Reply at 5; USA DataNet Comments at 2-3 (urging the Commission to act on the Vonage Petition).  *But see, e.g.*, DOJ/FBI Comments at 9; Minnesota Commission Comments at 4; Montana Independent Telecommunications Systems Comments at 5; Qwest Comments at 3-4; USTA Comments at 3-4; DOJ/FBI Reply at 5-7; Minnesota Commission Reply at 3; Verizon Reply at 6 (urging the Commission not to act on the Vonage Petition, but instead to decide these issues in a comprehensive rulemaking proceeding).

[47]As we noted above, this Order does not address Minnesota's general laws governing entities conducting business within the state, such as laws concerning taxation; fraud; general commercial dealings; marketing, advertising, billing and other business practices.  *See supra* para. 1.

amended the Act in 1996,[48] its statements regarding the Internet and advanced telecommunications capabilities in sections 230 and 706 indicate that our actions here are consistent with its intent concerning these emerging technologies.  In addition, we address the fact that multiple state regulatory regimes would likely violate the Commerce Clause because of the unavoidable effect that regulation on an intrastate component would have on interstate use of this service or use of the service within other states.  Finally, although we preempt the *Minnesota Vonage Order*, including its 911 requirements imposed as a condition to entry, we fully expect Vonage to continue its efforts to develop a 911 capability as we work toward resolving this important public safety issue in the *IP-Enabled Services Proceeding* as discussed below.[49]

### A.  Preemption of the *Minnesota Vonage Order*

15.  We begin our analysis by briefly examining the distribution of authority over communications services between federal and state agencies under the Act.  We then discuss judicial precedent that recognizes circumstances where state jurisdiction must yield to federal jurisdiction through the Commission's authority to preempt state regulations that thwart the lawful exercise of federal authority over interstate communications.  Next, we explain our current federal rules and policies for services like DigitalVoice followed by our demonstration of the impossibility of separating DigitalVoice into interstate and intrastate components for purposes of complying with the Minnesota regulations without negating federal policies and directly conflicting with our own regulations.  We conclude that preempting the *Minnesota Vonage Order* is compelled to avoid thwarting valid federal objectives for innovative new competitive services like DigitalVoice, finding consistency between our action here and Congress's articulated policies in sections 230 and 706 of the Act.

### 1.  Commission Jurisdiction over DigitalVoice

16.  In the absence of a specific statutory provision regarding jurisdiction over services like DigitalVoice, we begin with section 2 of the Act.[50]  In 1934, Congress set up a dual regulatory regime for communications services.[51]  In section 2(a) of the Act, Congress has given the Commission exclusive jurisdiction over "all interstate and foreign communication" and "all persons engaged . . . in such communication."[52]  Section 2(b) of the Act reserves to the states jurisdiction "with respect to intrastate communication service . . . of any carrier."[53]

---

[48] Telecommunications Act of 1996, Pub. Law No. 104-104, 110 Stat. 56 (1996) (1996 Act).

[49] Access to emergency services for VoIP services, including 911, is a critical public safety issue.  This issue, and the extent to which states may have a role in such matters, will be addressed in the *IP-Enabled Services Proceeding*.  We address this issue in a limited manner in this Order only because of the manner in which Minnesota ties its 911 requirements to entry authority.  *See infra* paras. 42-44.

[50] *See Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044 (D.C. Cir. 1997).

[51] *See generally* 47 U.S.C. § 152.

[52] 47 U.S.C. § 152(a).  Congress defined "interstate communication" as "communication or transmission . . . from any State, Territory, or possession of the United States. . . to any other State, Territory, or possession of the United States . . . but shall not . . . include wire or radio communication between points in the same State . . . through any place outside thereof, if such communication is regulated by a State commission."  47 U.S.C. § 153(22).

[53] 47 U.S.C. § 152(b).  "[I]ntrastate communications" is not separately defined in the Act except to the extent it is described in the definition of "interstate communication" as a "wire or radio communication between *points* in the same State."  47 U.S.C. § 153(22) (emphasis added).  We note that section 2(b) reserves to the states only matters

17.   In applying section 2 to specific services and facilities, the Commission has traditionally applied its so-called "end-to-end analysis" based on the physical end points of the communication.[54]  Under this analysis, the Commission considers the "continuous path of communications," beginning with the end point at the inception of a communication to the end point at its completion, and has rejected attempts to divide communications at any intermediate points.[55]  Using an end-to-end approach, when the end points of a carrier's service are within the boundaries of a single state the service is deemed a purely intrastate service, subject to state jurisdiction for determining appropriate regulations to govern such service.[56]  When a service's end points are in different states or between a state and a point outside the United States, the service is deemed a purely interstate service subject to the Commission's exclusive jurisdiction.[57]  Services that are capable of communications both between intrastate end points and between interstate end points are deemed to be "mixed-use" or "jurisdictionally mixed" services.[58]  Mixed-use services are generally subject to dual federal/state jurisdiction, except where it is impossible or impractical to separate the service's intrastate from interstate components and the state regulation of the intrastate component interferes with valid federal rules or policies.[59]  In such circumstances, the Commission may exercise its authority to preempt inconsistent state regulations that thwart federal objectives, treating jurisdictionally mixed services as interstate with respect to the preempted regulations.[60]

18.   Thus, our threshold determination must be whether DigitalVoice is purely intrastate (subject only to state jurisdiction) or jurisdictionally mixed (subject also to federal jurisdiction).  The nature of DigitalVoice precludes any suggestion that the service could be characterized as a purely intrastate service.[61]  As Vonage has indicated, it has over 275,000 subscribers located throughout the United States,

---

connected with "carriers," which means "common carriers" or "telecommunications carriers" under sections 3(10) and 3(44) of the Act.  47 U.S.C. § 153(10), (44).  Here, we do not determine whether Vonage is a "carrier"; however, our analysis with respect to section 2(b) assumes that it is.  This assumption for purposes of this Order, however, in no way prejudges how the Commission may ultimately classify DigitalVoice.

[54]*See, e.g., Bell Atl. Tel. Cos. v. FCC*, 206 F.3d 1, 3 (D.C. Cir. 2000); *see infra* para. 24 (addressing difficulties with an end-to-end approach for services involving the Internet).

[55]*See, e.g., Pulver*, 19 FCC Rcd at 3320-21, para. 21.

[56]*See* 47 U.S.C. § 152(b)(1).

[57]*See* 47 U.S.C. § 153(22).

[58]*See, e.g., MTS and WATS Market Structure Amendment of Part 67 of the Commission's Rules and Establishment of a Joint Board*, CC Docket Nos. 78-72, 80-286, Memorandum Opinion and Order on Reconsideration and Order Inviting Comments, 1 FCC Rcd 1287 (1987); *Petition for Emergency Relief and Declaratory Ruling Filed by the BellSouth Corporation*, Memorandum Opinion and Order, 7 FCC Rcd 1619, 1620, para. 7 (1992) (*BellSouth MemoryCall*); *Southwestern Bell Tel. Co. v. FCC,* 153 F.3d 523, 543 (8th Cir. 1998).

[59]*See Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368 (1986) (finding a basis for Commission preemption where compliance with both federal and state law is in effect physically impossible) (citing *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132 (1963)); *BellSouth MemoryCall*, 7 FCC Rcd at 1622-23, paras. 18-19.

[60]Indeed, the Eighth Circuit has recently noted the Commission's authority to preempt in the area of jurisdictionally mixed special access services.  *See Qwest Corp. v. Minnesota Pub. Utils. Comm'n,* 380 F.3d 367, 374 (8th Cir. 2004) (finding that, with respect to special access services, the Commission "*certainly has the wherewithal to preempt state regulation in this area if it so desires*") (emphasis added).

[61]We need not address in this Order the case of purely intrastate service, which is not the service we have before us in this petition.

each with the ability to communicate with anyone in the world from anywhere in the world.[62] While DigitalVoice clearly enables intrastate communications, it also enables interstate communications. It is therefore a jurisdictionally mixed service,[63] and this Commission has exclusive jurisdiction under the Act to determine the policies and rules, if any, that govern the interstate aspect of DigitalVoice service.[64]

## 2. Commission Authority To Preempt State Regulations

19.    Although the Communications Act establishes dual federal-state authority to regulate certain communications services, courts routinely recognize that there may be circumstances where state regulation would necessarily conflict with the Commission's valid exercise of authority.[65] Where separating a service into interstate and intrastate communications is impossible or impractical, the Supreme Court has recognized the Commission's authority to preempt state regulation that would thwart or impede the lawful exercise of federal authority over the interstate component of the communications.[66]

---

[62]*See* Vonage Oct. 1 *Ex Parte* Letter at 2 (explaining that its subscribers have billing addresses in each of the 50 states, the District of Columbia and throughout Canada, that its subscribers regularly use the service from countries outside North America, including "Argentina, Australia . . . and the United Kingdom," and that customers have used the service "from virtually every inhabitable continent in the world").

[63]We analyze DigitalVoice for purposes of preemption as a jurisdictionally mixed service due to its recognized capability to enable communications to occur not only between different states but within a particular state. This notwithstanding, it is possible that the Commission may find, in the context of the *IP-Enabled Services Proceeding*, that this type of service simply has no intrastate component.

[64]*See Louisiana Pub. Serv. Comm'n*, 476 U.S. at 360 (explaining how the Act would seem to divide the world of domestic telephone service into two hemispheres – one comprised of interstate service, over which the Commission has "plenary authority"); *see also Ivy Broad. Co. v. American Tel. & Tel. Co.*, 391 F.2d 486, 490 (2d Cir. 1968) ("The Supreme Court has held that the establishment of this broad scheme for the regulation of interstate service by communications carriers indicates an intent on the part of Congress to occupy the field to the exclusion of state law.").

[65]*See Louisiana Pub. Serv. Comm'n*, 476 U.S. at 375 n.4 (citing *North Carolina Utils. Comm'n v. FCC*, 537 F.2d 787 (4th Cir. 1976), *cert. denied*, 429 U.S. 1027 (1976); *North Carolina Utils. Comm'n v. FCC*, 552 F.2d 1036 (4th Cir. 1977) *cert. denied*, 434 U.S. 874 (1977) (upholding Commission preemption of state regulation because it was not possible to separate the interstate and intrastate components of the asserted Commission regulation)); *see also New York State Comm'n on Cable Television v. FCC*, 749 F.2d 804 (D.C. Cir. 1984) (affirming Commission order preempting state and local entry regulation of satellite master antenna television); *Promotion of Competitive Networks in Local Telecommunications Markets; Wireless Communications Association International, Inc. Petition for Rulemaking to Amend Section 1.4000 of the Commission's Rules to Preempt Restrictions on Subscriber Premises Reception or Transmission Antennas Designed to Provide Fixed Wireless Services; Implementation of the Local Competition Provisions in the Telecommunications Act of 1996; Review of Sections 68.104, and 68.213 of the Commission's Rules Concerning Connection of Simple Inside Wiring to the Telephone Network*, WT Docket No. 99-217; CC Docket Nos. 96-98, 88-57, First Report and Order and Further Notice of Proposed Rulemaking; Fifth Report and Order and Memorandum Opinion and Order; Fourth Report and Order and Memorandum Opinion and Order, 15 FCC Rcd 22983, 23031-32, para. 107 (2000) (preempting state regulation of fixed wireless antennas as an impediment to the full achievement of important federal objectives).

[66]*See Louisiana Pub. Serv. Comm'n*, 476 U.S. at 368-69. The Court also said that the "critical question in any pre-emption analysis is always whether Congress intended that federal regulation supersede state law." *Id.* at 369. As summarized by the Supreme Court, federal law and policy preempt state action in several circumstances: (1) where compliance with both federal and state law is in effect physically impossible (citing *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132); (2) when there is outright or actual conflict between federal and state law (citing *Free v. Bland*, 369 U.S. 663 (1962)); (3) where the state law stands as an obstacle to the accomplishment and

The D.C. Circuit, for example, applied this impossibility exception in affirming a Commission order preempting state regulation of the rate a local exchange carrier (LEC) charged an interexchange carrier for a disconnection service.[67]  The court explained that Commission preemption of state regulation is permissible when the matter to be regulated has both interstate and intrastate aspects; preemption is necessary to protect a valid federal regulatory objective; and "state regulation would 'negate[ ] the exercise by the FCC of its own lawful authority' because regulation of the interstate aspects of the matter cannot be 'unbundled' from regulation of the intrastate aspects."[68]  Such is the case with DigitalVoice service as discussed in detail below.

### 3. Conflict With Commission Rules and Policies

20.    Regardless of the definitional classification of DigitalVoice under the Communications Act, the *Minnesota Vonage Order* directly conflicts with our pro-competitive deregulatory rules and policies governing entry regulations, tariffing, and other requirements arising from these regulations for services such as DigitalVoice.[69]  Were DigitalVoice to be classified a telecommunications service, Vonage would be considered a nondominant, competitive telecommunications provider for which the Commission has eliminated entry and tariff filing requirements with respect to services like DigitalVoice.[70]  In particular,

---

execution of the full objectives of Congress (citing *Hines v. Davidowitz,* 312 U.S. 52 (1941)); (4) when Congress expresses a clear intent to preempt state law; (5) where there is implicit in federal law a barrier to state regulation; and (6) where Congress has legislated comprehensively, thus occupying an entire field of regulation. Additionally, the Supreme Court has held that preemption may result not only from action taken by Congress but also from a federal agency action that is within the scope of the agency's congressionally delegated authority.  *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 369 (citing *Fidelity Federal Savings & Loan Ass'n v. De la Cuesta,* 458 U.S. 141 (1982); *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691 (1984)).

[67]*See Pub. Serv. Comm'n of Maryland v. FCC,* 909 F.2d 1510 (D.C. Cir. 1990).

[68]*Id.* at 1515 (citing *National Ass'n of Regulatory Util. Comm'rs v. FCC,* 880 F.2d 422, 429-31 (D.C. Cir. 1989); *Illinois Bell Tel. Co. v. FCC,* 883 F.2d 104, 113 (D.C. Cir. 1989); *Public Util. Comm'n of Texas v. FCC,* 886 F.2d 1325, 1329, 1331-33 (D.C. Cir. 1989)).

[69]While we do not rely on it as a basis for our action in this Order, we also note that section 253 of the Act provides the Commission additional preemption authority over state regulations that "prohibit or have the effect of prohibiting the ability of an entity to provide any interstate or intrastate telecommunications service."  47 U.S.C. § 253.  *See* Vonage Petition at 28 n.55 (indicating it does not submit its petition under section 253).  Were DigitalVoice to be classified as a telecommunications service, however, it is possible that we could find state economic regulation such as that imposed by Minnesota to be a prohibition on the provision of an interstate and intrastate telecommunications services under section 253.  *See* Vonage Petition at 11, 28 (describing that it is technically and practically impossible to comply with Minnesota's "telephone company" rules).

[70]*See, e.g., Implementation of Section 402(b)(2)(A) of the Telecommunications Act of 1996; Petition for Forbearance of the Independent Telephone & Telecommunications Alliance*, CC Docket No. 97-11; AAD File No. 98-43, Report and Order and Second Memorandum Opinion and Order, 14 FCC Rcd 11364, 11372-75, paras. 12-16 (1999) (*Section 214 Order*) (granting blanket section 214 authority for new lines of all domestic carriers including dominant carriers like the Bell operating companies (BOCs)); *Policy and Rules Concerning the Interstate, Interexchange Marketplace; Implementation of Section 245(g) of the Communications Act of 1934*, CC Docket No. 96-61, Second Report and Order, 11 FCC Rcd 20730 (1996) (*Interexchange Detariffing Order*) (adopting mandatory detariffing of most domestic interstate, interexchange services); Order on Reconsideration, 12 FCC 15014 (1997); Second Order on Reconsideration and Erratum, 14 FCC Rcd 6004 (1999), *aff'd, MCI WorldCom, Inc. v. FCC,* 209 F.3d 760 (D.C. Cir. 2000); *Policy and Rules Concerning Rates for Competitive Common Carrier Services and Facilities Authorizations Therefor,* First Report and Order, 85 FCC 2d 1 (1980) (subsequent history

in completely eliminating interstate market entry requirements, the Commission reasoned that retaining entry requirements could stifle new and innovative services whereas blanket entry authority, *i.e.*, unconditional entry, would promote competition.[71]   State entry and certification requirements, such as the Minnesota Commission's, require the filing of an application which must contain detailed information regarding all aspects of the qualifications of the would-be service provider, including public disclosure of detailed financial information, operational and business plans, and proposed service offerings.[72]   The application process can take months and result in denial of a certificate, thus preventing entry altogether.[73] Similarly, when the Commission ordered the mandatory detariffing of most interstate, domestic, interexchange services (including services like DigitalVoice), the Commission found that prohibiting such tariffs would promote competition and the public interest, and that tariffs for these services *may actually harm consumers* by impeding the development of vigorous competition.[74]   Tariffs and "price lists," such as those required by Minnesota's statutes and rules, are lengthy documents subject to specific filing and notice requirements that must contain every rate, term, and condition of service offered by the provider, including terms and conditions to which the provider may be subject in its certificate of authority.[75]   The Minnesota Commission may also require the filing of cost-justification information or order a change in a rate, term or condition set forth in the tariff.[76]   The administrative process involved in entry certification and tariff filing requirements, alone, introduces substantial delay in time-to-market and ability to respond to changing consumer demands, not to mention the impact these processes have on how an entity subject to such requirements provides its service.

21.   On the other hand, if DigitalVoice were to be classified as an information service, it would be subject to the Commission's long-standing national policy of nonregulation of information services,[77]

---

omitted) (*Competitive Carrier Proceeding*) (adopting regulatory framework based on dominant or nondominant status of carriers).

[71]*See Section 214 Order*, 14 FCC Rcd at 11373, para. 14 ("By its very terms, blanket authority removes regulatory hurdles to market entry, thereby promoting competition."); *id.* at 11373, para. 13 ("Rather than maintaining [entry requirements] that may stifle new and innovative services[,] … we believe it is more consistent with the goals of the 1996 Act to remove this hurdle.").

[72]*See* Minn. Rule § 7812.0200.

[73]*See* Minn. Stat. § 237.16(c)

[74]*See Interexchange Detariffing Order*, 11 FCC Rcd at 20760, para. 52 (emphasis added) ("[W]e find that not permitting nondominant interexchange carriers to file tariffs with respect to interstate, domestic, interexchange services will enhance competition among providers of such services, promote competitive market conditions, and achieve other objectives that are in the public interest, including eliminating the possible invocation of the filed rate doctrine by nondominant interexchange carriers, and establishing market conditions that more closely resemble an unregulated environment."); *id.* at 20750, para. 37 ("We also adopt the tentative conclusion that in the interstate, domestic, interexchange market, requiring nondominant interexchange carriers to file tariffs for interstate, domestic, interexchange services may harm consumers by impeding the development of vigorous competition, which could lead to higher rates.").  We note that certain exceptions to the Commission's mandatory detariffing rules exist; however, these exceptions would not apply to services like DigitalVoice were it to be classified a telecommunications service.

[75]*See* Minn. Stat. § 237.07; *see also, e.g.*, Minn. Rules §§ 7812.0300(6), 7812.0350(6), 7812.2210(2).

[76]*See, e.g.,* Minn. Rule §§ 7812.2210(4),(8).

[77]*See Regulatory and Policy Problems Presented by the Interdependence of Computer and Communication Services and Facilities*, Docket No. 16979, Notice of Inquiry, 7 FCC 2d 11 (1966) (*Computer I NOI*); *Regulatory and Policy Problems Presented by the Interdependence of Computer and Communication Services and Facilities*, Docket No.

particularly regarding economic regulation such as the type imposed on Vonage in the *Minnesota Vonage Order*.[78]  In a series of proceedings beginning in the 1960's, the Commission issued orders finding that economic regulation of information services would disserve the public interest because these services lacked the monopoly characteristics that led to such regulation of common carrier services historically. The Commission found the market for these services to be competitive and best able to "burgeon and flourish" in an environment of "free give-and-take of the market place without the need for and possible burden of rules, regulations and licensing requirements."[79]

22.  Thus, under existing Commission precedent, regardless of its definitional classification, and unless it is possible to separate a Minnesota-only component of DigitalVoice from the interstate component, Minnesota's order produces a direct conflict with our federal law and policies, and impermissibly encroaches on our exclusive jurisdiction over interstate services such as DigitalVoice. This notwithstanding, some commenters argue that the traditional dual regulatory scheme must nevertheless apply to DigitalVoice *because it is functionally similar* to traditional local exchange and long distance

---

16979, Final Decision and Order, 28 FCC 2d 267 (1971) (*Computer I Final Decision*); *Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry)*, Docket No. 20828, Tentative Decision and Further Notice of Inquiry and Rulemaking, 72 FCC 2d 358 (1979) (*Computer II Tentative Decision*); *Computer II Final Decision,* 77 FCC 2d 384 (1980); *Amendment of Section 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry)*, CC Docket No. 85-229, Report and Order, 104 FCC 2d 958 (1986) (*Computer III*) (subsequent history omitted) (collectively the *Computer Inquiry Proceeding*).  In its *Second Computer Inquiry* proceeding, the Commission "adopted a regulatory scheme that distinguished between the common carriage offering of basic transmission services and the offering of enhanced services."  *Computer II Final Decision,* 77 FCC 2d at 387; *see also Computer III Further Remand Proceedings:  Bell Operating Company Provision of Enhanced Services; 1998 Biennial Regulatory Review – Review of Computer III and ONA Safeguards and Requirements*, 13 FCC Rcd 6040, 6064, para. 38 (1998).  The former services are regulated under Title II and the latter services are not.  *See Computer II Final Decision,* 77 FCC 2d at 428-30, 432-43, paras. 113-18, 124-49 (indicating it would not serve the public interest to subject enhanced service providers to traditional common carrier regulation under Title II because, among other things, the enhanced services market was "truly competitive").  The 1996 Act uses different terminology (*i.e.,* "telecommunications services" and "information services") than used by the Commission in its *Computer Inquiry* proceeding, but the Commission has determined that "enhanced services" and "information services" should be interpreted to extend to the same functions, although the definition in the 1996 Act is even broader.  *See Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as Amended*, CC Docket No. 96-149, First Report and Order and Further Notice of Proposed Rulemaking, 11 FCC Rcd 21905, 21955-56, para. 102 (1996) (*Non-Accounting Safeguards Order*) (subsequent history omitted) (explaining that all enhanced services are information services, but information services are broader and may not be enhanced services).

[78] *See, e.g.*, *Pulver*, 19 FCC Rcd at 3317-20, paras. 17-20 (explaining the Commission's policy of nonregulation for information services and how the 1996 Act reinforces this policy).  This policy of nonregulation refers primarily to economic, public-utility type regulation, as opposed to generally applicable commercial consumer protection statutes, or similar generally applicable state laws.  Indeed, the preeminence of federal authority over information services has prevailed unless a carrier-provided information service could be characterized as "purely intrastate," *see California v. FCC*, 905 F.2d 1217, 1239-42 (9th Cir. 1990), or it is possible to separate out the interstate and intrastate components and state regulation of the intrastate component would not negate valid Commission regulatory goals.  *See California v. FCC*, 39 F.3d 919 (9th Cir. 1994) (*California III*), *cert. denied*, 514 U.S. 1050 (1995) (affirming Commission preemption of certain state requirements for separation of facilities and personnel in the BOC provision of jurisdictionally mixed enhanced services as state regulations would negate national policy).

[79] *See Computer II Final Decision,* 77 FCC 2d at 425-33, paras. 109-27 (citing *Computer I*, *Tentative Decision*, 27 FCC 2d at 297-298).

voice service.[80]  Were it appropriate to base our decision today on the applicability of Minnesota's "telephone company" regulations to DigitalVoice solely on the functional similarities between DigitalVoice and other existing voice services (as the Minnesota Commission appears to have done),[81] we would find DigitalVoice *far more similar* to CMRS, which provides mobility, is often offered as an all-distance service, and needs uniform national treatment on many issues.[82]  Indeed, in view of these differences, CMRS, including IP-enabled CMRS, is expressly exempt from the type of state economic regulation Minnesota seeks to impose on DigitalVoice.[83]  Commenters that argue that the Act requires the Commission to recognize state jurisdiction over DigitalVoice to the extent it enables "intrastate" communications to occur completely ignore the considerations that dictate preemption here.[84]  Indeed, the fact that a particular service enables communication within a state does not necessarily subject it to state economic regulation.  We have acknowledged similar "intrastate" communications capabilities in other services involving the Internet, where for regulatory purposes, treatment as an interstate service prevailed despite this "intrastate" capability.[85]

### 4.  Preemption Based on "Impossibility"

23.  In this section, we examine whether there is any plausible approach to separating DigitalVoice into interstate and intrastate components for purposes of enabling dual federal and state regulations to coexist without "negating" federal policy and rules.[86]  We find none.  Without a practical means to

---

[80]*See, e.g.,* ITTA Comments at 10-12; Minnesota Commission Comments at 3; MTA Comments at 13-14; RIITA Comments at 2; Surewest Comments at 4-5; GVNW Reply at 2-3; Minnesota Commission Reply at 4-5, 7; NASUCA Reply at 9, 11-12; Sprint Reply at 2-3.  *But see* Verizon Reply at 2-6.

[81]*See Minnesota Vonage Order* at 8 (finding Vonage's service to be "functionally no different than any other telephone service").

[82]Indeed, other commenters note how DigitalVoice is like CMRS.  *See, e.g.*, California Commission Comments at 20-22; HTBC Comments at 9.

[83]*See* 47 U.S.C. § 332(c)(3)(A).  Pursuant to section 332 of the Act, state and local governments are specifically preempted from regulating the "*entry of or the rates charged* by any commercial mobile service or any private mobile service."  *Id.* (emphasis added).

[84]*See, e.g.,* New York Commission Comments at 3; California Commission Comments at 4, 19; NASUCA Reply at 15; OTA/WIT Reply Comment at 8; Sprint Reply at 6-7.

[85]For example, the Commission concluded that some traffic over GTE's asymmetrical digital subscriber line (ADSL) service would, in fact, be terminated in the state where it originated, or even locally, but the service is "an interstate service and is properly tariffed at the federal level."  *See GTE ADSL Order,* 13 FCC Rcd at 22466, 22478-79, paras. 1, 22.  The Commission left open the possibility that a purely intrastate xDSL service may be offered which would be tariffed at the state level.  *See id.* at 22481, para. 27.  The Commission similarly determined that cable modem service is an interstate service because the points among which cable modem communications travel are often in different states and countries.  *See Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4832, para. 59.  The jurisdictionally interstate finding of cable modem service was not an issue on appeal.  *See Brand X Internet Services v. FCC*, 345 F.3d 1120.  Finally, in *Pulver*, the Commission held that Pulver's "intrastate capabilities" should not remove the service from our jurisdiction.  *See Pulver*, 19 FCC Rcd at 3320-22, paras. 20-22.

[86]*See Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. at 368 (holding that the Supremacy Clause of Article VI of the Constitution provides Congress with the power to preempt state law and explaining the numerous bases for preemption); *see also Pub. Serv. Comm'n of Maryland v. FCC*, 909 F.2d at 1515 (citing *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 880 F.2d at 429-31); *Nat'l Ass'n of Regulatory Util. Comm'rs*, 880 F.2d at 425 ("We conclude that the Commission may only preempt state regulation over intrastate wire communication to the degree

separate the service, the *Minnesota Vonage Order* unavoidably reaches the interstate components of the DigitalVoice service that are subject to exclusive federal jurisdiction. Vonage has no means of directly or indirectly identifying the geographic location of a DigitalVoice subscriber. Even, however, if this information were reliably obtainable, Vonage's service is far too multifaceted for simple identification of the user's location to indicate jurisdiction. Moreover, the significant costs and operational complexities associated with modifying or procuring systems to track, record and process geographic location information as a necessary aspect of the service would substantially reduce the benefits of using the Internet to provide the service, and potentially inhibit its deployment and continued availability to consumers.[87]

24. DigitalVoice harnesses the power of the Internet to enable its users to establish a virtual presence in multiple locations simultaneously, to be reachable anywhere they may find a broadband connection, and to manage their communications needs from any broadband connection. The Internet's inherently global and open architecture obviates the need for any correlation between Vonage's DigitalVoice service and its end users' geographic locations. As we noted above, however, the Commission has historically applied the geographic "end-to-end" analysis to distinguish interstate from intrastate communications.[88] As networks have changed and the services provided over them have evolved, the Commission has increasingly acknowledged the difficulty of using an end-to-end analysis when the services at issue involve the Internet.[89] DigitalVoice shares many of the same characteristics as these other services involving the Internet, thus making jurisdictional determinations about particular DigitalVoice communications based on an end-point approach difficult, if not impossible.[90]

---

necessary to keep such regulation from negating the Commission's exercise of its lawful authority over interstate communication service.").

[87] *See* Letter from William B. Wilhelm, Jr. and Ronald W. Del Sesto, Jr., Counsel for Vonage, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 03-211, at 5 (filed Oct. 19, 2004) (Vonage Oct. 19 *Ex Parte* Letter)

[88] *See supra* para. 17.

[89] For example, in attempting to apply an end-to-end analysis to an incumbent LEC's digital subscriber line (DSL) telecommunications service to determine whether federal or state tariffing requirements should attach, the Commission noted that "an Internet communication does not necessarily have a point of 'termination' in the traditional sense." *GTE ADSL Order*, 13 FCC Rcd at 22478-79, para. 22. In a later proceeding involving the provision of Telecommunications Relay Service over the Internet, the Commission similarly noted the difficulty in pinpointing the origination of an IP-Relay call arising over the Internet because Internet addresses do not have geographic correlates equivalent to the PSTN's automatic number identifiers, which are tied to geographic locations, and thus, there is no automatic way to determine whether any call is intrastate or interstate. *See Provision of Improved Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CC Docket No. 98-67, Declaratory Ruling and Second Further Notice of Proposed Rulemaking, 17 FCC 7779, 7784, para. 15 (2002) (*IP-Relay Second FNPRM*). Significantly, as recently as June, the Commission issued yet another Further Notice of Proposed Rulemaking in this proceeding, recognizing the continued technological inability to identify the location of an IP-Relay user. *See Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CC Docket Nos. 90-571, 98-67; CG Docket No. 03-123, Report and Order; Order on Reconsideration; Further Notice of Proposed Rulemaking, 19 FCC Rcd 12475, 12561, para. 221 (2004) (*2004 IP-Relay FNPRM*). In *Pulver*, the Commission concluded that the concept of "end points" and an end-to-end analysis were not relevant to Pulver's Internet-based VoIP information service. *See Pulver*, 19 FCC Rcd at 3316-23, paras. 15-25.

[90] *See* Vonage Petition at 5, 28.

25.   In fact, the geographic location of the end user at any particular time is only one clue to a jurisdictional finding under the end-to-end analysis.  The geographic location of the "termination" of the communication is the other clue; yet this is similarly difficult or impossible to pinpoint.  This "impossibility" results from the inherent capability of IP-based services to enable subscribers to utilize multiple service features that access different websites or IP addresses during the same communication session and to perform different types of communications simultaneously, none of which the provider has a means to separately track or record.[91]  For example, a DigitalVoice user checking voicemail or reconfiguring service options would be communicating with a Vonage server.  A user forwarding a voicemail via e-mail to a colleague using an Internet-based e-mail service would be "communicating" with a different Internet server or user.  An incoming call to a user invoking forwarding features could "terminate" anywhere the DigitalVoice user has programmed.  A communication from a DigitalVoice user to a similar IP-enabled provider's user would "terminate" to a geographic location unknown either to Vonage or to the other provider.[92]  These functionalities in all their combinations form an integrated communications service designed to overcome geography, not track it.  Indeed, it is the total lack of dependence on *any* geographically defined location that most distinguishes DigitalVoice from other services whose federal or state jurisdiction is determined based on the geographic end points of the communications.[93]  Consequently, Vonage has no service-driven reason to know users' locations,[94] and

---

[91]*See, e.g.,* Vonage Oct. 19 *Ex Parte* Letter at 4-5 (explaining that in addition to having no way to determine a geographic origination point, determining a geographic destination is not possible either); *see also* Letter from Glenn T. Reynolds, BellSouth Corp., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 04-36; 03-211, Attach. at 6-12 (filed Oct.26, 2004) (BellSouth Oct. 26 *Ex Parte* Letter) (explaining the multitude of simultaneous capabilities during a single communication that makes a point of destination unknown); Letter from Howard Symons, Counsel for NTCA, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 03-211, 04-36 Attach. at 2-3 (filed Oct.28, 2004) (NCTA Oct. 28 *Ex Parte* Letter) (describing the core integrated features that "cable VoIP" provides to subscribers); Letter from Adam D. Krinsky, Counsel for CTIA, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 04-36; 03-211, (filed Oct.25, 2004) (CTIA Oct. 25 *Ex Parte* Letter) (explaining that IP-enabled services do not have definable termination points).

[92]*See* Vonage Oct. 19 *Ex Parte* Letter at 4-5.

[93]We note that these integrated capabilities and features are not unique to DigitalVoice, but are inherent features of most, if not all, IP-based services having basic characteristics found in DigitalVoice, including those offered or planned by facilities-based providers.  *See infra* note 113 for a brief summary of these basic characteristics; *see also, e.g.*, Letter from Kathleen Grillo, Verizon, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 03-211 at 1-3 (filed Nov. 1, 2004) (Verizon Nov. 1 *Ex Parte* Letter) (describing Verizon's VoiceWing service); Letter from Cronan O'Connell, Qwest, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 03-211 (filed Sept. 27, 2004) (Qwest Sept. 27 *Ex Parte* Letter) (describing Qwest's VoIP architecture and service); Letter from Judy Sello, AT&T, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 03-211 at 1-4, (filed Oct. 21, 2004) (AT&T Oct 21 *Ex Parte* Letter) (describing AT&T's CallVantage service); Letter from James K. Smith, Executive Director – Federal Regulatory, SBC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 03-211, 04-29, 04-36, Attach. at 4-11 (filed Oct. 8, 2004) (SBC Oct. 8 *Ex Parte* Letter) (describing SBC's VoIP architecture and service); Letter from Glenn T. Reynolds, Vice President – Federal Regulatory, BellSouth, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 03-211, 04-36, Attach. at 6-12 (filed Oct. 26, 2004) (BellSouth Oct. 26 *Ex Parte* Letter) (describing BellSouth's VoIP architecture and service); Letter from Glenn T. Reynolds, Vice President – Federal Regulatory, BellSouth, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 03-211, 04-36, Attach. at 4 (filed Oct. 7, 2004) (BellSouth Oct. 7 *Ex Parte* Letter) (describing BellSouth's VoIP architecture and service); Letter from Howard J. Symons, Counsel for National Cable & Telecommunications Association (NCTA), to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 03-211, 04-36, Attach. at 3-5 (filed Oct. 28, 2004) (NCTA Oct. 28 *Ex Parte* Letter) (describing cable VoIP architecture).

Vonage asserts it presently has no way to know.[95]  Furthermore, to require Vonage to attempt to incorporate geographic "end-point" identification capabilities into its service solely to facilitate the use of an end-to-end approach would serve no legitimate policy purpose.[96]  Rather than encouraging and promoting the development of innovative, competitive advanced service offerings,[97] we would be taking the opposite course, molding this new service into the same old familiar shape.

    26.   In the absence of a capability to identify *directly* DigitalVoice communications that originate and terminate within the boundaries of Minnesota, we still consider whether some method exists to identify such communications *indirectly*, such that Minnesota's regulations could nonetheless apply to only that "intrastate" usage such as voice calls between persons located in the same state.[98]  For example, assume Minnesota were to use DigitalVoice subscribers' NPA/NXXs as a proxy for those subscribers' geographic locations when making or receiving calls.  If a subscriber's NPA/NXX were associated with Minnesota under the NANP, Minnesota's telephone company regulations would attach to every DigitalVoice communication that occurred between that subscriber and any other party having a Minnesota NPA/NXX.  But because subscribers residing anywhere could obtain a Minnesota NPA/NXX, a subscriber may never be present in Minnesota when communicating with another party that is, yet Minnesota would treat those calls as subject to its jurisdiction.[99]

---

[94]*See American Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 170 (S.D.N.Y. 1997) ("Internet protocols were designed to ignore rather than document geographic location.").

[95]We acknowledge that certain geolocation products may be capable of identifying, to some degree, the geographic location of a Vonage user in the future, *see, e.g.*, Sprint Reply at 7, but the record does not reflect that such information is readily obtainable at this time.  *See, e.g.*, 8x8 Comments at 14-15.  Should Vonage decide in the future to incorporate geolocation capabilities into its service to facilitate additional features that may be dependent on reliable location determining capabilities, *e.g.*, E911-type features or law enforcement surveillance capabilities, this would not alter the fact that the service enables the user's location to change continually.  *See* Vonage Oct. 19 *Ex Parte* Letter at 3-6 (explaining how user location information for emergency services purposes would have no relevance to an end to end jurisdictional analysis for DigitalVoice).

[96]*See Pulver*, 19 FCC Rcd at 3320-21, para. 21 ("Attempting to require Pulver to locate its members for the purpose of adhering to a regulatory analysis that served another network would be forcing changes on this service for the sake of regulation itself, rather than for any particular policy purpose.").

[97]*See, e.g.*, Letter from Staci L. Pies, The VON Coalition, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 01-92; WC Docket Nos. 02-361, 03-211, 03-266, 04-36, Attach. at 1 (filed Aug. 19, 2004) (VON Coalition Aug. 19 *Ex Parte* Letter).

[98]Where the Commission has found it difficult to apply an end-to-end approach for jurisdictional purposes, it has proposed or adopted proxy or allocation mechanisms to approximate an end-to-end result.  *See, e.g., GTE ADSL Order,* 13 FCC Rcd at 22479, para. 23 (applying the 10% rule for determining interstate jurisdiction for federal tariffing purposes); *IP-Relay Second FNPRM*, 17 FCC Rcd at 7784, para. 15 (proposing either an allocator to approximate the mix of interstate/intrastate traffic or a user self-identification mechanism to identify its end-point location); *2004 IP-Relay FNPRM*, 19 FCC Rcd at 12561-64, paras. 221-30 (proposing either user-registration or allocation mechanisms to determine interstate or intrastate use; asking whether, in the alternative, all IP-Relay calls should simply be deemed interstate).  We find a 'percentage' proxy to be unhelpful in addressing the conflict between the federal and state regulatory regimes (in particular, the tariffing and certification requirements) at issue in this proceeding, because using such a proxy would not avoid frustration of the Commission's policy objectives discussed above.  *See supra* section III.A.3.  *But see, e.g.*, MTA Comments at 10.

[99]In this example, if we further assume Minnesota requires entry certification for Vonage, but has an entry condition that Vonage cannot meet, Vonage could be subject to state sanctions for "operating" in the state without authority to

27.   Similarly, if a Minnesota NPA/NXX subscriber residing in Minnesota used its service outside the state to call someone in Minnesota, that call would appear to be an intrastate call when it is actually interstate.  Some commenters suggest that because Vonage markets DigitalVoice to provide "local" and "long distance" calls it surely has an ability to distinguish between intrastate and interstate calls.[100]  These commenters fail to recognize that these calls are not "local" and "long distance" in the sense that they are for traditional wireline telephone services.  Rather, like we have seen with the proxy example above, Vonage describes these calling capabilities for convenience in terms that its subscribers understand.  A DigitalVoice call that would be deemed "local," for example, is actually a call between two NPA/NXXs associated with particular rate centers in a particular state, yet when the actual communication occurs one or both parties can be located outside those rate centers, outside the state, or even on opposite ends of the world.

28.   We further consider whether Minnesota could assert jurisdiction over DigitalVoice communications based on whether the subscriber's billing address or address of residence are in Minnesota.  This too fails.  When a subscriber with a Minnesota billing address or address of residence uses DigitalVoice from any location outside the state to call a party located in Minnesota, Minnesota would treat that communication as "intrastate" based on the address proxy for that subscriber's location, yet in actuality it would be an interstate call.[101]

29.   These proxies are very poor fits, yet even their implementation would impose substantial costs retrofitting DigitalVoice into a traditional voice service model for the sole purpose of making it easier to apply traditional voice regulations to only a small aspect of Vonage's integrated service.[102]  Forcing such changes to this service would greatly diminish the advantages of the Internet's ubiquitous and open nature that inspire the offering of services such as DigitalVoice in the first instance.[103]  Indeed, Vonage would have to change multiple aspects of its service operations that are not nor were ever designed to incorporate geographic considerations, including modifications to systems that track and identify subscribers' communications activity and facilitate billing; the development of new rate and service structures; and sales and marketing efforts,[104] just for regulatory purposes.[105]  The Commission has previously recognized the significant efforts and inefficiency to attempt to separate out an intrastate

---

the extent any of its customers nationwide obtain Minnesota NPA/NXXs and use the service to communicate with someone in Minnesota even though that subscriber never had a physical presence in Minnesota.

[100] *See, e.g.,* NASUCA Reply at 15.

[101] In this example, if we further assume Minnesota has imposed a specific rate requirement on DigitalVoice's intrastate communications, this rate requirement would apply to all DigitalVoice communications made by that subscriber to someone in Minnesota even though many of those communications are interstate under the Act.

[102] *See Pulver,* 19 FCC Rcd at 3321-23, paras. 22, 24 (finding it similarly impossible to separate Pulver's VoIP service).

[103] *See, e.g.,* Vonage Oct. 19 *Ex Parte* Letter at 6.

[104] In reviewing a challenge to a Commission requirement for BOC joint CPE/service marketing because it would "surely 'affect' charges for" and regulate "intrastate communications services," and preemption of inconsistent state regulation, the D.C. Circuit affirmed the Commission stating that "[e]ven if [it] were a purely intrastate service, the FCC might well have authority to preemptive regulate its marketing if – as would appear here – it was typically sold in a package with interstate services.  Marketing realities might themselves create inseparability." *Illinois Bell Tel. Co. v. FCC,* 883 F.2d 104, 112-13 & n.7 (D.C. Cir. 1989) (referencing *Louisiana Pub. Serv. Comm'n,* 476 U.S. 355).

[105] *See generally* Vonage Oct. 19 *Ex Parte* Letter.

component of other services for certain regulatory purposes where the provider, like Vonage here, *had no service-driven reason to incorporate such capability into its operations*.[106]  We have declined to require such separation in those circumstances, treating the services at issue as jurisdictionally interstate for the particular regulatory purpose at issue and preempting state regulation where necessary.[107]  For example, in preempting a state regulation specifying default per line blocking of a customer's "Caller ID" for intrastate calls based on "impossibility," the Commission found that "we need not demonstrate absolute future impossibility to justify federal preemption here.  We need only show that interstate and intrastate aspects of a regulated service or facility are inseverable as a practical matter in light of prevailing technological and economic conditions."[108]

30.   In the case of DigitalVoice, Vonage could not even avoid violating Minnesota's order by trying *not* to provide intrastate communications in that state.[109]  For the same reasons that Vonage cannot identify a communication that occurs within the boundaries of a single state, it cannot prevent its users from making such calls by attempting to block any calls between people in Minnesota.[110]  Indeed, Vonage could not avoid similar "intrastate" regulations if imposed by any of the other more than 50 separate jurisdictions.  Due to the intrinsic ubiquity of the Internet, *nothing short of Vonage ceasing to offer its service entirely* could guarantee that any subscriber would not engage in some communications where a

---

[106]*See MTS and WATS Market Structure, Amendment of Part 36 of the Commission's Rules and Establishment of a Joint Board,* CC Docket Nos. 78-72, 80-286, Decision and Order, 4 FCC Rcd 5660, n.7 (1989) (*MTS/WATS Market Structure Separations Order*) (finding that "mixed use" special access lines carrying more than a *de minimis* amount of interstate traffic to private line systems are subject to the Commission's jurisdiction for jurisdictional separations purposes because separating interstate from intrastate traffic on many such lines could not be measured without "significant additional administrative efforts"); *see also Qwest Corp. v. Minnesota Pub. Utils. Comm'n,* 380 F.3d 367, 374 (finding that the Commission's preemptive intent concerning the *de minimis* rule relates to cost allocation for ratemaking purposes rather than plenary regulatory authority but stating that the Commission "*certainly has the wherewithal to preempt state regulation in this area if it so desires"*) (emphasis added); *BellSouth MemoryCall*, 7 FCC Rcd at 1620, para. 7 (preempting order of a state commission imposing regulatory conditions on the offering of the intrastate portion of a jurisdictionally mixed service because of the expense, operational, and technical difficulties associated with identifying the intrastate portion and the effect it would likely have on the provider's continued offering of the interstate portion).

[107]*See, e.g., MTS/WATS Market Structure Separations Order,* 4 FCC Rcd 5660, n.7; *BellSouth MemoryCall*, 7 FCC Rcd at 1620, para. 7

[108]*See Rules and Policies Regarding Calling Number Identification Service – Caller ID,* Memorandum Opinion and Order on Reconsideration, Second Report and Order and Third Notice of Proposed Rulemaking*,* 10 FCC Rcd 11700*,* 11727-28, para. 77 (1995) (citing *California v. FCC,* 39 F.3d 919 (9th Cir. 1994)), *aff'd, California v. FCC,* 75 F.3d 1350 (9th Cir. 1996).  The Ninth Circuit affirmed the Commission's preemption in this case, finding it to fit within the impossibility exception.  *See California v. FCC*, 75 F.3d at 1360.  Indeed, when possible, this Commission prefers that economic and market considerations drive the development of technology, rather than regulatory requirements.  *See, e.g., Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers; Implementation of the Local Competition Provisions of the Telecommunications Act of 1996; Deployment of Wireline Services Offering Advanced Telecommunications Capability,* Order on Reconsideration, CC Docket Nos. 01-338, 96-98, 98-147, FCC 04-248, para. 19 (rel. Oct. 18, 2004) (concluding that decision regarding "which broadband technologies to deploy is best left to . . . the market . . . .  We decline to second-guess or skew those technology choices . . . .").

[109]*See* Vonage Petition at v, 31; *see also American Libraries Ass'n v. Pataki*, 969 F. Supp. at 171 (explaining that no aspect of the Internet can fairly be closed off to users from any state).

[110]*See* Vonage Petition at v, 31.

state may deem that communication to be "intrastate" thereby subjecting Vonage to its economic regulations absent preemption.

31.    There is, quite simply, no practical way to sever DigitalVoice into interstate and intrastate communications that enables the *Minnesota Vonage Order* to apply only to intrastate calling functionalities without also reaching the interstate aspects of DigitalVoice, nor is there any way for Vonage to choose to avoid violating that order if it continues to offer DigitalVoice anywhere in the world.[111]  Thus, to whatever extent, if any, DigitalVoice includes an intrastate component, because of the impossibility of separating out such a component, we must preempt the *Minnesota Vonage Order* because it outright conflicts with federal rules and policies governing interstate DigitalVoice communications.

32.    Indeed, the practical inseverability of other types of IP-enabled services having basic characteristics similar to DigitalVoice would likewise preclude state regulation to the same extent as described herein.  Specifically, these basic characteristics include:  a requirement for a broadband connection from the user's location; a need for IP-compatible CPE; and a service offering that includes a suite of integrated capabilities and features, able to be invoked sequentially or simultaneously, that allows customers to manage personal communications dynamically, including enabling them to originate and receive voice communications and access other features and capabilities, even video.[112]  In particular, the provision of tightly integrated communications capabilities greatly complicates the isolation of intrastate communication and counsels against patchwork regulation.  Accordingly, to the extent other entities, such as cable companies, provide VoIP services,[113] we would preempt state regulation to an extent comparable to what we have done in this Order.

---

[111] *See Public Util. Comm'n of Texas v. FCC*, 886 F.2d 1325 (citing *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 375, the court upheld preemption of a Texas Public Utility Commission order prohibiting an incumbent LEC from providing interconnection to the PSTN to a customer where the FCC cannot "separate the interstate and the intrastate components of [its] asserted regulation."); *Public Serv. Comm'n of Maryland v. FCC,* 909 F.2d at 1515 (citing *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 375, to uphold Commission's preemption of a state commission's prescribed rates for LEC charges to interexchange carriers for customer disconnections based on the impossibility exception).

[112] *See, e.g.*, SBC Oct. 8 *Ex Parte* Letter, Attach. at 4-11; BellSouth Oct. 26 *Ex Parte* Letter, Attach. at 6-12; BellSouth Oct. 7 *Ex Parte* Letter, Attach. at 4.

[113] *See, e.g.*, Letter from J.G. Harrington, Counsel for Cox Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 03-211, 04-36, at 1-2 (filed Oct. 27, 2004) ("This network design also permits providers to offer a single, integrated service that includes both local and long distance calling and a host of other features that can be supported from national or regional data centers and accessed by users across state lines. . . .  In addition to call setup, these functions include generation of call announcements, record-keeping, CALEA, voice mail and other features such as *67, conferencing and call waiting. ... [T]here are no facilities at the local level of a managed voice over IP network that can perform these functions."); Letter from Henk Brands, Counsel for Time Warner Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 03-211, 04-36, at 2, 9 (filed Oct. 29, 2004) (Time Warner Oct. 29 *Ex Parte* Letter) ("[T]he Commission should take a broader approach by recognizing additional characteristics of IP-based voice services and extend the benefits of preemption to all VoIP providers. . . . [B]y its nature, VoIP is provided on a multistate basis, making different state regulatory requirements particularly debilitating."); NCTA Oct. 28 *Ex Parte* Letter, Attach. at 1 ("Cable VoIP offers consumers an integrated package of voice and enhanced features that are unavailable from traditional circuit-switched service. . . . A cable company may have no idea whether a customer is accessing these features from home or from a remote location.  The integral nature of these features and functions renders cable VoIP service an interstate offering subject to exclusive FCC jurisdiction. . . . Not every cable VoIP service has the same mix of features and functionalities . . . , but all cable VoIP offers the types of enhancements that render it an interstate service.  Similarly, while the network architecture

**5.      Policies and Goals of the 1996 Act Consistent With Preemption of Minnesota's Regulations**

33.   We find that Congress's directives in sections 230 and 706 of the 1996 Act are consistent with our decision to preempt Minnesota's order.  As we have noted, Congress has included a number of provisions in the 1996 Act that counsel a single national policy for services like DigitalVoice.[114]

34.   Congress's definition of the Internet in the Act recognizes its global nature.[115]  In addition to defining the Internet in section 230 of the Act, Congress used section 230 to articulate its national Internet policy.  There, Congress stated that "[i]t is the policy of the United States - to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation."[116]  We have already determined in a prior order that section 230(b)(2) expresses Congress's clear preference for a national policy to accomplish this objective.[117]  In *Pulver*, we found this policy to provide support for preventing state attempts to promulgate regulations that would apply to Pulver's service.[118]  While we found Pulver's FWD service to be an information

of each cable VoIP system will not be identical, they share the same centralized network design that impart an interstate nature."); Letter from Daniel L. Brenner, Senior Vice President, Law & Regulatory Policy, NCTA, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 03-211, 04-36, Attach. at 1 (filed Oct. 27, 2004) ("Functions integral to every call, such as CALEA compliance, voicemail recording, storage, and retrieval, call record-keeping, 3-way calling and other functions are provided from these central facilities.  These facilities are often located in a state different from the origin of the call.").

[114] *See supra* para. 14; *see also, e.g.,* BellSouth Comments at 3; SBC Comments at 2; VON Coalition Comments at 13; MCI/CompTel Reply at 11; VON Coalition Aug. 19 *Ex Parte* Letter, Attach at 12-13; Time Warner Oct. 29 *Ex Parte* Letter at 8-9; Letter from Carolyn W. Brandon, Vice President, Policy, CTIA, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 03-211, 04-36, at 2 (filed Nov. 2, 2004).

[115] In section 230(f) of the Act, Congress describes the Internet as "an *international* network of federal and non-federal interoperable packet switched data networks." *See* 47 U.S.C. § 230(f)(1) (emphasis added).  Similarly, in section 231, the Internet is defined in terms of computer facilities, transmission media, equipment and software "comprising the interconnected *worldwide* network of computer networks."  47 U.S.C. § 231(e)(3) (emphasis added).  Courts have similarly described it. *See, e.g., Reno v. ACLU*, 521 U.S. 844, 849 (1997) ("The Internet is an international network of interconnected computers."); *see also Zeran v. America Online, Inc.*, 129 F.3d 327, 334 (4th Cir. 1997) (stating that section 230 represents Congress's approach to a problem of national and international dimension "whose international character is apparent").  DigitalVoice is a service that falls squarely within the phrase "Internet and other interactive computer services" as defined in sections 230(f)(1) & 230(f)(2), contrary to the claims of some commenters. *See* Minnesota Independent Coalition Comments at 5 (claiming 230(f) definitions pertain to content services which DigitalVoice does not meet).  While we do not decide the classification of DigitalVoice today so as to specify what type of "interactive computer service" it is under section 230(f)(2), that determination is unnecessary for purposes of demonstrating its nexus to section 230.  DigitalVoice is unquestionably an "Internet" service as defined in section 230(f)(1), a definition which is not limited to any particular content as we discuss in more detail below.

[116] 47 U.S.C. § 230(b)(2).

[117] *See Pulver*, 19 FCC Rcd at 3319, para. 18 n.66.

[118] *See id.* We found Pulver's FWD service to be an information service – a determination which further supported a national federal regulatory regime for that service.  Indeed, were we to reach a similar statutory "information service" classification determination for DigitalVoice in this Order, there would be no question that Congress intended it to remain free from state-imposed economic, public-utility type regulation, consistent with the Commission's long-standing policy of non-regulation for information services. *See id.* at 3317-22, paras. 17-22.  In *Pulver*, we explained that through codifying the Commission's decades old distinction between "basic services" and

service, the Internet policy Congress included in section 230 is indifferent to the statutory classification of services that may "promote its continued development."[119]  Rather, it speaks generally to the "Internet and other interactive computer services," a phrase that plainly embraces DigitalVoice service.[120]  Thus, irrespective of the statutory classification of DigitalVoice, it is embraced by Congress's policy to "promote the continued development" and "preserve the vibrant and competitive *free* market" for these types of services.[121]

35.    While the majority of those commenting on the applicability of section 230 in this proceeding share this view,[122] others claim that section 230 relates only to content-based services and DigitalVoice is not the type of content-based service Congress intended to reach.[123]  We are cognizant, as we must be, of context as we review the statute, but we look primarily to the words Congress chose to use.[124]  While we acknowledge that the title of section 230 refers to "offensive material," the general policy statements regarding the Internet and interactive computer services contained in the section are not similarly confined to offensive material.  In the case of section 230, Congress articulated a very broad policy regarding the "Internet and other interactive computer services" without limitation to content-based services.  Through codifying its Internet policy in the Commission's organic statute, Congress charges the Commission with the ongoing responsibility to advance that policy consistent with our other statutory obligations.  Accordingly, in interpreting section 230's phrase "unfettered by Federal or State regulation," we cannot permit more than 50 different jurisdictions to impose traditional common carrier economic regulations such as Minnesota's on DigitalVoice and still meet our responsibility to realize Congress's objective.

---

"enhanced services" as "telecommunications services" and "information services," respectively, in the 1996 Act, and by specifically excluding information services from the ambit of Title II, Congress indicated, consistent with the Commission's long-standing policy of nonregulation, that information services not be regulated.  *See id.* at 3318-19, para. 18; *see also Non-Accounting Safeguards Order*, 11 FCC Rcd at 21955-56, para. 102; *IP-Enabled Services Proceeding*, 19 FCC Rcd at 4879-81, 4890-91, paras. 25-27, 39.  While Congress has indicated that information services are not subject to the type of regulation inherent in Title II, Congress has provided the Commission with ancillary authority under Title I to impose such regulations as may be necessary to carry out its mandates under the Act.  Although the Commission has clear authority to do so, it has only rarely sought to regulate information services using its Title I ancillary authority.  *See Implementation of Section 255 and 251(a)(2) of the Communications Act of 1934, as Enacted by the Telecommunications Act of 1996; Access to Telecommunications Service, Telecommunications Equipment and* Customer *Premises Equipment by Persons with Disabilities*, WT Docket No. 96-198, Report and Order and Further Notice of Inquiry, 16 FCC Rcd 6417 (1999).

[119] 47 U.S.C. § 230(b)(1).

[120] 47 U.S.C. § 230(b)(1), (2) (emphasis added).  Indeed, the communications that occur when a subscriber uses the DigitalVoice service are Internet communications, no less than e-mail, instant messaging, or chat rooms.  *See, e.g.,* VON Coalition Aug. 19 *Ex Parte* Letter, Attach at 2.  Although DigitalVoice may be functionally similar in some respects to voice communications that are not dependent upon the Internet, this does not change the fact that *DigitalVoice is an Internet-based communications service.  See also supra* note 115.

[121] 47 U.S.C. § 230(b)(1), (2) (emphasis added).

[122] *See, e.g.,* MCI/CompTel Comments at 11; Motorola Comments at 12; SBC Comments at 2-4; VON Coalition Comments at 13; AT&T Reply at 2; Vonage Aug. 13 *Ex Parte* Letter, Attach. at 3; VON Coalition Aug. 19 *Ex Parte* Letter, Attach. at 13.

[123] *See, e.g.,* California Commission Comments at 15-17; Minnesota Independent Coalition Comments at 4-6; MTA Comments at 6.

[124] *See* 47 U.S.C. § 230.

36.   We are also guided by section 706 of the 1996 Act, which directs the Commission (and state commissions with jurisdiction over telecommunications services) to encourage the deployment of advanced telecommunications capability to all Americans by using measures that "promote competition in the local telecommunications market" and removing "barriers to infrastructure investment."[125]   Internet-based services such as DigitalVoice are capable of being accessed only via broadband facilities, *i.e.,* advanced telecommunications capabilities under the 1996 Act,[126] thus driving consumer demand for broadband connections, and consequently encouraging more broadband investment and deployment consistent with the goals of section 706.[127]   Indeed, the Commission's most recent *Fourth Section 706 Report* to Congress recognizes the nexus between VoIP services and accomplishing the goals of section 706.[128]   Thus, precluding multiple disparate attempts to impose economic regulations on DigitalVoice that would thwart its development and potentially result in it exiting the market will advance the goals and objectives of section 706.

37.   Allowing Minnesota's order to stand would invite similar imposition of 50 or more additional sets of different economic regulations on DigitalVoice, which could severely inhibit the development of this and similar VoIP services.[129]   We cannot, and will not, risk eliminating or hampering this innovative advanced service that facilitates additional consumer choice, spurs technological development and growth of broadband infrastructure, and promotes continued development and use of the Internet.   To do so would ignore the Act's express mandates and directives with which we must comply, in contravention of the pro-competitive deregulatory policies the Commission is striving to further.

## B.      Commerce Clause

38.   We note that our decision today is fully consistent with the Commerce Clause of the United States Constitution.   The Commerce Clause provides that "[t]he Congress shall have Power … [t]o regulate Commerce … among the several States."[130]   As explained by the Supreme Court, "[t]hough

---

[125]47 U.S.C. § 157 nt.   Section 706 of the 1996 Act is located in the notes of section 7 of the Communication Act. To implement section 706's mandate, the Commission has considered, among other things, whether its rules promote the delivery of innovative advanced services offerings.   *See Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket Nos. 01-338, 96-98, 98-147, Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, 18 FCC Rcd 16978 (2003) (*FNPRM*), *corrected by* Errata, 18 FCC Rcd 19020 (2003), *aff'd in part, remanded in part, vacated in part, United States Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004), *cert. denied sub nom. Nat'l Ass'n Regulatory. Util. Comm'rs v. United States Telecom Ass'n*, 73 USLW 3234 (U.S. Oct. 12, 2004) (Nos. 04-12, 04-15, 04-18).   We find that our actions in this ruling are also consistent with this provision of the Act.

[126]*See* 47 U.S.C. § 157 nt. (c)(1) (defining "advanced telecommunications capability").

[127]*See* 8x8 Comments at 5; VON Coalition Aug. 19 *Ex Parte* Letter, Attach at 7-8.

[128]*See Fourth Section 706 Report* at 38 ("[S]ubscribership to broadband services will increase in the future as new applications that require broadband access, *such as VoIP*, are introduced into the marketplace, and consumers become more aware of such applications.") (emphasis added); *see also id.* at 3 (Statement of Chairman Powell) ("Disruptive VoIP services are acting as a demand-driver for broadband connections, lighting the industry's fuse, and exciting a moribund market."); APT Comments at 2; Motorola Comments at 12.

[129]*See Pulver*, 19 FCC Rcd at 3319-20, para. 19; *see also American Libraries Ass'n v. Pataki*, 969 F. Supp. at 183 ("Haphazard and uncoordinated state regulation [of the Internet] can only frustrate the growth of cyberspace.").

[130]U.S. Const. art. 1, § 8, cl. 3.

phrased as a grant of regulatory power to Congress, the Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce."[131]  Under the Commerce Clause jurisprudence, a state law that "has the 'practical effect' of regulating commerce occurring wholly outside that [s]tate's borders" is a violation of the Commerce Clause.[132]  In addition, state regulation violates the Commerce Clause if the burdens imposed on interstate commerce by state regulation would be "clearly excessive in relation to the putative local benefits."[133]  Finally, courts have held that "state regulation of those aspects of commerce that by their unique nature demand cohesive national treatment is offensive to the Commerce Clause."[134]

39.   Minnesota's regulation likely has "the 'practical effect' of regulating commerce occurring wholly outside that [s]tate's borders."[135]  Because the location of Vonage's users cannot practically be determined,[136] Vonage would likely be required to comply with Minnesota's regulation for all use of DigitalVoice – including communications that do not originate or terminate in Minnesota, or even involve facilities or equipment in Minnesota – in order to ensure that it could fully comply with the regulations for services in Minnesota.  And, as we have explained above, this would likely be the result even if Vonage elected to discontinue seeking subscribers in Minnesota, given that end users could use the service from any broadband connection in Minnesota.[137]  While states can and should serve as laboratories for different regulatory approaches, we have here a very different situation because of the nature of the service – our federal system does not allow the strictest regulatory predilections of a single state to crowd out the policies of all others for a service that unavoidably reaches all of them.  For these reasons,

---

[131]*Oregon Waste Sys. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994) (citations omitted); *see also PSINet, Inc. v. Chapman*, 362 F.3d 227, 239 (4th Cir. 2004) (quoting *General Motors Corp. v. Tracey*, 519 U.S. 278, 287 (1997)); *American Libraries Ass'n v. Pataki*, 969 F. Supp. at 173 (holding that the Internet is an instrument of "interstate commerce" under the Commerce Clause).

[132]*Healy v. Beer Institute*, 491 U.S. 324, 332 (1989); *see also Cotto Waxo Co. v. Williams*, 46 F.3d 790, 793 (8th Cir. 1995) ("Under the Commerce Clause, a state regulation is *per se* invalid when it has an 'extraterritorial reach,' that is, when the statute has the practical effect of controlling conduct beyond the boundaries of the state.  The Commerce Clause precludes application of a state statute to commerce that takes place wholly outside of the state's borders.") (emphasis added) (citation omitted).

[133]*See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *see also Cotto Waxo Co. v. Williams*, 46 F.3d at 793 ("[I]f the challenged statute regulates evenhandedly, then it burdens interstate commerce indirectly and is subject to a balancing test.  Under the balancing test, a state statute violates the Commerce Clause only if the burdens it imposes on interstate commerce are 'clearly excessive in relation to the putative local benefits.'") (citation omitted).

[134]*American Libraries Ass'n v. Pataki*, 969 F. Supp. at 169 (citing *Wabash, St. Louis & Pac. Ry. Co. v. Illinois*, 118 U.S. 557 (1886)); *see id.* at 181 ("The courts have long recognized that certain types of commerce demand consistent treatment and are therefore susceptible to regulation only on a national level."); *American Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1162 (10th Cir. 1999).

[135]*Healy v. Beer Institute*, 491 U.S. at 332; *see also American Libraries Ass'n v. Pataki*, 969 F. Supp. at 173-74, 177; *American Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003) (acknowledging that because of "the Internet's boundary-less nature," regulations of Internet communications may not be "wholly outside" a state's borders, but nonetheless may impose extraterritorial regulation in violation of the Commerce Clause).

[136]*See supra* para. 5.

[137]*See supra* para. 30.

Minnesota's regulation would likely have the "practical effect" of regulating beyond its borders and therefore would likely violate the Commerce Clause.[138]

40.   In addition, we believe the burdens imposed on interstate commerce by the Minnesota Commission's regulation would likely be "clearly excessive in relation to the putative local benefits."[139] The Minnesota regulation would impose significant burdens on interstate commerce.[140]  As discussed above, even if it were relevant and possible to track the geographic location of packets and isolate traffic for the purpose of ascertaining jurisdiction over a theoretical intrastate component of an otherwise integrated bit stream, such efforts would be impractical and costly.[141]  At the same time, we believe that the local benefits of state economic regulation would be limited.  In a dynamic market such as the market for Internet-based services, we believe that imposing this substantial burden on Vonage would serve no useful purpose and would almost certainly be significant and negative for the development of new and innovative interstate Internet-based services.

41.   Finally, DigitalVoice, like other Internet services, is likely the type of commerce that is of such a "unique nature" that it "demand[s] cohesive national treatment" under the Commerce Clause.[142]  Because DigitalVoice is not constrained by geographic boundaries and cannot be excluded from any particular state, inconsistent state economic regulation could cripple development of DigitalVoice and services like it.  If Vonage's DigitalVoice service were subject to state regulation, it would have to satisfy the requirements of more than 50 jurisdictions with more than 50 different sets of regulatory obligations.[143]

---

[138] *See* Vonage Petition at 29 ("Vonage has no way of assuring that it is in compliance with the [*Minnesota Vonage Order*] unless it blocks a substantial amount of interstate traffic as well."); *id.* at 31 ("[S]ince *any* Vonage customer could, in theory, travel to Minnesota at any time and connect their MTA computer to a broadband Internet connection, Vonage could never prevent *all* intrastate Minnesota use of its service unless it blocked *all* interstate 'calls' as well.") (emphasis in original); *id.* at 25, 27; *see also American Libraries Ass'n v. Pataki*, 969 F. Supp. at 171 ("[N]o aspect of the Internet can feasibly be closed off to users from another state.").

[139] *See Pike v. Bruce Church, Inc.*, 397 U.S. at 142; *see also Cotto Waxo Co. v. Williams*, 46 F.3d at 793.  *See generally* Michael A. Bamberger, *The Clash Between the Commerce Clause and State Regulation of the Internet*, Internet Newsletter, Apr. 2002 (explaining that "[f]or the most part, courts have analyzed the constitutionality of state Internet regulation under the test employed by the *Pike* court") (emphasis added).

[140] Indeed, one federal court has already determined, in the specific context of Vonage, that state entry regulation of DigitalVoice would interfere with interstate commerce.  *See New York Preliminary Injunction* at 2; *see also American Booksellers Found. v. Dean*, 342 F.3d at 104 ("We think it likely that the [I]nternet will soon be seen as falling within the class of subjects that are protected from State regulation because they 'imperatively demand [] a single uniform rule.'") (citing *Cooley v. Bd. of Wardens*, 53 U.S. 299 (1851)).

[141] *See supra* para. 29; *see also American Libraries Ass'n v. Pataki*, 969 F. Supp. at 170 ("The Internet is wholly insensitive to geographic distances. . . . Internet protocols were designed to ignore rather than document geographic location . . . .").

[142] *American Libraries Ass'n v. Pataki*, 969 F. Supp. at 69 (citing *Wabash, St. Louis & Pac. Ry. Co. v. Illinois*, 118 U.S. 557); *see also American Civil Liberties Union v. Johnson*, 194 F.3d at 1162 ("As we observed, . . . certain types of commerce have been recognized as requiring national regulation. . . . The Internet is surely such a medium.").

[143] *See also American Libraries Ass'n v. Pataki*, 969 F. Supp. at 169 ("The menace of inconsistent state regulation invites analysis under the Commerce Clause of the Constitution, because that clause represented the framers' reaction to overreaching by the individual states that might jeopardize the growth of the nation - and in particular, the national infrastructure of communications and trade - as a whole.") (citing *Quill Corp. v. North Dakota,* 504 U.S. 298, 312 (1992)).

As discussed above, because of the unbounded characteristics of the Internet, Vonage would likely be required in practical effect to subject its service to all customers across the country to the regulations imposed by Minnesota.  Moreover, state regulation of Internet-based services, such as DigitalVoice, would make them unique among Internet services as the only Internet service to be subject to such state obligations.  Indeed, allowing the imposition of state regulation on Vonage would likely eliminate any benefit of using the Internet to provide the service.  The Internet enables individuals and small providers to reach a global market simply by attaching a server to the Internet; requiring Vonage to submit to more than 50 different regulatory regimes as soon as it did so would eliminate this fundamental advantage of Internet-based communication.  Thus, services, such as DigitalVoice, are likely of a "unique nature" that "demand[s] cohesive national treatment," and therefore, inconsistent state regulations would likely violate the Commerce Clause.[144]

### C.  Public Safety Issues

42.    As discussed above, we preempt the *Minnesota Vonage Order* because it imposes entry and other requirements on Vonage that impermissibly interfere with this Commission's valid exercise of authority.  As Vonage indicates in its Petition, Minnesota includes as one of its entry conditions the approval of a 911 service plan "comparable to the provision of 911 service by the [incumbent] local exchange carrier."[145]  In the *Minnesota Vonage Order*, the Minnesota Commission specifically subjected Vonage to this requirement.[146]  Because Minnesota inextricably links pre-approval of a 911 plan to becoming certificated to offer service in the state, the application of its 911 requirements operates as an entry regulation.  Vonage explains that there is no practicable way for it to comply with this requirement:  it

---

[144]Federal court decisions applying the Commerce Clause to state regulation of Internet services have come to similar conclusions.  In *American Libraries Ass'n v. Pataki*, a leading case on this issue, a federal district court struck down a New York state statute making it a crime to disseminate indecent material to minors over the Internet.  The court held that the New York law violated the Commerce Clause because it (1) overreached by seeking to regulate conduct occurring outside its borders; (2) imposed burdens on interstate commerce that exceeded any local benefit; and (3) subjected interstate use of the Internet to inconsistent regulations.  *See American Libraries Ass'n v. Pataki*, 969 F. Supp. at 183-84.  In several subsequent cases, federal courts of appeal expressly adopted these holdings.  *See PSINet, Inc. v. Chapman*, 362 F.3d 227; *American Booksellers Found. v. Dean*, 342 F.3d 96; *American Civil Liberties Union v. Johnson*, 194 F.3d 1149; *see also American Libraries Ass'n v. Pataki*, 969 F. Supp. at 182 ("The Internet . . . requires a cohesive national scheme of regulation so that users are reasonably able to determine their obligations.").

We also note examples from other network-based industries where, although an intrastate component may exist, state authority must nonetheless yield to exclusive federal jurisdiction in the area of economic or other state regulations affecting interstate commerce.  For example, in the case of railroads, the Supreme Court struck down a state regulation regarding the length of trains, holding that "examination of all the relevant factors makes it plain that the state interest is outweighed by the interest of the nation in an adequate, economical and efficient railway transportation service, which must prevail."  *Southern Pac. Co. v. Arizona*, 325 U.S. 761, 783-84 (1945).  Similarly, in trucking cases, the Supreme Court has invalidated state laws regulating the length of trucks under the Commerce Clause when the regulation imposes a burden on interstate trucking that is not outweighed by the local interest.  *See Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429 (1978); *Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662 (1981).  In another transportation case, the Court struck down an Illinois law mandating a particular type of mudguards on trucks operating in the state, concluding that the regulation imposed significant burdens on interstate trucking with no countervailing benefits.  *See Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520 (1959).

[145]*See* Vonage Petition at 25 (citing Minn. Rule § 7812.0550 subp. 1).

[146]*See Minnesota Vonage Order* at 8.

Federal Communications Commission                                      FCC 04-267

cannot today identify with sufficient accuracy the geographic location of a caller, and it has not obtained access in all cases to incumbent LEC E911 trunks that carry calls to specialized operators at public safety answering points (PSAPs).[147]  Under the Minnesota "telephone company" rules, therefore, this requirement bars Vonage from entry in Minnesota.  To that extent, this requirement is preempted along with all other entry requirements contained in Minnesota's "telephone company" regulations as applied to DigitalVoice.[148]  Although we preempt Minnesota from imposing its 911 requirements on Vonage as a condition of entry, this does not mean that Vonage should cease the efforts it has undertaken to date and we understand is continuing to take both to develop a workable public safety solution for its DigitalVoice service and to offer its customers equivalent access to emergency services.

    43.    There is no question that innovative services like DigitalVoice are having a profound and beneficial impact on American consumers.[149]  While we do not agree with unnecessary economic regulation of DigitalVoice designed for different services, we do believe that important social policy issues surrounding services like DigitalVoice should be considered and resolved.[150]  Access to emergency services, a critically important public safety matter, is one of these important social policy issues.  In this proceeding, Vonage has indicated that it is devoting substantial resources toward the development of standards and technology necessary to facilitate some type of 911 service, working cooperatively with Minnesota agencies and other state commissions, public safety officials and PSAPs, the National Emergency Number Association (NENA), and the Association of Public-Safety Communications Officials (APCO).[151]  Moreover, it has demonstrated that it is offering its version of 911 capability to all its customers, including those in Minnesota, and has provided us information indicating what actions its customers must take to activate this 911 capability.[152]  We are also aware that Vonage recently announced the successful completion of an E911 trial in Rhode Island, a state that has not, to our knowledge, attempted to regulate DigitalVoice.  In collaboration with the State of Rhode Island, Vonage has developed a technical solution to deliver a caller's location and call back number to emergency service personnel for 911 calls placed in that state by DigitalVoice users.[153]  We fully expect Vonage to continue

---

[147]See Vonage Petition at 8-9, 24-25.

[148]See supra paras. 20-22 (explaining preemption of entry requirements).  Indeed, Vonage notes in its petition that "[I]f the Commission preempts Minnesota's certificate requirement . . . this issue [911 comparability to an incumbent LEC] will be moot."  See Vonage Petition at 25.  Similarly, to the extent the Minnesota Commission demands payment of 911 fees as a condition of entry, that requirement is preempted.

[149]See VON Coalition Aug. 19 Ex Parte Letter at 4.

[150]As explained above, these issues are currently being considered in pending proceedings before this Commission.  See supra note 46.  See also, e.g., Minnesota Commission Comments at 4; Surewest Comments at 12; Texas 911 Agencies Comments at 2-3 (urging the Commission to consider public safety issues related to VoIP services).

[151]See NENA Reply at 1-2; Vonage Aug. 13 Ex Parte Letter at 1-2; Minnesota Statewide 911 Program Comments at 4.

[152]In offering its "911" capability to its customers, Vonage has provided the Commission information regarding how and what it tells its customers about its limited 911 capabilities such that its customers are fully aware of those limitations when they subscribe to the service and clearly understand that it is not a comparable emergency service to the 911 capability they obtain with local exchange service.  We fully expect Vonage to continue providing customers information such as this about its "911" capability.  See Vonage Oct. 1 Ex Parte Letter at 3-4 & Exhibit 10.

[153]See Letter from William B. Wilhelm, Jr. and Ronald W. Del Sesto, Jr., Counsel for Vonage, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 03-211, 04-36, at 1 (filed Oct. 14, 2004).

its 911 development efforts and to continue to offer some type of public safety capability during the pendency of our *IP-Enabled Services Proceeding*.[154]

44.   We emphasize that while we have decided the jurisdictional question for Vonage's DigitalVoice here, we have yet to determine final rules for the variety of issues discussed in the *IP-Enabled Services Proceeding*.  While we intend to address the 911 issue as soon as possible, perhaps even separately, we anticipate addressing other critical issues such as universal service, intercarrier compensation, section 251 rights and obligations,[155] numbering, disability access, and consumer protection in that proceeding.[156]

45.   Furthermore, we acknowledge that a U.S. District Court in New York has recently ordered Vonage "to continue to provide the same emergency 911 calling services currently available to Vonage customers" within that state[157] and to "make reasonable good faith efforts to participate on a voluntary basis" in workshops pertaining to the development of VoIP 911 calling capabilities.[158]  Because DigitalVoice is a national service for which Vonage cannot single out New York "intrastate" calls (any more than it can Minnesota "intrastate" calls), as a practical matter, the District Court's order reaches DigitalVoice wherever it is used.[159]  Thus, we need not be concerned that as a result of our action today, Vonage will cease its efforts to continue developing and offering a public safety capability in Minnesota. The District Court order ensures that these efforts must continue while we work cooperatively with our state colleagues and industry to determine how best to address 911/E911-type capabilities for IP-enabled services in a comprehensive manner in the context of our *IP-Enabled Services Proceeding*.[160]

---

[154]We look beyond Vonage's efforts of today, however, toward work that remains to be done in the area of 911 and the opportunities that this new technology presents for public safety.  To that end, we are aware of the six principles NENA has advanced:  (1) establish a national E911 VoIP policy; (2) encourage vendor and technology neutral solutions and innovation; (3) retain consumer service quality expectations; (4) support dynamic, flexible, open architecture system design process for 911; (5) develop policies for 911 compatible with the commercial environment for IP communications; and (6) promote a fully funded 911 system.  *See* National Emergency Number Association, *E9-1-1, Internet Protocol & Emergency Communications*, Press Release (Mar. 22, 2004).  We applaud NENA's vision in establishing these principles to support a process to "promote a fully functional 9-1-1 system that responds any time, anywhere from every device."  *See id.*.  We endorse these principles because they provide a sound blueprint for the development of a national 911 solution for VoIP services and we encourage all VoIP providers and industry participants to work toward their realization.

[155]We note that nothing in this Order addressing the Commission's jurisdictional determination of or regulatory treatment of particular retail IP-enabled services impacts competitive LEC access to the underlying facilities on which such retail services ride.  *See* Letter from Jason D. Oxman, General Counsel, Association for Local Telecommunications Services, to Marlene Dortch, Secretary, FCC, WC Docket Nos. 04-29, 04-36 (filed Nov. 2, 2004).

[156]*See supra* note 46.

[157]*See New York Preliminary Injunction* at 3.  We note that Vonage's "emergency 911 calling service" is not a service that is provided pursuant to the New York Commission's rules or any other state commission's rules.  This is a service Vonage has voluntarily undertaken in response to consumer demand.

[158]*See New York Preliminary Injunction* at 4.

[159]We recognize that Vonage's 911 capability relies on the cooperation of its customers in accurately registering and re-registering their user location when they move about with the service.

[160]*See IP-Enabled Services Proceeding*, 19 FCC Rcd at 4897-901, paras. 51-57.

## IV. CONCLUSION

46.   For the reasons set forth above, we preempt the *Minnesota Vonage Order*.  As a result, the Minnesota Commission may not require Vonage to comply with its certification, tariffing or other related requirements as conditions to offering DigitalVoice in that state.  Moreover, for services having the same capabilities as DigitalVoice, the regulations of other states must likewise yield to important federal objectives.  To the extent other entities, such as cable companies, provide VoIP services, we would preempt state regulation to an extent comparable to what we have done in this Order.

## V.  ORDERING CLAUSES

47.   Accordingly, IT IS ORDERED, pursuant to sections 1, 2, 3, 4(i) and 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-53, 154(i), 303(r), and section 1.2 of the Commission's rules, 47 C.F.R. § 1.2, that Vonage's Petition for Declaratory Ruling IS GRANTED in part and the *Minnesota Vonage Order* IS PREEMPTED.

48.   IT IS HEREBY FURTHER ORDERED, pursuant to section 1.103(a) of the Commission's rules, 47 C.F.R. § 1.103(a), that this Memorandum Opinion and Order SHALL BE EFFECTIVE upon release.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

Federal Communications Commission                                FCC 04-267

# APPENDIX
## LIST OF COMMENTERS

### Comments in WC Docket No. 03-211

| Comments | Abbreviation |
|---|---|
| 8x8, Inc. | 8x8 |
| Alliance for Public Technology | APT |
| Association of Public-Safety Communications Officials | APCO |
| Beacon Telecommunications Advisors, LLC | Beacon |
| BellSouth Corporation | BellSouth |
| California Public Utilities Commission | California Commission |
| CenturyTel, Inc. | CenturyTel |
| Cinergy Communications Company | Cinergy |
| Cisco Systems, Inc. | Cisco |
| Dr. Robert A. Collinge | Collinge |
| Communications Workers of America | CWA |
| DJE Teleconsulting, LLC | DJE Teleconsulting |
| Frontier and Citizens Telephone Companies | Frontier/Citizens |
| The High Tech Broadband Coalition | High Tech Broadband Coalition |
| ICORE, Inc. | ICORE |
| Independent Telephone and Telecommunications Alliance | ITTA |
| Iowa Utilities Board | Iowa Commission |
| Level 3 Communications, LLC | Level 3 |
| MCI<br>    CompTel | MCI/CompTel |
| Metropolitan 911 Board | Metropolitan 911 Board |
| Minnesota Attorney General's Office | Minnesota AG |
| Minnesota Department of Commerce | Minnesota Department of Commerce |
| Minnesota Independent Coalition | Minnesota Independent Coalition |
| Minnesota Public Utilities Commission | Minnesota Commission |
| Minnesota Statewide 911 Program | Minnesota Statewide 911 Program |
| Montana Independent Telecommunications Systems | Montana Independent Telecommunications Systems |
| Montana Telecommunications Association | MTA |
| Motorola, Inc. | Motorola |
| National Association of State Utility Consumer Advocates | NASUCA |
| National Exchange Carrier Association | NECA |
| National Telecommunications Cooperative Association | NTCA |
| New York State Department of Public Service | New York Commission |
| Organization for the Promotion and Advancement of Small Telecommunications Companies | OPASTCO |
| PAETEC Communications, Inc. | PAETEC |
| Public Utilities Commission of Ohio | Ohio Commission |
| Qwest Communications International Inc. | Qwest |
| Rural Iowa Independent Telephone Association | RIITA |

| SBC Communications Inc. | SBC |
|---|---|
| Sprint Corporation | Sprint |
| SureWest Communications | SureWest |
| Telcom Consulting Associates, Inc. | TCA |
| Texas Commission on State Emergency Communications and Texas Emergency Communications Districts | Texas 911 Agencies |
| Texas Coalition of Cities for Utility Issues | TCCFUI |
| Time Warner Telecom, Inc. | Time Warner Telecom |
| USA DataNet | USA DataNet |
| U.S. Department of Justice Federal Bureau of Investigation | USDOJ/FBI |
| United States Telecom Association | USTA |
| The Verizon Telephone Companies | Verizon |
| The Voice on the Net Coalition | VON Coalition |
| Warinner, Gesinger & Associates, LLC | WG&A |
| Washington Enhanced 911 Program | Washington E911 Program |

**Replies in WC Docket No. 03-211**

| **Replies** | **Abbreviation** |
|---|---|
| 8x8, Inc. | 8x8 |
| AT&T Corp. | AT&T |
| BellSouth Corporation | BellSouth |
| Earthlink, Inc. | Earthlink |
| GVNW Consulting, Inc. | GVNW |
| Inclusive Technologies | Inclusive Technologies |
| Iowa Utilities Board | Iowa Commission |
| MCI CompTel | MCI/CompTel |
| Michigan Public Service Commission | Michigan Commission |
| Minnesota Public Utilities Commission | Minnesota Commission |
| Montana Telecommunications Association | MTA |
| National Association of Regulatory Utility Commissioners | NARUC |
| National Association of State Utility Consumer Advocates | NASUCA |
| National Association of Telecommunications Officers and Advisors National League of Cities The National Association of Counties The Alliance for Community Media | NATOA *et al.* |
| National Emergency Number Association | NENA |
| Attorney General of the State of New York | New York State AG |
| Oregon Telecommunications Association Washington Independent Telephone | OTA/WIT |
| PacWest Telecom, Inc. RCN Corporation | PacWest/RCN |
| Pennsylvania Public Utility Commission | Pennsylvania Commission |
| Sprint Corporation | Sprint |

**Federal Communications Commission**                    **FCC 04-267**

| | |
|---|---|
| Telecommunications for the Deaf, Inc. | TDI |
| Texas Coalition of Cities for Utility Issues | TCCFUI |
| U.S. Department of Justice<br>    Federal Bureau of Investigation | USDOJ/FBI |
| The Verizon Telephone Companies | Verizon |
| Vonage Holdings Corp. | Vonage |

**STATEMENT OF**
**CHAIRMAN MICHAEL K. POWELL**

*Re:  Vonage Holdings Corporation Petition for Declaratory Ruling Concerning an Order of the
Minnesota Public Utilities Commission*, Memorandum Opinion and Order in WC Docket No. 03-
211.

Since 1870 home telephone service has been essentially the same—two phones connected by a
wire.  This landmark order recognizes that a revolution has occurred.  Internet voice services have
cracked the 19th Century mold, to the great benefit of consumers.  VoIP services certainly enable voice
communications between two or more people, just as the traditional telephone network does, but that is
where the similarity ends.  Internet voice is an internet application that takes its place alongside email and
instant messaging as an incredibly versatile tool for communicating with people all over the world.  As
such it has truly unique characteristics.

*Internet Voice is More Personal:*  VOIP services allow people to dynamically structure the way
they communicate and to customize and personalize messages in a way that is impossible with traditional
telephones.  Just as consumers personalize their cell phones with ring tones, pictures and applications, the
same is possible with internet voice.  Consumers have come to expect technology to be tailored to their
preferences—"My Amazon," "My Tivo," "My Ipod."  Internet voice, ushers in the era of "My
Telephone."  Adding enhancements to voice is no longer a highly complex and expensive modification to
the network – now it is just a matter of adding to the next software release.

*Internet Voice is Cheaper:*  Consumers always want to pay less and VOIP promises enormous
value.  Because of the efficient technology and underlying economics of the service, Consumers can
expect flat rate prices, for unlimited services and features.  Just as consumers have responded strongly to
buckets of minutes at low fixed prices in mobile phone service, the same characteristics will bring these
innovative pricing models to the wired phone world.  The proof is in the pudding, VOIP is barely a few
years old as a retail offering and providers have already cut prices several times to compete for
consumers.  VoIP providers have begun offering local and long-distance calling plans for as low as
$14.99 and $19.99 per month.  Most recently, Vonage and AT&T slashed the monthly prices of their
unlimited local and long-distance calling plans by $5 per month.  If we let competition and innovation
rage, unencumbered by the high cost of regulation, Consumers can expect more of the same—lower
prices, more choice, and more innovative offerings.

*Internet Voice is Global:*  Today's decision lays a jurisdictional foundation for what consumers
already know – that the Internet is global in scope.  The genius of the Internet is that it knows no
boundaries.  In cyberspace, distance is dead.  Communication and information can race around the planet
and back with ease.  The Order recognizes that several technical factors demonstrate that VoIP services
are unquestionably interstate in nature.  VoIP services are nomadic and presence-oriented, making
identification of the end points of any given communications session completely impractical and, frankly,
unwise.   In this sense, Internet applications such as VoIP are more border busting than either long
distance or mobile telephony– each inherently, and properly classified, interstate services.

To subject a global network to disparate local regulatory treatment by 51 different jurisdictions
would be to destroy the very qualities that embody the technological marvel that is the Internet.  The
founding fathers understood the danger of crushing interstate commerce and enshrined the principle of
federal jurisdiction over interstate services in the commerce clause of the U.S. Constitution.  In the same
vein, Congress rightly recognized the borderless nature of mobile telephone service and classified it an
interstate communication.  VOIP properly stands in this category and the Commission is merely affirming
the obvious in reaching today's jurisdictional decision.

This is not to say that there is no governmental interest in VOIP.  There will remain very important questions about emergency services, consumer protections from waste, fraud and abuse and recovering the fair costs of the network.  It is not true that states are or should be complete bystanders with regard to these issues.  Indeed, there is a long tradition of federal/state partnership in addressing such issues, even with regard to interstate services.  For example, in long distance services, the FCC and state commissions have structured a true partnership to combat slamming and cramming.  We have also worked closely with the states to strike a balance in the area of do-not-call enforcement.   In the mobile services area, the FCC has worked closely with states on E911 implementation.  With regard to critical 911 capability for VOIP, I note already that several Internet voice providers have entered into an agreement with the National Emergency Number Association to extend 911 capabilities to Internet voice services to "promote a fully functional 9-1-1 system that responds any time, anywhere from every device."   Efforts such as these are essential to educating policy makers and providing a basis for solutions to complex technical problems.  These can and will serve as models for VOIP.

While today's item preempts an order of the Minnesota Commission applying its traditional "telephone company" regulations to Vonage's DigitalVoice service, it is important that I emphasize that the Commission expresses no opinion here on the applicability to Vonage of state's general laws governing entities conducting business within the state, such as laws concerning taxation; fraud; general commercial dealings; marketing and advertising.  Just as this ruling does not alter traditional state powers, we do not alter facilities-based competitor rights, or state authority pursuant to section 252 of the Act.  It is my hope that the Commission's decision today will focus the debate and permit our colleagues in the industry and at the state commissions to direct their resources toward helping the Commission answer the important questions that remain after today's Order.

STATEMENT OF
COMMISSIONER KATHLEEN Q. ABERNATHY

*Re:  Vonage Holdings Corporation Petition for Declaratory Ruling Concerning an Order of the Minnesota Public Utilities Commission, Memorandum Opinion and Order in WC Docket No. 03-211.*

This decision provides much-needed clarity regarding the jurisdictional status of Vonage's DigitalVoice service and other VoIP services.  By fencing off these services from unnecessary regulation, this Order will help unleash a torrent of innovation.  Indeed, by facilitating the IP revolution, rather than erecting roadblocks, our action will drive greater broadband adoption and deployment, and thereby promote economic development and consumer welfare.

There is no doubt that VoIP services of the type provided by Vonage are inherently interstate in nature.  As the Order describes in detail, several factors combine to make it impossible to isolate any intrastate-only component of such services.  These factors include the architecture of packet-switched networks and the enhanced features that are offered as an integral part of VoIP services.  Together, these attributes necessarily result in the interstate routing of at least some packets.  These services are also marked — in striking contrast to circuit-switched communications — by a complete disconnect between the subscriber's physical location and the ability to use the service.  A subscriber's physical location is not only unknown in many instances, but also completely irrelevant.  Allowing state commissions to impose traditional public-utility regulations on these interstate communications services would frustrate important federal policy objectives, including the congressional directive to "preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation."[1]

Thus, while I do not lightly arrive at any decision to preempt state regulatory authority, I believe it is imperative for the Commission to do so here.  Allowing the Minnesota utility regulations — or comparable state regulations — to stand would authorize a single state to establish default national rules for all VoIP providers, given the impossibility of isolating any intrastate-only component.  Equally troubling is the prospect of subjecting providers of these innovative new services — which are being rolled out on a regional, national, and even global scale — to a patchwork of *inconsistent* state regulations.  In short, failure to preempt state utility regulations would likely sound the death knell for many IP-enabled services and would deprive consumers of the cost savings and exciting features they can deliver.

As necessary as preemption may be, I want to underscore my view that our assertion of exclusive federal jurisdiction still permits states to play an important role in facilitating the rollout of IP-enabled services.  To begin with, as the Order makes clear, states will continue to enforce generally applicable consumer protection laws, such as provisions barring fraud and deceptive trade practices.  Moreover, I have often emphasized that, even where the FCC alone possesses the ultimate decisionmaking authority, this Commission and state regulators can and should collaborate in the development of sound policy — much as we have done through our Federal-State Joint Boards and Joint Conferences, the approval of Section 271 applications, and in other contexts.  Indeed, I am encouraged that an increasing number of state commissioners agree that "preemption . . . does not preclude collaboration with States on key issues including public safety, consumer protection and reform of intercarrier compensation and universal service."[2]  These state commissioners further note that "clearly establishing the domain in which the

---

[1] 47 U.S.C. § 230(b)(2).

[2] Letter of Gregory Sopkin, Chairman, Colorado Public Utilities Commission; Thomas Welch, Chairman, Maine Public Utilities Commission; Jack Goldberg, Vice-Chairman, Connecticut Department of Public Utility Control;

regulatory treatment of IP-enabled services will be determined will facilitate resolution of these issues in a more streamlined manner and with less incentive for costly and protracted litigation."[3]

       I also want to acknowledge the concerns expressed by commenters who argued that the Commission should resolve outstanding questions about access to E911, the preservation of universal service, and other important policy matters before addressing this jurisdictional issue. Ideally, the Commission would have decided the jurisdictional issue in tandem with the various rulemaking issues. But the decision of several states to impose utility regulations on VoIP services, and the ensuing litigation arising from such forays, makes it imperative for the Commission to establish our exclusive jurisdiction as the first order of business. This Commission runs significant risks if we remain on the sidelines and leave it to the courts to grapple with such issues of national import without the benefit of the expert agency's views.[4] Looking ahead, I agree that the Commission should proceed with the rulemaking on IP-enabled services as expeditiously as possible. We should adopt rules to the extent necessary to ensure the fulfillment of our core policy goals, including access to E911, the ability of law enforcement to conduct lawful surveillance, access for persons with disabilities, and the preservation of universal service. And we should provide a thorough and careful analysis of whether IP-enabled services are information services or telecommunications services, given the potentially far-reaching implications of that classification.

       Finally, by the same token, I sympathize with parties who contend that the Commission should conclusively resolve the jurisdictional status of *all* VoIP services, rather than limiting our analysis to a subset of VoIP. I have endeavored to make our jurisdictional analysis as inclusive as possible, given the state of the record and the scope of the Declaratory Ruling Petition. This Order should make clear the Commission's view that all VoIP services that integrate voice communications capabilities with enhanced features and entail the interstate routing of packets — whether provided by application service providers, cable operators, LECs, or others — will not be subject to state utility regulation.

---

James Connelly, Commissioner, Massachusetts Department of Telecommunications & Energy; Charles Davidson, Commissioner, Florida Public Service Commission; Susan Kennedy, Commissioner, California Public Utilities Commission; and Connie Murray, Commissioner, Missouri Public Service Commission, at 6 (November 2, 2004).

[3] *Id.*

[4] *Cf. Brand X Internet Service v. FCC*, 345 F.3d 1120 (9th Cir. 2003), *petition for cert. filed* (Aug. 27, 2004) (No. 04-281).

## CONCURRING STATEMENT OF
## COMMISSIONER MICHAEL J. COPPS

Re:     *Vonage Holdings Corporation Petition for Declaratory Ruling Concerning an
        Order of the Minnesota Public Utilities Commission*, Memorandum Opinion and
        Order (WC Docket No. 03-211)

We all marvel at the tremendous and transformative potential of IP services.  They have the
power significantly to remake the telecommunications landscape by flooding the market with innovative
new services and providers.  But to unleash the full potential of this new technology and to ensure that
these services succeed, we need rules of the road—clear, predictable and confidence-building.

       Today's decision finds that VoIP services like Vonage's DigitalVoice have an undeniably
interstate character.  That's fine as far as it goes—but it doesn't go very far.  Proclaiming the service
"interstate" does not mean that everything magically falls into place, the curtains are raised, the
technology is liberated, and all questions are answered.  There are, in fact, difficult and urgent questions
flowing from our jurisdictional conclusion and they are no closer to an answer after we act today than
they were before we walked in here.  So rather than sailing boldly into a revolutionary new Voice Over
communications era, we are, I think, still lying at anchor.  By not supplying answers, we are clouding the
future of new technology that has the power to carry us over the horizon.

       So I can only concur in today's decision.  While I agree that traditional jurisdictional boundaries
are eroding in our new Internet-centric world, we need a clear and comprehensive framework for
addressing this new reality.  Instead the Commission moves bit-by-bit through individual company
petitions, in effect checking off business plans as they walk through the door.  This is not the way we
should be proceeding.  We need a framework for all carriers and all services, not a stream of incremental
decisions based on the needs of individual companies.  We need a framework to explain the consequences
for homeland security, public safety and 911.  We need a framework for consumer protection.  We need a
framework to address intercarrier compensation, state and federal universal service, and the impact on
rural America.  But all I see coming out of this particular decision is . . . more questions.

       The Commission's constricted approach denies consumers, carriers, investors and state and local
officials the clarity they deserve.  These are not just my musings.  A growing chorus of voices is urging
the Commission to stop its cherry-picking approach to VoIP issues.  When the National Governors
Association, the Association of Public Safety Communications Officials, the National Association of
Counties, the National League of Cities, the United States Conference of Mayors, the Communications
Workers of America, AARP, the Independent Telephone and Telecommunications Alliance, the National
Telecommunications Cooperative Association, the Organization for the Promotion and Advancement of
Small Telecommunications Companies, the Western Telecommunications Alliance, the National
Association of Regulatory Utility Commissioners, the National Association of Telecommunications
Officers and Advisors, the National Consumers League and local directors of 911 service in cities and
counties around the country all suggest that moving ahead in piecemeal fashion is irresponsible, I think
we should take heed.

       I want to point to language in this item—albeit it's in a footnote—that warns people not to draw
unwarranted conclusions from the narrow jurisdictional finding that we make.  What we do today should
not be interpreted as anything more than it is.  Yes, Vonage's DigitalVoice service has an interstate
character.  But what exactly that entails we do not say.  All that important work lies ahead.  Wouldn't it
be sad if we were to let it go at this, pretending we have done something truly responsive to the questions
that need to be answered, and then not proceed to tackle the related issues quickly and comprehensively?
And wouldn't it be tragic if the blunt instrument of preemption was permitted to erode our partnership

with the states?  We have worked long and hard to nourish a common federal-state commitment to a pro-competitive telecommunications environment.  This is no time to abandon that commitment.

Sometimes I wonder what the strategy is in this Commission's approach to VoIP.  Some warn that it may be a camel's nose under the tent strategy, proceeding inch-by-inch to far-reaching conclusions that a more straight-forward approach could not sustain.  I hope that is not the case and this decision should not be so interpreted.  What I hope this decision does is to force us finally to face up to the larger issues.  We are, after all, face-to-face here with issues that go to the very core of our statutory responsibilities.  These issues can't be ducked and they can't be dodged if we are truly serious about these technologies realizing their full transformative potentials.  So I'll withhold my approval for that happy day when we step up to the plate and begin answering the hard questions about what these technologies and services are and how they fit into America's communications landscape.

## CONCURRING STATEMENT OF
## JONATHAN S. ADELSTEIN

*Re: Vonage Holdings Corporation Petition for Declaratory Ruling Concerning an Order of the Minnesota Public Utilities Commission*, WC Docket No. 03-211, FCC 04-267 (2004).

While this Order rightly acknowledges the importance and unique qualities of Internet-based services, including Voice over Internet Protocol (VoIP) services, I am concerned that the Commission overlooks important public policy issues that will impact consumers across our country, and particularly in Rural America.

I concur to this item because it appropriately recognizes the unique nature of many IP-enabled services and the importance of reducing barriers to entry for Internet-based services. Indeed, I share my colleagues' enthusiasm for the promise of Internet Protocol (IP)-enabled services. All indications are that IP is becoming the building block for the future of telecommunications and its use is integral to the explosion of choices for consumers. It is becoming increasingly apparent that IP-based services will play an important role in our global economic competitiveness, by enabling economic productivity, providing a platform for innovation, and driving demand for broadband facilities. Whether through PDA phones, voice through Instant Messaging, or countless other innovative services, this technology is giving customers far greater control over, and flexibility in the use of, their communications services. With that control, consumers can convert messages with ease from voice-to-text and back, and can take their IP-services wherever they go. Though I am not comfortable with all of the analysis in this item, the Order reasonably reflects the unique qualities of Vonage's service and recognizes the challenges that this service poses for the Commission's traditional jurisdictional analysis.

Where this Order falls short is its failure to account in a meaningful way for essential policy issues, including universal service, public safety, law enforcement, consumer privacy, disabilities access, and intercarrier compensation, and the effect of our preemption here. In February of this year, we opened a VoIP-specific rulemaking proceeding to address not only the issue raised here, the jurisdiction of IP-based services, but to address the broader implications of VoIP services in a comprehensive and coordinated fashion. At that time, we acknowledged the social importance of these Congressionally-mandated policy objectives and the need to assess the potentially disparate impact of our decisions on particular communities. I am concerned that this Order may have dramatic implications for these Congressional objectives, yet we afford them no meaningful or comprehensive consideration here. I am also concerned that our inability to specify the exact parameters of the services at issue and the breadth of our preemption will have unintended effects, including effects on incentives for investment in these technologies, that could have been avoided with a more comprehensive approach. I highlight, below, two of the most pressing concerns – universal service and public safety.

The Act charges this Commission with maintaining universal service, which is crucial in delivering communications services to our nation's schools, libraries, low income consumers, and rural communities. Universal service has been the cornerstone of telecommunications policy for over 70 years and has enabled this country to enjoy unparalleled levels of access to essential communications services. That access has improved our economic productivity and our public safety in immeasurable ways and has been vital in fostering economic development in rural and underserved areas. The Act also expressly permits States to adopt consistent approaches to preserve and advance universal service. At least 24 States have answered that call, disbursing over $1.9 billion annually from their own universal service programs. Many of those States and other commenters express legitimate concern that our decision here could increase pressure on the federal universal service mechanisms and could potentially lead to rate increases for rural and low income consumers. With those reasons in mind, I've called for the Commission to quickly convene a universal service solutions summit modeled after the ones we've held

for other public policy issues.  Regrettably, this item does not acknowledge its potential impact on those programs, nor does it propose any solutions, or even make firm commitments to resolving these issues. We are left to hope that these unaddressed issues do not gridlock or curtail the full reach of the promised IP superhighway.

I also have reservations about our preemption of a State's efforts to ensure the public safety of its citizens, based here on the linkage of the 911 requirement with a State certification.  Our approach of overriding States' public safety efforts without clear federal direction takes us into a dangerous territory in which consumers may come to rely on services without the benefit of the critical safety net that they have come to expect.

Ultimately, I cannot fully endorse an approach that leaves unanswered so many important questions about the future of communications services for so many Americans.  Rural and low-income Americans, the countless governmental and public interest groups who have expressed concern about our piecemeal approach, and the communications industry, itself, all deserve more from this Commission.  If this Commission is to ensure that innovative services are widely available and also achieve the important public policy goals that Congress has articulated, the Commission must begin to wrestle in earnest with difficult issues that are largely ignored this Order.  We simply cannot afford to slow roll these issues.



# New York State
# Public Service Commission

## Application Form A
## For Certification as a Common Carrier

Complete this application to the best of your knowledge. Any inaccuracies or deficiencies will be promptly corrected or the application may be returned.  The applicant must sign and date the application before mailing an original and three copies to: Jaclyn A. Brilling, Secretary to the Commission, Three Empire State Plaza, Albany, NY 12223-1350.  If this application is granted, the company must comply with all applicable rules and regulations of the Public Service Commission.

1.   Identification of applicant and principal business office:

- Company Name
- Street Address (P.O. Box is <u>not</u> acceptable)
- City, State, Zip Code
- President and Telephone/Fax
- Other Officers and Telephone/Fax

2.   Provide the name, address, telephone number and fax number of the person responsible for responding to any consumer complaints referred to the company by the Commission or its staff.

3.   Provide a copy of the company's certificate of incorporation and, if not incorporated in New York State, a copy of the authority to transact business in New York State (foreign business authority). If not incorporated, attach a list of the names, addresses, and telephone numbers of the company's owners.

4.   Include a general description of the services to be offered and how it would enhance competition in the area to be served.

5.   Include a description of the plant and system to be constructed and the anticipated construction schedule.

6.   Include a statement as to whether the company has ever acquired a customer by switching it from another company without the customer's authorization.  If the company has ever acquired a customer by switching it from another company without the customer's authorization, please provide an explanation.

7.   Include a statement as to whether the company was ever the subject of a complaint and/or investigation for unauthorized switching of a customer's local or long distance service from one carrier to another.  If the company was ever the subject of a complaint and/or investigation for

unauthorized switching of a customer's local or long distance service from one carrier to another, please provide an explanation.

8.   Provide your company's Federal Social Security Account Number and/or Federal Employer Identification Number.

9.   If applying for authorization to provide local exchange service (residential and/or business dialtone), describe how your company will provide access to public safety/emergency telephone services, access to the statewide relay system and lifeline service. In addition, the applicant must comply with the requirements enumerated on pages 30-31 of the Commission's Order in Case 94-C-0095, issued May 22, 1996. The Commission will entertain waivers of any of these specific requirements only on a case-by-case basis. Please describe briefly how you plan to comply with these requirements. If you do not plan to provide local exchange services, please state so.

10.   If applying for authorization to provide local exchange service (residential and/or business dialtone), indicate whether your company will have "0-" emergency calls processed by the ILEC or other "0-" certified operator services provider, or intends to file a subsequent petition for "0-" certification of its own.

11.  If applying for authorization to provide local exchange service (residential and/or business dialtone), include an intraLATA presubscription implementation plan.



This page (http://www.dps.state.ny.us/forma.htm) was last modified: **January 5, 2004**
Questions regarding this web site? web_questions.html
Need info on filing a complaint against a utility? Complaint Dept.
Want to comment on utility issues? PSC Comment Form
PSC Home Page



**New York State**
# Public Service Commission
**Department of Public Service**

3 Empire State Plaza
Albany, New York 12223-1350

**CASE 94-C-0095**

*Opinion No. 96-13 Pages 30-31*

## Other Local Exchange Carrier Requirements

   All local service providers will be required to define their service territories, provide access to emergency services, and comply with our consumer protection rules. New entrants, however, will not be required to provide any particular services, though the choice to provide basic services and Lifeline may affect a carrier's ability to receive funding assistance and the terms of its intercarrier compensation.

   Our order instituting this proceeding identified "interim" requirements applicable to all local exchange carriers. These requirements encompass consumer and public interest protections and make clear the characteristics that further distinguish local exchange carriers from other telephone corporations:

a)  A local exchange carrier must file tariffs to provide local exchange service (a subscriber's initial access to the "public switched network") within a geographic area or areas defined by the carrier and filed with the Commission.

b)  As a provider of local exchange service, a local exchange carrier must:

>   i)  provide, without undue discrimination or preference, service to any willing customer within the carrier's defined service territory;

>   ii)  contribute to the Targeted Accessibility Fund (TAF) which funds programs such as Lifeline, safety/emergency services (911, E911, 0-), and Telecommunications Relay Service (TRS) for the hearing impaired;

>   iii)  comply with the Telephone Fair Practices rules (16 NYCRR Part 609, et. seq.);

>   iv)  comply with the Common Carrier rules (16 NYCRR Part 605);

>   v)  comply with our Statement of Policy on Privacy in Telecommunications (Case 90-C-0075, issued March 22, 1991);

>   vi)  comply with our Open Network Architecture (ONA) principles (Case 88-C-004, Opinion No. 89-28, issued September 11, 1989);

>   vii)  provide reasonable interconnections for the joint provision of service to any certified carrier requesting such interconnection;

>   viii)  comply with our service quality standards and infrastructure monitoring requirements (16 NYCRR, Parts 603 and 644.3).

c) All providers of local exchange service will be entitled to:

      i) comparable access to number resources;

      ii) comparable access to and inclusion in the local exchange routing guide;

      iii) reasonable access to customer information of other carriers necessary for billing and for the provision of directory listing and assistance services;

      iv) participation in intercarrier compensation agreements.



This page (http://www.dps.state.ny.us/otherreqs.htm)
was last modified: **March 2, 2001**
Questions regarding this service?web_questions.html
Need info on filing a complaint against a utility? Complaint Dept.
Want to comment on utility issues? PSC Comment Form
PSC Home Page



**NYS Home Page**